ORIGINAL

FILED
FEB 26 2007
U.S COURT OF FEDERAL CLAIMS

**UNITED STATES COURT OF FEDERAL CLAIMS**

**EDEN ISLE MARINA, INC.** **PLAINTIFF**

**V.** **CASE NO.** 07-127-C

**THE UNITED STATES OF AMERICA ACTING THROUGH AND ON BEHALF OF U. S. ARMY CORPS OF ENGINEERS, LITTLE ROCK DISTRICT** **DEFENDANT**

## COMPLAINT

Eden Isle Marina, Inc. ("Plaintiff") appears by and through its attorneys and for its Complaint states:

## PARTIES

1. Plaintiff is a domestic corporation doing business in Cleburne County, Arkansas, at #10 Yacht Harbor Road, Heber Springs, AR 72543.

2. The United States of America is the proper defendant in this case acting through and on behalf of the Army Corps of Engineers, Little Rock District (hereinafter "the COE").

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1491, which provides in pertinent part that it shall have jurisdiction to render judgment upon any claim against the United States founded upon either the Constitution, or any Act of Congress or any regulation of an executive

department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

4. Plaintiff contends that its claims against the United States fall within the scope of this statute, such that this Court may properly exercise jurisdiction and venue to resolve these claims. The exact amounts in dispute are unknown at this time but are expected to be well in excess of one million dollars ($1,000,000).[1]

## FACTUAL ALLEGATIONS

### Eden Isle Marina and Greers Ferry Lake

5. Plaintiff owns Eden Isle Marina, located on the Eden Isle Peninsula on Greers Ferry Lake, Arkansas, within what is commonly described as the Eden Isle Community.

6. Greers Ferry Lake is owned by the United States of America, and it is managed and operated by the U.S. Army Corps of Engineers, Little Rock District.

[1] Plaintiff believes that original jurisdiction over all of Plaintiff's claims is proper in this Court pursuant to the previously identified statute. However, because Plaintiff is asserting certain contract-related claims, it is possible that Defendant might conceivably claim that the Complaint should be filed with an appropriate Contracting Officer pursuant to the Contract Disputes Act, 41 U.S.C. Sec. 601, *et seq.*, so that Plaintiff will exhaust any administrative remedies it may purportedly have. Notwithstanding that Plaintiff believes that this Court is vested with jurisdiction over this dispute and that there is no requirement to pursue this claim administratively, out of an abundance of caution and without waiver or stipulation by Plaintiff that this Court does not have original jurisdiction, Plaintiff has simultaneously filed versions of the instant Complaint both with the Contracting Officer and with the Court of Federal Claims.

7. As a matter of history, Greers Ferry Lake comprises 45,548 acres (of which approximately 31,500 acres is the water) and was constructed between March 1959 and July 1964.

8. Eden Isle Marina was originally established in the early 1960's as one of the original marinas on Greers Ferry Lake.

9. Eden Isle Marina is located on the "lower lake" of Greers Ferry Lake.

**<u>Eden Isle Marina's Acquisition of Existing Lease</u>**

10. On June 15, 1995, the United States assigned and Plaintiff assumed all terms and conditions of an existing lease (together with addendums) to operate a marina at Eden Isle Marina, which lease was originally signed on January 1, 1970, and designated Lease No. DACW03-1-70-886. (A copy of the lease with all supplemental amendments is attached hereto as "**Exhibit A**," incorporated herein by reference, and will hereafter be referred to as the "**1995 Lease**").

11. Generally, Plaintiff leased property from the United States acting through the COE along approximately 2,252 feet of shoreline at Eden Isle Marina for commercial concession purposes comprising an existing marina and related facilities ("Eden Isle Marina").

12. All of the Eden Isle Marina leasehold had not been fully developed in 1995.

13. According to the 1995 Lease, Plaintiff was entitled to develop the undeveloped leasehold for docks and facilities provided there was a showing of public need among other things.

14. Plaintiff paid $1.6 million for the leasehold interest, improvements, appurtenances, and the right to continue the development within the leasehold area with income producing expectations.

15. Specifically, Plaintiff's purchase of the marina was an investment with the business expectation of completing the development of approximately 1,078 feet of shoreline, which had not been developed in 1995, with income-producing boat slips.

16. At the time of the purchase, the marina facilities were in disrepair, and Plaintiff purchased the marina realizing that repairs would be necessary pursuant to COE regulations and guidelines. In addition, Plaintiff intended to make substantial improvements to Eden Isle Marina to attract business.

17. Prior to its purchase, Plaintiff had several communications with the COE concerning Plaintiff's anticipated purchase and plans for repair, improvements, and future development of the leasehold area.

18. Plaintiff told the COE it intended to make a substantial investment not only in the purchase of the leasehold interest but, also in repair and improvements to the existing facilities with the goal of the marina being a *state-of-the-art* marina.

19. During the time frame of Plaintiff's purchase, the COE explained to Plaintiff that Plaintiff would be entitled to fully develop the leasehold interest based upon a showing of public need and consistent with COE regulations and indiscriminate discretion.

20. Plaintiff, in reliance upon the representations, obligations, and actions of the COE, had reasonable business expectations of fully developing the remaining leasehold area and of receiving the resulting profits therefrom during the term of the 1995 lease.

21. Based upon COE policies governing leasehold concessions in the Little Rock District, Plaintiff had reasonable business expectations that Plaintiff's lease would be renewed upon expiration provided Plaintiff was not in material breach of the terms of the lease.

22. Based upon the COE's affirmative representations of the potential development possible at the marina and the resulting business income, Plaintiff, after its purchase, invested substantial sums to repair and improve the existing marina facilities, raising the integrity of the facilities to one of the premiere marinas not only in the Little Rock District but also in the State of Arkansas.

23. At all times, both prior to Plaintiff's purchase and immediately thereafter, the COE voiced no reservations to Plaintiff's entitlement to develop the leasehold area to a maximum capacity based upon the needs of the public,

nor did the COE make any statements indicating boat slips existing at the time of the purchase could possibly be outside of the leasehold boundary.

24. In reliance upon the COE's statements, actions, regulations, and guidelines, Plaintiff acquired an interest in the marina consisting of the business income, business expectancy, buildings, docks, fixtures, improvements, right of ways, and all possessory and development rights in and to the leasehold area along 2,252 feet of shoreline at Eden Isle Marina.

25. According to COE regulations governing concession leases in the Little Rock District, any concession interest that is being sold, and the obligations of the lease assigned and assumed, must meet the prior approval of the COE.

26. The COE approved Plaintiff for the assignment and assumption of the 1995 Lease.

27. Soon after the repair and improvements to the Eden Isle Marina facilities by Plaintiff, the COE praised Plaintiff as one of the top-rated marinas in the State of Arkansas.

28. Since Plaintiff's acquisition and assumption of the lease, the COE was obligated to allow Plaintiff to develop the leasehold interest and realize the maximum benefit of the leasehold interest provided Plaintiff was in compliance with the terms of the 1995 lease and other COE regulations.

29. The entire lease area was available for commercial concession purposes, to be developed as needs warranted, and developed in a manner meeting the COE's approval.

30. In accordance with the lease and in accordance with federal law, the COE was obligated to fully cooperate and not hinder performance of Plaintiff's development.

31. Plaintiff continuously performed Plaintiff's obligations under the 1995 lease.

32. Plaintiff obtained a vested contract interest in its business expectations of improving and fully developing the leasehold interest.

33. Plaintiff obtained a vested property interest in the developed and undeveloped leasehold interest.

**Eden Isle Marina's Attempt to Develop**

34. After Plaintiff purchased the marina, as expected by Plaintiff and the COE, it began to grow, and further development became necessary to accommodate a waiting list of boat owners.

35. Since the inception of Plaintiff's lease and thereafter, Plaintiff satisfied the showing of public need and submitted its plan of development to the COE. Although not required by the COE, Plaintiff submitted a projected plan of development anticipated to occur in the following ten years.

36. Immediately after Plaintiff acquired the leasehold in June 1995

and was submitting plans to the COE for proposed development within the leasehold area, local residents of the Eden Isle Community, among others, lodged protests to the COE as to any further development, in particular the addition of boat slips.

37. Immediately thereafter, the COE met on numerous occasions with various Eden Isle property owners and the Eden Isle Property Owners Association ("EIPOA") to discuss Plaintiff's proposed development in attempts to appease the protests.

38. In fact, one or more individuals employed by the COE began direct communications with the EIPOA and others, all non-parties to the lease, and agreed to keep them fully apprised of any application by Plaintiff for development of its leasehold area, resulting in what would later become constant interference, manipulation, and meddling with Plaintiff's contractual rights.

39. Indeed, as will be detailed later in this Complaint, the COE not only permitted constant interference, manipulation, and meddling by non-parties to the 1995 lease, but encouraged same, thus violating its own obligations under the 1995 lease, all to the detriment of Plaintiff.

40. The COE focused its attention on appeasing these non-parties to the lease, prioritizing their interests over both Plaintiff and the COE's performance of its contractual obligations under the 1995 lease.

41. The Eden Isle Community comprises some of the wealthiest and most influential (including political influence) people in the State of Arkansas.

42. In particular, Richard Upton, the owner of the majority of land on Eden Isle (which includes the private golf course, private club, tennis courts, and swimming pool), together with the EIPOA waged war against further development of Eden Isle Marina.

43. Upon information and belief, Richard Upton, or someone acting on his behalf, had failed in his pursuit of acquiring Eden Isle Marina during the time frame of Plaintiff's acquisition and, therefore, was motivated to prohibit Plaintiff from realizing Plaintiff's business expectations.

44. More specifically, Upton wrote identical letters to William C. Garner, Resident Engineer; Arkansas State Senators and Representatives; and Washington D.C. COE representatives in the spring and summer of 1996 to enlist each one's assistance in prohibiting Plaintiff from further developing Eden Isle Marina.

45. Also during this time frame, the EIPOA had meetings encouraging its members (all property owners in Eden Isle) to flood the COE and their congressional representatives and others who may have political influence with letters and other forms of communications to prohibit Plaintiff from developing Eden Isle Marina.

46. COE representatives immediately responded in favor of these protests and continued to tell Plaintiff it was necessary for Plaintiff and the COE to work out a resolution pertaining to these protests. COE representatives told Plaintiff such resolution was necessary by Plaintiff before COE could allow any further development of Plaintiff's leasehold at Eden Isle Marina. In fact, the COE would not allow any additional boat slips during this period of time due to the protests of these non-parties to the lease.

47. Yet, prior to the protests having been lodged, the COE had already approved Plaintiff's application for additional boat slips.

48. In response to these protests, the COE took the position that the Little Rock District would allow development of the southern part of Plaintiff's leasehold area as needed and would continue to work with Plaintiff to find an alternate site to replace the northern portion of the leasehold area in order that the public demand for boat storage docks may be met. This plan for future development of Eden Isle Marina was approved in a meeting between COE representative Colonel Phillip S. Morris, Senator Dale Bumpers, and Senator David Pryor on or about June 3, 1996.

49. Plaintiff was not present at this meeting and had no notification of same.

50. Colonel Morris explained to Senator Bumpers in a letter dated June 17, 1996, in response to Richard Upton's protests contained in a letter

to Senator Bumpers, that a lakeshore management plan for Greers Ferry Lake prepared in 1975 prohibited any additional private docks at Eden Isle Marina and established a buffer to protect the Eden Isle Marina from conflicting shoreline uses by others. Further, the letter explained that Plaintiff's leasehold area was unchanged from the 1980 lease area. Further, the letter explained Plaintiff had done an excellent job since purchasing the marina, and the marina provides slips for a large number of sailboats which provides a smaller rate of income than other marinas.

51. Dissatisfied with the COE's response, Upton, by letter dated July 2, 1996, suggested the marina had wrongfully expanded east into the lake and requested that no development be allowed until Senator Pryor or Senators Bumpers and Lincoln were shown the plans.

52. Besides the above contacts, which began in the spring of 1995, other opponents to any development swarmed their Congressmen and Congresswomen, State Representatives, and COE representatives with protests of this.

53. Finally in late 1996, Martin Lancaster ASA (CW) attended a fund-raiser reception at the Red Apple Inn on Eden Isle for Congressman Marion Berry where the members of the EIPOA were invited to attend. Plaintiff was not invited to this meeting.

54. Lancaster later told EIPOA there would be no further development at Eden Isle,Marina.

55. Approximately two weeks after the Lancaster/EIPOA meeting, the Little Rock District Engineer received a faxed message from Lancaster stating his personal opposition to any further development of the marina.

56. Specifically, Lancaster and Colonel Morris believed their instructions to the District Engineer was to approve only six houseboat slips, however, not allow their placement until after the November 1996 elections.

57. The District responded by informing Plaintiff to cease any further development and placement of docks, including the docks that the COE had previously approved which were in the process of being placed at the marina.

58. The opponents' campaign against Eden Isle Marina development continued into 1999 and, in fact, continues today.

59. Throughout the time frame of 1995 to present, Plaintiff believed, based upon representations made by the COE, that it was Plaintiff's responsibility to resolve the objections by the opposition and approached the COE with various proposals to develop its leasehold area at Eden Isle Marina, modifying Plaintiff's original plans, in attempting to appease the protests. (Plaintiff did this because Plaintiff believed Plaintiff was obligated to do so at that time.)

60. All of Plaintiff's proposals were denied, and Plaintiff was prohibited by the COE from developing its leasehold at Eden Isle Marina from 1995 until 1999 when Plaintiff was forced to sign an agreement with the COE, which will be detailed later in this Complaint.

61. During this time frame from 1995 to present, COE did not disclose information to Plaintiff which had been disclosed to the opposition, *i.e.*, that the COE was legally obligated to allow Plaintiff to develop its leasehold interest despite the protests of EIPOA and other non-parties to the lease. In fact, just the opposite representations were made to Plaintiff whereby the COE continually justified the COE's denials in issuing permits for development of Eden Isle Marina.

62. Upon information and belief, each time Plaintiff approached the COE with requests for additional slips to its leasehold area, the COE informed the opposition. This would trigger another aggressive and oppressive campaign to prohibit Plaintiff from developing Eden Isle Marina and to influence the COE to deny Plaintiff's requests.

63. Upon information and belief, Plaintiff's request for additional boat slips which was made to the COE on approximately August 17, 1998, was approved with the condition that no additional slips would be permitted after these slips were added.

**The COE's Improper Succumbing to**
**Political Pressure and Abuse of Discretion**

64. Between 1995 to present, the COE represented to Plaintiff the concerns voiced by EIPOA and other non-parties to the lease must be resolved before the COE could approve further development.

65. The COE imposed upon Plaintiff an obligation to appease these concerns as a condition precedent for the COE to approve further development.

66. From 1995 to 1999, the COE stated to Plaintiff that the COE would not allow Plaintiff to develop the leasehold area at Eden Isle Marina, or, if allowed to do so, the COE would not agree to extend the term of the lease on the newly developed leasehold on its expiration date.

67. Plaintiff reasonably understood this representation to mean that any additional boat slips or development in the undeveloped area would have to be moved and Plaintiff would lose the cost of those slips.

68. From 1995 to 1999, Plaintiff had invested more than $2.5 million in its Eden Isle Marina operation with the expectation of developing and realizing income from its investment. Plaintiff borrowed substantially all of these funds, and, therefore, was committed to repayment of its loan.

69. The COE knew Plaintiff had borrowed substantially all of these funds because the COE was required to sign papers acknowledging the validity of the 1995 lease.

70. In 1999, after more than three years of restraint on development, which development was needed by the public, Plaintiff was suffering from financial duress.

71. The COE knew, or reasonably should have known, the COE's denials to Plaintiff on developing its leasehold interest had placed Plaintiff in financial duress.

72. In an effort to justify its actions or inactions for not allowing Plaintiff to develop its leasehold under the 1995 lease, the COE stated to Plaintiff that Plaintiff was in breach of its leasehold because Plaintiff had docks outside the eastern (lakeside) boundary.

73. In fact, the COE had approved the placement of these docks before Plaintiff's purchase, issued the permits, and collected revenues from them without any objection as to their placement.

74. The COE made these representations to Plaintiff in order to influence Plaintiff to agree to a COE proposal (which will later be detailed and described as the MOU and Eden Isle/Cove Creek Modification). This proposal required that Plaintiff relinquish substantially all the remaining undeveloped leasehold area, comprising approximately 1,078 feet of shoreline, at Eden Isle Marina and agree to a modification of the lease.

75. The COE offered in its proposal that in return for Plaintiff's relinquishment of 1,078 feet of the leasehold shoreline at Eden Isle Marina, the

COE would do the following: (1) lift a cease and desist order which had been in place for three years; (2) grant Plaintiff a leasehold at Cove Creek comparable to the leasehold area Plaintiff was relinquishing at Eden Isle Marina; (3) build an access road and infrastructure for a marina at Cove Creek; (4) extend the 1995 lease term to expire in 2023 (an additional eleven years); and (5) allow Plaintiff to add, as its maximum development, 192 slips at Eden Isle Marina.

76. The COE told Plaintiff that Plaintiff was powerless to fight this offer and if Plaintiff declined, the COE would restrict all future development at Eden Isle Marina, meaning Plaintiff could not add any additional boat slips.

77. Specifically, the COE told Plaintiff to "take it or leave it," knowing Plaintiff did not have sufficient political influence, power, or financial resources to do otherwise.

78. The COE represented to Plaintiff the COE was acting with proper authority and had the legal basis to make these demands.

79. Further, the COE placed an accelerated deadline on its offer.

80. Cove Creek did not have access to a marina or have any existing marina facilities or other infrastructure required for the operation of a marina.

81. Cove Creek does not have access to a marina, marina facilities, or other infrastructure required for a marina today.

82. Unbeknownst to Plaintiff, the COE sought and obtained the approval of the protesting property owners of the COE's proposal to Plaintiff.

83. Plaintiff believed and, indeed, was left with no choice but to accept the terms of the COE's proposal.

84. The terms of what has previously described herein as the COE proposal were memorialized in a Memorandum of Understanding ("MOU") on February 2, 1999, in a document dated April 22, 1999, and was designated by the COE as DACW03-1-99-837 ("EI/Cove Creek Modification"). (A copy of said MOU is attached hereto as "**Exhibit B**" and a copy of said EI/Cove Creek Modification is attached hereto as "**Exhibit C**." Both are incorporated herein by reference.)

85. Both the MOU and EI/Cove Creek Modification were drafted by the COE.

86. Plaintiff, through its officer, signed the MOU and EI/Cove Creek Modification and was not able to exercise its own free will because of the extreme financial hardship it was suffering, Plaintiff's being overpowered by the political influence, among other things, of the protesting parties, and the power and control of the COE.

87. Because of the number of amendments and sheer volume of the 1995 existing lease, the COE requested that a new document, the EI/Cove Creek Modification, be prepared and executed.

88. Although the EI/Cove Creek Modification has a separate reference number, it is actually only a modification or addendum of the 1995 Lease. Therefore, the 1995 Lease, the MOU, and the EI/Cove Creek Modification are and should be construed as one contract.

89. Plaintiff began making plans to develop the Cove Creek leasehold area immediately after signing the MOU and EI/Cove Creek Modification.

90. Plaintiff, in its efforts to develop its leasehold area at Cove Creek, began communicating with the COE regarding the COE's responsibility to construct an access road.

91. However, for eight years, from 1999 to present, the COE has continually refused to build the access road, repeatedly referencing the clause "when funds become available" and representing it has no funds in its budget.

92. Since 1999, the COE has made no effort, or its efforts were artificial, in fulfilling its obligations as to Cove Creek.

**<u>The COE's Refusal to "Make Funds Available"</u>**

93. The COE has continually represented to Plaintiff that the phrase "as funds become available" in paragraph 3(g) of the MOU means that a "congressional add" for the funds is required and the COE is not authorized to request same.

94. The COE has continually represented to Plaintiff that a "congressional add" means funds over and above the COE's annual allocation,

and that the burden and obligation rests solely upon Plaintiff to procure same from its Congressional representative. Plaintiff has now learned this representation was false.

95. From April 1999 to present, despite repeated efforts being made by Plaintiff so that Plaintiff could develop Cove Creek, the COE has not cooperated and has affirmatively hindered Plaintiff's performance by continually imposing new requirements upon Plaintiff at each request.

96. More specifically and by way of example, after numerous proposals made by Plaintiff to the COE to allow Plaintiff an opportunity to realize the benefit of its bargain as to Cove Creek, the COE told Plaintiff it was required to submit its maximum development plan to the COE before the COE could or would act.

97. Since the time of performance for the COE is not specified in the MOU or EI/Cove Creek Modification, the time frame in which the COE must perform falls within a reasonable time standard.

98. A reasonable time for the COE to perform has passed.

99. Plaintiff has, until recently, believed the COE was operating with good faith and fair dealing regarding the terms of the 1995 Lease, MOU, and EI/Cove Creek Modification since 1995 to present.

100. Plaintiff began to question the veracity of the COE representatives due to the COE's failure to perform, or take any steps in attempting to perform,

the COE's obligations at Cove Creek and, therefore, began to investigate the actions of the COE.

101. In approximately 2001, Plaintiff contacted the Engineer Inspector General and provided information concerning these events. Plaintiff received no response.

102. Plaintiff again contacted the Engineer Inspector General in 2003 and 2004 but, again, received no response.

103. Plaintiff began its own investigation in 2005 to present.

**Plaintiff's Recent Discovery of the COE's Fraud and the COEs Other Wrongful Actions, Omissions, and Concealment**

104. Upon information and belief, Plaintiff alleges and states that from the time it acquired the leasehold in June 1995 to present, the COE has purposefully concealed truthful information of material facts which Plaintiff was entitled to know prior to entering into the MOU and EI/Cove Creek Modification.

105. Upon information and belief, Plaintiff states and alleges that the following represent some, but not all, of the COE's misrepresentations and concealment from 1995 to present, which have only been discovered since Plaintiff's investigation which began in 2005:

A. The COE never intended to perform its obligations under the MOU and EI/Cove Creek Modification even if the COE had funds available as demonstrated by e-mail communications of COE

representatives. In particular, one email, dated September 20, 2000, states, in reference to funds directed for Cove Creek, "We need to stick to our guns here. We should budget for this, but it will always be deferrable.";

B. The COE entered into the MOU and EI/Cove Creek Modification under false pretenses that the COE would perform its obligations in good faith when, in truth, the COE never intended to perform any of its obligations as to Cove Creek and never intended to allow Plaintiff to develop Cove Creek;

C. The COE's substitution of Cove Creek for the leasehold interest at Eden Isle Marina was a farce, but the COE represented otherwise to Plaintiff;

D. The COE has required Plaintiff to submit plans of Plaintiff's intentions on maximum development of Cove Creek although Plaintiff is not obligated to do so and no other concessionaire in the Little Rock District has ever been required to present "maximum" development plans;

E. The COE withheld material information from Plaintiff, the public, the Engineer Inspector General, and others in a superior position with the United States Government concerning their true

intentions and the true events which have occurred from 1995 to present;

F. The COE representatives for the Little Rock District knew and have always known it was obligated to act in good faith to procure funds and perform its contractual obligations as stated in the MOU to effectuate EI/Cove Creek Modification at Cove Creek while representing to Plaintiff just the opposite;

G. The COE misrepresented to Plaintiff that Plaintiff was in material breach of the 1995 Lease, and the COE represented this provided legal grounds for the COE to prevent Plaintiff the right to fully develop Plaintiff's marina at Eden Isle when, in fact, Plaintiff has now discovered no such breach existed. Therefore, COE action preceding the MOU and EI/Cove Creek Modification were unjustified, misleading, and under false pretenses;

H. Specifically, Plaintiff believed, based upon the representations of the COE, that Plaintiff had docks outside the Eden Isle Marina leasehold area. Therefore, Plaintiff believed it was in breach of the 1995 Lease. Consequently, this required Plaintiff's agreement with the COE to reconfigure the leasehold area. In truth, however, Plaintiff was not in breach of its lease;

I. Despite Plaintiff's contentions that Plaintiff was not in breach of the leasehold area on the East as to the 1995 Lease, the COE, in a position of superiority both as to power, facts, and legal knowledge of leasehold areas for marinas, particularly on Greers Ferry Lake, stated as a matter of fact and law that Plaintiff was in breach of the 1995 lease because its docks exceeded the "eastern boundary" of the leasehold, and, therefore, the COE was entitled to prohibit Plaintiff from developing approximately 1,078 feet of shoreline;

J. At all times since Plaintiff acquired the leasehold in June 1995 to present, the COE represented to Plaintiff that the concerns and objections expressed by the EIPOA and other non-parties to the contract were valid objections and concerns which had to be rectified and resolved before the COE could legally approve any additional development of Plaintiff's leasehold area at Eden Isle Marina. Plaintiff has recently discovered these representations were false;

K. The COE met with non-parties to Plaintiff's lease "off the record" and at other times without Plaintiff's knowledge, presence, or consent and

secretly gave deference to these non-parties' wishes resulting in

the MOU and EI/Cove Creek Modification;

L. The COE, Eden Isle landowners, and other non-parties to Plaintiff's contract worked in concert prior to the MOU and EI/Cove Creek Modification ultimately achieving the goal of preventing Plaintiff from realizing the entire benefits of the 1995 Lease;

M. The COE wrongfully held and concealed its meetings, negotiations, and agreements with non-parties to Plaintiff's contract resulting in Plaintiff not receiving the benefit of its bargain and business expectancy;

N. The COE was not excused from performing its contractual obligations to Plaintiff under the 1995 lease due to objections of other landowners;

O. The COE represented to Plaintiff that the COE's actions were legal, rational, indiscriminate, and compulsory when the COE knew, or reasonably should have known, at all times these representations were false;

P. The COE's actions toward Plaintiff were contrary to any existing rule, regulation, or policy of the Little Rock District COE pertaining to marina development and contrary to any other marina in the Little Rock District while representing to Plaintiff the

COE was acting with full legal authority;

Q. The COE abused its discretion in yielding to the objections of EIPOA and other non-parties to Plaintiff's contract over the interests of Plaintiff even though the COE had also received approximately 1,000 signatures in favor of the development. Those in support of the development included the local community of Heber Springs, other interested organizations, and all other marina owners on Greers Ferry Lake;

R. The COE arbitrarily took the position that Plaintiff's docks were outside the leasehold area at Eden Isle Marina and represented same to Plaintiff as an undisputed fact with improper motives, bad faith, and discriminatory treatment toward Plaintiff for the purpose of obtaining "bargaining" leverage over Plaintiff. This was done so that Plaintiff would relent and agree to relinquish substantially all of Plaintiff's remaining undeveloped leasehold area and the COE could satisfy protesting landowners, politicians, and others with strong political or other influence;

S. In 1999, the COE, to induce Plaintiff to enter into a modified lease and to relinquish substantially all of the remaining undeveloped leasehold area at Eden Isle Marina, told Plaintiff it would allow an additional 192 slips at Eden Isle Marina, but never disclosed to

Plaintiff that the COE was already legally obligated to allow Plaintiff to develop its leasehold area, including the 192 slips;

T. The COE did not disclose to Plaintiff that in the ordinary course of doing business with concessionaires, provided the concessionaires are in compliance with their lease obligations, the COE automatically extends lease terms;

U. The COE misrepresented, suppressed, distorted, and concealed the truth from Plaintiff when telling Plaintiff about the removal of the 1,078 feet of shoreline and the COE's decision that Plaintiff was prohibited from developing the 1,078 feet of shoreline was outside of the COE's control because it had received directions from the Assistant Secretary of the Army, Colonel Martin Lancaster. In fact, the COE had been fully informed that the COE was required by law to allow Plaintiff to develop the leasehold area and the COE should advise Colonel Lancaster as well as the Congressmen and Congresswomen who participated with this issue, that if the COE were to deny the development that the COE would be guilty of a material breach of contract exposing the COE and the public to a minimum of $1.5 million in damages;

V. The COE misrepresented, suppressed, distorted, and concealed the truth from Plaintiff when telling Plaintiff that the COE was

entitled to deny development, notwithstanding political influence and Colonel Lancaster's mandate, because Plaintiff's development would cause damage to the property owners on Eden Isle; that the development could not sustain additional parking areas; that the development could not sustain the additional traffic; that the adjoining property owners' property values would decrease; that the adjoining property owners did not know and could not reasonably have foreseen the additional development of the 1,078 feet of shoreline; and that Colonel Lancaster was acting within his full power and authority; when, in fact, the COE knew, or reasonably should have known, these were not valid reasons for the COE to deny development;

W. The COE was required to disclose to Plaintiff, but did not, that the cease and desist order issued and in place for three years was unwarranted and illegal;

X. The COE wrongfully and purposefully placed Plaintiff in a position of extreme duress in order for the COE to accomplish its goals and the goals of protesting landowners, politicians, and others with strong political influence, among other things, all of which resulted in Plaintiff being forced to sign the MOU and EI/Cove Creek Modification;

Y. The COE knew, or reasonably should have known, that its actions were in bad faith, improper, discriminatory, oppressive, unreasonable, punitive, and under false pretenses, and the COE knew, or reasonably should have known, it was in a position of superior knowledge and power over Plaintiff and that COE was taking advantage of Plaintiff to Plaintiff's detriment and the detriment of the public;

Z. The COE, at all times since June 1995 to present, has asserted to Plaintiff the COE's actions were legally justifiable when, in fact, the COE knew, or reasonably should have known, its actions could not be justified by fact or law;

AA. The objections of the landowners, political influence, or personal mandates from persons in a superior position in government did not excuse the COE from fulfilling its obligations;

BB. From early June 1995 through and including this date, the COE has aligned itself with EIPOA and others with substantial financial wealth, political influence, or other influential power (particularly in government) for the sole purpose of negating Plaintiff from proceeding with Plaintiff's legitimate business purposes and fulfillment of Plaintiff's property and contractual rights;

CC. The COE knew, or reasonably should have known, and was obligated to disclose to Plaintiff and did not disclose to Plaintiff that it was in the public's best interest for Plaintiff to develop its leasehold area at Eden Isle Marina according to the 1995 Lease. This was in the public's best interest due to the existing recreational demands at the time, the foreseeable increase in demands for boat slips on Greers Ferry Lake (particularly in the Eden Isle area), the outstanding facilities at Eden Isle Marina, and the result of extensive litigation in *Save Greers Ferry Lake v. U.S. Corps. of Engineers*, 111 F.Supp.2d 1135 (E.D. Ark. 2000);

DD. The COE has not placed maximum development restrictions on any other marina located on a lake the size of Greers Ferry Lake, the COE was obligated to disclose same to Plaintiff, and the COE did not disclose same to Plaintiff;

EE. The COE has not treated any other marina operator in the Little Rock District in as good standing as the COE has treated Plaintiff (until later when the COE needed to justify its actions) throughout its history. In addition, the COE was obligated to disclose same to Plaintiff and did not disclose same to Plaintiff;

FF. The COE knew, or reasonably should have known, it had no valid reason to deny the development at Eden Isle Marina, although the

COE stated just the opposite to Plaintiff;

GG. The COE did not disclose to Plaintiff, and had a duty to do so during the relevant period, the MOU and EI/Cove Creek Modification is a nullity because the COE gave nothing in return because the COE was already obligated to do the following: (1) approve additional docks for Eden Isle Marina; (2) extend Plaintiff's lease term; (3) allow Plaintiff to develop and retain its original leasehold interest since its acquisition; and (4) provide truthful information to Plaintiff regarding the COE's obligations;

HH. The COE interfered and hindered Plaintiff from its entitlement to fully develop its leasehold at Eden Isle Marina although the COE knew that it had an implied duty to fully cooperate and not interfere or hinder performance of Plaintiff's development of Eden Isle Marina and did not disclose same to Plaintiff;

II. The COE concealed, suppressed, or distorted material facts from Plaintiff from June 1995 to present;

JJ. The COE concealed information from the Engineer Inspector General's office during its investigation, thereby continuing to conceal material facts from Plaintiff;

KK. The COE invented arbitrary rules applicable only to Plaintiff's proposals and as to Cove Creek to create or justify the COE's