# In the United States Court of Federal Claims

No. 07-127 C
(Filed: October 29, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| EDEN ISLE MARINA, INC., | \* | |
| | \* | RCFC 52(c), Motion for Judgment on |
| Plaintiff, | \* | Partial Findings; Concession Lease to |
| | \* | Operate a Marina; United States Corps of |
| v. | \* | Engineers; Political Influence; Breach of |
| | \* | Contract; Fifth Amendment Takings; |
| THE UNITED STATES, | \* | Statute of Limitations |
| | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Marian M. McMullan and Patrick R. James, Little Rock, AR, for plaintiff.

Vincent D. Phillips, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff Eden Isle Marina, Inc. operates a commercial marina located on a lake owned by the United States Corps of Engineers ("Corps"). It contends that the Corps breached the commercial concession leases governing its operation of the marina by thwarting its repeated attempts to develop its leasehold as permitted by the express terms of the leases. It further contends that the Corps deprived it of its property without just compensation in violation of the Fifth Amendment of the United States Constitution. After hearing plaintiff's case-in-chief at trial, it is crystal clear that the Corps–from its civilian leadership at headquarters through its personnel in the local office–breached its contracts and grievously wronged plaintiff. It is equally clear that one of plaintiff's elected representatives actively worked against plaintiff to prevent it from developing its leasehold. Plaintiff stood no chance to enjoy the benefit of its contracts with the Corps in the face of the political forces aligned against it.

However, despite plaintiff's presentation of an extensive record documenting the deleterious treatment it suffered at the hands of the government, it has failed to establish that it is entitled to relief from this court. Most of plaintiff's claims are barred by the statute of limitations, and plaintiff has not established that it can recover on the merits of its remaining claims. Thus, the court must grant defendant's motion for judgment on partial findings under Rule 52(c) of the Rules of the United States Court of Federal Claims ("RCFC"), and dismiss plaintiff's suit. Given the unavailability of judicial relief and the Corps' reprehensible treatment of plaintiff, the court strongly urges plaintiff to pursue redress from the United States Congress.

## TABLE OF CONTENTS

FACTS ........................................................................................................................... 7

  I. Early 1960s to Early 1995: Background.................................................................. 7

    A. Greers Ferry Lake ............................................................................................. 7

    B. Eden Isle and Eden Isle Marina......................................................................... 8

    C. Sale of Eden Isle Marina .................................................................................. 13

      1. Richard Upton .............................................................................................. 14

      2. Ronnie Walters............................................................................................. 14

      3. The Offers to Purchase the Marina .............................................................. 15

      4. Closing the Purchase of the Marina ............................................................. 15

  II. June 1995 to October 1996: Plaintiff's Operation and Development of Eden Isle Marina Until the Cease-and-Desist Order ............................................................................. 18

    A. Immediate Repairs to the Marina...................................................................... 18

    B. Plaintiff's Plans to Develop the Marina ........................................................... 18

      1. Initial Opposition to Plaintiff's Plans to Develop the Northern Portion of the Marina's Lease Area ................................................................................................... 19

      2. Candidate Marion Berry Becomes Involved................................................ 20

      3. Plaintiff's Formal Development Request....................................................... 20

    C. Opposition to Plaintiff's Development Plan Builds............................................ 22

      1. Immediate Opposition to Plaintiff's Development Plan................................ 22

      2. The April 18, 1996, and May 15, 1996 Meetings........................................ 24

      3. Arkansas's Congressional Delegation Becomes Involved ........................... 25

      4. The Corps' Rejection of Plaintiff's Long-Term Development Plan.............. 26

      5. The Corps' Efforts to Keep the Congressional Delegation Informed.......... 27

      6. The Eden Isle Property Owners Continue to Assert Their Opposition and Seek the Support of Their Congressional Delegation and Mr. Berry................................ 28

      7. The Assistant Secretary, Martin Lancaster, Becomes Involved .................. 30

    D. The Corps Concludes That There Were Docks Outside of the Marina's Lease Area .... 31

    E. Plaintiff's Addition of Boat Slips to Existing Docks at the Marina ................. 34

    F. Mr. Lancaster's Visit to Eden Isle ................................................................... 35

    G. The Cease-and-Desist Order ............................................................................ 37

  III. November 1996 to February 1999: Plaintiff's Operation of Eden Isle Marina Under the Cease-and-Desist Order Until the Memorandum of Understanding......................... 43

A.  Plaintiff's April 1997 Lawsuit Against Mr. Upton ............................................. 44

B.  Plaintiff's February 1998 Meeting With the Corps ........................................... 45

C.  A New District Engineer for the Little Rock District ........................................ 47

    1.  Tension Between Mr. Berry and Colonel Morris .......................................... 47

    2.  The Arrival of Colonel Holden ..................................................................... 49

D.  Plaintiff's August 12, 1998 Request for New Boat Slips .................................. 49

E.  The Corps' Consideration of Plaintiff's Request .............................................. 50

    1.  The Corps' Internal Discussions ................................................................... 50

        a.  The Docks Purportedly Outside of the Lease Area ................................. 52

        b.  Alternative Marina Sites .......................................................................... 53

    2.  Requesting Additional Information From Plaintiff........................................ 54

    3.  Colonel Holden's Opinion on Plaintiff's Earlier Attempt to Develop Eden Isle Marina
.............................................................................................................................. 54

    4.  Recommendations Made to Colonel Holden Regarding Plaintiff's Development
Request ................................................................................................................ 55

        a.  Advice From the Office of Counsel ......................................................... 55

        b.  Advice From Real Estate Division Counsel ............................................ 57

        c.  Summary of Legal Advice ....................................................................... 59

    5.  Input From Mr. Berry .................................................................................... 60

    6.  Colonel Holden Decides Upon the Corps' Approach to Plaintiff's Request .............. 62

    7.  The Corps' Overall Treatment of Plaintiff's Request .................................... 63

F.  The Corps Presents Its Proposal to Plaintiff .................................................... 64

    1.  The November 10, 1998 Meeting .................................................................. 64

    2.  The January 1999 Meetings ........................................................................... 67

    3.  Meeting at the Cove Creek Park Marina Site ............................................... 68

    4.  Support for Plaintiff's Request ...................................................................... 69

G.  The Corps Presents Its Proposal to the Eden Isle Property Owners ............... 71

H.  The Memorandum of Understanding ................................................................ 72

    1.  The Corps Reduces Its Proposal to Writing.................................................. 72

    2.  The February 2, 1999 Meeting ...................................................................... 74

    3.  Funding the Work at Cove Creek Park ......................................................... 75

        a.  Corps Budgeting and Appropriations...................................................... 75

            i.  Priorities and Rankings ........................................................................ 78

      ii.  Congressional Adds ...................................................................... 79

      iii.  Reprogramming of Appropriated Funds ........................................... 80

    b.  Interpretations of "as Funds Become Available" .................................. 80

  4.  The Corps' Reaction to Obtaining a Signed Agreement ........................... 81

IV.  February 1999 to April 1999:  Efforts Taken Under the Memorandum of Understanding Prior to the Execution of a New Lease ................................................................ 82

  A.  Efforts to Obtain Funding to Allow for Development at Cove Creek Park ................... 82

    1.  The Corps' Efforts ................................................................... 82

    2.  Plaintiff's Efforts .................................................................... 84

  B.  Plaintiff's Efforts to Build a Marina at Cove Creek Park ............................. 85

  C.  Choosing a Marina Site at Cove Creek Park ......................................... 86

  D.  Updating the Greers Ferry Lake Master Plan ....................................... 86

  E.  Executing a New Lease ............................................................. 87

  F.  Justifying the Alteration of Eden Isle Marina's Lease Area Boundary .................. 89

V.  April 1999 to June 2005:  Plaintiff's Attempts to Develop at Cove Creek Park Under the 1999 Lease ............................................................................................ 91

  A.  The Lease Area for the Future Marina at Cove Creek Park ............................ 91

  B.  Plaintiff's Initial Push to Begin Work at Cove Creek Park ........................... 92

  C.  Continued Pursuit of Funding ...................................................... 92

    1.  Congressional Add ................................................................... 92

    2.  The Project Office's FY 2002 Budget Request ..................................... 93

    3.  Funding for the Design of the Access Road ...................................... 93

  D.  Environmental Litigation Concerning the Greers Ferry Lake Shoreline Management Plan ........................................................................................... 94

    1.  The National Environmental Policy Act of 1969 .................................. 94

    2.  Issuing a New Shoreline Management Plan ....................................... 95

  E.  Mr. Walters's Complaint to the Engineer Inspector General .......................... 96

    1.  The June 27, 2000 Meeting .......................................................... 96

    2.  Mr. Walters Contacts the Engineer Inspector General's Office ................... 96

    3.  The Engineer Inspector General Initiates an Inquiry ............................ 97

    4.  The Preparation of a Legal Opinion ............................................... 97

    5.  The September 19, 2000 Conference Call .......................................... 99

    6.  The November 1, 2000 Conference Call ........................................... 101

    7.  The Directive From Corps Headquarters .......................................... 101

8.  The Requested Schedule of Costs and Timetable ..................................................... 101

9.  Further Efforts to Reprogram the Funds Pursuant to the Directive From Corps Headquarters .................................................................................................. 103

F.  Mr. Walters Continues to Make Plans for the Marina at Cove Creek Park in 2001 ..... 107

G.  The Continued Pursuit of Funding for the Work at Cove Creek Park Through the Appropriations Process ................................................................................................ 107

1.  The Corps' Budget Requests for FY 2004, FY 2005, and FY 2006 .......................... 107

2.  Congressional Efforts ............................................................................................ 110

H.  The Corps Conducts an Environmental Study at Cove Creek Park ............................. 110

I.  Mr. Walters's Continued Development Efforts in 2003 and 2004 ............................... 112

1.  Cove Creek Park ................................................................................................... 112

2.  Eden Isle Marina .................................................................................................. 112

J.  The EIG Inquiry Is Reinstated ..................................................................................... 112

VI.  June 2005 to the Present:  Plaintiff's Attempts to Recover the Lease Area It Relinquished Under the 1999 Lease ............................................................................................... 116

A.  Determining the Requirements for Requesting a Lease Area Expansion .................... 116

B.  Plaintiff Retains a Consultant to Perform an Environmental Study at Eden Isle Marina ...................................................................................................................................... 118

C.  The Corps' Budget Requests for FY 2007 and FY 2008 ............................................ 119

D.  Plaintiff's Request for Reinstatement of Its Former Lease Area at Eden Isle Marina .. 120

E.  Plaintiff Files a Lawsuit Against the Corps .............................................................. 121

F.  Plaintiff's Pursuit of Its Reinstatement Request ...................................................... 121

G.  The Corps Constructs the Road to the Cove Creek Park Marina Site ........................ 125

SUMMARY OF EXPERT OPINIONS ................................................................................. 131

I.  Dr. Jerry Overton ..................................................................................................... 131

A.  Credentials ........................................................................................................... 131

B.  The Formulation of His Opinion ............................................................................ 132

C.  His Opinions ......................................................................................................... 133

1.  Eden Isle Marina .................................................................................................. 133

2.  Other Marinas on Greers Ferry Lake .................................................................... 133

3.  The Cove Creek Park Marina Site ......................................................................... 135

II.  Roger Ross and John Miller, P.E. ............................................................................... 136

A.  Credentials ........................................................................................................... 136

B.  The Formulation of Their Opinions ....................................................................... 136

C.  Their Opinions................................................................................... 138

III.  Ronnie Walters .................................................................................... 139

A.  The Formulation of His Opinion ........................................................ 139

B.  His Opinion ..................................................................................... 140

PROCEDURAL POSTURE .............................................................................. 140

DISCUSSION .................................................................................................. 141

I.  RCFC 52(c) Motions ............................................................................. 141

II.  Plaintiff's Amended Complaint ............................................................... 141

III.  The Statute of Limitations ..................................................................... 142

A.  Legal Standards ............................................................................... 142

1.  Subject Matter Jurisdiction ........................................................ 142

2.  Claim Accrual ........................................................................... 143

B.  Breach of the 1995 Lease .................................................................. 143

C.  Breach of the MOU and the 1999 Lease .............................................. 145

1.  Failure to Perform Express Duties ............................................... 146

2.  Misrepresentation ...................................................................... 148

3.  Failure to Disclose Superior Knowledge ....................................... 150

4.  Implied Duty of Good Faith and Fair Dealing ................................ 152

D.  Rescission of the MOU and the 1999 Lease .......................................... 152

1.  Duress ...................................................................................... 153

2.  Failure of Consideration ............................................................. 153

3.  Mutual Mistake of Fact .............................................................. 155

E.  Fifth Amendment Taking .................................................................... 155

F.  Summary of Viable Claims ................................................................. 156

IV.  Express Contract Terms ......................................................................... 156

A.  Valid Contract .................................................................................. 157

B.  Obligation or Duty Arising From the Contract ..................................... 157

C.  Breach of the Obligation or Duty ....................................................... 157

D.  Damages .......................................................................................... 160

V.  Superior Knowledge .............................................................................. 161

VI.  Implied Duty of Good Faith and Fair Dealing ......................................... 162

CONCLUSION ................................................................................................. 162

# FACTS

This section contains the court's findings of fact as required by RCFC 52.[1]

## I. Early 1960s to Early 1995:  Background

### A.  Greers Ferry Lake

In the early 1960s, the federal government constructed the Greers Ferry Dam on the Little Red River in north-central Arkansas.  PX 236 at 138, 141-42; accord Jt. Stip. ¶¶ 1-2. Construction of the dam created Greers Ferry Lake, PX 236 at 142, which is used for flood control, power generation, the supply of municipal drinking water, and recreation, Tr. 1581 (Park).  To construct the dam and lake, the federal government generally acquired all of the affected land in the area up to an elevation of 476 feet ("fee acquisition line"), along with a flowage easement up to an elevation of 491 feet.  Id. at 1586-87 (Park).  When the water in the lake is at its normal elevation of 461 feet ("normal pool"), the lake covers more than 30,000 acres of water surface and is surrounded by a 276-mile land boundary.  PX  236 at 143; accord Jt. Stip. ¶ 2.  The lake consists of two bodies of water–the upper lake to the northwest and the lower lake to the southeast–connected by a narrow channel.  PX 5; PX 236 at 142.  Surrounding the lake are eighteen parks that provide a variety of recreational facilities, including campgrounds, boat launches, swim areas, and marinas.  Jt. Stip. ¶ 3.  The lake has seven million annual visitors.  Tr. 3601, 3677 (Murdock-McDaniel).

Greers Ferry Lake is owned by the United States, and is managed and operated by the Corps.  Am. Compl. ¶ 6; Jt. Stip. ¶¶ 8-9.  To administer its responsibilities, the Corps maintains a project office in Heber Springs, Arkansas, headed by a resident engineer/operations project manager.[2]  The project office is overseen by the Corps' district office in Little Rock, Arkansas. During the 1990s, the commander of the Little Rock District, also known as the district engineer, managed 850 employees and a $120 million budget, and was responsible for twenty-four lakes,

---

[1]  Some of the facts are undisputed by the parties:  defendant admitted certain allegations in plaintiff's amended complaint ("Am. Compl.") and the parties filed a Joint Stipulation of Facts ("Jt. Stip.").  The court derives facts related to the procedural history of this matter from various filings on the docket, including the original complaint ("Compl.") and a published decision regarding a discovery dispute.  The remaining findings of fact are derived from the transcript of testimony elicited at trial ("Tr.") and the exhibits admitted into evidence during trial ("PX" or "DX").  Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness; if more than one witness testified to the same fact, the court might only cite to the testimony of one witness.  And, where two copies of a single document have been admitted into evidence, the court will cite to only one version of the document.

[2]  When Greers Ferry Lake was created, the head of the project office held the title of "resident engineer."  This title was subsequently changed to "operations project manager."  The court uses both terms, as appropriate.

eleven locks and dams on the Arkansas River, seven hydropower plants, military construction, permitting under the Clean Water Act, managing the Corps' real estate, and emergency response. Tr. 813-14, 999-1000 (Morris).  The Little Rock District is part of the Southwestern Division headquartered in Dallas, Texas.  The division office, in turn, reports to the Corps' headquarters in Washington, DC.

Civilian oversight of the Corps' development and management of the nation's water resources is provided by the Assistant Secretary of the Army (Civil Works) ("Assistant Secretary").  In addition, the Corps maintains offices in each geographic division and district dedicated to its various functional responsibilities, such as managing its real estate (including its commercial concession leases), operating and maintaining its infrastructure, engineering and designing its facilities, monitoring the environment, complying with relevant regulations, and handling its legal affairs.

The Corps' management and operation of Greers Ferry Lake is guided, in part, by a Shoreline Management Plan.[3]  Id. at 1590-92 (Park).  Under the Shoreline Management Plan, the use of commercial marinas is encouraged due to restrictions placed on the construction of private docks.  Id. at 1788 (Park), 2323 (Holden).  The Corps' management and operation of the lake is further guided by the Greers Ferry Lake Master Plan, id. at 1930-31 (Park), 3945-48 (Overton); PX 236, a document the Corps maintains in both the project office and the district office,[4] Tr. 3945 (Overton).

## B.  Eden Isle and Eden Isle Marina

As of March 2011, there were nine marinas on Greers Ferry Lake under the Corps' purview.  PX 5.  Seven of the marinas are located in parks operated by the Corps:  those at Choctow Park, Dam Site Park, Heber Springs Park, Hill Creek Park, Narrows Park, Shiloh Park, and Sugar Loaf Park.  PX 6.  The other two marinas, Fairfield Bay Marina and Eden Isle Marina, are not located in Corps-managed parks.  PX 5.  Fairfield Bay Marina is located adjacent to and operated by the retirement and resort community of Fairfield Bay.[5]  Id.; PX 367.  Eden Isle Marina is also located within a resort community, Jt. Stip. ¶¶ 4-5, on the east side of a peninsula

---

[3]  The first Shoreline Management Plan, then called a Lakeshore Management Plan, was adopted in 1974 or 1975.  PX 35; PX 224 at 2.  It was subsequently updated in 1976, 1982, 1994, and 2002.  PX 224 at 2, 6.  The Corps withdrew a 2000 revision of the plan in response to a lawsuit challenging its validity.  Id. at 3.  That lawsuit is addressed in more detail below.

[4]  Counsel for the parties explained the existence of two versions of the Greers Ferry Lake Master Plan during the pretrial conference and at trial.  See Tr. 1438-39 (statement of plaintiff's counsel).

[5]  Specifically, Fairfield Bay Marina is located in a park that the Corps leases to Fairfield Bay, and Fairfield Bay, in turn, subleases the marina to Fairfield Bay Community Club, Inc.  PX 368.

on the south shore of the lower lake ("Eden Isle"), Am. Compl. ¶ 9; PX 5.  The Eden Isle community consists of primary residences and vacation homes, Jt. Stip. ¶ 4, and is "noted for being one of the most exclusive retirement recreational locations in the state of Arkansas," Tr. 4722 (Walters).  The community is governed by the Eden Isle Property Owners Association ("EIPOA").

Eden Isle Marina–established in the early 1960s–preexisted most of the residential development on Eden Isle, PX 25, and was one of the original marinas on Greers Ferry Lake, Am. Compl. ¶ 8.  The Corps initially leased the marina to The First Pyramid Life Insurance Company of America, Inc. ("First Pyramid").  PX 21 at 1, 10.  The Corps and First Pyramid executed a new lease in 1970–lease DACW03-1-70-886 ("the 1970 lease")–to conform with a proposed change to an agency regulation.  Id. at 1, 12.  The lease area encompassed by the 1970 lease was described as:

> That part of the north 825 feet of the SE¼ of the NE¼ and the south 1,000 feet of the NE¼ of the NE¼ of the Fractional Section 18, Township 10 North, Range 10 West of the 5th P.M., Cleburne County, Arkansas, lying between the 434-foot contour and the Government fee taking line, and containing 21.0 acres, more or less.

> Also, beginning at a point which is 120 feet east and 75 feet north of the southwest corner of the NW¼ of the SE¼ of Fractional Section 18, Township 10 North, Range 10 West of the 5th P.M., Cleburne County, Arkansas; thence north 26° east 300 feet to a point; thence south 84° 30′ east 515 feet to a point; thence south 15° 45′ west 260 feet to a point; thence north 86° 45′ west 575 feet to the point of beginning, and containing 3.3 acres, more or less.

> These two parcels contain in the aggregate 24.3 acres, more or less.

Id. at 3.  There is language in the 1970 lease suggesting that the lease area was depicted on a map attached to the lease as Exhibit A, see id. at 1 ("Said premises are designated in red on Exhibit 'A' attached hereto and made a part hereof."), but no such exhibit was included in the 1970 lease admitted into evidence at trial,[6] see id. at 1-15 (containing the 1970 lease).

According to the provisions of the 1970 lease, in exchange for the payment of a graduated rent, First Pyramid was permitted to "conduct . . . business in connection with the recreational development of the premises for the general use of the public," including:

---

[6]  Although no map was included in the 1970 lease admitted into evidence at trial, such a map apparently exists.  Plaintiff's expert geologist and hydrogeologist, Dr. Jerry Overton, reproduced in his expert report a map that he identified as the lease map referenced in the replacement lease.  See PX 190 at 57; Tr. 4206 (Overton).  The map reproduced by Dr. Overton does not bear a legend and is not marked as "Exhibit A."  See PX 190 at 57.

(1)  Sale of food, refreshments, packaged merchandise, fishing tackle, fish bait, and other supplies.
(2)  Sale of gasoline and lubricants.
(3)  Rental of boats and motors.
(4)  Sale of boats, motors, and accessories (optional).
(5)  Furnishing facilities for mooring and docking privately-owned boats.
(6)  Servicing, repairing, maintaining, and caring for privately-owned boats and motors.
(7)  Transportation of passengers by boats for hire.

Id. at 2, 4-5.  First Pyramid was required to furnish certain, specified facilities (e.g., various types of docks; a minimum number of boat slips; a parking lot and roads; and various buildings, boats, motors, and equipment), and could "provide additional facilities and services at any time after obtaining the written approval of the District Engineer."  Id. at 5, 13.  More specifically, the lease provided:

> [First Pyramid] shall have the right, during the term of the lease, to erect such structures and to provide such equipment upon the premises as may be necessary to furnish the facilities and services authorized under [the lease], . . . provided, however, that no structure may be erected or altered upon the premises unless and until the design and proposed location or alteration thereof shall have been approved in writing by the District Engineer.

Id. at 5.  With respect to these latter two provisions, the Corps could not deny a development request arbitrarily, unreasonably, or in bad faith.  DX 55; Tr. 128 (Cabe), 2322, 2339 (Holden); accord Tr. 827-28 (Morris) (noting that marina operators were typically allowed to expand within their lease areas so long as the contractual and regulatory requirements were met).  However, the Corps would not authorize or direct First Pyramid to "make investments which are inconsistent with an opportunity to make a fair profit on the total operations authorized for the premises."  PX 21 at 5.

The initial term of 1970 lease was eighteen years and ten months.  Id. at 1.  First Pyramid reserved the right to relinquish the lease at the end of a lease year by giving the Corps notice six months in advance.  Id.  On the other hand, the Corps could only revoke the lease in certain circumstances:

> The Government may revoke this lease at any time by giving 30 days written notice by the District Engineer to the lessee in the event the lessee violates any of the terms and conditions of this lease and continues and persists in such violation for a period of 90 days after the District Engineer had advised the lessee of such violation in writing.

Id.

-10-

The provisions of the 1970 lease were amended on numerous occasions through the execution of supplemental agreements. Jt. Stip. ¶ 23. Several supplemental agreements memorialized the transfer of the lease to new lessees. PX 21 (supplement agreements 1-2, 7, 13, 18, 20-22). Others reflected extensions of the term of the lease–ultimately to December 31, 2012–and adjustments to the calculation of rent payments. Id. (supplemental agreements 3, 5, 8-9, 13, 19). There were also supplemental agreements that contained revisions to the list of required facilities. Id. (supplemental agreements 8, 10-11, 13-16). And two supplemental agreements reflected changes to the description of the lease area. Id. (supplemental agreements 6, 19).

The first supplemental agreement affecting the lease area description, supplemental agreement 6, was executed on December 10, 1980, and reflected an expansion of the lease area, amending the description of the lease area to: "Two parcels of land and water area situated in the E½ of Fractional Section 18, Township 10 North, Range 10 West of the 5th Principal Meridian, Cleburne County, Arkansas, and containing 61.3 acres, more or less, of which 18.6 acres lie above elevation 461′ mean sea level."[7] Id. at 34. The parties to the lease purportedly attached a revised Exhibit A to this supplemental agreement, id., but no such exhibit was included with the supplemental agreement admitted into evidence at trial,[8] see id. at 33-35 (containing supplemental agreement 6).

The lease area was again altered with the execution of supplemental agreement 19 on September 14, 1993; however, on that occasion, the lease area was reduced through the removal of a small parcel of land near Lake Eden, PX 35; Tr. 4222 (Overton), to:

> One parcel of land and water area situated in the E½ of Fractional Section 18, Township 10 North, Range 10 West of the Fifth Principal Meridian, Cleburne County, Arkansas, and containing 51 acres, more or less, of which approximately 10 acres lie above the 461-contour, National Geodetic Vertical Datum of 1929.

PX 21 at 84; cf. PX 116 (noting that the Corps' standard operating procedure was to have a "vague description of the lease parcel"). A revised Exhibit A–a map depicting the new lease area–was included with this supplemental agreement. PX 21 at 86. The map showed that the western boundary of the lease area–the land boundary–followed the fee acquisition line along the

---

[7] According to Dr. Overton, this lease description was erroneous. His review of the Corps' files indicated that the lease area continued to include two parcels of land, a 51.3-acre parcel and a 3.3-acre parcel, and that the Corps later corrected its error. Tr. 4213-14, 4637 (Overton).

[8] Although no map was included in the supplemental agreement admitted into evidence at trial, such a map apparently exists. Dr. Overton reproduced in his expert report a map that he identified as the lease map referenced in the supplemental agreement. See PX 190 at 57; Tr. 4216 (Overton). The map reproduced by Dr. Overton does not bear a legend and is not marked as "Exhibit A." See PX 190 at 57.

shoreline of Greers Ferry Lake.  Id.  At the north end of the land boundary, a line was drawn due east into the water for an unspecified distance, and at the south end of the land boundary, another line was drawn to the southeast into the water for an unspecified distance.  Id.  The ends of these two lines were connected by a smooth, convex, crescent-shaped curve, creating the eastern, water boundary of the lease area.  Id.  The lease area was darkly shaded, and therefore did not reveal what natural or man-made features were included within the lease area.[9]  Id.; see also Tr. 1814 (Park) (noting that no docks were depicted on the map).  However, a map included in the Greers Ferry Lake Master Plan–reproduced below as Figure 1–reflects that the eastern boundary of the lease area extended into the water just far enough to include three berms jutting out from Eden Isle:  a berm in the northern portion of the lease area; a large, hook-shaped berm in the middle portion of the lease area; and a shorter berm in the southern portion of the lease area.  PX 236 at 48; see also PX 192 at 4 (depicting the lease area laid out over an aerial photograph of Eden Isle Marina). Also depicted on the master plan map are the marina's docks.  PX 236 at 48. However, because the master plan map was prepared more than five years after the execution of supplemental agreement 19, see id. at 47-49, it is unclear which of these docks existed at the time that the supplemental agreement was executed.

---

[9]  Because all versions of supplemental agreement 19 submitted by the parties contain a map with dark shading, the court presumes that the dark shading exists on the original version of the map in supplemental agreement 19.  See PX 21 at 86; DX 17 at 3; DX 325 at 86; see also Tr. 1812 (Park) (testifying to an inability to locate a berm located in the shaded area).



Figure 1

## C.  Sale of Eden Isle Marina

In September 1992, ownership of Eden Isle Marina was transferred to Amstar/First
Capital Joint Venture ("Amstar").  PX 21 (supplemental agreement 18).  Amstar then put the
marina up for sale in 1995.  Tr. 4739-40 (Walters).  Despite being in disrepair due to absentee
ownership and deferred maintenance, id. at 111, 136 (Cabe), 204-05 (Ragar), 1678 (Park), 4736-
37, 5329-30 (Walters), the marina had an appraised value of $1,800,000, id. at 4739-40
(Walters), and there were at least two individuals interested in purchasing the marina:  Richard
Upton and Ronnie Walters.

### 1. Richard Upton

The first interested individual was Mr. Upton, a businessman in the Heber Springs/Eden Isle area.  He is the majority owner of the Red Apple Enterprises Limited Partnership, DX 118, which owns much of the property on Eden Isle, including the Red Apple Inn and Country Club ("the Red Apple Inn")–an "extremely popular" private country club and resort, Tr. 4723 (Walters); PX 173 at 49–and all of the undeveloped land, Tr. 4724 (Walters).  The partnership at one time also owned Eden Isle Marina, PX 21 (supplemental agreement 13), but lost it to foreclosure, id. (supplemental agreement 18); PX 30, before Mr. Upton became the partnership's majority owner.

### 2. Ronnie Walters

Mr. Walters, the other interested and ultimately successful purchaser, was born in the 1940s–before the federal government built Greers Ferry Dam and created Greers Ferry Lake–on the land that now constitutes Eden Isle.  Id. at 4703, 4708 (Walters).  He and his family were farmers, and much of their land was taken by the government for the construction of the dam and lake.  Id. at 4704-05 (Walters).  When Mr. Walters was sixteen years old, he began working for the dock company that helped build the original Eden Isle Marina.  Id. at 4703-05, 4711 (Walters).  An employee of the dock company taught Mr. Walters how to scuba dive, a skill that led to him being hired to set anchors and cables at several marinas, including Eden Isle Marina, Shiloh Marina, Heber Springs Marina, Dam Site Marina, and Sugar Loaf Marina.  Id. at 4705-06 (Walters).  In addition, the Corps hired him to do work as a scuba diver on two or three occasions.  Id. at 4707 (Walters).

After helping build Eden Isle Marina, Mr. Walters joined the National Guard and worked in the construction business for approximately ten years.  Id. at 4711 (Walters).  He then entered the real estate business.  Id.  Finding work as a real estate broker to be "tough," Mr. Walters decided to diversify and become a real estate appraiser.  Id.  After taking the relevant courses, he became an appraiser in 1974, earned an SRA designation from the Appraisal Institute in 1976, and when Arkansas instituted a licensing requirement for appraisers, he obtained a certified general appraiser's license.  Id. at 4711-13 (Walters); PX 214 at 166.  Because Mr. Walters was the only certified appraiser in the area, he performed almost all of the appraisals around Greers Ferry Lake.  Tr. 4713-14 (Walters).  In fact, he appraised several of the marinas on the lake, including Shiloh Marina, Heber Springs Marina, Dam Site Marina, Sugar Loaf Marina, and Narrows Marina,[10] and performed twenty-five appraisals for the Corps when the Corps was trying to resolve certain eminent domain issues.  Id. at 4706-07 (Walters).  Mr. Walters eventually turned over responsibility for performing commercial appraisals to his brother, keeping his focus exclusively on residential appraisals.  Id. at 4712 (Walters).

---

[10]  The lease for Narrows Marina was transferred in 1978, PX 250 at 23-26, and was renamed Lacey's Narrows Marina, see, e.g., PX 251-A at 1-2 (containing a letter on Lacey's Narrows Marina letterhead).  However, for simplicity, the court refers to this marina throughout this opinion as Narrows Marina.

In 1996, Mr. Walters sold his real estate business. Id. at 4715 (Walters). He retained his appraisal business, however, until 2003 or 2004 to have a source of income that would help support the marina. Id. Thus, Mr. Walters accumulated over twenty years of experience as a real estate broker and approximately thirty years of experience as an appraiser in the Greers Ferry Lake area. Id. at 4708, 4713, 4715, 4725, 5268 (Walters); PX 214 at 166.

In addition to his real estate and appraisal work, Mr. Walters was a founding member of the Cleburne County Economic Development Commission, which was created to attract business to the local area. Tr. 4718-19, 5268 (Walters). Through his twenty years of service on the commission, he became knowledgeable about the area's economic climate. Id. at 4718-20, 5268, 5289 (Walters). Moreover, because he has spent most of his life in the vicinity of Greers Ferry Lake, both before and after the lake was created, and because most of his work revolved around the lake, Mr. Walters possesses an extensive amount of knowledge about the lake in general, id. at 4708 (Walters), and about Eden Isle in particular, id. at 4725 (Walters).

### 3. The Offers to Purchase the Marina

Before making an offer to purchase Eden Isle Marina, Mr. Walters visited the marina and expressed his interest in owning and operating the marina to its manager. Id. at 4739, 5374 (Walters). The manager advised Mr. Walters that he was wasting his time because Mr. Upton intended to purchase the marina. Id. at 4739 (Walters). Nevertheless, Mr. Walters sought financing from several local banks, only one of which–The Cleburne County Bank–agreed to loan him the money he needed for the purchase. Id. at 4738 (Walters); PX 22.

With financing in hand, Mr. Walters submitted a $1,500,000 offer to purchase Eden Isle Marina, putting up $100,000 in earnest money. Tr. 4739-40 (Walters). Amstar subsequently advised him that it had a competing offer, and asked if he wanted to raise his offer price. Id. Although unknown to Mr. Walters at that time, the competing offer was made by Mr. Upton in the amount of $700,000. Id. at 4740-41 (Walters). Mr. Walters raised his offer price to $1,600,000, and became the successful offeror. Id. at 4739-40 (Walters); PX 76 at 1.

### 4. Closing the Purchase of the Marina

On May 8, 1995, Amstar and a corporation formed by Mr. Walters, Walters Investments, Inc., executed an Asset Purchase and Sale Agreement for Eden Isle Marina. PX 20. The agreement reflected that in exchange for the $1,600,000 purchase price, Mr. Walters would receive the marina's lease, improvements, inventory, equipment, contracts, supplies, licenses and permits, books and records, warranties, and name. Id. The agreement also provided for a forty-five-day due diligence period during which Mr. Walters could inspect the physical and economic condition of the marina. Id.

During the due diligence period, Mr. Walters and his brother met with two employees of the Corps' Greers Ferry Lake Project Office: Carl Garner and Tommy Park. Mr. Garner was the resident engineer, a position he had held from the date the lake was established, Tr. 1584 (Park),

and Mr. Park had been the chief ranger since 1992, id. at 1579 (Park).  The main topic of the meeting was Mr. Walters's plans to expand Eden Isle Marina.  DX 23.  At the time the meeting occurred–June 1, 1995–the lease area for the marina was identical to the lease area depicted in Figure 1.  PX 21.  There was no development above the northern berm or below the southern berm.  Fig. 1.  During the meeting, Mr. Walters noted that he had made a sizeable investment and intended to run a profitable, first-class marina.  Tr. 1709, 1712 (Park).  To realize this goal, he explained that he wished to, among other things, (1) immediately expand the marina to the north and (2) reshape the bank/perform some "dredging" to make it easier to access the docks.[11] Id. at 4744-45 (Walters); DX 23.  Mr. Garner advised Mr. Walters that it would be difficult to get a dock placed north of the northern berm due to objections from adjacent property owners and that he personally objected to any development north of the northern berm.  DX 23.  Mr. Walters indicated that it was his belief that since the area to the north of the northern berm was part of the lease area, there was not much the public could say about his expansion plans.  Id.

Mr. Walters then met with several individuals from the Little Rock District Office to discuss his plans for Eden Isle Marina.  Tr. 4748-51 (Walters).  During the meeting, Mr. Walters relayed Mr. Garner's comments regarding the expansion of the marina; the district employees told him that Mr. Garner thought of Greers Ferry Lake as "his lake," but that the district office had the final decision-making authority.  Id. at 4746, 4748 (Walters); accord id. at 831 (Morris) (noting that subject to the district engineer's approval, the chief of the Real Estate Division rendered the final decision on development requests); see also id. at 460 (Ward) (referring to Mr. Garner as "Mr. Greers Ferry Lake").  Then, acknowledging that there was "extreme demand" for boat slips on Greers Ferry Lake, the district employees advised Mr. Walters that the area north of the northern berm was part of the lease area and there was no reason why he could not develop it, but that they would prefer that he develop the southern part of the lease area first due to the anticipated opposition to any northern development.  Id. at 4748-51 (Walters).  The district employees then produced the then-current Shoreline Management Plan, which indicated that adjacent property owners could not dictate the Corps' management of government property.  Id.; accord id. at 5369 (Walters) (indicating that what the district employees advised him at this

---

[11]  In his notes from this meeting, Mr. Park characterized Mr. Walters's desire to reshape the bank as "dredging."  DX 23.  Mr. Walters disputes this characterization, stating that all that he wanted to do was bring in a backhoe during low water conditions (so that no water would be disturbed) and pull up the bank.  Tr. 4744-45 (Walters).  However, the Corps' notes from a February 28, 1996 meeting with Mr. Walters reflect that Mr. Walters was aware at that time that his proposed dredging, entailing the use of dredged material to build a parking area, would require a permit, and that the Corps had previously provided Mr. Walters with all of the necessary paperwork to apply for a permit.  DX 41.  Indeed, when the operator of Shiloh Marina performed similar work in 1992 (the removal of rock and dirt from under a dock to the bank above the ordinary high water mark for use in the construction of a parking lot), the Corps characterized it as dredging.  PX 334.  Notably, the work at Shiloh Marina was performed without the Corps' prior approval; the Corps retroactively provided its authorization, id., and there is no indication that the marina operator was cited or assessed a penalty for dredging without permission, Tr. 3984 (Overton).

meeting was consistent with what Mr. Garner wrote in an February 23, 1995 memorandum (PX 227): "[O]wnership of land adjacent to the Government's property conveys no special privileges or use of that land.  The Government owned land around Greers Ferry Lake is public property and decisions regarding that land must be based on what is best for the general public.").

During their meetings with Mr. Walters, Corps employees explained the process for obtaining approval to further develop Eden Isle Marina.  Am. Compl. ¶ 19.  Generally, a marina owner was required to submit to the Corps a written request along with a drawing depicting the proposed development, Tr. 3916-17 (Overton), with two copies to be sent to the district office and one copy to be sent to the project office, id. at 4763 (Walters).  These procedures were not set out in the lease, see PX 21, and there is no evidence in the trial record reflecting that the Corps, or the Little Rock District in particular, had memorialized these procedures in writing. Nevertheless, so long as the marina owner complied with all of the contractual and regulatory requirements, the Corps would approve the development request.  Tr. 827-28 (Morris), 2322 (Holden).  Indeed, marina owners had (and have) a reasonable expectation to develop within their lease areas.  Id. at 2322 (Holden).

Corps employees also advised Mr. Walters that he would need to submit a five-year development plan for the marina.[12]  Id. at 141, 143, 1533 (Cabe); DX 23 (reflecting that Mr. Walters indicated during the June 1, 1995 meeting that he would submit a five-year plan to the Corps).  The submission of a five-year development plan was not required by the terms of the lease.  See PX 21.  Nor is there any evidence in the trial record reflecting that the Corps, or the Little Rock District in particular, had a written rule, regulation, or policy indicating that a marina owner must submit a five-year development plan.  See also Tr. 3892 (Overton) (noting that in reviewing the Corps' records, he "never saw any reference to a requirement of a five-year plan"). Indeed, it does not appear that the Little Rock District requested five-year development plans from any other marina on Greers Ferry Lake.  See id. at 3890, 3892, 4075 (Overton) (remarking that in his review of Corps files, he did not see a five-year master plan submitted by any other marina).

Although Mr. Walters consulted with Corps personnel from the project and district offices, he did not meet with any of the other marina operators on Greers Ferry Lake to discuss their business relationships with the Corps.  Id. at 5329 (Walters).  Nor did Mr. Walters meet with Amstar's principals to discuss their relationship with the Corps; his only discussion about Eden Isle Marina was with an Amstar employee–the marina's manager.  Id. at 5330 (Walters).

While Mr. Walters was conducting his due diligence, the Corps was engaged in its process to approve Mr. Walters as a new lessee for Eden Isle Marina.  Id. at 1677-78 (Park). Although Mr. Walters had agreed to purchase the marina and assume the lease, the Corps wanted to ensure that Mr. Walters possessed the necessary financial resources and business acumen to

---

[12]  It is unclear whether the requirement that plaintiff submit a five-year development plan was separate and distinct from the requirement that plaintiff submit a request whenever it wanted to add docks or boat slips at the marina.

run a viable business.  Id.  The Corps obtained a letter from Dale Miller, president of The Cleburne County Bank, indicating that the bank had approved a $1,500,000 loan to Mr. Walters, PX 22, and the Corps ultimately approved Mr. Walters as the new lessee, Am. Compl. ¶ 26.

Prior to finalizing his acquisition of Eden Isle Marina, Mr. Walters created a new corporate entity that would own the marina and its assets:  Eden Isle Marina, Inc. ("plaintiff"). Tr. 5328, 5332 (Walters).  Over several days in the middle of June 1995, plaintiff executed several agreements with its lender, The Cleburne County Bank; the Corps, through Billy Cabe, the chief of the Little Rock District's Real Estate Division; and the existing owner and lessee, Amstar.  On June 15, 1995, the Corps, Amstar, and plaintiff executed supplemental agreement 22 to the 1970 lease, transferring the lease from Amstar to plaintiff, effective the following day. Jt. Stip. ¶ 24; PX 24.  Plaintiff and Amstar executed a separate Assignment and Assumption of Lease on June 16, 1995.  PX 24-B.  That same date, plaintiff, its lender, and the Corps executed an Agreement as to Lease Assignment, reflecting the parties' understanding that the lease would serve as collateral for plaintiff's $1,500,000 loan to purchase and improve the marina.  PX 24-A. In accordance with this agreement, plaintiff assigned the lease to its lender.  PX 24-C.  The final part of the transaction was plaintiff's purchase of a separate property from Amstar:  on June 14, 1995, but effective June 16, 1995, Amstar conveyed to plaintiff approximately 4.8 acres of land adjacent to the marina.  PX 23; Tr. 4729-30 (Walters).  The property was conveyed to plaintiff subject to the Corps' flowage easement, PX 23; the easement affected approximately one-half acre of the land, Tr. 4753 (Walters).

## II.  June 1995 to October 1996:  Plaintiff's Operation and Development of Eden Isle Marina Until the Cease-and-Desist Order

### A.  Immediate Repairs to the Marina

When plaintiff assumed the lease in June 1995 ("the 1995 lease"), Eden Isle Marina had 580 boat slips, Jt. Stip. ¶ 26, distributed among a number of docks attached to and situated between the lease area's northern and southern berms, Fig. 1.  There was no waiting list for boat slips.  Tr. 4741 (Walters).  Among the first steps taken by Mr. Walters was to make a number of repairs and improvements to the marina, including replacing rotten boards and screws, cleaning out "old stuff," and paving a parking lot.  Id. at 4759 (Walters).  Then, in July and August 1995, the Corps approved additions to P dock and S dock, and the placement of a tire break.  PX 190 at 14.  Demand for boat slips at the marina soared.  Tr. 4761 (Walters).

### B.  Plaintiff's Plans to Develop the Marina

As noted above, Mr. Walters had discussed plaintiff's plans to develop Eden Isle Marina within the marina's lease area during his initial meetings with the Corps.  Plaintiff's plans included both developing the northern portion of the lease area and increasing the number of boat slips available on the marina's existing docks.

**1.   Initial Opposition to Plaintiff's Plans to Develop the Northern Portion of the Marina's Lease Area**

Plaintiff's plan to develop the northern portion of Eden Isle Marina's lease area was immediately controversial with the Eden Isle property owners.  The board of the EIPOA learned about plaintiff's plans after two of the property owners met with the marina's manager.  PX 26.  During the board's November 8, 1995 meeting, these property owners reported that plaintiff was planning to expand to the north of the existing marina, and requested that the board support them in their opposition to the plan.  Id.  The board agreed to obtain a copy of the lease to ascertain whether expansion was permitted and to consult with an attorney.  Id.  Later that month, the board obtained a copy of the lease and forwarded it to the EIPOA's attorney, Mike Beebe.[13]  PX 27.

Although plaintiff had not yet formally requested permission to develop the northern portion of the lease area, in January 1996, Eden Isle property owners began to write letters to the district engineer, Colonel Phillip Morris, in opposition to plaintiff's plans to expand the marina, with most of them sending a copy of their letters to Mr. Garner at the project office.  PX 28; Tr. 1263, 1275 (Morris); see e.g., DX 362; DX 383.  The property owners identified several reasons for their opposition:  increased commercial activity on Eden Isle's shoreline; an increased boating hazard; and lower property values due to the removal of trees.  DX 362; DX 383.

The board of the EIPOA was also monitoring the situation at the marina.  It was assisted in this endeavor by Mr. Garner, PX 28, even though it was not Mr. Garner's responsibility to serve as the EIPOA's watchdog, Tr. 829 (Morris).  During a January 31, 1996 meeting, the EIPOA's president, Charles Ward, advised the board that Mr. Garner had advised him that he would inform the board if and when plaintiff submitted a development request and that a public meeting would be held on the request.  PX 28.  Notwithstanding Mr. Garner's statement, there was no statutory or regulatory requirement for the Corps to conduct a public meeting regarding a marina's request to expand within a marina's existing lease area.  Tr. 830 (Morris); see also id. at 1940 (Park) (indicating that there was no public meeting for Choctaw Marina's 1996 lease area expansion request), 3812 (Overton) (reporting that the Corps did not hold any public meetings regarding the addition of docks at Narrows Marina, despite the existence of complaints).  Indeed, a request for a public meeting in these circumstances would be an extraordinary request subject to legal review and approval by the district engineer.  Id. at 833 (Morris).

---

[13]   At that time, Mr. Beebe was an Arkansas state senator, and he is currently the governor of Arkansas.  The court takes judicial notice of these facts pursuant to Rule 201(b)(2) of the Federal Rules of Evidence ("FRE").  See Mike Beebe (1946–) [abstract], The Encyclopedia of Arkansas History & Culture, http://www.encyclopediaofarkansas.net/ encyclopedia/entry-detail.aspx?entryID=4848# (last visited July 11, 2013).

## 2. Candidate Marion Berry Becomes Involved

During or shortly after February 1996, the EIPOA board and Wallace Fowler–a Greers Ferry Lake property owner, id. at 1732 (Park)–informed Marion Berry of their issues with plaintiff's plan to develop the northern portion of Eden Isle Marina's lease area.  At that time, Mr. Berry was campaigning for a seat in the United States House of Representatives ("House"), id. at 747-49, 751-52 (Berry), after serving as a special assistant to the President for Agricultural Trade and Food Assistance under President William Jefferson Clinton, id. at 652 (Berry).  Mr. Berry had met President Clinton in 1976, and when the former president was the governor of Arkansas, he appointed Mr. Berry to the Arkansas Soil and Water Conservation Commission. Id. at 651-52 (Berry).  Mr. Berry considers himself to be a friend of the former president.  Id. at 651 (Berry).

Mr. Berry met Mr. Fowler, who he described as an influential resident of northeast Arkansas, during his congressional campaign.  Id. at 647 (Berry).  Mr. Fowler assisted with Mr. Berry's campaign, and the two became good friends.  Id.  Although Mr. Berry was limited in what he could do for the Eden Isle property owners as a candidate, id. at 748 (Berry), he spoke with the EIPOA's president, Mr. Ward, several times about the marina's development plans,[14] id. at 686-88 (Berry).  Mr. Ward informed Mr. Berry that Eden Isle's infrastructure could not support a larger marina and that any further development would require amending the Shoreline Management Plan.  Id.

## 3. Plaintiff's Formal Development Request

On February 27, 1996, Mr. Walters and his brother hosted a meeting at Eden Isle Marina during which they presented plaintiff's long-term expansion plan to Corps personnel, including Anthony Ragar and Ellyce Best from the Little Rock District's Real Estate Division, PX 230, and Mr. Garner, Mr. Park, Chris Roark, and Jack Johnson from the project office.  DX 41; see also PX 51 (noting that Mr. Roark was a ranger); Tr. 620 (Cabe) (noting that Mr. Johnson worked in the Operations Division).  Mr. Walters proposed adding to the marina approximately fifty boat slips per year for ten years to bring total number of boat slips at the marina to 1,062, building a restaurant and dry boat storage, dredging, and redepositing the dredged material to build a parking area.  DX 41.  Corps personnel raised concerns over cleared lands remaining idle for an extended period of time, the sufficiency of parking, and the viability of a restaurant.  Id. In response to the parking issue, Mr. Walters indicated that he owned 4.8 acres of land adjacent to the marina that could be used for parking.  Id.  Mr. Garner then advised Mr. Walters that the residents of Eden Isle were opposed to Mr. Walters's plan, and Mr. Walters agreed to hold a

---

[14]  These facts are derived from Mr. Berry's deposition, which plaintiff used to impeach Mr. Berry regarding his testimony at trial that he did not recall Mr. Ward or anyone from the EIPOA calling him to enlist his assistance in defeating plaintiff's expansion plans.  Tr. 686-88 (Berry).  Mr. Berry was deposed three years before he testified at trial.  Because the deposition was closer in time to the events at issue, and because of Mr. Berry's hostile demeanor at trial, the court finds Mr. Berry's deposition testimony to be more credible.

public forum to explain the plan to the residents.  Id.; see also Tr. 1731 (Park) (indicating that Mr. Garner told Mr. Walters that the property owners' objections "were good objections").

Mr. Walters formally submitted a long-term development plan for the marina, identified as "Master Plan for 1996-2006," to the Corps on March 5, 1996.  Am. Compl. ¶ 35; PX 29.  Mr. Walters submitted a ten-year development plan, as opposed to a typical five-year development plan, because he wanted to do a good job, and he wanted to show the Corps that plaintiff's intent was to fully develop the lease area to satisfy the "astronomical" demand for boat slips.  Tr. 4762-63 (Walters).  The plan mirrored the proposal Mr. Walters presented to the Corps several days before.  See PX 29 at 1.  In his cover letter, Mr. Walters explained:

> The attached plan is submitted for your approval of the concepts pending detailed plans for the various elements of the plan.  The concepts of particular importance to us are as follows:
>
> - Construction of a large boat dock on the north end of the lease in 1996-1997 consisting of 20-25 open slips for large boats.  To have a covered walkway and an integrated wavebreak.
>
> - Opening up additional parking area on both ends of the lease area as additional docks are constructed over the next ten years.
>
> - Dredging for fill of parking lots and better low water operations above contour 440' MSL on the north and south ends of the lease.
>
> - Construction of a restaurant . . . on the existing jetty with provisions for flotation or elevation on piers above 491['] MSL.
>
> - Dry dock storage . . . in the lease area for future expansion near the end of the planning period.  To include a new launching ramp . . . for launching dry docked boats.
>
> The rest of the plan includes typical covered and open docks as demand requires with approximately forty to fifty new slips added per year until capacity is reached.  It is our intention to build state-of-the-art facilities and to continue to upgrade this marina to meet the needs of the recreational market.
>
> We would greatly appreciate comments on these general comments, understanding that more detail is necessary before actual construction begins.

Id.  Mr. Walters specifically identified in the plan the docks plaintiff intended to build for each two-year period (beginning with 1996-1997 and ending with 2004-2005) and their locations, as well as the fact that the total number of new boat slips being proposed was 482.  Id. at 2.  According to the plan, one of the first docks that plaintiff wanted to build would be situated in

the northernmost portion of the lease area.  Id.  That dock, Mr. Walters explained, would be for large boats, and would serve as wave break for the marina and future development to the south. Tr. 4765 (Walters).

## C.  Opposition to Plaintiff's Development Plan Builds

### 1.  Immediate Opposition to Plaintiff's Development Plan

As previously instructed, Mr. Walters sent copies of plaintiff's ten-year development plan for Eden Isle Marina to the district office and the project office.  PX 29 at 1.  Once Mr. Garner received the project office's copy of the plan, he shared its contents with the residents of Eden Isle.  Tr. 142-44 (Cabe), 4763 (Walters).  In fact, the district office began to receive complaints about the plan before it received its own copies.  Id. at 4763 (Walters).

Shortly after receiving plaintiff's development plan, Mr. Garner prepared a brief memorandum for the chief of the Real Estate Division, Mr. Cabe, containing some comments on the plan.  DX 44.  After noting the Corps' receipt of "numerous letters from individuals expressing strong opposition to any further expansion" and Mr. Walters's agreement to a public forum, Mr. Garner wrote:  "Where possible, we should seek ways to reduce any adverse impacts including the denial or modification of all or parts of the request."  Id.  Mr. Garner also suggested that instead of the dredging and deposit of materials for future parking needs, plaintiff be required to add parking incrementally as boat slips were added to the marina.  Id.

Now that they had a concrete plan to oppose, Eden Isle residents initiated an organized campaign against development of the marina.  At the EIPOA's annual membership meeting on March 16, 1996, those members present voted unanimously to pass "a resolution supporting the board's adamant opposition" to the marina's development.  PX 32-A at 2.  Throughout April 1996, Eden Isle property owners engaged in a letter-writing campaign to Colonel Morris in opposition to plaintiff's development plan; Mr. Garner was copied on many of the letters.[15]  Tr. 1263, 1275 (Morris); see e.g., PX 30; PX 32-A at 4-5; DX 384; DX 385; DX 388; DX 389; DX 391; DX 392; DX 393; DX 395; DX 398; DX 401; DX 406.  The property owners identified a number of reasons for their opposition, and many of them expressed the identical concerns: increased traffic; security concerns; water safety hazards from the new docks; decreased property values; the removal of trees and vegetation along the shoreline;[16] the effects of dredging;

_____

[15]  At least one property owner did include some positive comments regarding plaintiff's development plan in his letter.  See DX 406 ("We do feel there could be a need to 'upscale' the existing marina.  It would be nice to have additional facilities such as a better boat loading ramp, (wider and a less crowded entrance to the lake!!!) and possibly a larger store and mechanical service area, and a deli shop or restaurant.").

[16]  Notably, some of these same property owners were cited by the Corps for violating the Corps' rules regarding the clearing of vegetation.  See, e.g., Tr. 1277-78 (Morris) (noting that one of the property owners was cited more than once by the Corps for violating the rules regarding mowing near the lake); see also id. at 1732 (Park) (noting that another property owner

preservation of the natural state of the lake; the ability of those with property adjacent to the marina to quietly and privately enjoy the use of their property and their view of the lake; and the overall diminishment of the quiet, residential character of Eden Isle. PX 30; PX 32-A at 4-5; DX 384; DX 385; DX 388; DX 389; DX 391; DX 392; DX 393; DX 395; DX 398; DX 401; DX 406. But see Tr. 1238 (Morris) (noting that decreased property values were not the Corps' concern). One of the letters was written by Mr. Upton, who contended that any further development of the marina defied what he understood to be the marina's original purpose:

> The marina, as originally designed by the Thomas Family, was for the use of Eden Isle property owners and guests of the Inn. The north and south lines on the lease were extended past the current facility by Mr. Thomas to ensure there would be no encroachment by private docks. There was never an intention to extend north or south, as each side has private residences . . . .
>
>         . . . .
>
>         . . . This is a resort marina that was built for Eden Isle, and now has the potential of becoming a hostile element to the very environment that it was put there to support.

PX 30. But see Tr. 925 (Morris) (indicating that Mr. Upton's erroneous assertion that the marina was intended for the use of Eden Isle property owners and the guests of the Red Apple Inn was contrary to Corps policy). All of the letters authored by the residents of Eden Isle expressed the sentiment that Eden Isle "was created to approximate an eden in the middle of Arkansas," PX 45-A at 17, and that they considered Eden Isle to be "their own little paradise," Tr. 1854-56 (Cabe); accord id. at 826-27 (Morris). Significantly, the trial record contains no evidence that the property owners substantiated their concerns to the Corps with proof; in other words, they did not present any evidence to establish that (1) the county road providing access to the marina could not handle the increased traffic; (2) the marina did not have sufficient parking; (3) there would be detrimental environmental effects; or (4) property values would decrease. Although the Corps paid lip service to the need to ascertain the accuracy of the public's concerns, id. at 1238 (Morris), the trial record is bereft of any evidence that it did so in this case. Rather, the Corps ignored the fact that that there was no evidence supporting the property owners' concerns in considering plaintiff's development request.

The Corps was not the only recipient of letters in opposition to plaintiff's development plan. There was also a letter sent by Mr. Ward to "several legislators" expressing the EIPOA's opposition to plaintiff's development plan and seeking their assistance in defeating the plan. PX

---

received a citation for violating the Shoreline Management Plan on public property adjacent to the owner's residence), 3755-58 (Overton) (noting that there were many violations of Corps regulations by property owners with land adjacent to the northern portion of Eden Isle Marina's lease area); PX 171 at 178-84 (containing photographs taken in January 2006 depicting the clearing of vegetation by adjacent property owners).

32-A at 2-3; accord PX 34 (indicating that the relevant members of Arkansas's congressional delegation–senators Dale Bumpers and David Pryor, and congresswoman Blanche Lincoln– received correspondence from Eden Isle property owners).  And, Mr. Fowler–the individual described by Mr. Berry as a prominent Eden Isle resident–was keeping Mr. Berry apprised of the situation; on April 22, 1996, he sent Mr. Berry copies of two of the Eden Isle property owner letters, Mr. Ward's letter to the legislators, plaintiff's ten-year development plan, and an article from a weekly business-oriented newspaper about the development plan.  PX 32-A.

## 2.  The April 18, 1996, and May 15, 1996 Meetings

In an effort to engage the Eden Isle residents about plaintiff's plan to develop Eden Isle Marina, Mr. Walters agreed to host a meeting at the Red Apple Inn on April 18, 1996.  PX 31.  Prior to the meeting, Corps employees from the district and project offices, including Mr. Ragar, Ms. Best, Mr. Roark, and Mr. Johnson, visited the marina to familiarize themselves with the lease area and the locations of the proposed development.[17]  PX 32.  Mr. Ragar observed that there were homes on the property adjacent to the northern portion of the lease area, very close to the edge of the Corps' flowage easement, and that the southern portion of the lease area was heavily wooded with no houses.  Id.

After touring the marina, the Corps employees traveled to the Red Apple Inn for the meeting.  Id.  When they arrived, over 100 people were already in attendance, and one of the residents was gathering signatures in opposition to the placement of additional docks at the marina.  Id.  Among those present were Mr. Upton and the EIPOA's attorney, Mr. Beebe.  Id.  After Mr. Walters presented plaintiff's development plan, the Eden Isle residents, some of whom were hostile to Mr. Walters, began to ask questions.  Id.  Ultimately, Mr. Ragar felt that the meeting served little purpose because everyone knew about the opposition to plaintiff's development plan.  Id.  However, the Corps employees were able to explain to the Eden Isle residents that plaintiff was seeking to expand the marina within the existing lease area, and was not seeking an expansion of the lease area itself.  Id.  They also explained that plaintiff had the right to develop within its lease area.  Tr. 4786 (Walters).  Plaintiff's contractual rights notwithstanding, Mr. Ragar recommended, in a memorandum he prepared memorializing the marina visit and meeting, that plaintiff and the Corps try to work out a compromise with the EIPOA.  PX 32.  If such a compromise was not possible, Mr. Ragar suggested that the Corps require plaintiff to develop the southern portion of the lease area before developing to the north.  Id.  Mr. Cabe, who had not attended the meeting, concurred with Mr. Ragar's assessment.  Id.

---

[17]  Mr. Garner did not attend the meeting.  PX 32.  He subsequently retired from the Corps in May 1996.  Tr. 809-10, 829 (Morris).  However, according to Colonel Morris, Mr. Garner continued to assist the EIPOA after his retirement.  Id. at 940 (Morris); accord PX 38 (noting that prior to June 18, 1996, the EIPOA had received a response to its mailings from Mr. Garner); PX 42 (noting Mr. Garner's presence at a July 2, 1996 EIPOA board meeting, along with his advice to the board).

Twelve days after the meeting, Mr. Cabe forwarded to Mr. Beebe a copy of the 1995 lease, the evaluation criteria for new facilities,[18] and information regarding permit requests.  PX 33.  Then, on May 15, 1996, a meeting was held at the Red Apple Inn to further discuss plaintiff's development options.  DX 55.  Attending the meeting were Corps employees, including Mr. Cabe, Mr. Ragar, Ms. Best, and Mr. Roark; plaintiff's representatives, including Mr. Walters; and members of the EIPOA, including Mr. Ward and Mr. Upton.  Id.  Each group staked out its position:  Mr. Ragar indicated that the Corps was considering restricting development in the northern portion of the lease area; Mr. Walters asserted that development in the north was the most economical; and the property owners contended that the road to the marina would not support any development.  Id.  Mr. Cabe explained to the property owners that plaintiff was entitled to develop additional facilities within the lease area because plaintiff had a valid lease, there was no limit on the number of boat slips at the marina, and a development request could not be denied arbitrarily.  Id.  Mr. Ward responded that the marina was already large enough.  Id.  Indeed, the property owners attending the meeting believed it was time for the Corps to make a decision, and expressed their belief that the issue ultimately would be resolved in court.  Id.

Ultimately, the Corps advised plaintiff that they would need to work together to address the property owners' protests and reach a resolution, because without such a resolution, the Corps would not permit any further development at the marina.  Am. Compl. ¶ 46; Tr. 245-46 (Ragar).

### 3.  Arkansas's Congressional Delegation Becomes Involved

In the meantime, on May 10, 1996, Senator Bumpers, Senator Pryor, and Representative Lincoln sent a letter to Colonel Morris indicating that they had received correspondence from Eden Isle property owners regarding the development of Eden Isle Marina.  PX 34; see also Tr. 926 (Morris) (noting that it was unusual to receive a letter signed by multiple members of a congressional delegation).  They requested that the Corps give close attention to the environmental and public safety concerns raised by the property owners, and suggested that the Corps hold a public meeting with a period for public comment.  PX 34.  The letter served to focus Colonel Morris's attention on the ongoing dispute, Tr. 798-99 (Morris), and his first action upon receiving the letter was to consult with his chief counsel concerning the need to hold a public meeting, id. at 927-28 (Morris).

Colonel Morris and Mr. Cabe met with staff from the offices of Senator Bumpers and Senator Pryor on June 3, 1996.  PX 36-A; PX 47.  The trial record does not contain any contemporaneous notes from Colonel Morris or Mr. Cabe memorializing the meeting;[19] rather,

---

[18]  These evaluation criteria were not made part of the trial record.

[19]  Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files.  Tr. 1541-42 (Cabe).  However, if such a document was created, it was not provided to plaintiff during discovery.  Id. at 1541 (statement of plaintiff's counsel).

the meeting was mentioned in a June 5, 1996 memorandum prepared by someone outside of the Corps, PX 36-A, and a July 26, 1996 letter from Colonel Morris to Senator Bumpers, PX 47. According to the latter document, during the meeting, Colonel Morris advised the senator's staff that the Corps had come up with a "development concept" for the marina that provided for development to the south of the northern-most berm in the lease area, but no development to the north of that berm. Id.; see also id. ("The entire lease area is available for commercial concession purposes, to be developed as needs warrant, and developed in a manner meeting our approval.").

### 4. The Corps' Rejection of Plaintiff's Long-Term Development Plan

Also on June 3, 1996, in line with the information provided to the senators' staff, Mr. Cabe sent a letter to Mr. Walters rejecting plaintiff's long-term plan to develop Eden Isle Marina. PX 36. Mr. Cabe wrote:

> We have reviewed your master plan and cannot approve it as submitted. The part of the lease south of the existing docks must be fully developed before we would consider developing any part north of the dike. Also, dredging will not be allowed and you will only be allowed to develop parking as additional docks are approved.
>
> The Corps has serious reservations about developing the part of the lease north of the dikes and will never approve parking in such close proximity to the existing homes. We feel we should delete the area and find a more suitable site to compensate you for the loss of potential development. If an acceptable alternat[ive] cannot be found, you should be aware that we intend to delete the part of the lease north of the dikes upon expiration of the lease, December 31, 2012.[20]

Id. (footnote added). This letter raises two issues for the first time: (1) deleting the northern portion of the lease area from the lease and (2) locating an alternative site to compensate plaintiff for its inability to fully develop the existing lease area. Upon receiving the letter and reading the Corps' proposal to delete part of the lease area and locate a replacement site, Mr. Walters thought Mr. Cabe had "lost his mind" because there was no better site for a marina than Eden Isle. Tr. 4789 (Walters).

---

[20] Mr. Cabe asserted at trial that plaintiff's long-term development plan was rejected because it was not the requested five-year development plan. See Tr. 1533 (Cabe) ("Mr. Walters was not in compliance with our request, and that's the primary reason that the ten-year development plan was rejected, and we asked again, I'm sure, for a five-year development plan.") However, the text of the rejection letter does not support Mr. Cabe's testimony; there is no indication that the plan was rejected for being a ten-year plan rather than a five-year plan. Thus, the court does not find Mr. Cabe to be credible on this point.

The contents of this rejection letter were shared with Mr. Berry. Included in the files from Mr. Berry's campaign were typewritten notes of a June 5, 1996 telephone conversation with Mr. Cabe that contained a summary of the letter's contents.[21] Id. at 675-76 (Berry); PX 36-A. The notes also reflect that Mr. Cabe explained that access to the marina was via a county road, making the marina a public marina. PX 36-A.

### 5. The Corps' Efforts to Keep the Congressional Delegation Informed

Subsequently, on June 17, 1996, Colonel Morris responded to the legislators' May 10, 1996 letter, apprising them of the history of Greers Ferry Lake, the history of Eden Isle Marina, plaintiff's operation of the marina, and the status of the dispute regarding plaintiff's development plan. PX 35. With respect to the latter two topics, Colonel Morris wrote:

> On June 3, 1996, we informed our lessee that his ten-year development plan was not approved . . . . A copy of the letter to our lessee is . . . enclosed.

> The present lessee has done an excellent job since he purchased the marina for $1,500,000 in June of 1995. Prior to the purchase, the marina had suffered financial hardship and at one time the Corps was forced to turn off the electricity because of hazardous conditions. Because of the large number of sailboats, the marina returns a smaller rate of income than some of our other marinas. We feel that the marina needs to grow in an orderly fashion and meet the growing demand to be successful and provide the quality of service our customers demand.

> Members of my staff have met twice with the property owners, and have significantly limited our lessee[']s use of the area. . . . I do not feel that a public meeting is necessary at this time because no developments that require expansion of the existing lease area or Federal Permits have been requested by the lessee. The Corps is continuing to encourage our lessee and the property owners association to work closely to develop mutually acceptable plans.

Id.; see also Tr. 1676 (Park) (remarking that Mr. Walters was an excellent marina operator), 1708 (Park) (asserting that Mr. Walters ran a "really nice" marina), 4759-60 (Walters) (noting that the Corps nominated the marina for a national safety award, which it won). This letter and its attachments were widely disseminated. Colonel Morris forwarded copies to the Southwestern Division and Corps headquarters, PX 35, a standard practice when handling congressional

---

[21] There is nothing in the typewritten notes indicating who had the conversation with Mr. Cabe–whether it was Mr. Berry or one of his campaign staff–and there is no evidence in the trial record containing Mr. Cabe's notes, if any, from the conversation. Nevertheless, because the notes were produced from Mr. Berry's campaign file, the court finds that Mr. Berry either had the conversation with Mr. Cabe or, if not a party to the conversation, had knowledge of the conversation at or near the time it occurred.

inquiries, Tr. 933 (Morris).  And, upon receiving the letter from Colonel Morris, Senator Bumpers forwarded a copy to Mr. Ward.  PX 45-A at 3.

### 6.  The Eden Isle Property Owners Continue to Assert Their Opposition and Seek the Support of Their Congressional Delegation and Mr. Berry

In fact, Mr. Ward and the members of the EIPOA remained very engaged in the discussions concerning plaintiff's plan to develop Eden Isle Marina.  During a June 18, 1996 meeting, the EIPOA board approved mailing to the Eden Isle property owners an update on the board's actions and a copy of the EIPOA's position paper regarding development of the marina.  PX 38; see also PX 45-A at 14-17 (containing the EIPOA's May 1996 position paper, which reiterated the concerns raised by the property owners in their April 1996 letters to Colonel Morris).  In addition, Mr. Ward recommended that an "inventory" of the marina be conducted so that the board could "catch any activity that is not in agreement with what" the board had been told about plaintiff's ability to develop the marina.  PX 38.

At the end of June 1996, Mr. Ward received letters from Mr. Cabe and from the EIPOA's attorney, Mr. Beebe.  In his letter to Mr. Ward, Mr. Cabe summarized the contents of the letter he sent to Mr. Walters on June 3, 1996, rejecting plaintiff's long-term development plan.  PX 45-A at 2.  Mr. Cabe also forwarded a copy of his letter to Mr. Upton.  Id.  Mr. Beebe's letter, in turn, advised Mr. Ward and the EIPOA to treat the Corps' rejection of plaintiff's development plan as a fait accompli–as if it settled the matter entirely–when corresponding with Arkansas's senators, Mr. Berry, and the Corps.  PX 39.  Mr. Beebe emphasized that the EIPOA should not "let on" that it intended to continue "to monitor and assess the situation" and that it remained "concerned about future expansion."  Id.

The EIPOA board held another meeting on July 2, 1996, which was attended by Mr. Garner and Mr. Upton.  PX 42.  Mr. Garner advised the board that based on the correspondence received by Mr. Ward, it appeared that the pace of development at the marina would be slow, and that the board might benefit more from face-to-face meetings with politicians than from written correspondence.  Id.  Further, the board recommended, among other things, investigating the amount of sewage that would be generated from new houseboats and investigating whether parking on both sides of the road would create a fire hazard.[22]  Id.

That same day, Mr. Upton sent Colonel Morris a lengthy letter, typed in all capital letters, in response to Colonel Morris's June 17, 1996 letter to Senator Pryor.  PX 40.  Mr. Upton repeatedly expressed his opposition to any development at the marina; objected to not being apprised when the Corps approved the addition of docks in the southern portion of the lease area, an area where he owned property; and suggested more than once that the amount plaintiff paid to purchase the marina should not have any bearing on whether development should be allowed.  Id.  In addition, he made two requests:

---

[22]  The results of these investigations, if they occurred, are not part of the trial record.

> I respectfully request at this time, that no expansion be allowed until
> Senator Pryor, Senator Bumpers and Congressman Lincoln at least are shown the
> plans and the impact on the shoreline. . . .
>
> . . . .
>
> . . . I respectfully request, on behalf of myself as an affected property
> owner, and the other Eden Isle property owners, a plan that shows what you are
> granting and the maximum allowable slips for the entire plan up through the year
> 2012, where the immediate docks will be located, what will be the path of ingress
> and egress and what will happen to the existing shoreline and trees. Additional
> information as to fire and ambulance access, and disposition of additional sewage,
> would be appreciated. I would hope that you might also copy all interested
> parties, rather than just stating that the plan has been approved and no meetings
> are necessary.[23]

Id. (footnoted added). Upon his receipt of this letter, Colonel Morris questioned whether Mr.
Upton understood what development the Corps had approved at the marina. PX 43. In the
Corps' response to Mr. Upton, Colonel Morris explained that the entire lease area was available
for the purposes of operating the marina, to be developed, with the Corps' approval, as needs
warranted; as well as the development concept discussed in his meeting with members of the
senators' staffs. Id.

Mr. Upton sent similar, if not identical, letters to other individuals. One recipient was
Senator Bumpers. PX 46. In a July 17, 1996 letter, Senator Bumpers requested that Colonel
Morris provide his comments on the contents of the letter. Id. Colonel Morris responded on July
26, 1996, with essentially the same letter he had previously sent to Mr. Upton. PX 47.

Another recipient was Mr. Berry. PX 44. Mr. Berry responded to Mr. Upton, in a July 8,
1996 letter on campaign letterhead, that at that time, he would not take any action, but that Mr.
Upton should contact him if there was anything he could do. Id. Then, Mr. Berry handwrote the
following note at the bottom of the letter: "Call me if you want me to move on it." Id.

Four days later, Mr. Ward sent Mr. Berry a letter updating him on the marina dispute.[24]
PX 45-A. He expressed concern that the possibility existed that the Eden Isle property owners
would see "further development of unspecified magnitude" at the marina. Id. He therefore
wrote: "We realize that you are extremely busy, but felt that you would want to know of our
concerns. Any assistance you can provide in insuring [sic] that further development is curtailed

---

[23] For readability, the court amended this excerpt from Mr. Upton's letter to reflect
normal capitalization.

[24] The letter does not indicate whether Mr. Upton shared Mr. Berry's July 8, 1996 letter
with Mr. Ward, but the timing of Mr. Ward's letter suggests that he had seen Mr. Berry's letter.

will be greatly appreciated by our Property Owners."  Id.  At no time did Mr. Berry seek to confirm with the Corps or with plaintiff any of the information that was provided to him by Mr. Ward, Mr. Upton, or any other Eden Isle property owner.  Tr. 699 (Berry); accord id. at 661 (Berry) (agreeing that he did not contact Mr. Walters or any of the other marina operators on Greers Ferry Lake about the dispute while he was a candidate).

At its July 22, 1996 meeting, the EIPOA board discussed Mr. Berry's handwritten notation; Mr. Upton, who was not at the meeting, recommended that the board ask Mr. Berry to "move on it" and suggested that the board ask Mr. Fowler to make the request.  PX 48.  In accord with that recommendation, Mr. Ward later that day handwrote a letter to Mr. Fowler explaining the board's strong belief that there should be no further development at the marina and making the following request:  "Any help you can provide through Marion Berry and/or Warren Dupwe will be greatly appreciated."[25]  PX 49 at 2-3.  Three days later, Mr. Fowler transmitted Mr. Ward's letter to Mr. Berry via facsimile, asking:  "What do you think we should do next?"  Id. at 1.

### 7.  The Assistant Secretary, Martin Lancaster, Becomes Involved

In addition to enlisting the assistance of the current and likely future members of its congressional delegation, the EIPOA board sought the assistance of the civilian head of the Corps' civil works program, Assistant Secretary Martin Lancaster.

Mr. Lancaster had been appointed as the Assistant Secretary by President Clinton in January 1996.  PX 230.  He first met President Clinton when they and their families participated in Renaissance Weekends in Hilton Head, North Carolina, in the early 1980s; President Clinton was the governor of Arkansas at that time.  Tr. 844 (Lancaster).

In 1986, Mr. Lancaster was elected to the House to represent the third district of North Carolina.  Id. at 841 (Lancaster).  His service in Congress coincided with Mr. Berry's service as a special assistant to the President; the two eventually met, either through their overlapping substantive responsibilities (Mr. Lancaster served on the House Agriculture Committee and Mr. Berry's position related to agricultural trade) or through mutual friends.  Id. at 653-54 (Berry), 841-42 (Lancaster).  Mr. Lancaster and Mr. Berry occasionally met for lunch socially, and after Mr. Lancaster left Congress, they continued to communicate on a similar, infrequent basis.  Id. at 842-43 (Lancaster).  They remain friends to this day.  Id. at 654 (Berry).

Mr. Lancaster lost his bid for reelection to Congress in 1994.  Id. at 841 (Lancaster). After his term expired, President Clinton appointed him to serve as a special advisor on issues related to chemical weapons, a position in which he served for six or seven months.  Id. at 845

---

[25]  The court takes judicial notice pursuant to FRE 201(b)(2) that Mr. Dupwe was Mr. Berry's opponent in the 1996 general election.  See Freshmen of the 105th Congress, AllPolitics/Congressional Quarterly, http://www.cnn.com/ALLPOLITICS/1996/states/frosh/ 9612/01/ (last visited July 15, 2013).

(Lancaster).  Then, with a strong recommendation from Mr. Berry, who was still serving as a special assistant to the President, President Clinton nominated Mr. Lancaster to become the Assistant Secretary.  Id. at 654-55 (Berry).  In fact, once the President decided to nominate Mr. Lancaster, it was Mr. Berry who informed Mr. Lancaster about the nomination.  Id. at 656 (Berry).

Given all of Mr. Lancaster's connections to Arkansas politicians, it is unsurprising that the EIPOA would seek him as an ally.  In pursuit of that goal, Mr. Ward sent letters to Mr. Lancaster and Mr. Lancaster's principal deputy on May 23, 1996, requesting their assistance in preventing the development of Eden Isle Marina.  PX 45.  Mr. Lancaster, in turn, sent Mr. Ward a letter shortly thereafter.[26]  PX 38.  Then, on July 9, 2013, Mr. Lancaster sent another letter to Mr. Ward to advise him that had been informed that there would be no development in the northern portion of the lease area.  PX 45.

### D.  The Corps Concludes That There Were Docks Outside of the Marina's Lease Area

Later that month, on or before July 31, 1996, the Corps held a meeting with Mr. Walters to discuss its denial of plaintiff's request to develop the northern portion of Eden Isle Marina's lease area.  DX 71.  Attending the meeting on the Corps' behalf were Mr. Cabe, Mr. Ragar, Ms. Best, and Mr. Roark.  Id.  At the beginning of the meeting, Mr. Walters asserted that he had been treated unfairly because the Corps was considering the opinions of the Eden Isle property owners even though they provided no evidence that plaintiff's development plan would harm them or the environment.  Id.  In addition, he reiterated his claim that developing the northern portion of the lease area would be more cost effective for plaintiff.  Id.  Mr. Walters suggested that the Corps stand up to the Eden Isle property owners and allow plaintiff to pursue its development plan.  Id.  Mr. Cabe rejected this course of action, stating that the Corps would never approve development of the northern portion of the lease area and that the Corps would never approve dredging at any marina.[27]  Id.

---

[26]  Although the letter is part of the trial record, see PX 36-B, it was only admitted for the purpose of demonstrating that it was received by Mr. Berry's campaign and was produced from Mr. Berry's files, see Tr. 680-82 (exchange between trial counsel and the court).  Nevertheless, for the sake of clarity, the court notes that Mr. Lancaster's letter was dated June 12, 1996, and in the letter, Mr. Lancaster indicated that he was responding to Mr. Ward's earlier, April 9, 1996, letter.  PX 36-B.

[27]  Mr. Cabe's statement that the Corps would never approve dredging at any marina is contradicted by other evidence in the trial record.  See, e.g., PX 190 at 96 (containing a May 23, 1988 letter from the acting chief of the Real Estate Division to Heber Springs Marina indicating that the Corps would consider a proposal to dredge at the north end of the marina's lease area); PX 355 (containing an August 15, 1992 letter and an Application for Department of the Army Permit from Sugar Loaf Marina requesting permission to dredge to fix the erosion of the original rip rap due to high water and winter storms; the permit was granted, see Tr. 3986-87 (Overton)); PX 355-A (containing a January 4, 1993 memorandum from Mr. Roark indicating that the Corps had advised Sugar Loaf Marina that its requested dredging, which was "minor in scope, . . .

Then, Mr. Ragar advised Mr. Walters that several of the existing docks extended beyond the boundary of the lease area and that the Real Estate Division would take measures to remedy the situation "possibly by adding additional water area to the lease."[28]  Id.  Mr. Ragar had concluded that there were docks outside of the lease area while trying to find a resolution to the marina dispute.  Tr. 184 (Ragar).  At some point during the process, Mr. Ragar compared a map of the lease area with aerial photographs of the marina,[29] and discovered that some of the docks that existed when plaintiff purchased the marina extended out in the water beyond the lease area's eastern boundary as generally depicted in Figure 1.  Id.

Prior to this meeting, Mr. Walters had no reason to believe that any of the docks at the marina extended beyond the lease area's boundary.  Id. at 241-42 (Ragar).  All of the docks at issue had been previously approved by the Corps before plaintiff purchased the marina.  Id. at 184-85, 214 (Ragar), 1703 (Park).  No one from the Corps had advised Mr. Walters prior to the purchase that there were issues with the placement of any of the marina's docks.  Id. at 185, 241-42 (Ragar).  And, up until this meeting, there had been no indication that the Corps had an issue with the docks.  Id. at 213 (Ragar); accord id. at 2622 (Holden) (noting that the Corps collected rent from plaintiff based on the docks at issue).  Thus, it was the Corps' position that even though the protruding docks constituted a violation of the lease, id. at 189-90 (Ragar), 1740, 1818 (Park), Mr. Walters was not at fault, id. at 214 (Ragar), 1755 (Park).  But see id. at 2364 (Holden) (asserting that if the Corps approved the placement of docks outside of the lease area, then it acquiesced to having docks outside of the lease area).  Indeed, at the July 1996 meeting where the issue was first raised with Mr. Walters, Mr. Ragar implied that the Real Estate Division would take care of it without any negative consequences for plaintiff, DX 71; Tr. 4802 (Walters), and the Corps did not demand that plaintiff move the docks into the lease area or otherwise remedy the purported problem, Tr. 213-14 (Ragar), 1741 (Park).  Thus, Mr. Walters was not concerned about Mr. Ragar's pronouncement.  Id. at 4799, 4801 (Walters).

Dr. Overton agreed with Mr. Walters that there was no reason to be concerned about the docks protruding beyond the boundary of the lease area.  He explained that from the creation of

---

would also be covered under [a] nationwide permit with no public comment period.").  But see Tr. 3666 (Murdock-McDaniel) (noting that, in general, the Corps does not allow dredging on Greers Ferry Lake).

[28]  Mr. Cabe, in a Memorandum for Record prepared in April 1999, almost three years later, asserted that Mr. Ragar "only voiced his concern" and merely had a "suspicion" that the docks extended beyond the lease area boundary.  PX 109-A.  These assertions are belied by the contemporaneous documentation of the July 1996 meeting.  See DX 71.

[29]  It is unclear what map Mr. Ragar examined.  As noted above, the map of the marina's lease area included in the 1995 lease contained a darkly shaded lease area.  See PX 21 at 86; DX 17 at 3; DX 325 at 86.  Thus, it would have been difficult for him to ascertain the location of the berms to which the docks were attached.

the lake through 1995, when plaintiff purchased the marina, the eastern, water boundary of the lease area was drawn so as to include "the land area onto which the docks would be anchored," and not the water area into which the docks would extend.  Id. at 3778 (Overton); accord id. at 3779, 3787, 4317 (Overton); PX 21 at 3 (describing the area encompassed by the 1970 lease as lying between the fee acquisition line and the 434-foot contour[30]); PX 192 at 4 (depicting the lease areas from 1964 to 1995 and the 491-, 461-, and 434-foot contours).  In other words, the Corps had historically intended to allow docks attached to land within the lease area extend beyond the lease area's boundary.  Tr. 4310-11, 4319 (Overton); cf. id. at 97 (Cabe) (remarking that marina operators need to be able to move their docks when the level of the lake decreases so that the docks are not stranded on dry ground), 3062 (Ross) (noting that a marina would have to be moved with the fluctuation of the lake levels); DX 89 (addressing the need to move docks further from the shoreline while the lake was a low level).  Indeed, according to Dr. Overton, there was no need for the Corps to define a water boundary for the marina because there were no competing public recreation uses for the area adjacent to the marina–such as swimming areas or campgrounds–as there were with the marinas within Corps parks.  Tr. at 3789 (Overton).

Dr. Overton likened the marina to Narrows Marina.  Narrows Marina did not have a defined water boundary in the channel until after docks were placed in the channel.  Tr. 3789, 3793, 3795, 3798, 3801-03 (Overton); accord PX 250 at 1 (describing the lease area of Narrows Marina in 1970 as "[a] parcel of land . . . containing 7.2 acres, more or less, above elevation 461," which is the lake's normal elevation); PX 255 at 2 (depicting the lease area of Narrows Marina as of 1999 as containing no water area in the channel[31]); PX 256 at 4 (indicating, in a 1999 letter, that the Corps had granted permission for the placement of docks in the channel and that those docks were located in Narrows Marina's lease area); PX 263 at 23 (describing the lease area of Narrows Marina in 2003 as including both the land described in the earlier lease and an eleven-acre parcel lying below the 461-foot contour, i.e., eleven acres of water).  Nor did it have adjacent competing public recreation uses, because such uses were located in the portion of Narrows Park that was located on the north side of the bridge spanning the channel connecting the two parts of Greers Ferry Lake, while Narrows Marina was located to the south of the bridge.  Tr. 3789, 3802, 3805-06 (Overton); accord PX 255 at 2 (depicting Narrows Park and Narrows Marina).  Indeed, Dr. Overton's comparison of the two marinas is apt; at both marinas, the Corps approved, and the operator built, docks that were attached to land within the lease area but extended out into the water beyond the lease area's boundary.  However, unlike with Eden Isle Marina, there is no evidence in the trial record that the Corps ever advised the operator of

---

[30]  The 434-foot contour reflected the lowest elevation to which Greers Ferry Lake could be drawn down for power generation.  Tr. 3771, 3778 (Overton).

[31]  The lease area description for Narrows Marina was the same in 1999 as it was in 1970.  See generally PX 250.  Nevertheless, in the map depicting the lease area in 1999, the lease area boundary does not always coincide with the 461-foot contour.  See PX 255 at 2.  Instead, the map reflects that the lease area includes a small cove, all of which is water area below the 461-foot contour.  Id.  That small cove is where the first docks in Narrows Marina were located.  See id.; PX 190 at 68.

Narrows Marina that the Corps-approved docks built in the channel were outside of the lease area. In addition, the Corps' remedy differed. At Narrows Marina, the Corps simply added a parcel of water to the lease area to cover the previously built docks–precisely what Mr. Ragar told Mr. Walters that the Corps would do at Eden Isle Marina. But, as described later in this opinion, the Corps ultimately took a different course of action with plaintiff.

### E. Plaintiff's Addition of Boat Slips to Existing Docks at the Marina

Although the Corps had rejected plaintiff's long-term development plan for Eden Isle Marina, it did grant plaintiff permission to add boat stalls to existing docks and to build a new dock while the EIPOA was organizing its opposition to the marina's development. Specifically, on March 11, 1996, Mr. Cabe approved the addition of six boat slips to S dock. DX 42 at 2. On May 23, 1996, Mr. Cabe approved the addition of twelve boat stalls to P dock. DX 56. On June 3, 1996, Mr. Cabe approved the construction of a new six-stall houseboat dock to the south of the northernmost berm in the lease area.[32] PX 36. And, on August 14, 1996, Mr. Cabe approved the addition of twelve stalls to N dock. DX 338.

Subsequent to the approval of the extension of N dock, Mr. Walters informed Mr. Cabe that the extension would be delayed until the spring of 1997 due to the dock manufacturer's other commitments. PX 57-A. However, plaintiff was able to get the extension built, and on October 14, 1996, had the extension floated into place at the marina. Id.; Tr. 4800 (Walters). Utility connections were completed later in the week, and installation was in its final stage on October 24, 1996. PX 57-A; Tr. 4805 (Walters).

From the Corps' perspective, plaintiff's construction of the N dock extension at the marina was a defiant act. According to Colonel Morris, Mr. Cabe had advised him–on some unspecified date–that personnel from the Little Rock District's Real Estate Division had reached an agreement with Mr. Walters to delay the N dock extension until after the election. Tr. 968-70, 972, 981, 1247 (Morris); accord PX 55. Colonel Morris explained that the Corps was concerned that the development of the marina had become a political issue, and it was determined to remain neutral. Tr. 801-03, 981 (Morris). But see id. at 882-84 (Lancaster) (opining that an agreement to delay an activity until after an election would be improper, highly unusual, and highly irregular[33]). Whether such an agreement actually existed is questionable. It was not memorialized in writing. Id. at 973, 985, 987 (Morris). There are no contemporaneous documents referring to it. See, e.g., PX 57-A (indicating, in an October 1996 Corps memorandum, that Mr. Walters was delaying the N dock extension due to the dock

---

[32] Plaintiff declined to build the dock at the approved location. PX 51; PX 71; PX 79; see also DX 71 (indicating that on or before July 31, 1996, Mr. Walters advised the Corps that he would not build the dock until 1997).

[33] As discussed in more detail below, this was the stance taken by Mr. Lancaster during trial when denying any recollection of having knowledge of the purported agreement. Tr. 882-84 (Lancaster).

manufacturer's prior commitments,[34] not that the delay was based on political considerations). And, Mr. Walters denied entering into such an agreement. Tr. 4879 (Walters). Regardless of whether an agreement actually existed, however, the Corps' belief that an agreement existed had serious and devastating consequences for plaintiff, as discussed below.

### F.  Mr. Lancaster's Visit to Eden Isle

Around the time that Mr. Walters was meeting with the Corps to voice his concerns about the Corps' rejection of plaintiff's long-term development plan for Eden Isle Marina, Mr. Lancaster was planning a trip to visit several Corps districts, including the Little Rock District.[35] Eden Isle was placed on Mr. Lancaster's itinerary as part of his visit to the Little Rock District, PX 52, but there is conflicting evidence regarding how that happened. According to Mr. Berry, Mr. Lancaster likely asked him what places he should visit if he ever made it to Arkansas and Mr. Berry gave him some suggestions. Tr. 705-06 (Berry). Mr. Lancaster disputed Mr. Berry's recollection; he stated that the district engineer placed the trip to Eden Isle on his itinerary for his visit to the district, and that he did not know who requested his presence on Eden Isle. Id. at 865 (Lancaster). Colonel Morris, however, denied that Mr. Lancaster's trip to the district was his idea; rather, he was informed about the visit by someone from the Southwestern Division. Id. at 944-45 (Morris); accord id. (expressing surprise at Mr. Lancaster's visit). Indeed, the Eden Isle property owners knew before Colonel Morris did that Mr. Lancaster would be visiting Eden Isle. See id. at 945-46 (Morris) (noting that the EIPOA had a better source regarding Mr. Lancaster's trip than he did); PX 50 (containing minutes from an August 9, 1996 EIPOA board meeting indicating that Mr. Lancaster would be in Heber Springs on October 7, 1996).

Neither Mr. Berry's nor Mr. Lancaster's version rings true; indeed, the court found both witnesses lacking in candor throughout much of their testimony at trial. Mr. Berry would have the court believe that Mr. Lancaster, remembering his friend's suggestions about where he should visit if he ever traveled to Arkansas, placed Eden Isle on his itinerary at the exact same time that Mr. Fowler was asking Mr. Berry for assistance with the marina issue. And Mr. Lancaster would have the court believe that Colonel Morris placed Eden Isle on his itinerary while there was an ongoing dispute concerning the marina; it is improbable that a district engineer would take an Assistant Secretary to a site embroiled in controversy during a courtesy visit to his district. Instead, based on the totality of the evidence in the trial record, the court concludes that Mr. Berry, as a result of information provided to him by Mr. Fowler on July 25,

---

[34]  The date on this document is October 1, 1996, PX 57-A, but because it describes events that occurred on October 24, 1996, and events that would occur on October 25, 1996, it is likely that the document was prepared on October 24, 1996.

[35]  The approximate date is based on four facts:  (1) the trip began on October 6, 1996, PX 52; (2) Mr. Lancaster gave several speeches during the trip, id.; Tr. 864 (Lancaster); (3) trips that involved speeches were usually planned more than one month in advance, Tr. 864 (Lancaster); and (4) the EIPOA was advised of Mr. Lancaster's trip on or before August 9, 1996, PX 50.

1996, contacted Mr. Lancaster to request his assistance by lending his influence to help Mr.
Fowler–who was supporting Mr. Berry's congressional campaign–and the other Eden Isle
property owners.  Accord Tr. 456-57 (Ward) (asserting that Mr. Lancaster visited Eden Isle at
Mr. Berry's behest).  The court further concludes that Mr. Lancaster agreed to visit Eden Isle as a
favor to Mr. Berry.  Accord id. at 456 (Ward) (noting that the purpose of the visit was for Mr.
Lancaster to see the marina and learn about the proposed development), 755, 758 (Berry) (stating
that the purpose of the visit was to listen to the concerns of the Eden Isle residents about the
marina and obtain an understanding of the marina issue), 769 (Berry) (agreeing that the visit was
for political purposes), 944 (Morris) (noting that it was "[v]ery unusual" for an Assistant
Secretary to be involved in a marina issue on Greers Ferry Lake).

      Mr. Lancaster arrived at Eden Isle on October 7, 1996.  PX 52.  Upon his arrival,
members of the EIPOA gave him and Mr. Berry a tour of the marina.[36]  Tr. 456 (Ward), 707-08
(Berry); see also PX 56 (reflecting that Mr. Lancaster could not "conceive" that there was
sufficient parking at the marina, implying that he had visited the marina).  Although Mr.
Lancaster's visit to Eden Isle was planned, and the EIPOA was informed of the visit, over two
months earlier, Mr. Walters was neither invited to nor present during the tour.  Tr. 707-08
(Berry), 4803 (Walters).  Indeed, according to his trial testimony, it never occurred to Mr. Berry
that he should contact Mr. Walters to advise him that he would be visiting Eden Isle in relation to
the marina dispute; nor did it occur to Mr. Berry during the tour itself that he should see if Mr.
Walters was available.  Id. at 772 (Berry).  Also absent from the tour were any local Corps
employees, who had been given the specific instruction to steer clear of Mr. Lancaster's
activities on Eden Isle due to their political nature.  Id. at 951-53 (Morris); accord id. at 386
(Cabe), 1748-49 (Park).

      After touring the marina, Mr. Lancaster attended a fundraiser for Mr. Berry at the Red
Apple Inn, which was attended by Eden Isle property owners.[37]  Id. at 457 (Ward); 873-76
(Lancaster); Am. Compl. ¶ 53; PX 76 at 1; PX 79.  Among those present were Mr. Ward and the
Uptons, Tr. 875-76 (Lancaster), but Mr. Walters was notably absent, see id. at 4731, 4735
(reflecting that Mr. Walters did not meet Mr. Berry or Mr. Lancaster until after plaintiff filed this

---

      [36]  Mr. Lancaster testified at trial that he had no recollection of a marina tour.  Tr. 874
(Lancaster).  He stated that his memories of his visit to Eden Isle were based on the trip report
prepared by one of his staff members immediately after the trip's conclusion.  Id. at 873
(Lancaster).  The trip report merely mentioned that Mr. Lancaster met with Eden Isle property
owners and attended a "reception."  PX 52.  However, both Mr. Ward and Mr. Berry testified
that a tour occurred and that Mr. Lancaster was, in fact, present.  Tr. 456 (Ward), 707-08 (Berry).

      [37]  Mr. Lancaster testified at trial that he had no recollection of attending a fundraiser,
only of attending a "function."  Tr. 873-74, 918 (Lancaster).  Further, the trip report prepared by
one of his staff members immediately after the trip's conclusion merely mentioned that Mr.
Lancaster met with Eden Isle property owners and attended a "reception."  PX 52.  However,
defendant has admitted that the event attended by Mr. Lancaster was a fundraiser.  Am. Answer
¶ 53.

lawsuit). During the event, Mr. Lancaster told Mr. Ward that there would be no further expansion of the marina. Id. at 531 (Ward); PX 53. Moreover, it was rumored that during the fundraiser, someone promised that "there would never be another nail driven . . . at the marina . . . if Marion Berry were elected." Tr. 299 (Ragar); accord id. at 804 (Morris) (stating that Mr. Berry had made the development of the marina a political/campaign issue).

At some point during Mr. Lancaster's trip to the Little Rock District, Colonel Morris briefed him on the marina issue. Id. at 972 (Morris); see also id. at 946 (Morris) (noting that he would have reviewed a fact sheet–PX 51–prior to Mr. Lancaster's arrival). During the briefing, Colonel Morris may have shared with Mr. Lancaster that the district had an agreement with Mr. Walters to delay development at the marina until after the election, but if he did not, the information was conveyed to Mr. Lancaster by other means. Id. at 972-73 (Morris). After returning to Washington, DC, Mr. Lancaster notified the Little Rock District that he wanted to review its guidelines for the required number of parking spaces at marinas and for marina access. PX 52; PX 54. The court received no evidence at trial regarding the district's response.[38]

### G. The Cease-and-Desist Order

Not long after Mr. Lancaster's visit to Eden Isle, one of its residents reported the construction of the N dock extension at Eden Isle Marina to Mr. Lancaster. PX 55. As a result, Mr. Lancaster called Colonel Morris on the morning of October 24, 1996,[39] to discuss the construction.[40] Id.; Tr. 961, 969, 978 (Morris). During the telephone call, Mr. Lancaster stated

---

[38] Pursuant to Corps policy, there should have been a response, Tr. 959 (Morris), but if a response was prepared, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 958-61 (Morris).

[39] Pursuant to Corps policy, the telephone call would have generated a lot of activity and documentation within the Corps because Colonel Morris would have advised his superiors at the Southwestern Division of a communication from the Assistant Secretary. Tr. 979 (Morris). However, if any documentation of this activity was created, it was no longer in the Corps' files when discovery commenced in this lawsuit. Id.

[40] Colonel Morris testified at trial that earlier in the morning of Mr. Lancaster's telephone call, he had been informed about the N dock extension and, after conferring with Mr. Cabe and district counsel, had directed that a written cease-and-desist order be issued to plaintiff due to plaintiff's violation of the purported agreement not to proceed with any development at the marina until after the election. Tr. 970-71, 981-82, 984 (Morris). Colonel Morris's testimony is not supported by the trial record, which is bereft of any documentary evidence or testimony from other witnesses that he had such knowledge or took such action. The accuracy of Colonel Morris's testimony on this point, however, is irrelevant to the ultimate outcome of the case. Regardless of whether Colonel Morris learned about the N dock extension from some unknown source early in the morning of October 24, 1996, or later in the morning that same day from Mr. Lancaster, the fact remains that the Corps believed that it had an agreement with Mr. Walters that there would be no development at the marina until after the election, and as a result

that it was his understanding that aside from the six-stall houseboat dock, no new boat slips had been approved at the marina and "nothing was to be done until after the election in November due to the sensitive nature of the activity."[41]  PX 55.  Colonel Morris responded that he shared that understanding, and after the telephone call, he confirmed it with Mr. Cabe and Mr. Ragar.  Id.  But see id. at 973, 987 (Morris) (confirming that there were no documents memorializing such an agreement), 4879 (Walters) (denying the existence of any such agreement); PX 57-A (indicating, in an October 1996 Corps memorandum, that Mr. Walters was delaying the N dock extension due to the dock manufacturer's prior commitments).

Because Mr. Lancaster asked for an update as soon as possible, PX 55; Tr. 979 (Morris), Colonel Morris called Mr. Park–now the resident engineer at the Greers Ferry Lake Project Office, Tr. 1583 (Park)–to have him and his staff investigate the situation at the marina, PX 55.  Mr. Roark went to the marina, where Mr. Walters informed him that he had only built what had been previously approved.  Tr. 4805 (Walters).  After Mr. Roark visited the marina, two things happened, but it is unclear which occurred first:  (1) Colonel Morris provided an update to Mr. Lancaster, PX 56; and (2) after consulting with Colonel Morris, Mr. Cabe called Mr. Walters and directed him to cease all further development at the marina, PX 57-A; Tr. 199 (Ragar), 980 (Morris), 4805 (Walters).

On October 25, 1996, after receiving the update from Colonel Morris, Mr. Lancaster sent a letter to Colonel Morris expressing his opposition to further development at the marina.  PX 56; see also PX 71 (noting that the letter was sent to Colonel Morris via facsimile).  The court reproduces his letter in full:

> Thank you for your prompt attention to my request for information and action on the Eden Isle Marina expansion.

> Let me state emphatically my personal opposition to any further expansion of the Eden Isle Marina.  Though you may be correct that Eden Isle Marina has adequate parking for existing slips, I would question that.  There may be available land which he could clear and level to result in one space for every two boat slips.  However, I cannot conceive of parking spaces currently available for even every

---

of that understanding, the discovery of the N dock extension on October 24, 1996, triggered the issuance of a written cease-and-desist order.

[41]  At trial, Mr. Lancaster testified that he did not remember calling Colonel Morris or having any knowledge about an agreement with Mr. Walters to delay development at the marina until after the election; indeed, he stated, such an agreement would be improper, highly unusual, and highly irregular.  Tr. 882-84 (Lancaster).  However, Mr. Lancaster's statement was memorialized in an electronic-mail message that Colonel Morris sent to Mr. Cabe and Mr. Park on October 24, 1996, at 10:10 a.m.–the same morning of Mr. Lancaster's telephone call.  PX 55.  In light of the contemporaneous description of the telephone conversation by Colonel Morris, Mr. Lancaster's conflicting testimony is not credible.

four boat slips. I would want to see a diagram of how you would fit the requisite number of parking spaces on the existing site. If we have to approve of modification to the site, I would certainly oppose clearing and leveling any additional space at the site to provide needed parking. We simply cannot allow a complete denuding and leveling of every acre that he owns just to maximize his utilization of the site. We have to take into account the aesthetics of the Marina and interest of the surrounding property owners. To allow such maximization by a developer would reinforce the old image of the Corps as an organization which rapes and pillages the environment for the sake of development.

    In addition to what I believe is already significantly inadequate parking, I am even more concerned about the access to this site. The streets are extremely narrow and winding and pass through residential areas where safety is a major concern. To allow the maximum development at this site which one might be able to mathematically compute would create a safety hazard which I strongly oppose and given the opportunity, will disapprove.[42]

    I am greatly concerned by the bad faith shown by Mr. Walters in applying for an extension to be built in the spring of 1997 and then having the extension built off-site and floated into place to avoid opposition being raised in a manner which would stop his construction on-site. These are not the actions of an individual interested in working with the Corps and property owners in a positive and cooperative manner.

PX 56 (footnote added).

    There are a number of striking things about Mr. Lancaster's letter. First and foremost, Mr. Lancaster "emphatically" expressed his "personal opposition" to any development at the marina and "strongly oppose[d]" maximum development of the marina. Id. The fact that the Assistant Secretary would choose to intervene to exert his influence in a local, relatively minor, dispute when he was charged with overseeing the entirety of the Corps' civil works program is remarkable.[43]  See Tr. 944, 991 (Morris). Mr. Lancaster recognized this fact at trial, when he

---

[42]  The district engineer who succeeded Colonel Morris, Colonel Thomas Holden, testified at trial that at the time Mr. Lancaster sent this letter, the Assistant Secretary was not in the chain of command above the Corps' chief of engineers, and therefore any directive contained in the letter was not truly binding. Tr. 2416-17 (Holden). However, because the Assistant Secretary was the President's appointee to oversee the Corps' civil works program, his letter constituted the administration's position on the issue. Id. at 2417.

[43]  Currently, Eden Isle Marina is one of the nine marinas on Greers Ferry Lake overseen by the Greers Ferry Lake Project Office. PX 5. The Greers Ferry Lake Project Office is one of sixteen project offices overseen by the Little Rock District. The Little Rock District is one of four districts overseen by the Southwestern Division. And, the Southwestern Division is one of nine divisions–both within the United States and abroad–overseen by the Assistant Secretary.

contended, contrary to the impression left by his letter, that the Eden Isle Marina dispute was not a major concern for him, id. at 858, 868 (Lancaster), and that he had no personal interest in the marina dispute, id. at 886-87 (Lancaster).

Second, at no time prior to pronouncing his personal opposition to development at the marina did Mr. Lancaster seek out or otherwise obtain the views of the marina's owner, i.e., plaintiff or its principal, Mr. Walters. See id. at 840 (Lancaster) (noting that the first time he met Mr. Walters was during his deposition for this lawsuit), 4735 (Walters) (same). Mr. Lancaster did not even read the 1995 lease to acquaint himself with plaintiff's right to develop. Id. at 859 (Lancaster). Third, Mr. Lancaster rejected the factual information he had been provided from Colonel Morris concerning the availability of parking at the marina and instead opined to the contrary that there was inadequate parking. PX 56; see also Tr. 992-93 (Morris) (noting that the there was no basis for some of the assertions in the letter). Fourth, Mr. Lancaster characterized the clearing of trees to create more parking as "a complete denuding and leveling of every acre" Mr. Walters owned,[44] something that, as explained at trial by Mr. Cabe, the Little Rock District would never allow. See Tr. 1849 (Cabe).

Fifth, Mr. Lancaster's stated concerns mirrored, in large part, the concerns asserted by Eden Isle property owners. Id. at 993 (Morris), 1850 (Cabe); see also id. at 992 (Morris) (noting that Mr. Lancaster's opinion was derived from sources outside of the Corps), 993-94 (Morris) (remarking that his staff believed that Mr. Lancaster obtained his information from the individuals attending the fundraiser). Sixth, Mr. Lancaster mischaracterized the approval and construction of the N dock extension; the Corps' approval of plaintiff's request of the extension was not conditioned on the extension being built in the spring of 1997, DX 338, and there was nothing unusual about boat slips being built off-site and then floated in place, see Tr. 4806 (Walters) (explaining that docks are always built off-site in a flat location that makes it easy to construct the dock).

Seventh, the final sentence of Mr. Lancaster's letter erroneously implies that Mr. Walters had not been working with the Corps and the Eden Isle property owners, see, e.g., PX 32 (memorializing an April 18, 1996 meeting hosted by Mr. Walters and attended by Corps employees and Eden Isle property owners); DX 55 (memorializing a May 15, 1996 meeting of Mr. Walters, Corps employees, and Eden Isle property owners); DX 71 (memorializing a meeting occurring on or before July 31, 1996, between Mr. Walters and Corps employees), and

---

The court takes judicial notice of the number of current Corps project, district, and division offices pursuant to FRE 201(b)(2). See Little Rock District Locations, U.S. Army Corps of Engineers, http://www.swl.usace.army.mil/Locations/LittleRockDistrictLocations.aspx (last visited July 19, 2013); Where We Are, U.S. Army Corps of Engineers, http://www.usace.army. mil/Locations.aspx (last visited July 19, 2013).

[44] Despite Mr. Lancaster's reference to preventing Mr. Walters from engaging in earthwork activities on "every acre that he owns," most of the 4.8 acres of land owned by plaintiff in fee simple is not subject to the Corps' authority.

that Mr. Walters had an obligation to work with the Eden Isle property owners in the first place. Moreover, it is stunning that Mr. Lancaster would accuse Mr. Walters of not being cooperative. PX 56.  The evidence in the trial record demonstrates that Mr. Walters acquiesced to all of the Corps' demands, to his detriment.  Clearly, it was the Eden Isle property owners who were not interested in cooperation–their goal was to foreclose all development, with no exceptions.  See, e.g., PX 40 (containing Mr. Upton's July 2, 1996 objection to any development); PX 49 at 2-3 (containing Mr. Ward's July 22, 1996 representation that the EIPOA board "believe[d] strongly that no additional growth should be allowed"); DX 55 (reflecting Mr. Ward's May 15, 1996 statement that the marina was large enough and that he would not recommend further expansion).

Last, but certainly not least, the trial record contains no evidence that Mr. Lancaster consulted any experts or relied on any studies–technical, environmental, or otherwise–in preparing his letter.  Rather, it is apparent that Mr. Lancaster's factual contentions were based only on his personal observations from his brief visit to Eden Isle and the opinions of the Eden Isle property owners.

Altogether, Mr. Lancaster's involvement in the dispute over the marina's development was extensive.  He corresponded at least twice with the EIPOA.  See PX 38; PX 45.  Upon Mr. Berry's recommendation, he visited Eden Isle, listened to the property owners' concerns, and toured the marina.  See PX 52; Tr. 456-57 (Ward), 705-08, 755, 768 (Berry).  And, acting on a communication from an Eden Isle property owner, he called the Corps for an update on the new boat slips being built at the marina and followed up the telephone call with a letter expressing his personal opposition to further development at the marina.  See PX 55; PX 56.  However, despite the clear evidence describing the extent of his personal involvement, Mr. Lancaster testified at trial that he could not remember having any conversations with the Eden Isle property owners, Tr. 888 (Lancaster); he did not do any favors for Mr. Berry,[45] id. at 860, 881, 918 (Lancaster); he could not remember touring the marina, id. at 874 (Lancaster); he could not remember attending the fundraiser for Mr. Berry at the Red Apple Inn, id. at 873-74, 918 (Lancaster); he could not remember calling Colonel Morris to discuss the report of new boat slips being built at the marina, id. at 882-84 (Lancaster); and he could not remember the contents of his October 25, 1996 letter expressing his opposition to further development, id. at 890 (Lancaster).  Indeed, he testified that he had no memory of the marina dispute at all prior to being deposed for this lawsuit, id. at 857-58, 860, 885, 896 (Lancaster), noting that the dispute was not a major concern for him, id. at 858 (Lancaster); accord id. at 912 (Lancaster) ("It was just one of many projects that I visited during my tenure. . . . It was no more important than other issues that I dealt with on the trips.").  He explained that he would have treated the dispute like any others that came across his desk:  "If there were controversies that rose to the level of the Assistant Secretary's office, I became involved by determining as best I could the facts involved and then making an informed decision based on those facts before me."  Id. at 898 (Lancaster).

_____

[45]  Mr. Lancaster would have the court believe that he would have visited Eden Isle merely at the behest of some local property owners, and that he just happened to be visiting Eden Isle at the same time that Mr. Berry was holding a fundraiser there.  The court rejects Mr. Lancaster's version of the facts.

Mr. Lancaster's attempt to minimize his involvement in the marina dispute defies credulity.  As the evidence elicited at trial clearly demonstrates, Mr. Lancaster's desire to return a political favor for a friend running for office, the same friend who strongly recommended to President Clinton that he be appointed as Assistant Secretary, caused him to throw his support behind Mr. Berry's political backers and campaign contributors.  This is reflected by his corresponding with the EIPOA, visiting Eden Isle, seeking updates from the Little Rock District, and penning a letter expressing his personal opposition to further development at the marina.  He inserted himself with alacrity into a dispute that never would have risen to the level of the Assistant Secretary but for his friendship with Mr. Berry, with far-reaching consequences.  As Colonel Morris testified, Mr. Lancaster "showed a lot of interest" in the development of the marina and the interest was of such magnitude that it "could not be ignored."  Id. at 799 (Morris); accord id. at 801 (Morris) (agreeing that Mr. Lancaster's involvement had an effect on the Corps' actions).

Whether in reaction to Mr. Lancaster's communications or an independent decision, the oral directive to Mr. Walters to cease all work at the marina was reduced to writing by the Real Estate Division, and on October 25, 1996, Mr. Cabe and Mr. Ragar delivered the cease-and-desist order to Mr. Walters in person.  Id. at 200 (Ragar), 1847-48 (Cabe).  During trial, Mr. Walters recalled some of the conversation that occurred between him and Mr. Cabe:[46]

> Mr. Cabe:  "Ronnie, I just never seen anything like this in my life, in my . . . thirty-five [years] . . . , I [have] never seen anything like this.  There's more political pressure, they're killing us, we've got to do something, . . . we've got to stop you."

> Mr. Walters:  "Man, how can you do this?  You just got through telling me I could develop my leasehold, my whole leasehold, and now I ask you about this."

> Mr. Cabe:  "Just too much political pressure, we've got to do something."

> * * *

> Mr. Cabe:  "If you will wait 'til after the election, Ronnie, you may very well, . . . depend[ing] on the administration[,] . . . get to do just what you want to do.  We just need to wait until after the election and the heat gets off of this."

Id. at 4806-07, 4879 (Walters).  His recollection is consistent with an affidavit he executed in December 1997 for the purpose of another lawsuit (discussed in more detail below):

---

[46]  The quoted language constitutes Mr. Walters's recollection of the conversation and does not reflect the actual words used during the conversation.

14.  On October 25, 1996 the Assistant Secretary of the Army in Washington, D.C. ordered my development to stop.  This fact was told to me by Mr. Tommy Parks [sic] and Mr. Cabe of the Little Rock Corps office.  They each said this decision did not come from the local office.  They had never seen this type of action before and they were certain I would get an offer to buy me out soon.

. . . .

20.  On October 25, 1996, Mr. Tommy Parks [sic], Resident Engineer and Mr. Billy Cabe, Chief, Real Estate Division, with the Army Corps of Engineers told me the decision to stop my development of the Marina did not come from the local office or from the District Office in Little Rock.  They said the decision came from the Assistant Secretary of the Army in Washington.  Mr. Cabe told me he thought I would get an offer to buy the Marina from Mr. Upton.  Mr. Cabe said the decision to stop me was political.  Mr. Parks [sic] and Mr. Cabe said nothing like this had ever happened before and it was totally out of their hands.

. . . .

27.  . . .  On October 25, 1996 . . . I was ordered from Washington to totally stop any further development.  No explanation was given except I was told by Mr. Cabe it was political and that they wouldn't be surprised if I got an offer to buy the Marina from Mr. Upton.

DX 363.

The cease-and-desist order provided, in its entirety:  "In accordance with our telephone conversation, October 24, 1996, please cease all new construction and expansion of your docks until further notice."  PX 57.  Both Mr. Cabe and Mr. Walters signed the order.  Id.  At no time prior to the issuance of the order did Colonel Morris meet with Mr. Walters; indeed, the two did not meet until Colonel Morris's deposition for this lawsuit.  Tr. 809 (Morris).

### III.  November 1996 to February 1999:  Plaintiff's Operation of Eden Isle Marina Under the Cease-and-Desist Order Until the Memorandum of Understanding

Plaintiff ceased all construction at Eden Isle Marina from the moment the cease-and-desist order was presented and signed.  To ensure plaintiff's compliance with the order, the EIPOA continued to monitor activity at the marina.  See, e.g., PX 53 (noting a report to the EIPOA board that there was no new construction at the marina as of December 13, 1996).  It did not detect anything improper, but it remained concerned about plaintiff's development plans and expressed this concern to the Corps.  See, e.g., id. (indicating that the EIPOA board wanted written assurances from the Corps that plaintiff was not permitted to develop the marina); PX 58 (reflecting that during a March 5, 1997 telephone conversation with Mr. Park, Mr. Ward expressed the EIPOA's continued concerns regarding the development of the marina, suggested

-43-

that the Corps offer plaintiff an alternative site, sought confirmation that the Corps was not permitting plaintiff to expand, and requested that Mr. Park attend an EIPOA meeting).

The EIPOA had no reason for concern.  At all times, plaintiff adhered to the order, and was acutely aware that any activity at the marina might be perceived as violating its terms.  For example, when plaintiff needed to move some of the marina's docks further out into the lake in November 1997 due to low lake levels, Mr. Walters first contacted the Corps to ensure that he would not be deemed to be in violation of the cease-and-desist order should the residents of Eden Isle complain to the Corps about his activities.  DX 89; Tr. 4883-86 (Walters).  Mr. Park reassured Mr. Walters that he could do whatever was necessary to protect the marina–even temporarily relocating the docks to the northern portion of the lease area.  DX 89.  However, because the Corps remained sensitive to the concerns of the Eden Isle property owners, Mr. Park decided to issue a press release announcing that due to the low lake level, marinas on Greers Ferry Lake may need to temporarily move their docks.  Id.

Not only did plaintiff abide by the cease-and-desist order, it did not even broach the topic of developing the marina until January 1998.  See DX 91.  Instead, plaintiff pursued another course of action.

## A.  Plaintiff's April 1997 Lawsuit Against Mr. Upton

On April 11, 1997, plaintiff, represented by attorneys John Belew and Harvey Bell, filed suit against Mr. Upton in the Circuit Court of Cleburne County, Arkansas.  Jt. Stip. ¶ 28; DX 87.  In its complaint, plaintiff generally alleged that Mr. Upton intentionally and maliciously interfered with its business expectations and contractual relationship with the Corps in an effort to force the sale of Eden Isle Marina to Mr. Upton or an entity controlled by Mr. Upton.  DX 87.  More specifically, plaintiff alleged:

> Subsequent to the Plaintiff's plan and announced intentions of orderly growth, the Defendant, through his own conduct, and through his agents, servants, employees, and persons acting for or in behalf of Defendant, undertook the intentional and malicious tortious interference with Plaintiff's economic expectancy.  Defendant stated, "the island itself cannot survive with this kind of invasive commercialism."  The Defendant, through the utilization of improper political influence and through a malicious course of conduct, has caused the Army Corps of Engineers through the Secretary of the Army to order the Plaintiff to cease and desist any further development of the boat dock and marina although such improvements had been approved.  The Plaintiff has been told by the Army Corps of Engineers that there will be no further expansion of the boat dock and marina.  Defendant maliciously caused the breach or termination of this contractual relationship and business expectancy.

Id. ¶ 5.

Plaintiff sued Mr. Upton, not the Corps, due to Mr. Walters's belief that Mr. Upton was responsible for pressuring the Corps to halt all development at the marina.  Tr. 4881 (Walters); accord id. at 4807 (Walters) (indicating that when Mr. Cabe presented the cease-and-desist order to Mr. Walters on October 25, 1996, he confirmed that Mr. Upton was responsible, but stated he would deny it in a court of law); DX 363 (containing more detailed allegations against Mr. Upton).  The Corps, Mr. Walters believed, was merely doing the best it could muster when faced with all of the political pressure brought to bear on the agency.  Tr. 4881 (Walters).  In fact, Mr. Walters considered the Corps employees he was dealing with–Mr. Cabe, Mr. Ragar, and Mr. Park–to be his friends who were looking out for him the best they could.  Id. at 4881, 5316, 5372 (Walters).  He trusted these individuals and relied on their representations, id. at 5316, 5372 (Walters), leading to his belief that they were working on plaintiff's behalf and trying to find a way to make plaintiff whole, id. at 5372 (Walters).

Mr. Walters continued to have faith that the Corps was looking out for plaintiff's best interests even after discovery in the Upton lawsuit revealed many of the Corps' internal communications from the prior year.  Significantly, Mr. Walters agreed that he learned much of what occurred in 1996 during plaintiff's lawsuit against Mr. Upton.  Id. at 4880, 5371 (Walters).  He obtained this information from:  (1) publicly available sources, see, e.g., DX 366 ¶¶ 1, 3 (noting that documents were obtained from the Federal Election Commission and implying that some documents came from local property records); (2) depositions, see, e.g., Tr. 439 (Ward) (noting that Mr. Ward was deposed), 5343-44 (Walters) (noting that Mr. Cabe, Mr. Ragar, Mr. Park, and possibly Mr. Roark were deposed); and (3) the Corps via a Freedom of Information Act ("FOIA") request, DX 363 ¶ 28.  In a December 4, 1997 affidavit, Mr. Walters indicated his familiarity with Mr. Upton's correspondence with the Corps and Mr. Lancaster's October 25, 1996 letter.  DX 363 ¶¶ 11, 18.  In a July 15, 1998 affidavit, Mr. Walters indicated that he had obtained from the Corps a drawing of the development proposed for the marina in 1981 and 1982; documents regarding the marina dated April, May, and July 1996; and a copy of a master plan depicting proposed covered docks after February 1996.  DX 366 ¶¶ 2, 4-5.  And, Mr. Walters testified at trial that the Corps fact sheet presenting a timeline of events from February 2, 1996, through January 4, 1999, was produced during the litigation.  Tr. 4901, 4908 (Walters) (referring to PX 79).  The timeline in the fact sheet reflects, among other events, Mr. Lancaster's attendance at a reception at Red Apple Inn on October 7, 1996; Colonel Morris's receipt of Mr. Lancaster's October 25, 1996 letter expressing his opposition to development at the marina; Colonel Holden's September 24, 1998 meeting with Mr. Berry to ascertain Mr. Berry's position on plaintiff's request; and Mr. Berry's October 5, 1998 letter expressing his continued opposition to development.  PX 79.

Proceedings in the lawsuit concluded in 1999.  Id. at 5338 (Walters).  Mr. Upton prevailed; the state court found that Mr. Upton's lobbying efforts constituted a protected activity that could not be the basis for lawsuit.  Id. at 4881-82 (Walters).

## B.  Plaintiff's February 1998 Meeting With the Corps

While plaintiff's lawsuit against Mr. Upton was pending, one of plaintiff's attorneys wrote a letter to the Corps to request a meeting to discuss the possibility of lifting the cease-and-

desist order and allowing further development at Eden Isle Marina. DX 91. In the letter, Mr. Belew indicated that there was a need to expand the marina to accommodate the demand for boat slips, specifically noting that the marina had a 100-person waiting list. Id.; accord PX 35 (reflecting that Colonel Morris recognized the "growing demand" for boat slips at the marina as of June 1996); PX 56 (reflecting the Corps' recognition of the demand for boat slips and the existence of a waiting list at the marina as of October 1996); Tr. 1751 (Park) (noting that the marina had a waiting list and that there people who supported plaintiff's request to expand the marina), 2324 (Holden) (recognizing the existence of a waiting list at the marina), 4761 (Walters) (noting that there was "unbelievable" demand for boat slips after plaintiff purchased the marina that could not be met), 4762-63 (Walters) (remarking that plaintiff submitted a ten-year plan due, in part, to the "astronomical" demand).

The requested meeting occurred on February 10, 1998, at the marina. PX 59; PX 60. Representing plaintiff at the meeting were Mr. Walters, Mr. Belew, Mr. Bell, and the marina manager, who was also Mr. Walters's sister. PX 59; PX 60. Attending the meeting on behalf of the Corps were Mr. Cabe, Mr. Ragar, Ms. Best, Mr. Park, Mr. Roark, and Mr. Johnson. PX 59; PX 60. During the meeting, the participants discussed plaintiff's options for developing the marina. PX 59; PX 60. One option discussed was the placement of new docks in the southern portion of the lease area. PX 60. The Corps employees indicated that they would entertain a request to expand the marina within the existing lease area to meet plaintiff's immediate need, but could not guarantee that the request, which would overturn the cease-and-desist order, would be granted. Id.; PX 59.

Also discussed during the meeting was the possibility of providing plaintiff with an alternative site for expansion.[47] PX 59; PX 60. This was not the first time that the Corps suggested compensating plaintiff for its inability to fully develop the marina with an alternative marina site; the possibility was mentioned in Mr. Cabe's June 3, 1996 letter rejecting plaintiff's long-term development plan. See PX 36. However, it was the first time that specific sites– which are depicted in Figure 2, an excerpt from PX 5–were discussed. One site, Miller's Point, was suggested by Mr. Park but rejected by Mr. Walters as a terrible location to build a marina due to the area's isolation. PX 59; PX 60; Tr. 4890-92, 4919-20, 5145, 5147 (Walters). Mr. Walters then suggested an area near the entrance to Eden Isle. PX 59; Tr. 4892, 5145, 5147 (Walters). The Corps rejected this idea, noting that the Eden Isle property owners would object. Tr. 5145, 5147 (Walters). Mr. Walters then floated the idea of Cove Creek Park, believing that the existence of Corps facilities, including campgrounds, at that location might provide a customer base for a marina. Id. at 4919, 5145-47, 5219 (Walters). Mr. Park agreed that the existence of campgrounds at Cove Creek Park would make the park a good location for a marina, id. at 5219 (Walters), but no further discussion of alternative sites occurred. After the meeting, plaintiff began to make plans to develop the southern portion of the lease area. Id. at 5317 (Walters).

---

[47] The evidence in the trial record contains some conflicting information regarding who initiated this discussion, the particular alternative sites discussed, and who suggested the particular alternative sites. The court has reviewed the conflicting evidence; what is set forth in the opinion reflects its resolution of those conflicts.



Figure 2

## C.  A New District Engineer for the Little Rock District

### 1.  Tension Between Mr. Berry and Colonel Morris

At the same time that plaintiff was seeking to restart development at Eden Isle Marina, the Little Rock District was encountering political pressure regarding another lake within its jurisdiction.  The instigator was Mr. Berry, who, having won his election, was the United States congressman representing the first congressional district of Arkansas.  Id. at 640, 713 (Berry).  Sometime after he assumed office, Mr. Berry called Colonel Morris on behalf of one of his friends–a lobbyist for Tyson Foods, Inc.–who wanted to build a private boat dock on Beaver Lake despite the moratorium on private docks.[48]  Id. at 804-05 (Morris).  Colonel Morris advised Mr. Berry that legally, he could not make an exception to the moratorium, and instead suggested that Mr. Berry's friend apply for a community dock.  Id. at 805 (Morris).  Mr. Berry was

---

[48]  Beaver Lake is located in northwest Arkansas and was not in Mr. Berry's congressional district.  Tr. 805 (Morris).

unhappy with this response.  Id. at 806 (Morris).  He told Colonel Morris that he would get him fired, and asked for his superior's name.  Id.  However, when Mr. Berry called Colonel Morris's superior, Brigadier General Henry Miller, Jr., commander of the Southwestern Division,[49] and demanded that Colonel Morris be fired, Brigadier General Miller declined, advising Mr. Berry that Colonel Morris correctly rejected his request.  Id. at 806-07 (Morris).  Indeed, shortly thereafter, Brigadier General Miller's superior, the Corps' Chief of Engineers, told Colonel Morris that he had heard about his run-in with Mr. Berry and confirmed that he had done the right thing.  Id. at 807 (Morris).

After this incident, Colonel Morris found his working relationship with Mr. Berry to be "very difficult . . . ."  Id.  For the next few months, communications with Mr. Berry were accomplished through Colonel Morris's civilian deputy, David Burrough, who had known Mr. Berry for thirty years.  Id.  However, that relationship soured when Mr. Berry accused Mr. Burrough of lying to him, which, from Mr. Berry's perspective, also made Colonel Morris a liar. Id. at 807-08 (Morris); accord id. at 808 (Morris) (calling the relationship "testy"), 1262 (Morris) (calling the relationship "strained"); see also id. at 774 (Berry) ("I did have great difference with Colonel Morris, found him not to be a man of great–of any integrity.").  After Mr. Burrough retired, the problems subsided.  Id. at 808 (Morris).  However, Mr. Berry made it known that he would attend Colonel Morris's change of command ceremony–typically, a new district engineer was assigned to the district every three years[50]–to ensure Colonel Morris actually left the district.[51]  Id.

---

[49]  Colonel Morris's superior is only identified in the trial record as General Miller.  Tr. 806-07 (Miller).  The court takes judicial notice pursuant to FRE 201(b)(2) of Brigadier General Miller's full name, rank, and position.  See Southwestern Division History, U.S. Army Corps of Engineers, http://www.swd.usace.army.mil/About/History.aspx (last visited July 24, 2013).

[50]  Colonel Morris served as the district engineer from July 1995 to July 1998.  Jt. Stip. ¶ 18.  His successor, Colonel Holden, served from July 1998 to July 2001.  Id. ¶ 19.

[51]  Mr. Berry's personal disdain for Colonel Morris is further exemplified by his testimony at trial concerning Colonel Morris's duties during Mr. Lancaster's visit to Eden Isle:

Q      . . . Colonel Morris couldn't attend, could he, because it was a fundraiser?
A      I suppose.  I don't [know].
Q      Okay.  Were you aware that Colonel Morris was sitting out in his car waiting for Secretary Lancaster and couldn't come in?
A      No.
Q      Okay, we'll ask him about that.
A      That's good for colonels.
Q      I'm sorry?
A      That's good for colonels.
Q      To sit out and wait?  Sometimes you're [sic] taxi drivers?
A      Yes.

The change of command occurred in July 1998.  Jt. Stip. ¶ 19.  As promised, Mr. Berry attended the ceremony, Tr. 808-09, 1262 (Morris), 2325-26 (Holden), missing a day of House proceedings to do so, id. at 809 (Morris).

## 2.  The Arrival of Colonel Holden

During the week prior to the change of command, Colonel Morris briefed Colonel Holden on the issues in the Little Rock District.  Id. at 2328 (Holden).  Colonel Morris mentioned his issues with Mr. Berry.  Id. at 2328-29 (Holden).  He also advised Colonel Holden about the Eden Isle Marina situation, noting that he had received a letter from Mr. Lancaster; that based on the information before him, he had stopped plaintiff's development of the marina; and that the issue was something that Colonel Holden would need to address.  Id. at 2330-32 (Holden); accord id. at 2413 (Holden).  Colonel Morris did not provide many details about the marina situation, such as the fact that Mr. Lancaster had visited Eden Isle.  Id. at 2331-32 (Holden).  Colonel Holden learned more about the marina situation after he was formally installed as district engineer from his staff.  See id. at 1873 (Cabe) (noting that each of the district's division chiefs briefed Colonel Holden).

## D.  Plaintiff's August 12, 1998 Request for New Boat Slips

Not long after Colonel Holden became the district engineer of the Little Rock District, plaintiff sought permission to build new docks at Eden Isle Marina.  In an August 12, 1998 letter to Mr. Cabe, Mr. Walters requested that the Corps lift the cease-and-desist order in writing and allow him to add three sixty-stall docks (to be designated T, U, and V docks) and a twelve-stall addition to an existing dock (S dock)–for a total of 192 new boat slips–at the marina.  DX 97.  All of these docks were to be located in the southern part of the lease area, id., an area in which the Corps had previously stated it would permit development, see, e.g., PX 36.  In support of this request, Mr. Walters enclosed approximately 150 requests for boat slips that plaintiff had collected over the prior three years, which represented some, but not all, of the current demand for boat slips at the marina.  DX 97.  In further support of his request, Mr. Walters represented that he was awaiting bids from two dock manufacturers and that he had secured financing from The Cleburne County Bank.  Id.  Then, after noting that the marina had sufficient parking to accommodate the new boat slips and that plaintiff owned land adjacent to the lease area, he requested permission to build parking closer to the proposed docks.  Id.  Mr. Walters concluded his letter as follows:  "Eden Isle Marina has lost substantial profits and business because of not being able to provide our existing and prospective public customers the previously approved facilities, and damages in connection thereto.  Please approve this request promptly with written approval."  Id.  In fact, Mr. Walters anticipated that his request would be approved because he had been told previously that development of the southern portion of the lease area was acceptable.  Tr. 4899 (Walters).  Unfortunately for plaintiff, however, prompt approval of its development request was not forthcoming.

---

Tr. 711-12 (Berry).

### E. The Corps' Consideration of Plaintiff's Request

On August 19, 1998, shortly after receiving plaintiff's request to build 192 new boat slips at Eden Isle Marina, Mr. Cabe sent Mr. Walters an "interim response,"[52] in which he indicated that the Corps would meet and review plaintiff's proposal and requested that Mr. Walters provide a sketch showing where plaintiff's private property was located in relation to the lease area. PX 70. Mr. Cabe further noted that he anticipated having a decision for Mr. Walters by September 25, 1998. Id.

### 1. The Corps' Internal Discussions

Corps employees scheduled a meeting to discuss plaintiff's development request for August 25, 1998. PX 72. Prior to the meeting, a fact sheet was prepared and circulated to the attendees that contained a chronology of events regarding Eden Isle Marina, as well as the Real Estate Division's position on the request: "Because of the controversy surrounding the construction, we should contact Marion Berry and inform him that we have a request for additional docks. We should inform Mr. Berry there is no legitimate reason for denying the request. Mr. Walters should be told he will have to use his private property for parking." PX 71; accord Tr. 2388-89 (Holden) (acknowledging that his staff advised him that there was no legitimate reason to deny plaintiff's request), 2403 (Holden) (stating that he "needed to" inform Mr. Berry "of the facts and the direction we were going"). Mr. Walters was not informed at this time that there was no legitimate reason to deny plaintiff's request. Tr. 4900 (Walters).

Attending the August 25, 1998 meeting were Colonel Holden; Mr. Cabe; Mr. Ragar; Ms. Best; Mr. Park; Thomas "Phil" Risher, the deputy chief of the Operations Division, id. at 1776 (Park); and Edward Watford from the district's Project Management Division, PX 85.[53] PX 72. One individual who was invited, but could not attend due to a schedule conflict, was Michael Miller. Id. Mr. Miller was the chief of the Operations Division in the Little Rock District,[54] PX 257-B, and "was responsible for the operations and maintenance budget and the operations of all the project field offices," Tr. 3196 (Noggle). In an electronic-mail message noting his

---

[52] The use of an interim response was standard operating procedure when an immediate answer was not available. Tr. 209 (Ragar).

[53] Because the trial record does not contain any documents memorializing the meeting, the court deduced the participants from a series of electronic-mail messages from August 24, 1998, in which a copy of the Fact Sheet was circulated and discussed in advance of the meeting. See PX 72.

[54] The Operations Division was previously named the Construction-Operations Division. See, e.g., PX 62 at 3; Tr. 815, 832 (Morris). Because the timing of the change in nomenclature is not set forth in the trial record, and for simplicity, the court refers to this division throughout this opinion as the Operations Division.

unavailability, Mr. Miller stated that the Operations Division needed to develop a position and remarked: "Sounds political, but we don't need to be pushed somewhere we don't need to go. Remember the [district engineer]'s common sense rule." PX 72.

The trial record does not contain any documents memorializing the August 25, 1998 meeting.[55] However, it appears that Colonel Holden requested information from his staff regarding plaintiff's earlier attempt to develop the marina. He learned about Colonel Morris's electronic-mail message documenting Mr. Lancaster's October 24, 1996 telephone call, Mr. Lancaster's October 25, 1996 letter, and Mr. Cabe's June 3, 1996 letter rejecting plaintiff's development plan. Tr. 2391-92 (Holden). He was also told that plaintiff's original request was denied due to complaints from adjoining property owners and political influence, id. at 2393-94 (Holden), that Mr. Lancaster visited Eden Isle, id. at 2398 (Holden), and that the cease-and-desist order was inconsistent with the development plan, id. at 2422 (Holden). Colonel Holden requested copies of Colonel Morris's electronic-mail message documenting Mr. Lancaster's October 24, 1996 telephone call, Mr. Lancaster's October 25, 1996 letter, and the marina's waiting list for boat slips, PX 73, so that he could explore plaintiff's request further and understand why plaintiff's development request was denied in the first place, Tr. 2391-93 (Holden).

A second internal meeting was scheduled for September 10, 1998, involving a broader group of Corps employees.[56] PX 74. As with the earlier meeting, Colonel Holden, Mr. Cabe, Mr. Ragar, and Mr. Park were in attendance. Id. Also present were Mr. Miller, Dale Leggett, Kenneth Lyon, Bob Faletti, Ralph Allen, and Nancy Brooks. Id. Mr. Leggett was the head of the Operation Division's Natural Resources Management Branch. PX 170; PX 329 at 5-6. Mr. Lyon was from the Little Rock District's regulatory office. PX 355-A. Mr. Faletti was from the district's public affairs office. Tr. 2427 (Holden). Mr. Allen was an attorney in the district's Office of Counsel. PX 75. And, Ms. Brooks was an attorney in the district's Real Estate Division. Tr. 624 (Cabe), 2428 (Holden). Meetings with so many participants were not typically convened when a marina operator submitted a request to build additional docks or boat slips within an existing lease area. Id. at 2425 (Holden). However, it was not unusual for a new district engineer to approach a decision cautiously and involve a greater number of people in the decision-making process to cover his bases. Id. at 1876 (Cabe). Thus, with respect to plaintiff's request, Mr. Leggett was asked to participate in the meeting due to purported environmental concerns, id. at 2424-25, 2427 (Holden), and two attorneys were asked to attend the meeting so that Colonel Holden, given the risk of litigation, could have two legal opinions, id. at 2433-34 (Holden); accord id. at 2453-55 (Holden) (noting that he worried about a lawsuit regardless of

---

[55] Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files, Tr. 2407 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 1872 (Cabe), 2408 (Holden).

[56] Because the trial record does not contain any documents memorializing the meeting, the court derived the names of the participants from a September 1, 1998 electronic-mail message advising the recipients to plan to attend the meeting. See PX 74.

how he decided to proceed).  The trial record does not contain any documents memorializing the meeting, but does contain evidence that the meeting occurred as scheduled.[57]  See PX 79; see also PX 75 (containing a September 10, 1998 memorandum prepared by Mr. Allen addressing the pros and cons of granting plaintiff's development request).

The Corps held a third meeting on September 18, 1998, with "all offices involved," to review its options, and another meeting on October 15, 1998, with "District Office personnel" to review additional information.  PX 79.  However, once again, the trial record does not contain any documents memorializing these meetings.[58]

Although there is no contemporaneous documentation of the discussions that occurred during the Corps' August 25, September 10, September 18, and October 15, 1998 meetings, the testimony at trial revealed that two important issues were addressed during one or more of the meetings:  the existence of docks purportedly outside of the lease area and alternative marina sites.

### a.  The Docks Purportedly Outside of the Lease Area

The first major topic of discussion within the district office was whether plaintiff had docks outside of Eden Isle Marina's existing lease area.  See, e.g., Tr. 2337-38 (Holden).  As noted above, Mr. Ragar had previously determined, based on a comparison of a map of the lease area with aerial photographs of the marina, that some of the docks extended out in the water beyond the lease area's boundary.  Id. at 184 (Ragar).  Mr. Ragar advised Mr. Walters around July 31, 1996, that the Real Estate Division would take measures to remedy the situation "possibly by adding additional water area to the lease."  DX 71.  However, the Corps never took that action.

Plaintiff's request to build 192 new boat slips at the marina revived the issue.[59]  Corps employees advised Colonel Holden that plaintiff might have docks extending beyond the lease area boundary and that the lease area boundary was not clearly determined.  Tr. 2357, 2364-35, 2389 (Holden).  Colonel Holden decided that the marina's lease area boundary was an issue that

---

[57]  Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files, Tr. 1880 (Cabe), 2464 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 1880 (Cabe).

[58]  Pursuant to Corps policy, the September 18, 1998 meeting should have been memorialized in writing for the Corps' files, Tr. 2467 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id.

[59]  In an April 1999 memorandum, Mr. Cabe provided an explanation for the Corps' failure to take any action regarding the docks at issue between the summer of 1996 and the receipt of plaintiff's development request in August 1998.  PX 109-A.  The memorandum is discussed in more detail below.

needed to be addressed.  Id. at 2353 (Holden); accord id. at 2514 ("[O]nce [it was] brought to my attention [that we] were not in compliance with the contract, even if both parties had sincerely honored the contract to the best of their abilities, that doesn't compel us to continue doing something wrong because we are exposed from other parties that may take exception we're not enforcing the terms.").  Accordingly, Corps employees "check[ed]" the lease area and confirmed Mr. Ragar's prior assessment "that parts of several docks east of the breakwater were in fact outside of the reasonable area of the lease."  PX 109-A.

Several Corps employees recommended reconfiguring plaintiff's lease area to accommodate the docks that extended beyond the lease area's boundary.  See, e.g., Tr. 184-90 (Ragar), 1756-57 (Park), 2369 (Holden).  Two of these employees–Mr. Ragar and Mr. Miller– suggested that rather than increasing the overall size of the lease area as Mr. Ragar proposed in July 1996, the Corps reconfigure the lease area boundaries so that plaintiff retained the fifty-one acres described in the 1995 lease.  Id. at 184-90 (Ragar), 2369 (Holden); cf. PX 21 at 84 (containing the relevant lease area description).  At no time did Colonel Holden intend to direct plaintiff to remove the offending docks, id. at 2585 (Holden), and had plaintiff not ultimately agreed to the reconfiguration of the lease area, the Corps likely would have "reestablished the boundaries further out" to accommodate the docks, id. at 2370 (Holden).  Mr. Walters was never advised that no adverse consequences would flow to plaintiff from the docks purportedly extending beyond the boundary of the lease area.  Id. at 2371, 2592-93, 2623 (Holden).  Indeed, had Mr. Walters known that plaintiff would not have had to move the docks, he would have rejected the Corps' proposal, discussed below, regarding plaintiff's development request.  Id. at 4942, 4951 (Walters).

### b. Alternative Marina Sites

Because the meeting participants were discussing limiting plaintiff's ability to fully develop Eden Isle Marina, the second major topic of discussion within the Little Rock District was whether plaintiff should be offered an alternative marina site as compensation for the lost development opportunity, and if so, what location should be offered.  See, e.g., id. at 210 (Ragar).  As noted above, the possibility of using Cove Creek Park as an alternative marina site for plaintiff had been raised during a February 10, 1998 meeting between Mr. Walters and Corps employees.  Id. at 4919, 5145-47, 5219 (Walters).  After plaintiff submitted its request to add 192 boat slips at the marina, the Corps revisited the use of Cove Creek Park as an alternative marina site.[60]  In fact, Corps employees, including Mr. Miller, Mr. Park, Mr. Leggett, Mr. Cabe, Mr. Ragar, Ms. Best, and Win Hargis, another Real Estate Division employee, PX 121, represented to Colonel Holden that Cove Creek Park was feasible site at which to locate a marina.  Tr. 2582-83 (Holden); see also id. at 2316 (Holden) (stating that the Little Rock District had the capability to determine a feasible marina site).

---

[60]  There is no documentary evidence in the trial record that Corps employees discussed using Cove Creek Park as an alternative marina site.  However, given that the Corps offered Cove Creek Park to plaintiff upon concluding its internal deliberations, the court presumes that such discussions occurred.

## 2. Requesting Additional Information From Plaintiff

While the Corps was engaged in its internal deliberations, it decided to request some additional information from plaintiff. In a September 16, 1998 letter, Mr. Cabe asked Mr. Walters to provide "a conceptual plan showing additional parking" indicating "a typical section showing grade, elevation, any cut and fill required." PX 78. Mr. Cabe indicated that the Corps' "need for this additional information" would delay its decision on plaintiff's request to add 192 boat slips at Eden Isle Marina. Id. The Corps' request was not standard operating procedure. Tr. 1796, 1798 (Park). In fact, from Mr. Walters's perspective, it was "quite obvious" that the real reason for the delay was to give the Corps sufficient time to obtain the approval of Mr. Upton and Mr. Berry. Id. at 4908 (Walters). However, Corps employees denied at trial that the request was a delay tactic. Id. at 1909-10 (Cabe), 2465 (Holden). Moreover, it was Colonel Holden's position that the request was reasonable because it concerned "the environmental impacts of additional traffic . . . ." Id. at 2466 (Holden).

## 3. Colonel Holden's Opinion on Plaintiff's Earlier Attempt to Develop Eden Isle Marina

Throughout the Corps' internal deliberations, Colonel Holden received and reviewed a large amount of information regarding plaintiff's attempt to develop Eden Isle Marina prior to the cease-and-desist order, including reports from his staff and relevant documentation. According to Colonel Holden, his information gathering reflected his approach to tackling an issue; at trial he testified: "[W]hen it's brought to my attention that there may be an issue, it's my responsibility to determine what it is, what are our options, and what should we do. And that's how I learned a lot about how marinas operate because it was the beginning of my education." Id. at 2390-91 (Holden).

Based on all of the information at his disposal, Colonel Holden formed an opinion concerning the Corps' rejection of plaintiff's original long-term development plan. However, his testimony at trial on this point was contradictory. On the one hand, he testified that it was improper for the plan to be rejected based on opposition from adjacent property owners and politicians. Id. at 2394 (Holden). He also said that he had "reservations,"[61] id. at 2815 (Holden),

---

[61] This testimony was in response to the court questioning whether Colonel Holden thought the Corps had treated plaintiff fairly by issuing the cease-and-desist order. See Tr. 2815 (statement of the court). Colonel Holden avoided answering the court's question, instead stating:

> I had reservations, but I didn't dig to undo it based on that. What I did was in the context of the request that we would consider favorable, which we did. . . . But I can't say that I would go as far to say that I had problems with what my predecessor did, but I was intrigued when I received it, because it is a very substantial decision to tell him that he will not do anything further, and do not ask, which I don't know what that was done. I knew only what I had read. I don't know what else there was.

and "strong concerns," id. at 2819 (Holden), about the issuance of the cease-and-desist order, and "would not have made that decision on the evidence that [he] was presented," id. at 2821 (Holden); see also id. at 2414 (Holden) (indicating that upon reviewing of all of the documents, he did not think that plaintiff did anything improper at the time of the cease-and-desist order). On the other hand, he claimed that he was unable to determine the propriety of the rejection of the plan and the cease-and-desist order because he did not have all of the information that was before Colonel Morris when those decisions were made.  Id. at 2397-98, 2511, 2627, 2813-16 (Holden); see also id. at 2414 (Holden) (noting that in 1998, he believed the cease-and-desist order meant that plaintiff had done something improper); cf. id. at 2398 (Holden) (noting that he was not concerned by Mr. Lancaster's and Mr. Berry's visit to Eden Isle, the correspondence from Mr. Lancaster expressing his personal opposition, or the cease-and-desist order).  In fact, Colonel Holden indicated that he had not been concerned with the cease-and-desist order because he did not have the "ability to address it."  Id. at 2398 (Holden).

**4.  Recommendations Made to Colonel Holden Regarding Plaintiff's Development Request**

In addition to requesting information concerning plaintiff's earlier attempt to develop Eden Isle Marina, Colonel Holden sought and received advice from his staff regarding the disposition of plaintiff's current request to add 192 boat slips at the marina.  As previously noted, the Real Estate Division's initial position on plaintiff's request was:  "[T]here is no legitimate reason for denying the request.  Mr. Walters should be told he will have to use his private property for parking."  PX 71; accord Tr. 2388-89 (Holden) (acknowledging that his staff advised him that there was no legitimate reason to deny plaintiff's request).  In addition, Mr. Cabe, Mr. Miller, and Mr. Park–three individuals who Colonel Holden trusted and respected–all recommended to Colonel Holden that plaintiff should be permitted to develop the marina in the southern portion of the lease area.  Tr. 2333 (Holden).  Colonel Holden also received advice from Corps' attorneys at the district office.[62]

**a.  Advice From the Office of Counsel**

Colonel Holden first sought advice from the Little Rock District's Office of Counsel, requesting that the office provide him with a list of pros and cons of granting plaintiff's development request, as well as a legal recommendation.  Id. at 2441 (Holden).  In a September 10, 1998 memorandum, Mr. Allen responded to Colonel Holden's request:

1.  PROS:
- No legal reason for denial
- Will lose a lawsuit and may pay big damages or lost profits
- Marinas reduce lake-wide private dock pressure

Id. at 2815-16 (Holden).

[62]  Defendant waived the attorney-client and work-product privileges that normally would have attached to the documents being addressed in this section.  See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480 (2009).

- Will provide future expanded service to the public, per ER 405-1-12, at p. 8-90
- Owner already has 150+ requests for future boat slips
- This expansion has been planned for 20+ years at this site
- Local residents have always been able to check with Resident Office and learn about this expansion
- Present marina owner has relied on Corps representations that he can expand in the future (he bought the marina in 1995)
- Corps in the past has recommended this southern area for expansion
- Eden Isle [Marina] owner has been a good operator
- If denied, negative effect on marina owners association
- No other marina owner is known in this district to have been denied permission to expand in owner's existing lease area
- Owner has a $500,000 bank letter-of-credit for expansion (positive steps taken)
- [Red] Apple Properties advertises this marina as a positive feature!

2.  CONS:
- Some local residents are against this plan
- Increased boat slips does mean increased traffic
- Former ASACW (Lancaster) was against this expansion
- House Representative may be against this expansion
- Moving this marina is too expensive and not a real option
- Regulatory review if any parking on public land

3.  OTHER THOUGHTS
- Since marina and plan were [there] first, no decreased value on nearby property owners
- Private launch ramp remains unless marina owner is moved; this ramp is a benefit to the community
-No known safety problems with this request

4.  LEGAL RECOMMENDATION
        Office of Counsel finds no legal basis for denial of Eden Isle Marina owner's request for expansion in the southern area of his marina lease. Recommend approval of request and that facts, maps, and request should be copied and quickly explained to the Congressional delegation and [Corps headquarters] along with the expected decision to grant the request.  A public meeting is not required, but some type of public forum may be helpful.

PX 75; see also Tr. 2419 (Holden) (noting that his nonlegal staff advised him that due to Mr. Lancaster's opposition to development at the marina, the Little Rock District's authority to allow development was tenuous).  Mr. Walters did not see this document until 2005, Tr. 4902 (Walters), and the Corps never advised him that it did not believe there was a legal basis for the denial of plaintiff's request, id. at 4905-06 (Walters).[63]

--------

        [63]  Because these were attorney-client communications, the Corps did not have the duty

### b.  Advice From Real Estate Division Counsel

Colonel Holden next sought legal advice from the Real Estate Division.  Ms. Brooks's analysis was contained in an undated briefing paper:[64]

Current Situation - The lessee has requested permission to construct 192 slips in the southern portion of his lease.  There have been letters for and against the construction.  Congressman Marion Berry opposes the development.  The district favors allowing the requested development and is trying to negotiate with the lessee to find an alternate site to replace the area north of the dike.  The development as it is proposed is not intrusive.

Scope of Development - The lessee proposes to use the existing public road to access his lease site.  There will be no dredging or trees cut for parking.  The existing parking on Corps property and Mr. Walters'[s] adjacent private property [is] adequate for the additional slips.  Approximately a dozen trees will need to be removed to construct a footpath to the additional docks.  Any tree to be removed must be approved by the project office.

District position - The district proposes that we allow the development since it is authorized by the lease.  In reviewing the request, the district discovered [it] had approved docks which are outside the water portion of the designated lease area.  The district proposes to change the lease boundary to enlarge the water area to include the existing docks [and] the requested docks, and remove the remaining area from the lease.  To compensate for the loss of 1000 feet of shoreline, the district proposes to grant 1000 feet of land in the Cove Creek Park.

The marina operator has never threatened any kind of legal action to enforce his right to maximize the return on this investment, however, if we outright deny his proposed addition of three new docks containing 150 new slips, we leave him no option but to appeal or file suit.

. . . .

---

to share the document or its contents with Mr. Walters.  Indeed, if Mr. Walters believed that the Corps was acting contrary to the terms of the lease, it was incumbent on him to obtain his own legal opinion.

[64]  Ms. Brooks's name does not appear on the briefing paper.  However, during trial, defense counsel stipulated that Ms. Brooks prepared the document.  See Tr. 1890 (statement of defense counsel).

If we deny the additional slips, we would point to the county road and the residential nature of the entrance to the marina.  The attorney for the marina operator would, without a doubt, try to compare the Eden Isle Marina to other marinas on Greers Ferry Lake and other lakes in the Little Rock District, comparing their neighborhood locations and the county roads leading to each marina[,] and would point to similarities with this marina and its neighborhood location.

1.  If we approve construction of the additional slips and "let the chips fall," we may encounter repercussions from the Eden Isle Property Owners Association and congressional inquiries.

If the property owners or an attorney for any of the property owners[] then attempt to stop the additional slips, they would put themselves in the position of being the possible defendant in a suit by the marina operator for lost profits, and/or malicious interference with business practices.

We are not sure what the repercussions would be from the congressman.  We don't believe he could get legislation passed in time to block the additional slips.

2.  Re-negotiate with the Marina Operator, allowing him to add fewer slips, reconfiguring the lease area to keep all slips within the area, taking away the north and southern most part of the lease area and giving him a time extension of his lease with the same (old) rental system.  Allowing him to remain under the old rental system is financial[ly] advantageous to him, as well as having a longer-term lease.

If the marina agrees with this option, we could then begin a PR campaign to win support [and] minimize opposition to this plan.

PX 76; see also Tr. 3555-56 (Murdock-McDaniel) (noting that a revised graduated rental system was normally required for new leases, and that use of the older graduated rental system was more beneficial to lessees).  The briefing paper concluded with a summary of what plaintiff and the property owners would gain and lose if plaintiff agreed to a renegotiation of its lease.  PX 76.  Plaintiff would gain the approval of approximately 200 new boat slips, the retention of the older, more financially advantageous rental system, and an extension of the term of the lease, but would lose the northern and southern portions of its lease area, the ability to develop in the future, and the approximately 280 boat slips that it had originally proposed in its long-term expansion plan.  Id.  The property owners would gain by seeing fewer new boat slips at the marina than requested by plaintiff; a prohibition of future development, dredging, and clear-cutting of trees; and the assurance that there would be no development in the northern and southern portions of the existing lease area.  Id.  All that the property owners would lose was that the Corps would allow some development at the marina.  Id.

The Corps never advised Mr. Walters that it was concerned about the residential nature of the road to the marina or the possibility of retaliatory litigation from Mr. Berry.  Tr. 4924-25 (Walters).

### c.  Summary of Legal Advice

Once Mr. Allen and Ms. Brooks provided their legal advice to Colonel Holden, someone at the Corps summarized the Corps' options in an undated, untitled document:

1.  We can deny expansion for a valid reason because condition 3(c) allows construction of additional facilities only after obtaining written approval of the District Engineer.  However, Condition 4 states the lessee has the right to erect such structures as are necessary to meet demand with the District Engineer[']s approval of location and design.

The lease encourages development of the lease area.  . . .

The lease allows termination only for noncompliance of the lessee.  If the lessee is agreeable, the lease can be renegotiated.

2 & 3 - Public Hearing - Recommend against public hearing or comments for use of existing lease area for activities authorized by the lease.  . . .  We have never held public comment period for a request for additional docks.

4.  If meeting were held with select individuals, would suggest Mr. Upton, and his attorney, and President of the Eden Isle Property Owners Association.

5.  If denied, believe Mr. Walters would sue and probably win, as substantiated by Nancy Brooks, Attorney-Real Estate and Ralph Allen, Attorney-Office of Counsel, Attorney's Opinions provided at last meeting.  . . .

6.  Options:  a.  Deny construction and wait out appeal process by Mr. Walters.  This method could cost the Corps an estimated $1.5 million and is not recommended.

b.  Meet with Mr. Upton, Mr. Walters and their attorneys to try and work out an equitable solution.

c.  Approve construction of the docks Mr. Walters has requested and deal with the repercussions as they come from the property owners association, Mr. Upton and congressional inquiries.  Marion Berry should be told in advance by the Colonel that upon the [advice] of his attorneys he is going to allow the docks to be built as requested.

PX 77.  It was Colonel Holden's position that the Corps had to explain to Mr. Upton and the EIPOA what the Corps was planning to do "so they understood."  Tr. 2531 (Holden).  Mr. Walters was unaware of the advice contained in this document.  Id. at 4927, 4929 (Walters).

### 5.  Input From Mr. Berry

In addition to conferring with his staff, Colonel Holden conferred with Mr. Berry about plaintiff's request to add 192 boat slips at Eden Isle Marina.  At the end of September 1998,[65] Colonel Holden and Mr. Watford met with Mr. Berry in Brinkley, Arkansas.  Id. at 2566 (Holden); PX 79.  The trial record does not contain any contemporaneous documentation of the meeting;[66] rather, the first documents prepared by the Corps that acknowledged this meeting were a December 22, 1998 letter from Colonel Holden to Mr. Ward, PX 85, a December 28, 1998 letter from Colonel Holden to Cleburne County Judge Claude Dill, PX 86, and a January 5, 1999 fact sheet, PX 79.

At trial, Colonel Holden testified that the meeting with Mr. Berry was a courtesy, Tr. 2395 (Holden), and something he would do for any member of Congress, id. at 2483 (Holden).  But, a document prepared less than four months after the meeting reflects that the purpose of the meeting was to advise Mr. Berry of plaintiff's request and determine his position.  PX 79.  During the meeting, Colonel Holden and Mr. Watford informed Mr. Berry of the Corps' desire to be sensitive to the needs and concerns of all members of the public, as well as the Corps' contractual responsibilities under the 1995 lease.  PX 84; PX 85; PX 86.  Although Colonel Holden indicated at trial that he could not remember what he told Mr. Berry specifically, he felt that it was likely that he would have informed Mr. Berry that there was no legitimate reason to deny plaintiff's request.  Tr. 2405, 2462, 2567 (Holden).  He was also confident that he would have told Mr. Berry that he did "not suffer political influence" and would not "change direction" solely due to Mr. Berry's opinion.  Id. at 2568 (Holden); accord id. at 2394-95 (stating that he did not confer with politicians in developing a response to plaintiff's request; he is his own man; he advised Mr. Berry of what actions he would be taking based on the facts and what was best for "Mr. Walters, the local residents, [and] the recreating public that has an interest in the marinas"; and his decision had "nothing to do with Congressman Berry's political pressure").  Mr. Walters was not informed about the meeting with Mr. Berry when it occurred.  Id. at 4909 (Walters).

In a September 24, 1998 letter, Mr. Berry thanked Colonel Holden for meeting with him and keeping him apprised of the marina situation.  PX 78-A.  Mr. Berry apparently wrote a

---

[65]  The evidence in the trial record indicates that the meeting occurred either on September 21, 1998, PX 79, or September 24, 1998, PX 84; PX 85; PX 86.

[66]  Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files, Tr. 2469 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 2570 (Holden).

second letter to Colonel Holden on October 5, 1998, indicating his continued opposition to further development at the marina.[67]  PX 79.

According to Colonel Holden, he did not have any further communications with Mr. Berry about the marina.  Tr. 2483 (Holden).  However, Mr. Berry continued to communicate with other individuals at the Corps.  On November 17, 1998, Mr. Berry sent a letter to Dr. Joseph Westphal, who had succeeded Mr. Lancaster as the Assistant Secretary.[68]  PX 82.  In his letter, Mr. Berry expressed his opposition to plaintiff's request to add 192 boat slips at the marina, writing:  "After giving this matter much thought, I have concluded that the proposed expansion is unnecessary and ill-advised."  Id.  He raised concerns about traffic, the removal of trees, and dredging, and further noted the opposition of the 635 members of the EIPOA.  Id.  Notably, despite his insistence that his role in the public sphere required him to "care about the people," at no time during his involvement in the marina dispute did Mr. Berry ever contact Mr. Walters to hear plaintiff's side of the story.  Tr. 751-52 (Berry); accord id. at 641 (Berry) (indicating that the only time Mr. Berry met Mr. Walters was at Mr. Berry's deposition for this lawsuit[69]), 4731 (Walters) (same).

An employee at Corps headquarters forwarded Mr. Berry's letter to the Little Rock District with instructions to draft a response.  PX 82; PX 83.  On November 20, 1998, the district sent a proposed response to headquarters through command channels; Colonel Holden, Mr. Watford, Mr. Cabe, Mr. Miller, Mr. Park, and the chief district counsel all had knowledge of the draft.  PX 83.  The trial record does not contain the draft response or reflect whether Dr. Westphal used it as the basis for a response to Mr. Berry.[70]

_____

[67]  This letter is not in the trial record and Mr. Berry could not recall it, Tr. 717-18 (Berry), but it is referenced in a January 5, 1999 fact sheet prepared by the Corps, PX 79.

[68]  Mr. Lancaster's last day as the Assistant Secretary was June 30, 1997.  Tr. 838 (Lancaster).  He was succeeded by a career Corps employee who served as the acting Assistant Secretary until a new political appointee assumed the position.  Id. at 851-52 (Lancaster).  During the seventeen months that Mr. Lancaster served as the Assistant Secretary, see id. at 838 (Lancaster) (noting his dates of service as January 1996 through June 1997), he exercised significant influence on the Corps' contractual relationship with plaintiff and Mr. Walters.

[69]  Mr. Berry's deposition occurred on March 13, 2008, Tr. 4734 (Walters), while he was still a congressman, see id. at 640 (Berry) (noting that his last term in Congress ended on January 2, 2011).  At trial, Mr. Walters reported that after the deposition had concluded, he entered the elevator to leave and was joined by Mr. Berry.  Id. at 4732 (Walters).  According to Mr. Walters, Mr. Berry asked him whether 200 more slips would help him at the marina, to which Mr. Walters responded that all he wanted was what he had paid for.  Id. at 4732-33 (Walters).  Mr. Berry testified at trial that he did not recall this conversation.  Id. at 738 (Berry).

[70]  At trial, plaintiff's counsel suggested that PX 84, an undated, unaddressed letter, was the draft response.  Tr. 2560-61, 2563 (statement of plaintiff's counsel).  However, the content of the document–particularly the third-person reference to Mr. Berry–refutes that suggestion.  See

### 6. Colonel Holden Decides Upon the Corps' Approach to Plaintiff's Request

The Corps held one final internal meeting relating to plaintiff's request to build an additional 192 boat slips at Eden Isle Marina on November 4, 1998.  PX 79.  Attending the meeting were Colonel Holden and his staff.  Id.  The purpose of the meeting was for the participants to "discuss options."  Id.  Their discussion resulted in an agreement regarding how to proceed:

> Proposed allowing Mr. Walters to build the docks requested [on] August 17, 1998, allowing no further expansion.  Northern area and most southern area would be removed from the lease area, protecting the homes adjacent to these areas from having docks directly behind them.  Mr. Walters currently meets parking requirements for this expansion.  Trees will be marked by the project office fo[r] a foot path to access the new docks.  No dredging will be allowed.

Id.; see also Tr. 221 (Ragar) (noting that although it was not mentioned in the notes from this meeting, part of the plan was to give plaintiff land elsewhere).  Indeed, Colonel Holden acknowledged that he developed an approach for addressing plaintiff's August 12, 1998 request after internal discussions and meeting with Mr. Berry, but before meeting with Mr. Walters.  Tr. 2401 (Holden); accord id. at 2354 (Holden) (stating that he did not "speak directly to Mr. Walters during the development of the analysis"), 4909 (Walters) (indicating that he was not present at this meeting).  The approach was memorialized in an undated document titled "SWL Commander's Strategy":

> 1.  Proposed construction of the 3½ docks requested by Mr. Walters[] in the southern portion of his lease area will be allowed.  No additional parking will be allowed.  A footpath will be allowed.  A minimum number of trees will be removed.  Trees to be removed will be designated by the Project Office.  There will be no dredging and no fill allowed.  No future construction of docks will be approved at this location.

> 2.  The northern and a portion of the southern most area of Mr. Walters'[s] lease will be removed.  If Mr. Walters agrees, to offset the loss of this area, 1000 feet of shoreline has been offered at Cove Creek Park for an alternate Site B to this lease; and we have proposed extending the lease to a full 25-year term under the old graduated rental system.  (This area to the north will be removed due to the close proximity to homes adjacent to the government land.)

> 3.  If Mr. Walters does not accept our proposal . . . , we will notify him in writing that our offer has been withdrawn, he may construct the 3½ docks, but the alternat[ive] site and extension to his lease are no longer available.

PX 84.

4.  No review under the Shoreline Management Plan is required since this is not a lease expansion, but simply a request for additional docks within his existing lease area.

PX 80.

In developing his strategy, Colonel Holden considered a number of factors that he deemed relevant.  First, he balanced plaintiff's rights under the 1995 lease with the impact the proposed development might have on other people.  Tr. 2370 (Holden); see also id. at 2602, 2799 (Holden) (noting that the concerns of competing marina operators factored into his decision).  Second, he considered Mr. Walters's expectation of receiving a reasonable return on his investment in the marina.  Id. at 2337, 2339 (Holden).  Third, he contemplated the possibility of a lawsuit arising from his decision.  Id. at 2509 (Holden).  And fourth, he weighed the risk of repercussions from Mr. Berry if he approved plaintiff's request.  Id. at 2463 (Holden).  Overall, Colonel Holden believed that by giving plaintiff the choice of accepting the Corps' proposal, id. 2516, 2533, 2598 (Holden), the Corps was offering plaintiff "the best solution [it] could achieve to address [plaintiff's] need," id. at 2533 (Holden).  Colonel Holden's belief, however, is belied by the evidence in the trial record reflecting that the district engineer had the ability to grant plaintiff's request to develop Eden Isle Marina without conditions.  See, e.g., PX 75; PX 76; PX 77.  Thus, the court concludes that Colonel Holden's belief was inauthentic and not sincerely held.

### 7.  The Corps' Overall Treatment of Plaintiff's Request

Nothing about the Corps' processing of plaintiff's August 12, 1998 request to add boat slips at Eden Isle Marina comported with the Corps' typical practice.  Tr. 425 (Holden), 1769, 1773 (Park).  Indeed, plaintiff's previous requests to add docks or boat slips at the marina were granted without fanfare and within a short period of time.  See, e.g., DX 42 at 2 (approving the March 1, 1996 request to add six boat slips to S dock on March 11, 1996); DX 56 (approving a request, which, per PX 57-A, was made in April 1996, to add twelve boat stalls to P dock on May 23, 1996); DX 338 (approving a request, which, per PX 57-A, was made in June 1996, to add twelve boat stalls to N dock on August 14, 1996).  And, requests from other marinas to expand within their existing lease areas were handled in the same manner.  See Tr. 1715-16 (Park) (indicating that he did not recall the Corps rejecting a request from any other marina to expand within its lease area prior to June 1995); cf. id. at 1902 (Cabe) (noting that the Corps had to treat every marina the same), 2517 (Holden) (same).  For example, on November 13, 1997, Dam Site Marina requested permission to add docks within its lease area.  PX 270 at 2.  The Corps approved this request on January 13, 1998.  Id.  Similarly, on July 26, 2000, Dam Site Marina requested permission to add 124 boat slips within its lease area.  PX 280 at 1.  The Corps approved this request on August 10, 2000.  Id. at 3.  Even when there were issues with another marina operator's expansion request, the Corps' approval process remained relatively straightforward.  For example, there was opposition to Narrows Marina's September 17, 1998 request to add six docks in the channel connecting the two parts of Greers Ferry Lake, even though the docks would be placed within the marina's lease area.  PX 254-A.  Nevertheless, the

Corps' approval process consisted only of an initial memorandum from Mr. Park addressing merits of the request, id., a telephone conversation between Mr. Park and the owner of Narrows Marina, PX 254-B, and a second memorandum from Mr. Park updating his recommendation, PX 254-C.  The Corps approved the placement of new docks in the channel on January 11, 1999, less than four months later.  PX 254-D.

In stark contrast, plaintiff's request to add boat slips to Eden Isle Marina resulted in numerous internal Corps meetings; the involvement of a wide range of Corps personnel, including the Assistant Secretary; the solicitation of legal opinions from two Corps attorneys; and consultation with a congressman.  And after all of that, the Corps did not decide to just grant plaintiff's request; rather, it decided that it would only grant plaintiff's request so long as plaintiff agreed to future restrictions on its ability to develop the marina, and for no other reason than to appease the Eden Isle property owners.  See also PX 103 ("Mr. Walters has been denied additional construction due to complaints from adjoining landowners and strong political influence.  Real Estate Division has been attempting to develop a proposal that would accommodate Mr. Walters'[s] desire to develop his lease area, along with being sensitive to the landowners of Eden Isle.").

## F. The Corps Presents Its Proposal to Plaintiff

Mr. Walters had not been privy to any of the Corps' internal discussions regarding plaintiff's request to add 192 boat slips at Eden Isle Marina.  Tr. 4901-02 (Walters).  It was not until three months after it received plaintiff's request that the Corps presented its proposal to Mr. Walters.

### 1. The November 10, 1998 Meeting

On November 10, 1998, several Corps employees–Mr. Cabe, Mr. Ragar, Ms. Best, Mr. Park, and Mr. Hargis–traveled to Eden Isle Marina to meet with Mr. Walters.  PX 79.  Colonel Holden specifically sent individuals to the meeting who Mr. Walters knew and trusted, believing that they had a better chance of obtaining Mr. Walters's agreement.  Tr. 2544-45 (Holden).  This was a wise decision by Colonel Holden because Mr. Walters considered Mr. Cabe, Mr. Ragar, Ms. Best, and Mr. Park to be his friends, id. at 4881, 4903, 4911-12, 5316 (Walters), and trusted that they were looking out for plaintiff's best interests, id. at 4903, 4912-13, 5316, 5372 (Walters).  Mr. Walters was cruelly deceived.

The trial record does not contain any contemporaneous documentation of the November 10, 1998 meeting;[71] the meeting is first mentioned in a January 5, 1999 fact sheet, PX 79.  According to that fact sheet, during the meeting, the Corps employees presented to Mr. Walters the plan that had been finalized during their November 4, 1998 meeting (and memorialized in

---

[71]  Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files, Tr. 2594 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 2593 (Holden).

Colonel Holden's strategy document).  Id.  As noted above, part of the Corps' proposal was the substitution of shoreline at Cove Creek Park for 1,000 feet of shoreline at Eden Isle Marina.[72] The Corps employees advised Mr. Walters–as they advised Colonel Holden–that Cove Creek Park was a feasible site for a marina.  Tr. 2582 (Holden), 5219 (Walters); accord id. at 1954 (Park) (indicating that he told Mr. Walters that he believed that Cove Creek Park was a "good site with potential"); cf. id. at 2730-32 (Park) (noting that to determine the suitability of a site for the placement of a marina, one would examine the site's physical characteristics, such as topographical features, water depth, and wind, and that the Corps possessed the tools needed to assess a site's physical characteristics), 2315-16 (Holden) (indicating that the Corps' Engineering, Research, and Development Center Coastal Hydraulics Laboratory in Vicksburg, Mississippi was a resource available to the Little Rock District), 2316 (Holden) (stating that the Little Rock District had the capability to determine a feasible marina site).  Further, according to Colonel Holden, he instructed his staff to inform Mr. Walters that funding for an access road to the Cove Creek Park marina site–which did not already exist–would require congressional action:  the Corps would put the road in its budget request, but because recreation-related work was not a high priority for funding, it could take the Corps three to five years to receive funding through the normal process; thus, to speed up the process, they were to advise Mr. Walters to directly prevail upon his congressional delegation for congressional add-on funds (i.e., a "congressional add").  Id. at 2575-77 (Holden); accord id. at 5220 (Walters) (indicating that he was told that it would take at least three years for the road to the Cove Creek Park marina site to be built in the absence of a congressional add); PX 118-A at 3 ("[Mr. Walters] was informed that [the Little Rock District] would include the Cove Creek Road in [its] budget but it would be three years before [it] would be able to begin to construct the road."); PX 119 ("Plaintiff] was told [the Little Rock District] would include Cove Creek Road in [its] budget, but it would be at least 3 years before [it] would be able to begin construction without a congressional add.").  It is unclear whether the Corps employees shared the feasibility and funding information with Mr. Walters during this meeting.  However, as discussed below, if they did not provide the information during this meeting, they did provide it during a subsequent meeting prior to Mr. Walters accepting the Corps' proposal.

In addition to the discussion of the details of the Corps' proposal, for the first time since July 1996, the purported extension of docks beyond the lease area boundary was raised with Mr. Walters as an issue that needed to be addressed.  Tr. 4905-06, 4914 (Walters).  In fact, there are no documents in the trial record from August 1996 through October 1998 indicating that the Corps considered the offending docks to be a problem–indeed, no document even mentions the issue.  See, e.g., PX 57 (cease-and-desist order); PX 60 (memorandum memorializing the February 10, 1998 meeting with Mr. Walters); PX 75 (Mr. Allen's legal memorandum); PX 77 (document summarizing legal advice); PX 79 (January 5, 1999 fact sheet); PX 80 (SWL Commander's Strategy); Tr. 2392 (Holden) (noting that none of the correspondence he reviewed

---

[72]  The trial record does not include any documentary evidence that the Corps employees discussed the proposed marina site at Cove Creek Park with Mr. Walters during the November 10, 1998 meeting.  However, the trial record as a whole suggests that Cove Creek Park was a topic of conversation during the meeting.

relating to the issuance of the cease-and-desist order mentioned docks being outside of the lease area), 4800 (Walters) (noting that the Corps did not use the docks-outside-the-lease-area issue as a reason for the cease-and-desist order), 4893-94 (Walters) (remarking that as of February 10, 1998, the Corps had not advised him that it was concerned about docks extending beyond the boundary of the lease area), 4905-06 (Walters) (stating that as of September 10, 1998, the Corps had not advised him that it was concerned about docks extending beyond the boundary of the lease area). Moreover, the trial record reflects that nobody at the Corps considered the existence of docks extending beyond the lease area boundary to be a material or fatal breach of the lease.[73] See, e.g., PX 109-A; Tr. 2367 (Holden); see also id. at 2345 (Holden) (noting that the offending docks did not affect the marina's day-to-day operations), 2384 (Holden) (stating that the offending docks did not pose a safety issue), 4984, 4951 (Walters) (indicating that nobody told him that it was a material or fatal breach of the lease). Nevertheless, it was Colonel Holden's decision to use the offending docks to the Corps' advantage as a way to entice plaintiff to accept the Corps' proposal. Tr. 2342, 2367, 2405, 2585, 2620 (Holden); cf. id. at 2514 ("[O]nce [it was] brought to my attention [that we] were not in compliance with the contract, even if both parties had sincerely honored the contract to the best of their abilities, that doesn't compel us to continue doing something wrong because we are exposed from other parties that may take exception we're not enforcing the terms.").

Using a map attached to a foam board, Mr. Ragar showed Mr. Walters that there were docks outside of the lease area and that this was a problem for plaintiff. Id. at 1916 (Walters). Mr. Walters was incredulous, responding that the Corps allowed those docks to be placed before plaintiff purchased the marina. Id.; accord id. at 185 (Ragar), 1816-17 (Park), 2621 (Holden). Nevertheless, the Corps employees explained that if Mr. Walters did not agree to the Corps' proposal, plaintiff would be required to move the offending docks. Id. at 4915 (Walters); accord id. at 212-13 (Ragar), 1756, 1818 (Park). This would have had severe consequences for plaintiff: there was not enough room in the lease area to relocate the docks, id. at 4917 (Walters), plaintiff would not have any more room to build more docks, id. at 4915 (Walters), and plaintiff could not afford to move the docks, id. at 4918 (Walters). In other words, if Mr. Walters did not agree to the Corps' proposal, plaintiff would have gone out of business. Id. It appeared to Mr. Walters that plaintiff was being asked to bear the cost for something it was not responsible for, which, to him, was completely unfair. Id. at 4919 (Walters). Yet, the Corps employees insisted to Mr. Walters that despite having so much pressure on them, they were doing their best to make plaintiff whole. Id. at 4915 (Walters).

Mr. Walters was devastated by the Corps' proposal. Id.; accord id. at 1969 (Park). He particularly did not want to relinquish the valuable 1,000 feet of shoreline at Eden Isle Marina. Id. at 1953, 1967, 1969 (Park). However, he felt that he had no choice but to accept what the

---

[73] At trial, Colonel Holden gave conflicting testimony that the offending docks both constituted and did not constitute a material breach of the lease. Compare Tr. 2343 (Holden), with id. at 2367 (Holden). The court discounts Colonel Holden's testimony that there was a material breach of the lease given that the Corps had knowledge about the alleged breach for years without taking any action.

Corps was offering.  Id. at 4915 (Walters); accord id. at 1968 (Park) (characterizing Mr. Walters's position as "resigned"), 4917 (Walters) ("They had all the power, and I had zero.  I was scared.").  Mr. Walters advised the Corps employees that he would discuss the proposal with his attorneys and get back to them.  PX 79.  Colonel Holden claims that Mr. Walters was given a deadline to respond, Tr. 2591 (Holden), but there are no documents in the trial record confirming his assertion.

## 2.  The January 1999 Meetings

Before reaching a decision on the Corps' proposal, Mr. Walters met with Corps employees at least twice more in January 1999.  The first of these meetings, for which there is no contemporaneous documentation aside from a brief summary of the meeting contained in a fact sheet prepared the following day, occurred on January 4, 1999.[74]  PX 79.  Once again, Mr. Cabe, Mr. Ragar, Ms. Best, Mr. Park, and Mr. Hargis were present at the meeting, during which the Corps' proposal was restated to Mr. Walters.  Id.  The Corps employees gave Mr. Walters a January 25, 1999 deadline to respond to the offer,[75] asserting that if they did not receive a response, plaintiff would lose the opportunity to expand at the Cove Creek Park marina site.[76]  Id.  In a January 5, 1999 fact sheet, the Corps memorialized its position:

> If Mr. Walters approves this proposal, we will be able to justify the requested expansion.  We believe we have made every effort to be sensitive to the residents of Eden Isle[,] the general public[,] and our lessee.  If the proposal is turned down by Mr. Walters, we will restrict any future development.

Id.

---

[74]  Pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files, Tr. 2594 (Holden), but if such a document was created, it was no longer in the Corps' files when discovery commenced in this lawsuit, id. at 2593 (Holden).

[75]  The original deadline was January 15, 1999, but was extended to January 25, 1999, to accommodate a meeting Mr. Walters and his attorneys scheduled for January 13, 1999, with Colonel Holden.  PX 79.

[76]  The Corps' notes from this meeting, prepared no later than the following day, indicate that Mr. Walters was told that if he failed to respond to the Corps' offer by the deadline, the Corps would permit plaintiff to build the 192 boat slips at Eden Isle Marina.  PX 79; see also Tr. 2370, 2516, 2592 (Holden) (indicating that his staff was cleared to tell Mr. Walters that the Corps would approve plaintiff's request even if Mr. Walters did not agree to the Corps' proposal).  However, this statement was contradicted by Colonel Holden and Mr. Walters at trial, both of whom agreed that nobody advised Mr. Walters of this fact.  See Tr. 2512-13 (Holden), 4913, 4923, 5221 (Walters).  Indeed, Mr. Walters testified that he was told that plaintiff would never be able to build another boat slip at the marina if he did not accept the Corps' proposal.  Id. at 4915, 4940 (Walters).

Mr. Walters's second meeting with the Corps occurred on January 13, 1999.  Id.  Because there is no contemporaneous documentation of the meeting, the court must rely on trial testimony to discern what was discussed.[77]  Pursuant to that testimony, Mr. Walters, who was accompanied by his attorneys at the meeting,[78] presented Colonel Holden with the signatures of 600 local individuals who supported plaintiff's request to add the 192 boat slips at Eden Isle Marina.  Tr. 4921, 5354 (Walters).  Mr. Walters also gave Colonel Holden a document outlining plaintiff's concerns and letters of support from the community and plaintiff's competitors.  Id. at 592 (Cabe), 4930 (Walters).  None of the documents that Mr. Walters provided to Colonel Holden caused Colonel Holden to change the Corps' proposal.  Id. at 2597-98 (Holden).

### 3.  Meeting at the Cove Creek Park Marina Site

There is evidence of a fourth meeting between Mr. Walters and the Corps during this period of time.  According to Mr. Park, he met with Mr. Walters and Mr. Walters's attorneys to visit the Cove Creek Park marina site before Mr. Walters accepted the Corps' proposal.  Id. at 1979 (Park).  Although plaintiff's attorneys "seemed really excited" about the site during the meeting, Mr. Park stated that Mr. Walters did not share their excitement.  Id. at 1963-64 (Park).  Mr. Walters told Mr. Park that he did not really want the Cove Creek Park marina site.  Id.

Mr. Park further testified that during the site visit, one of Mr. Walters's attorneys advised him that it would not be a problem to obtain funding from Congress.  Id.; see also id. at 2017 (Park) (stating that Mr. Walters "was very confident that he would be able to come up with the congressional add"), 4938 (Walters) (acknowledging that one of his attorneys indicated that he knew Senator Tim Hutchinson[79]); PX 118-A (reflecting, in an issue paper prepared by Ms.

---

[77]  It would appear that pursuant to Corps policy, the meeting should have been memorialized in writing for the Corps' files.  If a document memorializing the meeting was created, however, it was no longer in the Corps' files when discovery commenced in this lawsuit.  Tr. 2604 (Holden).  This is the tenth instance noted by the court in this opinion where the Corps, in accordance with policy, should have created a document to memorialize an event, but no such document was located during a search of the Corps' files.  Several Corps employees who testified at trial made this observation concerning missing documents.

[78]  Mr. Walters continued to be represented by Mr. Bell and Mr. Belew.  Tr. 5338 (Walters).  The attorney-client relationship ended sometime in 1999, when his lawsuit against Mr. Upton concluded.  Id.

[79]  The court takes judicial notice pursuant to FRE 201(b)(2) that Senator Hutchinson was elected to the United States Senate in 1996, replacing Senator Pryor.  See Young Timothy (Tim) Hutchinson (1949–), The Encyclopedia of Arkansas History & Culture, http://www. encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=4168 (last visited August 7, 2013).

Brooks in August 2000, approximately eighteen months after the site visit likely occurred,[80] that when Mr. Walters accepted the Corps' proposal, he "stated that he had discussed the congressional add-on funds with Senator Hutchinson and had a commitment for the funds"). Indeed, during a January 27, 1999 meeting with Eden Isle property owners, Corps employees purportedly described Mr. Walters's concern about the lack of an access road to the Cove Creek Park marina site and indicated that Mr. Walters's attorneys would approach the congressional delegation for funding.  PX 90.

### 4.  Support for Plaintiff's Request

As previously noted, plaintiff's request to add 192 boat slips at Eden Isle Marina was not universally opposed.  In fact, many in the Greers Ferry Lake community supported plaintiff's request.  These individuals expressed their backing in a number of ways.  For example, on December 4, 1998, they sent a "Petition of Support" to Senator Lincoln,[81] Senator Hutchinson, Mr. Berry, Dr. Westphal, and Colonel Holden–the petition included a twelve-page-long list of supporters.  PX 63.  They also sent letters.  Ron McKenzie, an Eden Isle property owner and local businessman, sent a letter to Senator Lincoln, copying the other petition recipients.  PX 66 at 4-5.  In his letter, he remarked:

> In the case of Eden Isle Marina's proposed expansion of its public boat dock, I suggest no material health or welfare impact to the property owners of Eden Isle would result.  In addition, there is no precedent in government policy or practice to artificially limit the legitimate activities of selected businesses in order to improve [the] financial welfare of bordering residential property owners - especially when the suggested negative impact has not been demonstrated.  . . .

> If the public's interest . . . is suspected of being negatively impacted by the proposed expansion, then the Corps of Engineers should isolate, evaluate and articulate those findings before making a decision to deny what is otherwise appropriate to grant.

> . . . .

---

[80]  As addressed in more detail below, the date of this issue paper is based on the fact that it appears to have been prepared in response to an August 9, 2000 electronic-mail message from an attorney at Corps headquarters.  Compare PX 118 (electronic-mail message), with PX 118-A (issue paper).

[81]  The court takes judicial notice pursuant to FRE 201(b)(2) that former Representative Lincoln was elected to the United States Senate in 1998, replacing the retiring Senator Bumpers.  See Blanche Meyers Lambert Lincoln (1960–), The Encyclopedia of Arkansas History & Culture, http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1& entryID=2751 (last visited August 7, 2013).

Considering that the public road to the marina in question is capable of handling expanded traffic, and considering that the related commercial activities have been fully sanctioned for thirty-five years, and considering that Eden Isle has not demonstrated negative impact to anyone, the evaluation of the proposed expansion should only consider its impact on the Corps' operation and mission.

What some Eden Isle residents pursue is simply based on their belief that their interests supersede those of others. From the inception of Eden Isle, the residents perceived the Eden Isle Marina as a private enterprise as it was indeed owned and operated under their control. This is no longer the case and their influence should not enter the upcoming decision with respect to the application of government policy.

Id. Another individual, Doddridge M. Daggett, a sailboat slip renter at the marina, sent a letter to Senator Lincoln, Senator Hutchinson, Mr. Berry, Dr. Westphal, and Colonel Holden on December 15, 1998, expressing his support for the marina's development. Id. at 1.

In addition, on December 11, 1998, Judge Dill sent a letter supporting plaintiff to Mr. Berry. PX 64. Mr. Berry considered Judge Dill, given his role as the county administrator, Tr. 650 (Berry), 4932 (Walters), to be "astute and knowledgeable as to what was transpiring in Cleburne County," id. at 650 (Berry). In his letter, Judge Dill expressed his belief that marinas on Greers Ferry Lake should be allowed to expand within their lease areas to accommodate the area's rapid growth, and further noted:

Greers Ferry Lake is a PUBLIC lake and Eden Isle Marina is a PUBLIC marina that is accessible by county roads that everyone utilizes. Road accessibility to the marinas [is] maintained either by the county or state services. Eden Isle Marina has adequate access for the facilities that they are requesting.[82] A vast majority of the visitors as well as potential new residents of Cleburne County need a place to leave their boat on Greers Ferry Lake. Presently, the Corps of Engineers allows no new, private boat docks and there is a growing demand for boat slips on Greers Ferry Lake.

PX 64 (footnote added). Judge Dill also sent a letter of support to Dr. Westphal. PX 86.

Colonel Holden also received letters. For example, the operators of Shiloh Marina, Dam Site Marina, Narrows Marina, and Sugar Loaf Marina sent letters to Colonel Holden on January 12, 1999, expressing their concern about how the Corps was mistreating their competitor. PX 65. Further, letters representing the views of local realtors indicated that local property values

---

[82]  Despite recognizing Judge Dill's extensive knowledge of Cleburne County, including its roads, Mr. Berry testified that he knew more about the road leading to Eden Isle Marina than did Judge Dill. Tr. 724-25 (Berry).

would not be adversely affected; rather, additional boat slip availability would increase the marketability of local property.  PX 66 at 2-3.

## G.  The Corps Presents Its Proposal to the Eden Isle Property Owners

It is unclear when the EIPOA learned of plaintiff's request to add 192 boat slips at Eden Isle Marina, but the request was a topic of discussion at the EIPOA board's October 19, 1998 meeting.  PX 81-A.  During that meeting, the board decided to take the same position it had taken with respect to plaintiff's long-term development plan, and to forward a copy of the EIPOA's position paper to Mr. Park.  Id.; see also PX 81 (containing the EIPOA's November 1998 revised position paper).  Moreover, during a November 19, 1998 meeting, the EIPOA board decided to send letters to all property owners asking them to contact the congressional delegation regarding their opposition to plaintiff's request.  PX 82-A; see also PX 88 (reflecting that as of January 21, 1999, Senator Lincoln's office was familiar with plaintiff's request and the Corps' proposal).

Eventually, on December 2, 1998, Mr. Ward, the president of the EIPOA, sent a letter to Dr. Westphal, which was forwarded to the Little Rock District for a response.  PX 85.  In a December 22, 1998 letter, Colonel Holden provided Mr. Ward with an update of the situation.[83] Id.  Colonel Holden described the Corps' proposal to Mr. Walters and indicated that Mr. Walters had not decided whether to accept it.  Id.  He also noted that he had previously met with Mr. Berry to discuss the Corps' "desire to be sensitive to all members of the public," the Corps' "duty to weigh the interests of non-resident users of the lake, as well as the interests of the Eden Isle residents," and the Corps' need to consider its "contractual obligation" to plaintiff.  Id. Finally, Colonel Holden advised Mr. Ward that the Corps did not anticipate additional traffic being an issue.  Id.

On December 28, 1998, Mr. Upton's attorney, Stuart Hankins, sent a letter to Mr. Cabe requesting a conference to discuss the status of plaintiff's request.  DX 118.  According to Mr. Hankins, Mr. Upton and the EIPOA opposed the request for three reasons:  possible degradation of the shoreline, the residential nature of the area surrounding the marina, and the lack of sufficient parking.  Id.  Mr. Hankins asserted that he was entitled to present the position of Mr. Upton and the EIPOA to the Corps because Corps employees had already met with Mr. Walters. Id.

The requested meeting was held on January 27, 1999.  PX 88; PX 90; DX 126. Attending the meeting were Mr. Cabe, Mr. Ragar, Mr. Allen, Ms. Brooks, Mr. Hankins, Mr. Upton, Mr. Ward, Ronald Fair of Red Apple Enterprises, and Don Tollefson of the Eden Isle Corporation.  PX 90.  The property owners expressed their concern that the Corps did not include them in the process of considering plaintiff's request to add 192 boat slips at the marina.  Id. They were informed that it was "not the Corps['] policy to notify landowners of actions in existing lease areas" but that the Corps briefed Mr. Berry with the assumption that Mr. Berry

---

[83]  Colonel Holden sent a similar letter to Judge Dill on December 28, 1998.  See PX 86.

would pass on the information.  Id.  The Corps employees also advised the property owners that Mr. Walters was concerned about the lack of an access road to the Cove Creek Park marina site and that his attorneys would approach the congressional delegation for funding; Mr. Upton indicated that he was willing to approach a congressman if necessary.  Id.  The property owners concluded that the Corps' proposal was "acceptable"; according to the Corps' notes from the meeting, "[t]he meeting was cordial and it seems that a solution may have been reached."  Id.  Although Mr. Cabe contends that the meeting was purely informational and not for the purpose of obtaining the property owners' consent to the proposal, Tr. 3240-41, 3243-44 (Cabe), in a March 31, 1999 letter, Dr. Westphal advised Mr. Berry that the Corps met with the property owners "to try and reach a mutually agreeable plan for marina development," and at the meeting, "an agreement was reached on a proposal," PX 96-B; see also Tr. 2825 (Holden) ("[W]e didn't have to get their agreement . . . but . . . because we did, we reported that the outcome was mutually agreeable.").

## H. The Memorandum of Understanding

### 1. The Corps Reduces Its Proposal to Writing

At some point prior to February 2, 1999, Mr. Walters either advised the Corps directly, or gave some other indication, that plaintiff would accept the Corps' proposal.[84]  Accordingly, Real Estate Division personnel, with the assistance of Mr. Miller, Mr. Allen, and Ms. Brooks, drafted a Memorandum of Understanding ("MOU") to memorialize the agreement.  Tr. 2615 (Holden).  The MOU drafted by the Corps provided, in its entirety:

1. INTRODUCTION

This Memorandum of Understanding (MOU) is between Eden Isle Marina, Inc., hereinafter called the "lessee" and the United States Army, Corps of Engineers, hereinafter called "COE."

The lessee has requested permission to construct an addition to an existing dock and three new docks outside the limits of the existing lease area.  The COE wishes to restrict development at the site to that presently requested and have all docks within the lease site.

2 .  PURPOSE AND SCOPE

This memorandum establishes an agreed upon proposal between the lessee and the COE.

3. AGREEMENTS

---

[84]  There is no evidence in the trial record reflecting how the Corps came to understand that plaintiff would accept its proposal.

a.  The lease site will be reconfigured, deleting the northernmost and southernmost portion of the lease, as shown in red[] on the attached map, and 1000 feet of shoreline at Cove Creek Park will be added to the lease.

b.  The COE agrees to allow the lessee to construct the 3½ docks (192 slips) requested, in the south area of his reconfigured lease site, as shown in purple[] on the attached map.

c.  The COE will issue a lease reflecting the new lease area for a 25-year term beginning 1 January 1999 and expiring on 31 December 2023, and the rental will be calculated using the Graduated Rental System contained in the present lease, No. DACW03-1-70-886.

d.  No additional parking will be authorized to serve the new docks at the Eden Isle site.  A footpath will be allowed for access.  Any trees needing to be removed will be identified by the project office.  Tree removal will be minimal.  Any additional parking needed will be on private land.

e.  The cease and desist order previously issued to the lessee is hereby lifted.

f.  The COE will construct an access road and parking for the marina at Cove Creek Park as funds become available.

g.  The lessee may develop the area at Cove Creek Park in accordance with a timetable to be developed.

PX 92.  The attached map, reproduced as Figure 3 below, depicted the old and new lease areas, as well as the existing and proposed docks:[85]

---

[85]  The court has rotated the map to make it consistent with Figure 1.



Figure 3

Id.  Neither Mr. Walters nor his attorneys had any input regarding the language or contents of the MOU.  Tr. 2616 (Holden), 4941, 5373 (Walters).

## 2. The February 2, 1999 Meeting

A meeting between plaintiff and the Corps was convened on February 2, 1999.  Id. at 4939-42 (Walters).  Attending the meeting were Mr. Walters, his wife, and his attorneys; Mr. Cabe; and Mr. Allen.  Id. at 4905, 4939, 4966 (Walters).  To Mr. Walters's surprise, the Corps employees presented him with the MOU for his signature.  Id. at 4941 (Walters).  According to Mr. Walters, Mr. Cabe presented him with an ultimatum:

> [W]hen we got there, . . . Mr. Cabe [came] down on me . . . and he was a little bit
> [mean] because I'm sure that he was being killed on his end to get something
> done also.  But he [came] down on me and said, Mr. Walters, if you don't sign

> this right now, not only will you never build another slip in Eden Isle Marina,[86]
> we're going to make you put all those docks back in your lease area, and the Cove
> Creek thing is off the table.  You will never get anything else, period.

Id. at 4940 (Walters) (footnote added); accord id. at 4941-42, 4948, 5334 (Walters); see also id.
at 1964-65 (Park) (noting that if Mr. Walters did not sign the MOU, the cease-and-desist order
would remain in effect).  Mr. Walters asked Mr. Cabe whether the Corps could legally do what
Mr. Cabe indicated, and was told that it could.  Id. at 4942, 5319 (Walters).

The MOU was not acceptable to Mr. Walters.  Id. at 4989 (Walters).  One of the primary
reasons for his dissatisfaction was that he did not want to relinquish the 1,000 feet of shoreline at
Eden Isle Marina.  Id. at 1962 (Park).  However, Mr. Walters was not permitted to make any
changes to the MOU.  Id. at 4941, 5373 (Walters).

Ultimately, Mr. Walters felt that he had no option but to sign the MOU.  See id. at 4940-
41 (Walters) ("So, you know, at what point do you accept defeat?  I didn't know anything else to
do but to sign their papers."), 5357 (Walters) ("I was under extreme duress . . . .").  However, he
continued to trust that the Corps was trying to do its best for plaintiff.  Id. at 4942, 5317
(Walters), accord id. at 5357 (Walters) ("I think I was depending upon the Corps of Engineers to
make me whole and treat me fairly . . . .").  At least one Corps employee, Mr. Park, believed that
he was doing so.  Id. at 1960 (Park) ("I wanted to be sure that [Mr. Walters] was satisfied. . . .
[M]y prime charge was as we met with Real Estate and with [Mr. Walters] and his folks that he
was getting something that he also could live with."); accord id. at 1963-64 (Park) ("We were
trying our best to come up with a solution that he could live with . . . .").  In fact, so long as Mr.
Walters could obtain funding for the Cove Creek Park marina site access road, Mr. Park believed
that the agreement represented in the MOU could be a good deal for Mr. Walters.  Id. at 1973-75
(Park).  Unfortunately, in retrospect, Mr. Walters characterized his decision to sign the MOU as
the worst decision in his life.  Id. at 4942 (Walters).

### 3.  Funding the Work at Cove Creek Park

Regarding the need to obtain funding, the MOU contained the following provision:  "The
COE will construct an access road and parking for the marina at Cove Creek Park as funds
become available."  PX 92.  Because this provision quickly became controversial, it is
appropriate to pause here to explain the Corps' funding process.

### a.  Corps Budgeting and Appropriations

The Corps, like other government agencies, receives much of its funding through annual
appropriations from Congress.  Those annual appropriations contain funds requested by the
Corps through its normal budget process, as well as funds added by members of Congress during

---

[86]  But see supra note 76 (discussing the veracity of this statement).

the appropriations process; the latter is referred to as congressional adds.  See generally Tr. 737-38 (Berry), 3431-33 (Murdock-McDaniel).

The Corps' budget process begins two years in advance of the relevant fiscal year ("FY" when referring to a particular year).  Id. at 2041, 2045 (Park), 3624 (Murdock-McDaniel).  There are a number of steps in the process:

(1)  The Little Rock District's Programs Management Branch–which up until January 2003 was headed by Thomas Noggle, id. at 3146 (Noggle)–prepares budgeting guidelines and provides them to the project offices.  Id. at 3148 (Noggle).  These guidelines are derived from budget circulars provided by Corps headquarters.  Id. at 3303, 3564-65 (Murdock-McDaniel).

(2)  Each project office prepares a budget request pursuant to the provided guidance.  Id. at 2041 (Park), 3148 (Noggle).  The project offices determine a priority level (1, 2, 3, or 4) for each item on their lists and then rank the items within each priority level.[87]  Id. at 2023, 2029, 2047 (Park), 3148 (Noggle), 3302, 3577 (Murdock-McDaniel).  The priority levels are defined by regulation.  Id. at 3574-75 (Murdock-McDaniel).

(3)  The project offices in the Little Rock District send their budget requests to the district's Programs Management Branch.  Id. at 3149 (Noggle), 3577, 3579 (Murdock-McDaniel).

(4)  The Programs Management Branch verifies that the budget requests conform to the guidance given to the project offices, id., and compares the budget requests to determine whether there are any duplicate items, id. at 3150 (Noggle).

(5)  A team of lower-level managers, section chiefs, and individuals with the necessary technical expertise (power, navigation, recreation, etc.) evaluate the budget requests and create a priority list for the district.  Id. at 3150-52 (Noggle).  The district engineer has final approval authority of the list.  Id. at 818 (Morris).  In creating its list, the district uses the budget cap provided to it by Corps headquarters, id. at 3582-84 (Murdock-McDaniel), to assist in ascertaining what may and may not be funded, id. at 3584-86 (Murdock-McDaniel).

(6)  The district sends its budget request to the Southwestern Division, where it competes against the budget requests of the other districts within the division.  Id. at 3153-54 (Noggle), 3590 (Murdock-McDaniel); see also id. at 3154 (Noggle) (noting that the district would send representatives to the division office to

---

[87]  The prioritization of items in this manner changed in 2002 for FY 2004 and beyond.  Tr. 3558, 3595 (Murdock-McDaniel).  The changes made to the prioritization process in 2002 budget are discussed below.

advocate for the district's priorities).  The district's budget request includes the items that fall outside its budget cap, along with an explanation of their importance, to demonstrate that its funding need is greater than what the budget cap allows.  Id. at 3588-89 (Murdock-McDaniel).

(7)  The division sends its budget request to Corps headquarters.  Id. at 3154 (Noggle), 3590 (Murdock-McDaniel).

(8)  Corps headquarters sends its overall budget request to the President via the Office of Management and Budget.  Id. at 3608-09, 3590 (Murdock-McDaniel).

(9)  After making any desired changes, the President sends his budget to Congress.  Id. at 3951-92 (Murdock-McDaniel).  The deadline for the submission of a fiscal year's budget is the first Monday in February of the prior fiscal year.  2 U.S.C. § 631 (2012).

(10)  In Congress, the House and Senate Budget Committees develop budget resolutions; a concurrent resolution must be completed by April 15.  Id.  Through this process, money is allocated to each subcommittee of the Appropriations Committees.  Tr. 737 (Berry).

(11)  Members of Congress contact the Corps about projects in their districts, seeking information on the Corps' capacity and needs.  Id. at 728-29 (Berry), 3593-94 (Murdock-McDaniel).  The Corps provides the requested information. Id. at 729, 676 (Berry), 3608-09 (Murdock-McDaniel).

(12)  Based on input from legislators and their own priorities, the appropriations subcommittees prepare the appropriation bills.  Id. at 743 (Berry).  The bills would contain both member-directed spending–funding within the subcommittee's allocation that is to be used for a specific purpose–and congressional adds–funding beyond the subcommittee's allocation that is to be used for a particular purpose.[88]  Id. at 737-38 (Berry).  In addition, funds are appropriated by project.  Id. at 3560, 3622 (Murdock-McDaniel); accord PX 165 at 3-15 (showing how much funding was requested for and appropriated to the Greers Ferry Lake project from FY 1995 to FY 2006).  The House must complete its action on the annual appropriation bills by June 30; the new fiscal year begins on October 1.  2 U.S.C. § 631.

---

[88]  Mr. Berry's distinction between member-directed spending, which he stated was another term for earmarks, Tr. 741 (Berry), and congressional adds does not find support elsewhere in the record.  See, e.g., id. at 3620 (Murdock-McDaniel) (equating congressional adds with earmarks).  Nevertheless, the distinction is not important in this case; all that matters is that there was a separate process by which a member of Congress could direct funds for a specific purpose.

(13)  Ultimately, once the appropriation bill covering the Corps is enacted as law,
Corps headquarters receives and distributes the funds.  Tr. 3155 (Noggle), 3584,
3614-18, 3621, 3632 (Murdock-McDaniel).

Certain aspects of this funding process require further comment.

### i.  Priorities and Rankings

Prior to 2002, for each item that it wanted funded, the Corps was required to assign the
item to a priority level and then rank the item within the priority level.  There were four priority
levels.  Level 1 was the baseline and was used for routine recurring activities pertaining to
existing infrastructure.  Id. at 2024, 2027 (Park), 3428, 3565-67 (Murdock-McDaniel).  Level 1
encompassed approximately eighty percent of the funds needed for current operations.  Id. at
1982, 2024, 2027 (Park), 3566 (Murdock-McDaniel).  Level 2 (tier 1) was for nonroutine
recurring activities, such as periodic inspections, that were required by law.  Id. at 3428, 3567-69
(Murdock-McDaniel).  Level 2 (tier 2) encompassed the additional twenty percent needed to
bring funding up to one-hundred percent of the current level of operations.  Id. at 3567, 3569
(Murdock-McDaniel).  All Level 2 activities were nondeferrable.  Id. at 3569-70 (Murdock-
McDaniel).  Level 3 was for deferrable, nonroutine, noncritical activities, i.e., activities beyond
what was necessary to maintain current operations at the one-hundred-percent level, such as
modernization or new construction.  Id. at 3570-74 (Murdock-McDaniel); see also id. at 2025
(Park) ("Level 3 would be those items . . . that weren't 'the world's . . . going to come to an end
if you don't get them done,' but it's certainly activities that we'd like to see done.").  Level 4 was
for "maintenance and repair beyond the building," which "capture[d] large projects that would
require continuing funding over multiple fiscal years."  Id. at 3574 (Murdock-McDaniel).
Although Level 4 existed, the trial record reflects that it was not used by the Greers Ferry Lake
Project Office for any of the years at issue in this case.  See generally PX 143; PX 145; PX 147;
PX 149; PX 151; PX 152; PX 153.

Within each priority level, items were ranked based on the importance of the associated
Corps mission.  Tr. 3544 (Murdock-McDaniel).  Items related to flood damage reduction and
flood risk management were ranked highest, followed by items related to hydropower,
environmental stewardship, recreation, and water supply.[89]  Id. at 3540-41, 3560-63 (Murdock-
McDaniel).  In addition, projects constituting new construction were automatically ranked at the
bottom of Level 3 due to the preference to fund existing activities.  Id. at 3429, 3651, 3670
(Murdock-McDaniel).

Typically, the Greers Ferry Lake Project Office received funding for its Level 1 and
Level 2 items.  Id. at 2099, 2101-02 (Park), 3585 (Murdock-McDaniel).  Because Level 3 items

---

[89]  Another Corps mission, navigation, which is ranked between flood control and
hydropower, is not relevant to the Greers Ferry Lake project.  Tr. 3544, 3560-63 (Murdock-
McDaniel).

were deferrable, however, obtaining funding for them was a "long shot." Id. at 2102 (Park). Indeed, the budget cap supplied by Corps headquarters generally fell somewhere in Level 2 (tier 2) or among the higher ranked Level 3 items.  Id. at 3586 (Murdock-McDaniel).

In 2002, for FY 2004 and beyond, the way the Corps prioritized items in its budget request changed, due to a shift to performance-based budgeting.  Id. at 3558, 3595 (Murdock-McDaniel).  Each mission now constitutes a separate business line, and each business line has its own set of metrics that the Corps uses to establish one item's performance relative to other items. Id. at 3596-97 (Murdock-McDaniel).  Examples of metrics include the number of visitors and amount of revenue collected (for recreation areas); the downstream population and amount of damages that could be prevented (for dams); and the number of kilowatts produced (for hydropower plants).  Id. at 3597, 3599-602 (Murdock-McDaniel).  Based on the metrics, each item is assigned an increment of work rather than a priority level.  Id. at 3598 (Murdock-McDaniel).  New activities are automatically placed at the bottom of the list because they lack data in any of the metrics.  Id. at 3607-08 (Murdock-McDaniel).  Thus, new activities are not normally funded through the regular budget and appropriations process.  Id. at 3637 (Murdock-McDaniel).  Instead, new activities receive funding only if something big was not done or if there was some reason to prioritize other work.  Id.  Moreover, it is more difficult to obtain funding in general because, among other things, there is less money to go around, and after the events of September 11, 2001, items related to security were prioritized.  Id. at 3609-11 (Murdock-McDaniel).

In addition to their annual budget requests, each project office maintains a five-year major items list, which "identifies projects that haven't historically been funded but . . . we would like them to be funded for whatever reason[,] . . . as well as items that might be deferrable maintenance that may move up the ladder as time passes, and the continually don't get funded in each year."  Id. at 2025 (Park); accord id. at 3643 (Murdock-McDaniel) (noting that the list is similar to a to-do list or a backlog of maintenance items).  The district uses the five-year major items lists to prioritize items in its budget request and to determine where to spend funds that become available.  Id. at 3640-41 (Murdock-McDaniel).  The list is prepared every year and is constantly updated as needed.  Id. at 3641-42, 3645-47 (Murdock-McDaniel).  An update might result from, among other things, the receipt of a congressional add, obtaining the results of an inspection, the discovery of a health and safety issue, or the need to protect the Corps' long-term infrastructure investment.  Id. at 3648, 3650-51 (Murdock-McDaniel).

### ii.  Congressional Adds

The Corps is not permitted to lobby Congress to fund particular projects, PX 107; PX 118-A; rather, the appropriate funding mechanism is to include a project in its budget request, along with an explanation, with the hope that if the project is not funded through normal appropriations, a member of Congress will try to get it funded through a congressional add, id. at 3431-33 (Murdock-McDaniel).  A congressional add sets aside a specific amount of money to be used for a specific purpose.  Id. at 3648 (Murdock-McDaniel).  The Corps cannot alter a congressional add.  Id. at 3621 (Murdock-McDaniel).

### iii. Reprogramming of Appropriated Funds

Once the district receives its annual appropriation, it generally must use the funds for their designated purpose. Id. at 3629 (Murdock-McDaniel). However, because budgets are prepared two years in advance, when the district receives its annual appropriation, it must compare its earlier plans with its current needs to ascertain whether its priorities had changed. Id. at 3624-27, 3632 (Murdock-McDaniel). If there was a change in priorities, some shifting of funds is permitted. For example, the district can reprogram funds that become available at a project office through slippages or savings to another activity within that project office. Id. at 3434, 3626, 3695 (Murdock-McDaniel). In addition, funds can be reprogrammed from one project office to another project office in the district with the authorization of the division, Corps headquarters, or Congress in accordance with the relevant regulations. Id. at 3157 (Noggle), 3626, 3695-96 (Murdock-McDaniel); see also id. at 3158 (Noggle) (noting that the Operations Division had the authority, up to a certain dollar amount, to reprogram funds). And, funds could be reprogrammed to accomplish part of an activity. Id. at 3197 (Noggle).

### b. Interpretations of "as Funds Become Available"

The evidence elicited at trial reflects that before Mr. Walters was presented with the MOU, Corps employees had advised him and his attorneys that the Corps would place the access road in its regular budget request, but that the best chance of obtaining expeditious funding would be through Mr. Walters's securing of a congressional add.[90] However, this advice was not specifically set forth in the MOU. Rather, when drafting the MOU, one of the Corps' attorneys–Mr. Allen–included the provision indicating that the Corps would construct the access road and parking for the Cove Creek Park marina site "as funds become available." Id. at 239 (Ragar). Despite the vagueness of the language, it was the Corps' position that this provision only required it to seek the necessary funds in its annual budget request, like any other item for which it sought funding. Id. at 2574-75 (Holden). In other words, the Corps did not believe that it was committing itself to reprogramming existing available funds.

At trial, Mr. Walters claimed that the Corps' interpretation of this provision was not made clear to him. He testified that it was his understanding that the Corps would build the access road when the funds became available and that a congressional add would just speed up the process. Id. at 4962-63 (Walters); accord id. at 4938 (Walters) (characterizing the suggestion that he contact his congressional delegation as a formality). He further testified that he

---

[90]   Mr. Walters testified at trial that at the February 2, 1999 meeting, after he signed the MOU, Mr. Cabe told him that he needed to get a congressional add to obtain funding to build the road to access the Cove Creek Park marina site. Tr. 4953 (Walters). He then testified that he asked what a congressional add was, and was told that he needed to request the money from Congress. Id. Given that the weight of the evidence elicited at trial reflects that the Corps suggested to Mr. Walters prior to February 2, 1999, that he secure a congressional add, the court discounts Mr. Walters's recollection that this particular conversation occurred on February 2, 1999.

understood this provision to mean that the Corps was responsible for obtaining the funds, id. at 4953 (Walters), and would do so right away, possibly within a year. Id. at 5356-58 (Walters).  In contrast, Mr. Park testified that it was made clear to Mr. Walters that the Corps did not anticipate obtaining the money for the Cove Creek Park marina site through its normal budget and appropriations process because it was hard enough to get money to "make ends meet," and therefore "the best avenue would be" for Mr. Walters to obtain funds from the congressional delegation.  Id. at 1978 (Park); accord id. at 1982, 2016 (Park).  Regardless of his level of understanding, Mr. Walters did what the Corps suggested:  he wrote letters to his congressional delegation to request the funding.  Id. at 4731, 4962-63 (Walters).

### 4.  The Corps' Reaction to Obtaining a Signed Agreement

After the MOU was executed–by Mr. Walters for plaintiff and Mr. Cabe for the Corps, PX 92–the Corps celebrated the event.  In response to an electronic-mail message from Mr. Cabe advising that the Corps had an executed MOU, Colonel Holden wrote "HOO-AH!" and praised the work done by the Real Estate Division, the Operations Division, and the Office of Counsel.  PX 93; see also Tr. 2800 (Holden) (indicating that he was congratulating Mr. Cabe, Mr. Ragar, and Mr. Park for getting the MOU signed).  In the same message, Colonel Holden requested that letters be prepared for him to send to the "elected officials."  PX 93.  One of the recipients of Colonel Holden's message, Mr. Miller, acknowledged the good work done by Mr. Park, but noted that a $1 million congressional add would be needed.  Id.; see also Tr. 1959 (Park) (indicating his belief that Mr. Miller was trying to give him credit for getting Mr. Walters to sign the MOU, but that he does not take credit for it).  Colonel Holden stated that he was aware of the need for a congressional add and directed Mr. Miller to send the information to Senator Hutchinson's office.  PX 93.

Overall, Colonel Holden and his staff at the Corps were pleased that with the execution of the MOU, they would no longer have to deal with the politicians or property owners with respect to Eden Isle Marina.  Tr. 1969-70 (Park).  Colonel Holden sent letters to the congressional delegation informing them of the executed MOU on February 4, 1999.[91]  PX 96-A.  And, there was one additional exchange of correspondence between the Corps and the Eden Isle property owners.[92]  PX 96-C; PX 101-A.

_____

[91]  In addition, as previously noted, Dr. Westphal, the Assistant Secretary, sent Mr. Berry a letter about the MOU on March 31, 1999.  PX 96-B.

[92]  In a February 3, 1999 letter, Mr. Upton's attorney, Mr. Hankins, advised Mr. Cabe that the governing boards of the Eden Isle Corporation, the EIPOA, and the Red Apple Enterprises Limited Partnership met to discuss the Corps' proposal to plaintiff, and found the proposal to be a "good faith effort" on the Corps' part "to resolve a difficult, contested matter."  PX 96-C.  However, they still had some concerns regarding further expansion of the lease area, access to the new docks, the cutting of trees, parking, and the number of boat slips to be built.  Id.  Mr. Cabe responded to their concerns in a February 24, 1999 letter.  PX 101-A.  Among other things, Mr. Cabe wrote:  "I can assure you that the Eden Isle Marina has a 'footprint area' of 51 acres and this area will not change in size.  The Corps of Engineers in Little Rock has memorialized

**IV. February 1999 to April 1999:  Efforts Taken Under the Memorandum of
Understanding Prior to the Execution of a New Lease**

The execution of the MOU triggered a flurry of activity at the Corps and by plaintiff
related to the Cove Creek marina site:  efforts to secure funding for the access road,
preparations to begin development, and the determination of the precise location for the marina.
The Corps also took the steps necessary to ensure that the provisions of the MOU were reflected
in the Greers Ferry Lake Master Plan and a new lease with plaintiff.

**A.  Efforts to Obtain Funding to Allow for Development at Cove Creek Park**

As an initial matter, both plaintiff and the Corps took steps in an attempt to obtain
funding for the construction of an access road to the Cove Creek Park marina site.

**1.  The Corps' Efforts**

The Corps began the process of obtaining funding for work at the Cove Creek Park
marina site on February 1, 1999, when Mr. Watford requested a cost estimate from the
Operations Division.  PX 94.  Mr. Park prepared the estimate on February 2, 1999.  Id.  In the
estimate, Mr. Park described the costs of four "packages" for Cove Creek Park:

> 1.  Package A - Construct road to serve area C during high water and provide
>     access to Optional Marina site to be located in eastern portion of Cove
>     Creek Park.  Total length of road will be approximately 3,800 feet.
>     Estimated cost = $418,000 . . . .[93]
>
> 2.  Package B - Relocate 12 campsites from South Fork Park.  The Park
>     Operations Efficiency Review identified an efficiency measure of
>     redesignating South Fork [P]ark as a boat launch/access area only.  South
>     Fork has 12 campsites that would be relocated to Cove Creek Park.  The
>     addition of the new sites at Cove Creek would generate additional revenue
>     since Cove Creek is full throughout the recreation season.  The Master
>     Plan includes areas for additional development.  This package would

---

this fact in its files."  Id.

[93]  The trial record does not reflect why the parking promised in the MOU was omitted
from this cost estimate.  During a March 18, 1999 telephone call, Mr. Walters reminded Mr. Park
that he would need parking at the marina site.  PX 108.  In an exchange of electronic-mail
messages the following day, Corps employees discussed providing parking at the site and agreed
that parking would be provided–a thirty-vehicle lot if the Corps' budget request was approved or
a lot to accommodate plaintiff's initial development if funding came through a congressional
add.  Id.

include the construction of a road and 12 campsites. . . . Estimated cost = $300,000[.]

    3.   Package C - Construct/place pre-fabricated toilet in new camp area. The new area will be somewhat removed from the remainder of the sites at Cove Creek and it will be necessary to provide toilet facilities. There is not adequate space to place a waterborne facility with the required sewer absorption field. Therefore, an ADA compliant pre-fab toilet is the best choice for this site. Estimated cost = $30,000. An option to this would be construct a waterborne toilet with showers and pump the effluent to a remote absorption field. Estimated cost = $200,000.

    4.   Package D - Construct 13 additional campsites in new area (Package B). There is sufficient room to allow the construction of additional campsites in the new area. The most cost efficient means to complete the camp loop will be to construct, at one time, the total number of sites the area will allow. Estimated cost = $100,000[.]

PX 136 (footnote added). Depending on which option was chosen for Package C, the total estimated cost of the work proposed by Mr. Park was either $848,000 or $1,018,000. Id. Notably, this initial estimate, which was prepared to address the requirements of the MOU, included much more work than was necessary to satisfy the Corps' obligation to plaintiff.

The next day, upon receiving a copy of the MOU, Mr. Miller, the chief of the Operations Division, asked Mr. Park and Mr. Risher what would happen if the Corps did not receive a congressional add. PX 101. In particular, he wondered whether the Corps would remain "on the hook for the road." Id. Even though he purportedly was involved in drafting the MOU, Tr. 2615 (Holden), Mr. Miller opined that the Corps "should have had a contingency for this," PX 101.

Despite the uncertainty surrounding the potential for a congressional add, the Corps continued to take steps to realize its plans for Cove Creek Park. Mr. Park prepared three design requests: one on February 9, 1999, related to the relocation of the campsites from South Fork Park (Package B), PX 137; another on March 3, 1999, related to the construction of the access road to the marina site (Package A), PX 138; and a third on March 4, 1999, related to the construction of thirteen new campsites (Package D), PX 139. In addition, the Greers Ferry Lake Project Office included the Cove Creek Park marina site access road in its FY 2001 budget request. The budget request, dated February 12, 1999, reflected that the project office assigned the access road to Level 2, ranked the access road seventh (out of seven items) within that priority level, and indicated that the cost of the access road was $418,000. PX 145. Mr. Park explained at trial that the ranking of the access road within Level 2 was informed by his belief that funding would come through a congressional add rather than through the normal budget process. Tr. 2015 (Park). Nevertheless, Mr. Park remained hopeful that the access road would be funded through the regular budget process. Id. at 2099 (Park) ("We wouldn't have put it down there had we not been hoping to get funding for it. . . . I wasn't prepared to put Cove

-83-

Creek ahead of firing employees and closing parks and shutting our hydropower plant down, and we did put it in the budget package with hopes that somebody would pick it up.").

Although the project office requested funding only for the access road to the Cove Creek Park marina site, it appears that its request was later amended at the district office; an August 24, 2000 issue paper indicates that the Little Rock District actually requested $1,510,000 for FY 2001 to use for the construction of the access road, parking, restroom, campsites, and utilities. PX 119. Colonel Holden explained that the district office requests funds on a project basis and since Cove Creek Park was a project site, the Corps requested its entire need, and not just what was described in the MOU. Tr. 2581 (Holden). Colonel Holden's explanation notwithstanding, Corps personnel had to know that by requesting more money than what was needed to satisfy the Corps' obligations under the MOU, they were making it less likely the Corps would receive funding for the access road through normal appropriations.

## 2. Plaintiff's Efforts

As noted above, Mr. Walters wrote letters to his congressional delegation to request the funding for the work for the Cove Creek Park marina site.[94] Id. at 4731-32, 4962-63 (Walters). During a March 11, 1999 telephone conversation, a staff member at Senator Hutchinson's office informed Mr. Park that Mr. Walters had requested the funds for the access road. PX 107. However, in his summary of the conversation, Mr. Park did not indicate that Senator Hutchinson had provided his assurances that funding was forthcoming. Id. Rather, the staff member advised Mr. Park that the funding would be placed on the senator's "wish list." Id. The staff member

---

[94] On March 10, 1999, Mr. Berry wrote a letter to Mr. Walters; the full letter is as follows:

Thank you for contacting me to express your views on the expansion of Eden Isle Marina. I have learned that the Corps of Engineers will allow the marina to expand, therefore[] resulting in 192 additional slips. I hope that everyone interested in Greers Ferry Lake can work together to enjoy the lake.

Again, thank you for allowing me to serve the people in the First Congressional District of Arkansas. Please do not hesitate to contact me or my staff if we can be of assistance.

PX 106. The contents of the letter do not indicate precisely what communication from Mr. Walters that Mr. Berry was responding to. The letter's date seems to indicate that the letter was sent in response to a post-MOU communication, but the letter does not mention the funding sought by Mr. Walters. The letter's contents imply that the letter was sent in response to a letter expressing support for plaintiff's August 12, 1998 development request, but there is no evidence in the trial record that Mr. Walters sent such a letter. In any event, Mr. Berry's March 10, 1999 letter was the only written communication Mr. Walters received from Mr. Berry. Tr. 4965 (Walters).

requested a cost estimate; Mr. Park sent her a copy of the document he prepared on February 2, 1999, describing the four packages related to Cove Creek Park for which the Corps was seeking funding.  Id.

### B.  Plaintiff's Efforts to Build a Marina at Cove Creek Park

In line with his belief that the Corps intended to move quickly on its own to obtain funding for the access road to the Cove Creek Park marina site, Mr. Walters was prepared to move forward with development as soon as the MOU was executed.  Tr. 5357 (Walters).  He advertised and began to compile a waiting list for boat slips.  Id. at 4955 (Walters).

In addition, on February 26, 1999, Mr. Walters wrote a letter to Mr. Park regarding plaintiff's need to immediately begin construction at Cove Creek Park.  PX 102.  Mr. Walters identified several reasons for this need.  First, given the approaching summer season, it was important that plaintiff be able to finalize its strategic planning, including financing, advertising, staffing, insurance, and construction scheduling.  Id.  Second, plaintiff's lenders, appraisers, insurers, and dock builders were requesting estimated completion dates.  Id.  And third, it was more economical for plaintiff to seek bids for the Cove Creek Park marina facilities at the same time it was obtaining bids for the new docks at Eden Isle Marina.  Id.; cf. DX 234 at 4-9 (containing proposed plans for the future Cove Creek Marina prepared by Atlantic Meeco, a dock manufacturer, and dated March 4, 1999).  Accordingly, Mr. Walters requested that the Corps provide him with estimated completion dates for the access road and necessary utilities, as well as a copy of a survey so that he could determine a good location for a gas storage tank.  PX 102.  Mr. Walters also requested that if construction of the access road was delayed, a temporary road be built so that he could proceed with construction.  Id.  According to Mr. Walters, there was an existing path that would require only minimal work to expand into a temporary road.  Tr. 4959-60 (Walters).

Upon receiving the letter from Mr. Walters, Mr. Park was confused–he believed that the Corps had made it clear to Mr. Walters that nothing would be built at the Cove Creek Park marina site until the Corps received a congressional add.  Id. at 2003 (Park).  Mr. Park reiterated this fact to Mr. Walters in person at the beginning of March 1999, and further explained that the Corps could not lobby Congress for the funds.  PX 107.  Mr. Miller agreed with Mr. Park; in a March 3, 1999 note, he wrote that the Corps "need[ed] to hold tight to our requirement for a Congressional Add."  PX 105.

Mr. Park also had reservations about allowing a temporary road.  The Corps had been planning to build the marina access road in Cove Creek Park in such a way as to separate campground traffic from marina traffic.  Tr. 1992, 2006, 2008-09 (Park).  However, a temporary road at the proposed location would cause marina traffic to mix with campground traffic.  PX 104.  Mr. Miller concurred with Mr. Park's concern.  PX 105.  However, it does not appear that the Corps denied Mr. Walters's request for a temporary road at this time.

## C.  Choosing a Marina Site at Cove Creek Park

While Mr. Walters was making plans to build a marina at Cove Creek Park, the Corps was taking action to determine precisely where in Cove Creek Park the marina should be located. Although the Corps formally offered plaintiff a marina at Cove Creek Park in November 1998, there is no evidence in the trial record that it had identified a location for marina prior to the execution of the MOU.  Indeed, according to Mr. Walters, at the time he signed the MOU, he had "no earthly idea of what they were going to give me at Cove Creek . . . ." Tr. 4954 (Walters).

In a March 18, 1999 electronic-mail message, Mr. Park indicated that he had sent a map depicting the proposed lease area for the marina at Cove Creek Park to Mr. Walters.[95]  PX 108; see also Tr. 4954, 5145, 5149, 5219 (Walters) (noting that the Corps chose the site for the marina at Cove Creek Park).  Mr. Walters trusted the Corps to select a feasible site for a marina.  Tr. 5318 (Walters).  The Corps had the expertise to choose a feasible site, id. at 5318, 5221 (Walters), and, Mr. Walters claims, he did not have sufficient time, information, or resources to investigate whether Cove Creek Park was a feasible location for a marina, id. at 5318 (Walters); see also id. at 5325 (Walters) (stating that he did not know that the proposed marina site at Cove Creek Park was not a feasible marina site until he engaged experts for this lawsuit).  Accordingly, Mr. Walters approved the lease area proposed by Mr. Park.  PX 108.  Mr. Park thereafter sought the Real Estate Division's approval of the lease area.  PX 12.

## D.  Updating the Greers Ferry Lake Master Plan

The Corps' actions immediately after the execution of the MOU were not limited to those affecting only Cove Creek Park.  Approximately one month after the MOU's execution, Mr. Cabe requested that the Operations Division supplement the Greers Ferry Lake Master Plan to reflect the new lease area at Eden Isle Marina.  PX 11; accord Tr. 3944-45 (Overton) (noting that every time a marina's lease area is altered, a new map is generated and placed in the master plan).  Mr. Cabe justified his request by noting that "[t]he change [was] needed in order to realign the lease area so all docks [were] within the lease boundaries."  PX 11.  According to Mr. Cabe, a request such as this one was typically all that was needed to amend the master plan.  Tr. 3249 (Cabe).  However, Mr. Cabe refused to agree that the master plan could have been amended in the same manner in 1996.  Id.  Mr. Cabe's position at trial conflicts with what was implied during the Corps' July 1996 meeting with Mr. Walters–that the Real Estate Division could and would amend the lease area without any negative consequences for plaintiff.  Id. at 4802, 4971 (Walters); DX 71.

---

[95]  Mr. Walters testified at trial that he did not see a map depicting the Cove Creek Park marina site until he was presented with a new lease on April 22, 1999.  Tr. 4965 (Walters).  The court concludes that Mr. Park's contemporaneous recording of events is more accurate than Mr. Walters's testimony, which occurred almost twelve years later.

**E. Executing a New Lease**

In addition to amending the Greers Ferry Lake Master Plan, the Corps was preparing a new lease to conform to the terms of the MOU. The Corps preferred executing a new lease to amending the 1995 lease because the 1995 lease, with all of its amendments, was voluminous. PX 95; accord Tr. 2811 (Holden) (noting that the new lease was for the parties' convenience). Mr. Cabe's first step was to obtain approval to extend the term of the lease under the existing graduated rental system and a waiver of competition related to the Cove Creek Park marina site. PX 95. Mr. Cabe's request was directed to the Southwestern Division. Id. The Southwestern Division, in turn, forwarded the request to Corps headquarters with a recommendation that it be approved. PX 96. In explaining the need for an extension of the lease term using the graduated rental system, the Southwestern Division indicated that the accommodation was meant to "partially compensate the lessee for the business loss experience[d] during the Corp[s'] imposed moratorium on expansion." Id.; accord Tr. 2806-09, 2821 (Holden) (noting that the terms of the new lease were to partially compensate plaintiff for the cease-and-desist order, as well as to allow sufficient time for the improvements at the Cove Creek Park marina site). However, it is unknown whether anyone advised plaintiff that extension of the lease term using the graduated rental system was meant as partial compensation for the imposition of the cease-and-desist order. Tr. 2810 (Holden).

Eventually, Mr. Cabe's requests were granted. See generally PX 98 (containing the lease). Thus, attorneys within the Real Estate Division prepared a lease, Tr. 2350 (Holden), that reflected the Corps' agreement with plaintiff as set forth in the MOU, PX 98. On April 22, 1999, the Corps presented the new lease–lease DACW03-1-99-837 ("the 1999 lease")–to Mr. Walters for his signature. Id. Mr. Walters was not accompanied by his attorneys, Tr. 4967 (Walters), and did not make any changes to the lease, id. at 5373 (Walters). In fact, Mr. Walters likely did not even read the lease because he "was dealing with the United States government" and presumed that it was "being truthful." Id. at 4968 (Walters); accord id. at 5375 (Walters) (noting that he trusted the representations of the Corps employees he was dealing with, who he thought of as his friends). Mr. Walters signed the lease on plaintiff's behalf; Mr. Cabe signed on behalf of the Corps. PX 98.

Several provisions of the 1999 lease bear mentioning. First, as approved by Corps headquarters, the term of the lease was twenty-five years, from January 1, 1999, through December 31, 2023, and the lease retained the old graduated rental system. Id. Second, with respect to the condition of the leased premises, paragraph six of the lease provided: "The Lessee acknowledges that it has inspected the premises, knows its condition, and understands that the same is leased without any representations or warranties whatsoever and without obligation on the part of the United States to make any alterations, repairs, or additions thereto." Id. Third, regarding parking at Eden Isle Marina, paragraph thirty-eight of the lease provided:

> The Lessee agrees no additional parking will be authorized to serve the new docks at Eden Isle Marina site. A footpath will be allowed for access. Any trees needing to be removed will be identified by project personnel. Tree removal will be minimal. Any additional parking needed will be on private land.

Id.  And fourth, with respect to funding the construction of infrastructure for the Cove Creek Park marina site, paragraph thirty-nine of the lease provided:  "The Corps will construct an access road, utilities and parking for the marina at [the] Cove Creek Park site as funds become available."[96]  Id.  Notably, even though Mr. Miller had previously expressed concern about the MOU's lack of a contingency plan if the Corps did not receive a congressional add, no such contingency plan was included in the 1999 lease.  Tr. 2022-23 (Park).

In addition, Exhibit A of the 1999 lease contained descriptions of the two lease areas covered by the lease.  The Eden Isle Marina lease area was described as:

> A tract of land situated in the County of Cleburne, State of Arkansas, being that part of the E½ of the E½ of Section 18, and that part of the W½ of the W½ of the NW¼ of Section 17, all in Township 10 North, Range 10 West of the Fifth Principal Merid[i]an, and containing 51 acres, more or less . . . .

PX 98 at 21.  And, the lease area for the future Cove Creek Marina was described as:

> A tract of land situated in the County of Cleburne, State of Arkansas, being that part of the SE¼ of the SE¼ of Section 27, and that part of the NE¼ of the NE¼ of Section 34, all in Township 10 North, Range 11 West of the Fifth Principal Merid[i]an, and containing 31 acres, more or less . . . .

Id. at 22.  Moreover, and in contrast to the 1995 lease, the lease area descriptions were placed on maps depicting the lease areas.  Id. at 21-22.  These maps represent the first time that a water area was described or depicted in a lease for Eden Isle Marina.  Tr. 3779, 3788 (Overton).  Finally, it should be repeated here that by changing Eden Isle Marina's lease area to remove 1,000 feet of shoreline and add water area to encompass existing docks, the Corps was treating the marina differently from how it treated Narrows Marina, where the Corps merely added water area to the existing lease area to encompass docks built in the channel.  As Dr. Overton testified: "[T]wo different policies took place here between the two marinas."  Id. at 3885 (Overton).

On the same day that the parties executed the 1999 lease–April 22, 1999–they also executed an "Agreement for Mutual Cancellation of Lease."  DX 155.  Signed by Mr. Walters

---

[96]  The provision obligating the Corps to build infrastructure at Cove Creek Park to serve a future marina (paragraph thirty-nine) conflicts with the provision indicating that the Corps was leasing property to plaintiff without any obligation to make any alterations or additions to the leased property (paragraph six).  However, because the court must consider the contract as a whole and interpret it "so as to harmonize and give reasonable meaning to all of its parts,"  NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004), it interprets paragraph thirty-nine as subordinate to paragraph six.  In other words, the Corps disclaimed any obligation to make alterations or additions to the leased property except for the alterations and additions specifically identified for Cove Creek Park.

and Mr. Cabe, and witnessed by Ms. Best, the document reflected the termination of the 1995 lease effective December 31, 1998, as well as the parties' agreement to execute the 1999 lease. Id.  Mr. Walters signed the document based on the representations of the Corps employees he was dealing with, whom he thought of as his friends.  Tr. 5375 (Walters).

In addition, upon the parties' execution of the 1999 lease and the agreement cancelling the 1995 lease, the Corps provided Mr. Walters with a letter formally approving his request to add 192 boat slips at Eden Isle Marina.  PX 109.  In line with plaintiff's request, these boat slips would be distributed among three new docks–T, U, and V docks–and an addition to S dock.  Id. Mr. Walters was very pleased to receive this letter.  Tr. 4967 (Walters).  He immediately authorized Atlantic Meeco to build the docks; their construction took a little over one year.[97]  Id. at 4971 (Walters); see also PX 110 (reflecting that as of July 1, 1999, plaintiff had already begun constructing new docks at the marina).  Mr. Walters opted to build some larger boat slips, which, although they were more expensive to build, benefitted the marina due to the more dependable rental income stream derived from the large boats they would serve.  Tr. 4971, 4973 (Walters).

## F.  Justifying the Alteration of Eden Isle Marina's Lease Area Boundary

Four to six days after plaintiff and the Corps executed the 1999 lease, Mr. Cabe prepared a memorandum for the Eden Isle Marina file with the following subject line:  "Real Estate Position on Boundary Differences."  PX 109-A.  In the memorandum, Mr. Cabe purported to explain the basis of the Corps' decision to pursue a change in the marina's lease area boundary. Id.  He described Mr. Ragar's determination during the summer of 1996 that some docks at the marina extended outside of the lease area, and provided an explanation for why the Corps did not take any action to correct the purported problem:

> [T]he boundary out into the water was unclear to Mr. Ragar and he only voiced his concern at that time.[98]  . . .

---

[97]  Dr. Overton testified at trial that, as set forth in the environmental assessment ("EA") he had prepared for Eden Isle Marina in 2006, the last addition to the marina was M dock, which was added in March 2004.  PX 171 at 19-20; Tr. 4555-56 (Overton); see also PX 171 at 20 (noting that M dock was filled to maximum capacity within ten months of completion); Tr. 4555 (Overton) (same), 5310 (Walters) (stating that M dock was full in six or seven months).  Dr. Overton further testified that M dock was part of what the Corps approved in April 1999.  Tr. 4555-56 (Overton).  This does not appear to be accurate.  Rather, in July 2003, plaintiff requested permission to replace the existing M dock with a new M dock that contained more boat slips.  PX 131; see also Tr. 5309 (Walters) (indicating that plaintiff replaced the old M dock, a twelve-slip sailboat dock, with a new eighty-slip dock, netting sixty-eight slips).  In other words, the new M dock was not added to the marina as a result of the Corps' approval on April 22, 1999, of the 192 boat slips that plaintiff requested in August 1998.

[98]  Mr. Cabe's statement is inaccurate.  Documentation from July 1996 reveals that Mr. Ragar, rather than being suspicious, actually stated that the docks were outside of the lease area. DX 71.

> . . .  The Corps of Engineers had other priorities for funding during the
> next three years, so a proper survey and drawing were not done by the Corps in
> order to check the suspicion of Mr. Ragar.  However, in 1998, when Eden Isle's
> new proposed expansion arose, the Corps went ahead and did check the area . . . .

Id. (footnote added).  He continued by explaining that even though the marina allegedly had
docks extending beyond the lease area boundary, it was not a serious problem:

> The fact that prior to 1999, parts of Eden Isle Marina's docks were outside of the
> regular lease area is not a material or fatal breach of the lease.  It also does not
> appear to have been intentional since there is no evidence that either party prior to
> 1998 knew conclusively about the crossing, and the demarcation line in the water
> is unclear.  In fact, it appears the docks were outside the lease area when the lease
> was transferred to Mr. Walters.  It was also immaterial because the marina had not
> used all of [its] regular leased area, there was no safety issue presented by the
> extra space and docks, and the extra space did not [a]ffect the day-to-day
> operations of the marina or the Corps.

Id.  Mr. Cabe did not explain why, in 1999, the docks purportedly existing outside of the lease
area suddenly became a material issue that needed to be addressed.  He merely explained that the
lease area was reconfigured with the execution of the 1999 lease.  Id.

The trial record, taken as a whole, demonstrates that Mr. Cabe's after-the-fact
explanation for why the Corps did not take any action between the summer of 1996 and the
receipt of plaintiff's development request in August 1998 to correct the issue identified by Mr.
Ragar is inaccurate.  There is no evidence in the trial record indicating that the Corps had
intended to do a survey or was prevented from doing a survey due to funding concerns, and it
defies belief that the Corps was able to obtain funding for a survey at the exact time that plaintiff
submitted its request to add 192 boat slips at the marina.  See also Tr. 4947 (Walters) (noting that
in 1996, there was no mention of other funding priorities or the need to do a survey).  Rather, it
is readily apparent that the Corps only became concerned about the docks at issue when the
docks could be used as an excuse not to grant plaintiff's development request.  See id. at 2371
(Holden) (stating that he used the docks-outside-the-lease-area issue as a negotiating point), 2533
(Holden) (stating that the issue was a discussion point, not a negotiating point).

Why Mr. Cabe was spurred to prepare this memorandum is unclear.  Given that the lease
area had already been altered with the execution of the 1999 lease, there does not appear to be
any reason or need for the Corps to justify its position.  The court sees twin motivations for the
memorandum:  (1) Mr. Cabe was uncomfortable with plaintiff being forced to agree to an
alteration of the lease area and wanted to ensure that the Real Estate Division's role in the matter,
with respect to its treatment of plaintiff, was placed in the best possible light or (2) Mr. Cabe
realized that there was nothing in the Eden Isle Marina file reflecting that the Corps believed that
the docks extending beyond the lease area boundary was problematic–likely because the Corps
did not hold such a belief–and wanted to fill that void.

The memorandum contains a notation indicating that copies were sent to plaintiff's attorney, Mr. Belew, and Mr. Upton's attorney, Mr. Hankins.  PX 109-A.  According to Mr. Walters, this memorandum was not in Mr. Belew's file when he obtained it in connection with this lawsuit, and if Mr. Belew did indeed receive a copy of the memorandum, he did not provide him with a copy.  Tr. 4943-44 (Walters).

## V.  April 1999 to June 2005:  Plaintiff's Attempts to Develop at Cove Creek Park Under the 1999 Lease

### A.  The Lease Area for the Future Marina at Cove Creek Park

After plaintiff executed the 1999 lease, which contained a map depicting the lease area for the future marina at Cove Creek Park, Mr. Walters visited the site with Corps employees.  Id. at 4966 (Walters).  Although Mr. Walters had received a copy of a map depicting the lease area being proposed by the Corps in March 1999, PX 108, it appears that he did not visit the site before providing his approval.[99]  Thus, when he went to the site, he complained:  "I said, you know what, this doesn't have any marina in the water to build off.  You all need to move this thing around to where I can get enough room to build enough dock[s] to justify even thinking about doing this."  Tr. 4966 (Walters).

On November 27, 2000, Mr. Cabe forwarded to Mr. Walters a supplemental agreement to the 1999 lease for his signature.  PX 98-A.  The supplemental agreement was intended to replace the portion of Exhibit A to the 1999 lease pertaining to the Cove Creek Park marina site.  Id.  The new map depicted the addition of 1.88 acres requested by the district's Engineering Division and the new lease area description indicated that it covered "[a] tract of land . . . containing 32.88 acres, more or less . . . ."  Id.  Plaintiff and the Corps did not immediately execute the supplemental agreement; instead, they executed it on March 2, 2001.  Jt. Stip. ¶ 36.

In the meantime, on February 8, 2001, Mr. Walters requested that the lease area at Cove Creek Park be modified to allow for a marina large enough to turn a profit and to account for the shallowness of the water in the back of the cove.  DX 224.  Likely as the result of this request,

---

[99]  The trial record does not contain any direct evidence that reflects the precise reason why Mr. Walters did not visit the site upon receiving the map.  The most likely reason, given Mr. Walters's repeated testimony that he trusted the Corps personnel, is that Mr. Walters believed that the Corps would choose an appropriate site for a marina.  Other possible reasons include the existence of barriers to physical access to the site and the pressure of moving along the process so that a new lease could be executed and new boat slips could be added at Eden Isle Marina.

Mr. Walters did visit the general vicinity of the marina site before March 1999, as reflected by his February 26, 1999 suggestion for a temporary road to access the marina site.  See PX 102.  However, it appears that Mr. Walters did not know the precise location of the marina site at that time.

plaintiff and the Corps executed a second supplemental agreement on August 31, 2001, that
again amended the portion of Exhibit A to the 1999 lease pertaining to the Cove Creek Park
marina site.  PX 98-B.  The new map contained in the second supplemental agreement depicted a
lease area with a noticeably different shape than what was depicted in the original 1999 lease.
Compare PX 98 at 22, with PX 98-B at 2.  And, the new lease area description, "[a] tract of land
. . . containing 24 acres, more or less," PX 98-B at 2, reflected a seven-acre reduction of the lease
area as compared with the original 1999 lease, see PX 98 at 22.

## B.  Plaintiff's Initial Push to Begin Work at Cove Creek Park

While the precise boundaries of the lease area at Cove Creek Park were being
determined, Mr. Walters attempted to begin development of the marina site.  Indeed, Mr. Walters
was "excited" and "motivated" to begin work there.  Tr. 4977 (Walters); cf. PX 128 (noting that
Mr. Walters expected to spend $1,000,000 upfront on infrastructure at the site).  In an August 4,
1999 letter to the Little Rock District, Mr. Walters requested permission to begin preliminary
construction at Cove Creek Park later that summer or in the early fall.  DX 162.  Specifically,
Mr. Walters wanted part of the site cleared and an area staked out for placement of the gas
storage tank.  Id.  He also wanted to set some land anchors for docks and begin construction of
the store building and rental boat slips.  Id.

Mr. Park responded to Mr. Walters's letter on August 11, 1999.  PX 111.  He stated:

> We are not willing to commit resources or allow any work at Cove Creek
> until funding for the project is approved.  Currently, there is no language in the
> FY 2000 appropriation to indicate that monies have been earmarked for this
> activity.  Once we know that this is a viable plan, we will make every effort to
> accomplish our part of this project in a timely manner.

Id.  In an electronic-mail message the following day, Mr. Hargis concurred with prohibiting any
preliminary work at Cove Creek Park until funding was secured, and further declared:  "Eden
Isle Marina should not be allowed to do any work, nor should we commit any resources to
something that is up in the air."  PX 112.

## C.  Continued Pursuit of Funding

### 1.  Congressional Add

Both Senator Hutchinson and Senator Lincoln remained interested in trying to obtain
funding for the work at the Cove Creek Park marina site.  In August 1999, a staff member from
Senator Lincoln's office contacted the Corps regarding the funding.  DX 166.  During an August
25, 1999 telephone conversation, Mr. Cabe advised her of the need for funding–$1,150,000–to
construct an access road, build the toilet, relocate campsites, build new campsites, and provide
utilities.  Id.  He further informed her that the Corps had placed the Cove Creek Park work in its
FY 2001 budget request, and that Mr. Walters continued to seek a congressional add.  Id.

Several months later, Senator Hutchinson contacted the Corps.  In a December 7, 1999 letter to Colonel Holden, the senator requested that the Corps work with Mr. Walters to develop the marina at Cove Creek Park.  PX 114.  He explained:

> Despite the timely need for federal funding, I was not notified of this shortfall until after the FY 2000 Energy and Water Development Appropriations bill was passed by the Senate.  It is my hope that the Little Rock District will begin seeking funds for this need as soon as possible.  In addition, I will include developing the marina's infrastructure in my requests for FY 2001 Energy and Water Development funding.

Id.

## 2.  The Project Office's FY 2002 Budget Request

The Greers Ferry Lake Project Office continued to include the Cove Creek Park marina site access road in its budget requests.  Its FY 2002 budget request, dated March 9, 2000, reflected that the project office moved the access road from Level 2 to Level 3, ranking it eighth out of the eight items within that priority level.  PX 147.  It also increased the estimated cost of the access road from $418,000 to $430,000.  Id.  Two other Cove Creek Park-related items also appeared in this budget request:  the construction of thirteen new campsites for $155,000 and the construction of a waterborne toilet for $207,000.  Id.  Both of these items were assigned to Level 2, ranked eighth and ninth out of the eleven items in that priority level.  Id.  Presumably, the three Cove Creek Park-related items were placed in their respective priority levels based on the regulatory guidelines; however, the trial record does not contain an explanation for why new campsites and a new toilet belonged in Level 2, which was for nondeferrable, currently existing activities, Tr. 3567, 3569-70 (Murdock-McDaniel), while a new access road belonged in Level 3, which was for deferrable, nonroutine, noncritical activities, id. at 3570-74 (Murdock-McDaniel).

## 3.  Funding for the Design of the Access Road

Between February and July 2000, the Corps, for the first time, indicated that money had been allocated for work at Cove Creek Park.  Compare PX 142 (containing a February 1, 2000 fact sheet indicating that the district office's FY 2000 budget request did not include a request for funds related to the Cove Creek Park marina site and that there were no proposed activities at the site for FY 2000), with PX 144 (containing a July 17, 2000 fact sheet with a FY 2000 allocation).  A July 17, 2000 fact sheet indicates that the Corps had allocated $360,000 in FY 2000 to design the access road to the Cove Creek Park marina site, design a restroom at the site, and construct twenty-five new campsites.  PX 144; see also PX 119 (characterizing the allocated funds as "scarce").  The money for the design work may have come from the Little Rock District's budget, PX 119, or from Corps headquarters, Tr. 3439 (Murdock-McDaniel).

It appears that the design work began as early as April 2000.  See PX 198-A (containing drawings dated April 2000); see also PX 118-A at 3 (reflecting that design work was ongoing in August 2000).  A ninety percent submittal was produced on November 1, 2000, containing

drawings for the access road, two parking lots, a prefabricated vault toilet, and utilities.  PX 198-A.  In conjunction with these drawings, the Corps prepared a document–dated November 28, 2000–reflecting a total estimated cost of $640,123, and an estimated time of construction of 190 days, for the access road and other improvements.  PX 198.

## D.  Environmental Litigation Concerning the Greers Ferry Lake Shoreline Management Plan

While plaintiff was trying to get a marina at Cove Creek Park off of the ground, controversy was mounting over the Corps' issuance of a new Shoreline Management Plan for Greers Ferry Lake.  Although plaintiff was not directly involved in the controversy, the resulting litigation ultimately affected plaintiff and its quest to build a marina at Cove Creek Park.

## 1.  The National Environmental Policy Act of 1969

Some basic background on the legal requirements affecting the Corps' preparation and issuance of a new Shoreline Management Plan is appropriate.[100]  The relevant federal statute is the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321-4370f (2000).  "NEPA is an 'environmental full disclosure law' which seeks to assure that potential environmental impacts are subject to thorough study and a detailed statement."  Sun Oil Co. v. United States, 572 F.2d 786, 812 (Ct. Cl. 1978) (per curiam).  Under NEPA, federal agencies must include, in any recommendation or report on a proposal for a major federal action that significantly affects the quality of the environment, a detailed statement of the action's environmental impact.  42 U.S.C. § 4332(2)(C).  To begin the process, an agency typically prepares an EA, involving environmental agencies, applicants, and the public.  40 C.F.R. § 1501.4(b) (2000).  An EA must contain a discussion of the environmental impacts of the proposed action and alternatives, and is a public document.  Id. § 1508.9.  Based on the EA, an agency can prepare a finding of no significant impact ("FONSI"), which must be made available to the public.  Id. §§ 1501.4(e), 1506.6.  Or, an agency can proceed to the preparation of an environmental impact statement ("EIS"), id. § 1501.4, which must address the environmental impacts of reasonable alternatives to the proposed action, id. § 1502.1.  In most cases, the agency must place notices regarding the preparation of an EIS in the Federal Register, and must "[i]nvite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds)" in the EIS process.  Id. § 1501.7; accord id. § 1503.1.  An EIS prepared by an agency is, in most cases, a public document.  Id. §§ 1502.19, 1506.6(f).

---

[100]  The description of the relevant legal requirements in this section is not comprehensive, but is sufficient to provide the necessary context for the events that occurred in this matter.

## 2.  Issuing a New Shoreline Management Plan

On March 14, 2000, after the Corps had prepared an EA and a FONSI, the commander of the Southwestern Division approved a new Shoreline Management Plan for Greers Ferry Lake and immediately began issuing permits for the construction of private docks on the lake.  PX 224 at 2.  Less than one month later, an organization known as Save Greers Ferry Lake, Inc. filed a lawsuit challenging the validity of the new plan in the United States District Court for the Eastern District of Arkansas ("district court").  Id. at 3; see also Save Greers Ferry Lake, Inc. v. U.S. Army Corps of Eng'rs, No. 1:00-cv-00051-BRW (E.D. Ark. filed Apr. 12, 2000).  After the district court concluded that the FONSI was not supported by the EA and that an EIS should have been prepared, the Corps, in June 2000, withdrew the new plan.  PX 224 at 3.

The Corps issued a final EIS in April 2002 and a new Shoreline Management Plan on July 2, 2002.  Id. at 6.  Two weeks later, Save Greers Ferry Lake, Inc. and others filed another lawsuit in district court challenging the new plan.  Id. at 1; see also Save Greers Ferry Lake, Inc. v. U.S. Army Corps of Eng'rs, No. 1:02-cv-00064-BRW (E.D. Ark. filed July 15, 2002).  In its September 30, 2004 ruling upholding the validity of the final EIS and the new Shoreline Management Plan, the district court addressed the plaintiffs' contention that the Corps "failed to consider the cumulative impact of a new commercial dock on Cove Creek . . . ."  PX 224 at 20.  The district court wrote:

> In the Final EIS, the [Corps] mentions that the "only important future action known to be planned and included in the analysis [in the] [Final EIS] was the new marina under consideration for Cove Creek in the south lake area."  Plaintiffs contend that the [Corps] failed to consider the impact of the new marina as an alternative to private boat docks in the south lake area, or the cumulative impact of that commercial dock in addition to several new private docks under the 2002 [Shoreline Management Plan].

> The record contains multiple references to the Cove Creek marina, and although the [Corps] is required to evaluate cumulative impacts, there is no evidence in the record that the Cove Creek marina had proceeded beyond the planning or speculative phase when the Final EIS for the 2002 [Shoreline Management Plan] was prepared.  Nonetheless, Defendants considered the Marina when preparing the Final EIS, and stipulated that an additional EA (or EIS, presumably) will be completed when and if the project ever[] proceeds beyond the speculative phase.

Id. at 22-23 (third alteration in the original) (footnote omitted).  As discussed below, the Corps issued an EA for Cove Creek Park in November 2002, PX 129, after it issued the final EIS for Greers Ferry Lake, but before the district court rendered its final decision.

### E.  Mr. Walters's Complaint to the Engineer Inspector General

### 1.  The June 27, 2000 Meeting

In the meantime, during the early stages of the litigation over the Shoreline Management Plan for Greers Ferry Lake, Mr. Walters traveled to the Little Rock District Office to discuss the Cove Creek Park marina site with district employees.  PX 115.  During the June 27, 2000 meeting, Mr. Walters reiterated his desire to get the Cove Creek Park marina site in operation and furnished plans of the docks he would use.  Id.  He asked the Corps for a better map of the lease area, which the Corps employees agreed to provide, and indicated that after he received the map, he would submit a site map depicting all of his planned improvements and a five-year development plan.  Id.  Next, Mr. Walters renewed his request for a temporary road to access the site, and explained that the costs would be minimal.  Id.  The Corps employees advised him, however, that the project office was opposed to the construction of a temporary road.  Id.; see also Tr. 4961 (Walters) (noting that the Corps ultimately rejected his request for a temporary road due to its concerns about the safety of mixing campground and marina traffic).  Another topic of discussion was funding; the notes prepared by one of the Corps participants indicated: "Briefly discussed that funding had been promised by Congressional add-on, and that apparently the project had no authority to spend current funding on the access road."  PX 115.

It appears that Mr. Walters may have met with Corps employees in the district office on more than one occasion during this time period.  See Tr. 4980 (Walters) ("I went down to Little Rock to one of those meetings that I was at.").  At the end of one of these meetings, Mr. Ragar "tore a sheet off the wall" that provided information about the Engineer Inspector General ("EIG").[101]  Id.; see also id. at 4983 (Walters) (indicating that the sheet was similar to DX3, which is a flier containing contact information for the EIG to report fraud, waste, and abuse at the Corps).

### 2.  Mr. Walters Contacts the Engineer Inspector General's Office

Shortly after receiving the flier, Mr. Walters called the EIG's office.  Id. at 4980-81 (Walters).  The individual he spoke with advised him to send the EIG a letter explaining the issues; Mr. Walters did so.  Id.; PX 117.  In his letter, Mr. Walters summarized what had occurred when he sought to develop Eden Isle Marina.[102]  PX 117.  He indicated that due to

---

[101]  Mr. Walters testified that as he and his wife were leaving the meeting, Mr. Ragar stopped them and gave him the flier.  Tr. 4980 (Walters).  In the notes prepared by one of the Corps participants memorializing the June 27, 2000 meeting, neither Mrs. Walters nor Mr. Ragar was listed as attending the meeting.  See PX 115.  Thus, it is unclear whether Mr. Walters's encounter with Mr. Ragar occurred on June 27, 2000.

[102]  Mr. Walters's letter is not part of the trial record.  See Tr. 4983 (Walters) (noting that he could not locate a copy of his letter and that the EIG's records were lost in the attack on the Pentagon on September 11, 2001).  The contents of the letter are described in a July 31, 2000 memorandum prepared by the EIG.  See PX 117.

political pressure, Mr. Lancaster visited the marina and instructed Colonel Morris to direct plaintiff to cease all further development of the marina.  Id.  He further noted the Corps' offer to trade 1,000 feet of shoreline at the marina for the rights to a marina at Cove Creek Park, an offer that he felt he had to accept.  Id.  Mr. Walters then stated that the although the MOU indicated that an access road and parking lot would be built in Cove Creek Park for the future marina as funds became available, no progress had been made.  Id.

### 3.  The Engineer Inspector General Initiates an Inquiry

On July 31, 2000, upon receiving Mr. Walters's complaint, the EIG requested, presumably from attorneys at Corps headquarters,[103] "a legal opinion as to the propriety of the initial agreement and the status of the MOU, considering that no action has been taken to provide access to the site . . . ."[104]  PX 117.  The EIG suggested coordination with Laura Norman, an employee in the Real Estate Division at Corps headquarters, who had personal knowledge of some of the issues.  Id.  He set an August 11, 2000 deadline for a response and identified Robert Jones as his point of contact.  Id.; cf. Tr. 5011 (Walters) (noting that he had spoken with Mr. Jones on at least one occasion).

### 4.  The Preparation of a Legal Opinion

In response to the EIG's request, Rupert Jennings, the Corps' Assistant Chief Counsel for Legislation, Fiscal, and General Law, contacted Ms. Norman on August 9, 2000, for more information.  PX 118.  In particular, he requested:

> Please provide the views of your office with respect to:  the legal propriety of the MOU, our commitments (if any) under it (e.g. whether we're obligated to make good faith efforts to seek funds for construction of the access road), information on any representations [Corps] officials may have made with respect to seeking funds for constructing the road, information on what steps [the Corps] has taken to date to seek funds for constructing the road, information on whether [the Corps] is taking or plans to take any steps to seek funds in the next available budget, and any other information you believe may be relevant to our providing a legal opinion in this matter.

---

[103]   The EIG directed his request to "CECC-ZA," which, based on other documents in the trial record, appears to denote the Corps of Engineers Office of the Chief Counsel.  See, e.g., PX 95 (containing a memorandum from the Little Rock District's Real Estate Division (CESWL-RE) that was routed through the Southwestern Division's Real Estate Division (CESWD-RE) on its way to the Real Estate Division's office at Corps headquarters (CERE-RE)).

[104]   Defendant waived the attorney-client and work-product privileges that normally would have attached to the legal documents addressed in this section.  See Eden Isle Marina, Inc., 89 Fed. Cl. at 480.

Id.  Mr. Jennings, noting that he had requested an extension of the EIG's deadline, asked Ms. Norman for a response to be sent to Susan Nee, his point of contact, by September 1, 2000.  Id.

It appears that Mr. Jennings's request was forwarded to the Little Rock District because Ms. Brooks prepared an issue paper that addressed most of his questions.  See PX 118-A. Specifically, Ms. Brooks stated the district's views on four topics:  (1) the legal propriety of the MOU, (2) the Little Rock District's commitment under the MOU, (3) the representations made by the Corps to plaintiff, and (4) the Corps' plans for seeking funds for the Cove Creek Park work in its budget.  Id.  In the background section of the issue paper, Ms. Brooks mentioned Mr. Walters's ten-year development plan for Eden Isle Marina, the docks purportedly extending beyond the lease area boundary, property owner objections to the development of the marina, Mr. Lancaster's attendance at a fundraiser for Mr. Berry at the Red Apple Inn, Mr. Lancaster's subsequent message in opposition to marina expansion, the cease-and-desist order, and the "compromise" between the Corps, the EIPOA, and Mr. Walters that led to the MOU.  Id. at 1-2.

Ms. Brooks then addressed each of the four topics seriatim.  Id. at 2-4.  Some of her remarks bear special note.  With respect to the first topic, Ms. Brooks wrote:

> The terms of the MOU reflect the agreed upon compromise which was acceptable to all parties and by entering into this MOU, we undoubtedly avoided lengthy and costly litigation.

> Since Mr. Walters had docks outside the lease area and the homeowners association objected to expansion especially in certain areas, the lease area was reconfigured and a new lease . . . was executed on April 22, 1999.

Id. at 2.  As noted above, Mr. Walters disputes that he found the MOU acceptable.  Tr. 4989 (Walters).

Then, regarding the second and third topics, Ms. Brooks asserted that Mr. Walters had clearly stated that he had a commitment for a congressional add.  See PX 118-A at 3 ("At the time of the signing of the MOU, Mr. Walters stated that he had discussed the congressional add-on funds with Senator Hutchinson and had a commitment for the funds. . . .  He very emphatically stated in a meeting with Little Rock District Real Estate Division that he had a commitment for the funding.").  Mr. Walters denies that he had a congressional commitment for funding, Tr. 4989 (Walters), and the trial record is devoid of any congressional correspondence or other documentation reflecting such a commitment.

Finally, with respect to the fourth topic, Ms. Brooks stated that the Little Rock District had "placed funds in [its] budget request for FY 2000 for the study and design and in FY 2001 for the construction of the road and park amenities for Cove Creek Park."  PX 118-A at 4.  This assertion cannot be reconciled with the evidence relating to the Corps' budget process.  The Greers Ferry Lake Project Office's annual budget request was typically submitted to the district office in the first two or three months of the year prior to the beginning of the fiscal year.  See, e.g., PX 145 (showing that the project office's budget request for FY 2001, which began on

October 1, 2000, was prepared on February 2, 1999).  Thus, the project office's FY 2000 budget request was likely submitted to the district office in early 1998, which is well before the Corps even offered the Cove Creek Park marina site to plaintiff.  Indeed, it was well before plaintiff submitted its request to add 192 boat slips to Eden Isle Marina.  It is therefore not conceivable that the Little Rock District would have placed the design of the access road to the Cove Creek Park marina site in its FY 2000 budget request.  See also PX 141 (indicating that the district office's FY 2000 budget request did not include a request for funds related to the Cove Creek Park marina site); PX 142 (same).

At no point in the issue paper did Ms. Brooks convey the district's position that there was no legitimate reason to deny plaintiff's request to develop Eden Isle Marina, see PX 118-A at 1-4, despite Colonel Holden's expectation that his staff would convey that fact if necessary, Tr. 2847 (Holden).  As discussed in more detail below, Mr. Walters did not see this issue paper until 2006.  Id. at 4987 (Walters).  However, it appears that the issue paper did make its way up the Corps' chain of command to its headquarters.

### 5.  The September 19, 2000 Conference Call

A conference call was held on September 19, 2000, to discuss Mr. Walters's complaint to the EIG.  PX 120.  Participating in the call from the Little Rock District were Mr. Noggle, Mr. Ragar, and Mr. Hargis.  Id.  Participants from Corps headquarters included Vince Montante from the Programs Management Division, Ms. Nee from the Office of the Chief Counsel, and an individual from the Real Estate Division.  Id.  It appears that Mr. Montante arranged the conference call because he wanted to speak directly with Little Rock District employees.  Tr. 3172 (Noggle).

During the conference call, the participants discussed what they believed was the genesis of Mr. Walters's complaint:  "[T]he real complaint was against prior ASA(CW), Mr. Lancaster, regarding remarks he made at a fund raising meeting in the Greers Ferry area about additional marina construction."  PX 120.  In addition, the participants addressed the Corps' responsibilities under the terms of the MOU.  Id.  According to Ms. Nee, the "as funds became available" language indicated the Little Rock District's intent to build the road to the marina site at Cove Creek Park, even in the absence of a congressional add.  Id.  Ms. Nee was not swayed by Mr. Noggle's assertion that the Little Rock District "had a 1″ thick file of documents" reflecting that Mr. Walters had been informed that no road would be built in the absence of a congressional add.[105]  Id.  She said that if the district had wanted to condition funding on the receipt of a congressional add, it should have included that condition in the MOU.  Id.  Mr. Noggle advised that the cost for the work at Cove Creek Park was approximately $1.1 to $2 million, and that the access road was low priority and would never be built.  Id.; see also Tr. 3178 (Noggle) ("My

---

[105]  The trial record does not include the "1″ thick file of documents" described by Mr. Noggle.  Indeed, there is no contemporaneous documentary evidence in the trial record that Corps personnel advised plaintiff in 1999 that the only way the work at Cove Creek Park would be funded was through a congressional add.

people had said quite frankly that this was a . . . deferral kind of work; unless somebody at headquarters . . . kicked this item out to move it within the budget, the President's budget, or some congressman . . . got it, that it would never be done."), 3180 (Noggle) (noting that he was told that it would be "virtually impossible" to build the access road with available funds), 3186 (Noggle) (indicating that based on budget guidance, the Cove Creek Park facilities would always be deferrable in the Corps' budget process).  Nevertheless, Mr. Ragar was left with the impression from the discussions that the road should be built.  Tr. 25-56 (Ragar).

After the conference call, Mr. Noggle sent an electronic-mail message to, among others, Mr. Watford, Mr. Hargis, and Mr. Risher, summarizing the discussions and commenting:

> Anthony Ragar says he talked to the EIG and he told him there were other issues concerning . . . Mr. Lancaster.  If this is true, I'm concerned that the access road issue in the MOU may be a way for HQ[] to make the political issue go away, i.e. direct [the Little Rock District] to build the road.

PX 120.  Mr. Noggle was in charge of the Little Rock District's budget, Tr. 3147, 3154-55 (Noggle), and participated in the conference call because Mr. Montante was his counterpart at Corps headquarters, id. at 3172 (Noggle).  His interest in the Cove Creek Park matter was therefore limited to what effect it might have on the budget; he had no knowledge of the underlying political issue.  Id. at 3178, 3181-82 (Noggle).

Mr. Hargis forwarded Mr. Noggle's message to Mr. Park, PX 121, and Mr. Risher forwarded it to Mr. Miller, PX 120.  In his response to Mr. Risher, Mr. Miller wrote:  "We need to stick to our guns here.  We should budget for this, but it will always be deferrable."  Id.  Mr. Miller then forwarded his response to Mr. Park.  Id.  Mr. Park did not interpret Mr. Miller's message as a directive to keep the Cove Creek Park work in the deferrable category; rather, it was his understanding that the agreement with Mr. Walters was that the Corps would build the road to the marina site when funds were appropriated, and that the appropriation would likely not occur through the regular budget process but through a congressional add.  Tr. 2097, 2012, 2105 (Park).  Indeed, Mr. Noggle indicated that Mr. Miller's message was just a restatement of the budget guidance he provided to the district.  Id. at 3184-86 (Noggle).

As with Ms. Brooks's issue paper, Mr. Walters did not see these electronic-mail messages until 2006.  Id. at 4995-96, 4999 (Walters).  Prior to that time, Mr. Walters had not known that funding for work at the Cove Creek Park marina site would always be categorized as deferrable.  Id. at 4999 (Walters).  Had Mr. Walters known when he contacted the EIG that the Corps considered the work to be deferrable, he would have filed a lawsuit at that time; he explained:

[T]hey just were not truthful with me.  At [no] point did they ever tell me the whole truth and nothing but the truth.  They just deceived me is what they did, and behind my back all this stuff was going on.  I had no idea I had any legal rights.  I didn't know that they–this is the government.  I didn't think about taking on the government.  That's just not something you think about want[ing] to do.

Id. at 4999-5000 (Walters).

### 6.  The November 1, 2000 Conference Call

The trial record does not reflect what actions, if any, were taken between September 20 and October 31, 2000, as a result of the EIG's inquiry.  However, a second conference call regarding Mr. Walters's complaint occurred on November 1, 2000.  PX 122; PX 123 at 2.  Among the participants from Corps headquarters were Mr. Montante and Ms. Norman, and Little Rock District participants included Mr. Cabe and Mr. Ragar.  PX 123 at 2.  The participants ultimately agreed that the Little Rock District would "reprogram sufficient [Operations] funds in FY 2000 to complete design and initiate construction of the subject road, utilities, and parking for the site per the lease agreement with Mr. Walters."  Id.

### 7.  The Directive From Corps Headquarters

In a December 6, 2000 memorandum, the chief of the Program Management Division at Corps headquarters instructed the Southwestern Division and the Little Rock District to reprogram the funds as agreed to during the November 1, 2000 conference call.  Id.  He further directed the division and district to provide Mr. Montante "with a schedule of costs and a timetable of events leading to the completion of the access road, utilities, and parking" by January 30, 2001.  Id.  According to Colonel Holden, this directive constituted an order with which the district was required to comply.  Tr. 2858, 2860 (Holden).  However, nobody from the Corps advised Mr. Walters that the district had been ordered to reprogram the funds necessary to comply with the terms of the MOU and the 1999 lease.  Id. at 5002 (Walters).

### 8.  The Requested Schedule of Costs and Timetable

Colonel Holden was confident that the Little Rock District complied with the directive to provide a schedule of costs and a timetable to Mr. Montante.  Id. at 2860-61 (Holden).  Although the trial record does not contain the schedule of costs and timetable prepared by the district, it does contain two documents supporting Colonel Holden's position.  The first document is a January 27, 2001 fact sheet that may have been prepared, in part, to satisfy the requirement.  See PX 146.  The fact sheet reflected a remaining estimated cost of $2,400,000 to complete the design and construction of the access road, parking, prefabricated toilet, and utilities for the Cove Creek Park marina site, and the restroom, campsites, and utilities at Cove Creek Park.  Id.  According to Mr. Park, the escalation in cost from $1,150,000 to $2,400,000 was likely due to two factors:  (1) the design had been completed and therefore they could get more accurate cost estimates and (2) inflation.  Tr. 2037 (Park).  On the other hand, Mr. Noggle, the employee in charge of the district's budget, could not explain why the cost increased from $1,150,000 to

$2,400,000 over the course of six to seven months. Id. at 3168-69 (Noggle). The fact sheet further indicated that the district's proposed activities for FY 2001 were the "[c]ontinued design of a restroom and the access road" and the construction of twenty-five new campsites. PX 146. However, the fact sheet did not break down how the $2,400,000 would be split among the work at the marina site and work at the park. Id. Nor did the fact sheet include a timetable. Id.

The second document–a February 8, 2001 memorandum from William Dawson, P.E., the director of the Programs Management Directorate at the Southwestern Division–did include a cost breakdown and a timetable that were provided by the Little Rock District. PX 125-A. According to the memorandum, the district's cost estimate included $580,000 for the access road, parking, and utilities for the marina site; $60,000 for a vault toilet for the marina site; $242,000 for a waterborne toilet; and $1,500,000 for campsites; for a total estimated cost of $2,382,000. Id. Both the district and the division recognized that of the $2,382,000, only $640,000 was needed "to satisfy the terms of the lease agreement." Id. The remaining improvements were meant to "upgrade the existing park facilities to meet the anticipated increase in visitation." Id.

The memorandum also indicated that the Little Rock District would complete the plans and specifications for the work in March 2001, and had planned to award a contract to build the road to the marina site in 2001. Id. It appears that the district began to complete the plans as scheduled; in February 2001, the ninety percent submittal containing drawings for the access road, two parking lots, a prefabricated vault toilet, and utilities was circulated among district employees for comment. See PX 199. However, a superseding event affected the remainder of the district's proposed schedule:

> [F]unds are not available in FY01 to initiate construction due to the need to repair facilities damaged by the December 2000 ice storm. Total costs for these repairs is estimated to be $15,410,000, of which $1,400,000 is high priority work for essential health and safety repairs that must be accomplished before the parks can be opened.
>
> . . . . The Southwestern Division and Little Rock District will continue to monitor [Operations], General execution to determine if funds can be made available to construct the required facilities this year, but we do not consider this a likely outcome. We have already reprogrammed $1,000,000 from the Galveston District to the Little Rock and Tulsa Districts to assist with the [Operations] deficit caused by the ice storm. In addition to this action, the Little Rock District will include work packages in future fiscal year [Operations], General program requests to try and obtain the necessary funding.

PX 125-A; accord PX 165 at 30 (indicating that the Little Rock District was directed to reprogram funds for the Cove Creek Park marina site's access road, utilities, parking lots, and prefabricated toilet, but that funding was not available due to the reprogramming of funds to clean up ice storm damage, which was "higher priority mission work"). Mr. Dawson addressed his memorandum to Corps headquarters, and indicated that any questions should be directed to

Ray Russo. PX 199. Mr. Russo was Mr. Montante's and Mr. Noggle's counterpart at the Southwestern Division. Tr. 2898 (Holden), 3172 (Noggle).

### 9.  Further Efforts to Reprogram the Funds Pursuant to the Directive From Corps Headquarters

At some point during this period of time, either the EIG or someone from his office called Mr. Walters to follow up with his complaint.[106] Id. at 5019-20 (Walters); DX 224. That individual was surprised to hear that the district had not done anything on the Cove Creek Park marina site access road, Tr. 5019-20 (Walters), and advised Mr. Walters that the work would be done in 2001, DX 224. Mr. Walters relayed this information to Corps employees during a February 8, 2001 meeting. Id. The meeting, which was held at the at the Greers Ferry Lake Project Office and the Cove Creek Park marina site, was attended by, among others, Mr. Walters, Mrs. Walters, Mr. Park, and Mr. Ragar, who was at that time the acting chief of the Little Rock District's Real Estate Division.[107] Id. The purpose of the meeting was to discuss the Cove Creek Park marina site; plans for the road, parking lots, toilet, and utilities were presented, discussed, and approved by the Walterses, and, as noted above, Mr. Walters requested that the lease area be modified. Id. In addition, Mr. Walters asked whether the work would be completed in 2001. Id. He was told that the Corps did not know when the work would be done because there were no funds available to do it. Id. Mr. Walters "expressed his displeasure" and described his conversation with the EIG or his representative noted above. Id. The Corps employees explained to Mr. Walters that "the recent ice storm strapped an already overtaxed Operations budget and short of a Congressional Add, it [would] be most difficult to come up with funds for the work." Id.

Given its professed inability to fund the work at Cove Creek Park, it is no surprise that the Corps continued to include the work in its annual budget requests. However, starting with the FY 2003 budget request, the Greers Ferry Lake Project Office consolidated all of the work at Cove Creek Park–the marina access road, the waterborne toilet, and the twenty-five new campsites–into one package. See PX 149. In its FY 2003 budget request, dated February 23, 2001, the project office assigned the consolidated package to Level 2, ranking it seventh out of the twelve items within that priority level. Id. The cost of the package was $2,525,000, id., a $125,000 increase over what the district had estimated in its fact sheet from the previous month. Again, the trial record does not contain an explanation for why the package belonged in Level 2, which was for nondeferrable, currently existing activities. Tr. 3567, 3569-70 (Murdock-McDaniel).

---

[106]  Mr. Walters testified at trial that he told Corps employees during a February 8, 2001 meeting that the EIG had called him. Tr. 5019-20 (Walters). Additionally, a February 8, 2001 memorandum prepared by Mr. Park reflects that Mr. Walters stated that he had been in contact with the EIG. PX 224.

[107]  Mr. Cabe retired effective December 31, 2000. Tr. 26 (Cabe).

The Little Rock District apparently remained in communication with the Southwestern Division regarding funding for the work at Cove Creek Park.  A March 29, 2001 electronic-mail message reflects that Mr. Noggle had been in discussions with Mr. Russo and had offered to award a contract–a $420,000 base bid with a $160,000 road paving option and a $60,000 vault toilet option–if Corps headquarters furnished the $420,000.  PX 125 at 2.  Mr. Russo had conferred with Mr. Montante and presented the Little Rock District with two options:  (1) Corps headquarters would provide $250,000, the only sum it had available, which the district could accept and then fund the balance itself or (2) the district could tell the EIG that the Corps lacked the funds for the project, which would result in a lawsuit by Mr. Walters, and, if Mr. Walters prevailed, the district would have to pay the entire cost.  Id.

One of the recipients of the message, Mr. Miller, forwarded it to Mr. Park and Mr. Risher and commented that he was tempted to take the $250,000, eat the rest, and try to get $170,000 from Corps headquarters in FY 2002.  Id.  He also suggested that he could get the maintenance crew from Pine Bluff to build the road for less than $420,000.  Id.; see also Tr. 3400 (Murdock-McDaniel) (explaining that the Pine Bluff crew was a group of individuals at the Pine Bluff Project Office who serve as a maintenance crew).  He asked Mr. Park for his opinion and Mr. Risher whether $170,000 would be available in FY 2002.  PX 125 at 2.  Mr. Risher responded on April 2, 2001, that it would be tough to find the $170,000, but did not rule it out.  Id.  That same day, Mr. Park responded:

> First, I am concerned about using [Operations] funds to construct a facility for a commercial marina.  Obviously, a Congressional Add is the preferred method.  Other marinas, not only at [Greers Ferry Lake], but other projects as well, will no doubt be asking for similar work.  The [MOU] with Ronnie Walters was written to include language that road, parking lot, toilet & utilities would be built as funds allow.  It was explained to Mr. Walters & his attorneys that this meant they would have to convince a member of Congress to provide the funds.  It is most unfortunate this was not included in the [MOU] language.

> Now, however, with the report by the [EIG],[108] it appears that the Corps is getting stuck with the bill.

> If we are to move forward with this, [I] recommend we use either the Pine Bluff crew or the Memphis crew to construct the road.  . . .

>     . . . .

---

[108]   The trial record does not include an EIG report.  At trial, Colonel Holden testified that he would have seen the EIG report when it was published, Tr. 2903 (Holden), and Mr. Park testified that if there was a formal EIG report, he never saw it, id. at 2114-15 (Park).

> Another big benefit of holding out for the Cong[ressional] Add is the possibility the camp loop & waterborne toilet with showers might be included in an Add.

Id. at 1-2 (footnote added); see also Tr. 2112 (Park) (noting that he was concerned about using Operations Division funds for a commercial marina because while the Corps used to provide all of the infrastructure at the marinas, in the 1980s, that changed because the Corps could no longer afford to do so).

Ultimately, after conferring with Mr. Watford, Mr. Miller decided to pursue the $250,000 offered by Corps headquarters to try to get the road to the Cove Creek Park marina site constructed. PX 125 at 1. In an April 2, 2001 electronic-mail message, he asked Mr. Noggle to try and get the money from Corps headquarters and directed another staff member to "begin the planning and scheduling." Id.

The following week, on April 9, 2001, Mr. Park sent an electronic-mail message to Mr. Miller, Mr. Risher, Mr. Watford, and Mr. Ragar reiterating some of his "serious concerns" about proceeding with work at Cove Creek Park. PX 126. His first concern was that the Corps would need to conduct an environmental study before the marina could be built. Id. He noted: "This has not been done and was not done prior to the agreement for offering the Cove Creek site to Eden Isle Marina. I believe someone in [the] Corps was under the impression this was categorically exempt from NEPA, but . . . this is not the case." Id. Mr. Park's second concern was that construction at Cove Creek Park might "furnish ammunition" for Save Greers Ferry Lake, Inc., which was "hunting for any avenue to attack [the] Corps, especially [its] credibility." Id.; accord Tr. 2118 (Park) (remarking that Save Greers Ferry Lake, Inc. watched everything that happened on the lake like a hawk). His third concern was that without a congressional add, the construction of a road, toilet, and utilities for the marina site was contrary to district policy. PX 126. He noted that even if a congressional add was forthcoming, a "failure to obtain necessary environmental documentation would place [the] Corps in jeopardy with the Congressperson responsible for obtaining funds." Id. Mr. Park concluded:

> I recommend everyone with [the] Corps get together and plan strategy before any funds/work is obligated for this effort. We may need to "relick our calf" on this one. I realize Mr. Walters may want to sue but would we be worse-off than before? In other words, if he sues and judgment goes against the Corps, would we lose more than we originally would have lost? If we lose, would it cost us more than the proposed facility at Cove Creek?
>
> . . . .
>
> Right now, there is no marina, nothing for environmental action against the Corps.

Id.; see also Tr. 5023 (Walters) (confirming that he had not threatened to sue the Corps).

Mr. Park's message–more than three years after Cove Creek Park was mentioned as a possible alternative marina site, almost two-and-one-half years after Cove Creek Park was formally offered to plaintiff as an alternative marina site, and more than two years after plaintiff and the Corps executed the MOU–represents the first time that the Corps raised the need to conduct an environmental study at Cove Creek Park before a marina could be built.[109]  The evidence in the trial record does not reflect when the Little Rock District began to require environmental studies, but the policy was definitely in place as of August 2, 2000.  On that date, Mr. Park advised Mr. Johnson and other Corps employees that based on a letter he received from Mr. Johnson, he had informed representatives of Fairfield Bay Marina and Shiloh Marina that it was Little Rock District policy to require "commercial marinas to perform an EA prior to [the] Corps granting an ex[p]ansion to [a] lease area," with the cost to be borne by the marina operators.  PX 366.  Mr. Park then commented:

> I concur with the concept of the EA, [which] should justify need for expansion and make the lessees really assure they have the need, but [the Little Rock District] needs to coordinate this <u>new policy</u> with the [Operations Managers] and the lessees.  I am afraid we will have another battle to fight that we might not have to have done had this been coordinated on the front end.  [A Little Rock District p]olicy statement should be provided to [Operations Managers] and [a] letter sent to all lessees advising of the policy should be prepared.

<u>Id.</u> (emphasis added).  The timing of Mr. Park's August 2, 2000 message and the letter from Mr. Johnson that prompted it is notable.  The message came shortly after the Corps withdrew its Shoreline Management Plan in June 2000 in response to the district court concluding, in the first <u>Save Greers Ferry Lake, Inc.</u> lawsuit, that the Corps' FONSI was not supported by the EA it had prepared.  <u>See</u> PX 224 at 3.  In other words, the message came shortly after the Little Rock District's environmental policies and procedures had been successfully challenged in district court.  It appears likely that the district's new requirement for lease area expansion requests to be preceded by an environmental study was a direct result of this successful challenge.  <u>Accord</u> Tr. 2121 (Park) (noting that as a result of the <u>Save Greers Ferry Lake, Inc.</u> lawsuit, the district was learning more about NEPA and realized that, with respect to Cove Creek Park, if it had a better EA, it might not face the same opposition).

Mr. Park's April 9, 2001 message is also notable for containing the first suggestion from the Little Rock District, in direct opposition to the directive from Corps headquarters in light of

---

[109]  Mr. Park's message was followed, two days later, by a memorandum prepared by Jim Ellis of the Little Rock District's Planning Branch regarding the need for an EA at Cove Creek Park.  DX 231.  In his memorandum, Mr. Ellis noted that the master plan for Greers Ferry Lake did not include a marina at Cove Creek Park, expressed concern about a marina's effect on water quality at that location, remarked that the intent and spirit of NEPA would seem to require public notice and public involvement, and recommended that an EA–which would take sixty days and cost $10,000–be performed.  <u>Id.</u>

the EIG inquiry, that the Corps cease all efforts to try and procure funding for the work at Cove Creek Park.  Engaging in a cost-benefit analysis, Mr. Park proposed that even if Mr. Walters filed a lawsuit and prevailed, the Corps might not be worse off.  PX 126.  At trial, Mr. Park further explained that if the Corps lost such a lawsuit and was ordered to return the 1,000 feet of shoreline at Eden Isle Marina to plaintiff, it would cost the Corps less than it would to build the road to the Cove Creek Park marina site.  Tr. 2127-28 (Park).

It does not appear that the Corps advised Mr. Walters at this time that an EA was required before work could begin at Cove Creek Park.  Nor did the Corps advise Mr. Walters that it was considering whether it would benefit more from ceasing its efforts to procure funding for the work at Cove Creek Park.  Id. at 5024 (Walters).  Indeed, Mr. Walters did not see Mr. Park's April 9, 2001 electronic-mail message until 2006 at the earliest.  Id. at 5022 (Walters).

For the next few years, the Little Rock District did not take any further action to comply with the directive from Corps headquarters to reprogram funds to satisfy its responsibility under the MOU and the 1999 lease.

**F.  Mr. Walters Continues to Make Plans for the Marina at Cove Creek Park in 2001**

The lack of funding for the road to the Cove Creek Park marina site did not prevent Mr. Walters from pursuing his plans.  In fact, he "was jumping up and down" to move forward with work at Cove Creek Park.  Id. at 5024 (Walters).  On July 6, 2001, Mr. Walters sent a copy of a five-year development plan for the future Cove Creek Marina to Mr. Ragar and Mr. Park.  PX 127.  In his plan, Mr. Walters contemplated building or installing, in the first year of operation, a gas storage tank, a maintenance and storage facility, a store, a rental boat dock, and a dock with sixty boat slips.  Id.  In each of the next four years, Mr. Walters planned to build approximately one dock or sixty slips.  Id.  Mr. Walters estimated that to realize this plan, he would need to spend $1,000,000 up front on infrastructure.  PX 128.

**G.  The Continued Pursuit of Funding for the Work at Cove Creek Park Through the Appropriations Process**

Although it appears that the Little Rock District abandoned its attempts to reprogram existing funds to perform the work at Cove Creek Park after April 2001, efforts to fund the work through the normal appropriations process remained ongoing.

**1.  The Corps' Budget Requests for FY 2004, FY 2005, and FY 2006**

Because the district was unable or unwilling to reprogram funds for the work at Cove Creek Park, the Greers Ferry Lake Project Office continued to include the work in its budget requests.  Although the project office's FY 2004 budget request, which would have been prepared in early 2002, is not part of the trial record, it is fair to presume that the work was included in the request since it appeared in prior and subsequent budget requests.  See PX 149; PX 151.  In its FY 2005 budget request, dated February 17, 2003, the project office assigned the Cove Creek Park package, which continued to include the marina access road, the waterborne

-107-

toilet, and the twenty-five new campsites, to the third increment of work, ranking it tenth out of the fifteen items within that increment.[110]  PX 151.  The cost of the package remained the same as it cost in the FY 2003 budget request:  $2,525,000.  Id.  Then, in its FY 2006 budget request, dated May 24, 2004, the project office assigned the Cove Creek Park package to the third increment of work, ranking it thirteenth out of the thirteen items within that increment.  PX 152.  The cost of the package increased by $50,000 to $2,575,000.  Id.

As is evident from the budget requests, the Greers Ferry Lake Project Office began to rank the Cove Creek Park package lower and lower.  After assigning it to the second priority level, with a rank of seven out of twelve, in the FY 2003 budget request, the project office reassigned the package to the third increment of work, with rankings of ten out of fifteen in the FY 2005 budget request and thirteen out of thirteen in the FY 2006 budget request.  Id.; PX 149; PX 151.

This reduction in ranking was mirrored in the project office's five-year major items lists.  In the list for FY 2002, dated June 20, 2002, the project office ranked the three elements of the Cove Creek Park package as its seventh, eighth, and ninth highest priorities.  PX 157.  In the list for FY 2003 list, dated December 12, 2002, the project office ranked those same items as its eighth, ninth, and tenth highest priorities.  PX 159.  In the list for FY 2004, dated November 26, 2003, the project office ranked the items as its fifty-fourth, fifty-fifth, and fifty-sixth highest priorities.  PX 160.  And, in the list for FY 2005, dated November 2004, the project office ranked the items as its twenty-ninth, thirtieth, and thirty-first highest priorities.  PX 161.

By way of comparison, the Dam Site Park modernization project made its first appearance on the five-year major items list for FY 2002, where it ranked thirty-fifth, well below the Cove Creek Park work.  PX 157.  The modernization project remained lower ranked in the FY 2003, with a ranking of thirty-six.  PX 159.  But then, in the FY 2004 list, the modernization project moved well ahead of the Cove Creek Park work, with a ranking of five.  PX 160.  It retained its high ranking in the FY 2005 list, moving up to the project office's fourth highest priority.  PX 161.  The trial record does not contain any explanation from a Corps employee concerning why the Dam Site Park modernization project jumped from a ranking of thirty-six on December 12, 2002, to a ranking of five on November 26, 2003.  But, this increased ranking coincides with a telephone call that Mr. Park received from Mr. Berry's office in which Mr. Park was asked whether there was anything for which the Greers Ferry Lake Project Office could use some extra money.[111]  Tr. 2711, 2713-17 (Park).  Rather than requesting funding for the work at

_____

[110]  Although the testimony elicited at trial indicated that the Corps had changed the way it prioritized items in its budget requests for FY 2004 and beyond, Tr. 3558, 3595 (Murdock-McDaniel), the Greers Ferry Lake Project Office's budget requests did not reflect the change in terminology to "increment of work" until approximately 2006 (the FY 2008 budget request), see PX 151 (FY 2005 budget request); PX 152 (FY 2006 budget request); PX 153 (FY 2007 budget request); PX 154 (FY 2008 budget request).

[111]  At trial, Mr. Park testified that the telephone call might have come from Mr. Berry's or Senator Lincoln's office.  Tr. 2711, 2713 (Park).  Because it was Mr. Berry who announced

Cove Creek Park to satisfy the Corps' contractual obligation to plaintiff or for other higher-ranked work, Mr. Park requested funds to modernize Dam Site Park because it was an extremely important park, both to the project office and the local economy, but was showing its age.  Id.; see also id. at 765 (Berry) (noting that Dam Site Park was important to the Corps because President John F. Kennedy had visited it).  On August 21, 2003, Mr. Berry issued a news release announcing the appropriation of $2,000,000 for the Dam Site Park modernization project for FY 2004.  DX 267.  In the news release, Mr. Berry noted that "Greers Ferry Lake was one of only two lakes in the nation that received funding for recreation construction."  Id.

Taken together, the budget requests and five-year items lists reflect that the Little Rock District's contractual obligation to construct an access road, parking, and utilities for the Cove Creek Park marina site as funds became available was insufficient to cause it to prioritize that work when it came time to request funding from Congress.  Accord Tr. 3430-31 (Murdock-McDaniel) (noting that the budget process did not allow the Corps to take its contractual obligations into consideration when prioritizing budget items); see also id. at 3425 (Murdock-McDaniel) ("[The work at Cove Creek Park] was always a high priority, but that doesn't necessarily reflect in the budget submission because of the rules and regulations that dictate what can go in each level in that budget request.").

The Corps' budget requests and five-year major items lists further reflect that the work at Cove Creek Park was not a high priority for the district despite its assertions to the contrary.  The trial testimony of Andrea Murdock-McDaniel[112]–then the chief of the Operations Division at the Little Rock District, id. at 3299-300 (Murdock-McDaniel)–that despite the low project ranking for the Cove Creek Park work, it "was always a high priority,"[113] id. at 3425 (Murdock-McDaniel), particularly when funds became available due to slippages on other work, id. at 3433 (Murdock-McDaniel), is belied by the low ranking of the Cove Creek Park work on the five-year major items lists and the fact that when funds became available from Congress for work of its choosing, the district chose to fund work at Dam Site Park and not Cove Creek Park.

---

the funding for the Dam Site Park modernization project, DX 267, the court presumes that the call came from Mr. Berry's office.

[112]  Ms. Murdock-McDaniel was formerly known as Andrea Lewis.  See, e.g., PX 201 (containing electronic-mail messages addressed to Andrea Lewis).  For simplicity, the court refers to her by her current name throughout this opinion.

[113]  Ms. Murdock-McDaniel joined the Little Rock District as the deputy chief of the Operations Division in November 2006.  Tr. 3479 (Murdock-McDaniel).  It is unclear whether her statement that the Cove Creek Park work "was always a high priority" was limited to her tenure at the district.

## 2. Congressional Efforts

In addition to the Corps requesting funding through the normal budget process, at least one member of Congress, Mr. Berry, sought funding for construction of the access road, parking, and utilities at the Cove Creek Park marina site in 2002 and 2003.[114]  DX 254.  On March 22, 2002, Mr. Berry sent letters to the chairman and ranking member of the Subcommittee on Energy and Water Development for the Committee on Appropriations requesting that the subcommittee consider several Corps projects in his congressional district for FY 2003 funding.  Id. at 1-2.  One of the projects was Cove Creek Park; an information sheet attached to the letters contained the following explanation and justification for the funds:

> Funds will be used to construct an access road, parking and utility connections at Cove Creek Park, Greers Ferry Lake, Arkansas.  The U.S. Corps of Engineers has agreed to perform construction pursuant to a Memorandum of Understanding dated February 2, 1999.  Cove Creek, when completed, will provide additional access and marina space for visitors to Greers Ferry Lake.

Id. at 4.  Mr. Berry requested $640,000 for the work at Cove Creek Park.  Id.  Mr. Berry made a virtually identical request on March 28, 2003, for FY 2004.  Id. at 5-6.  Neither of Mr. Berry's requests for funding for the work at the Cove Creek Park marina site was granted, as reflected by the Corps' continued inclusion of the work in its subsequent budget requests.

## H. The Corps Conducts an Environmental Study at Cove Creek Park

Contrary to its representation to the district court during the second Save Greers Ferry Lake, Inc. lawsuit, PX 224 at 23, the Corps did not wait until after the Cove Creek Park marina "proceed[ed] beyond the speculative phase" before performing an environmental study.  Rather, it issued an EA for the marina site in November 2002, PX 129, many years before the Corps was able to secure funding for an access road to the marina site, see Tr. 3492 3656-61 (Murdock-McDaniel) (noting that funds became available in 2008).  The Corps described the need for the EA as follows:

> The need for the construction at Cove Creek Park resulted from the desire of the proprietor of Eden Isle Marina to expand his facility.  An Environmental Assessment (EA) is required in order to determine the impacts of the proposed expansion on the environment.  The need for the construction at Cove Creek Park resulted from complaints by adjoining landowners in the Eden Isle area to the previously proposed expansion of Eden Isle in its current location.

---

[114]  The genesis of Mr. Berry's request is unknown.  There is no evidence in the trial record that Mr. Walters contacted his congressional delegation regarding funding for the work at the Cove Creek Park marina site after early 1999.

> In addition to the proposed construction of the new marina at Cove Creek Park by the concessionaire, [t]he U.S. Army Corps of Engineers plans to upgrade the facilities at Cove Creek Park by constructing a new road, utilities, two parking areas and a vault toilet within the park.

> The purpose of this environmental assessment is to assess the environmental effects from the proposed construction of a marina and associated Corps of Engineers improvements at the Cove Creek Park area of Greers Ferry Lake.

PX 129 at 6.  The Corps did not perform an environmental study at the Cove Creek Park marina site before it offered the site to plaintiff as a replacement for the 1,000 feet of shoreline lost at Eden Isle Marina because it did not believe a study was required due to the marina site being located within a Corps park.  Tr. 2119 (Park).  The Save Greers Ferry Lake, Inc. litigation caused the Corps to reevaluate its position.  See id. at 2121 (Park) (noting that as a result of the Save Greers Ferry Lake, Inc. lawsuit, the district was learning more about NEPA).

In the EA, the Corps analyzed two alternatives:  (1) doing nothing, and (2) developing the marina in accordance with the five-year master plan submitted by plaintiff, which entailed the construction of an access road, two parking areas, and a vault toilet; installation of a gas storage tank; and construction of marina facilities, including various buildings and boat docks.  PX 129 at 7.  The impact of the second alternative was summarized as follows:

> Implementation of Alternative 2 . . . would result in the clearing and development of approximately 11.3 acres of upland forest and the placement of a marina within approximately 12.7 acres of Greers Ferry Lake.  . . .  The proposed road would be 3200 ft long and an average of 25 ft wide, with a maximum of four acres of total ground disturbance.  Localized minor, long-term adverse impacts to terrestrial resources, aesthetics, and cumulative effects could potentially occur as a result of the placement and operation of the marina and associated infrastructure.  Minor, short-term impacts to the soils would occur in the project area due to site construction activities.  There would be long-term beneficial impacts to recreational resources, primarily for those individuals that would rent the boat slips, as a result of implementing this alternative.  There would also be minor long-term beneficial impacts to socio-economic resources for the marina owner and surrounding small businesses.  In addition, surrounding property values would be expected to rise due to the development.  These localized impacts would be related to the increased expenditures associated with boats, boat maintenance, dock purchases, fuel, and other recreational purchases.

Id.  As a result of these findings, the Corps concluded that implementation of the second alternative "would not result in significant adverse impacts to the human environment, either by itself, or through cumulative effects of past, present or reasonably foreseeable actions" and issued a FONSI to that effect.  Id. at 46-48.

-111-

### I.  Mr. Walters's Continued Development Efforts in 2003 and 2004

### 1.  Cove Creek Park

In early 2003, Mr. Walters had a discussion with Mr. Ragar regarding whether the Corps might permit him to build the road to the Cove Creek Park marina site himself, in exchange for rental credit.  PX 130; Tr. 5034 (Walters).  Mr. Park, in a March 5, 2003 electronic-mail message, noted a number of issues with this plan:  construction practices, compliance with NEPA, interference with park operations, protecting the park, and bond requirements.  PX 130.  Mr. Park also recommended a public comment period to, among other things, protect the Corps from litigation.  Id.  Ultimately, the Corps did not allow Mr. Walters to build the road for rental credit.  Tr. 5037 (Walters).

### 2.  Eden Isle Marina

Later in 2003, plaintiff requested permission to replace the existing M dock at Eden Isle Marina with a new M dock that contained more boat slips.  PX 131.  Mr. Park believed that the request should be allowed, but recommended, in a July 31, 2003 memorandum, that the Real Estate Division conduct additional research to ensure that it would be "on firm ground" by approving plaintiff's request.  Id.  The Real Estate Division must have approved the request because plaintiff replaced the M dock in March 2004.  PX 171 at 19-20; see also Tr. 5309 (Walters) (indicating that plaintiff replaced the old M dock, a twelve-slip sailboat dock, with a new eighty-slip dock).

### J.  The EIG Inquiry Is Reinstated

Having seen no progress at the Cove Creek Park marina site, Mr. Walters called the EIG for an update.  The timing of this call is unclear, but based on the totality of evidence adduced at trial, the court concludes that Mr. Walters did not call the EIG until the summer of 2004.  See Tr. 4983 (Walters) (noting that when he called the EIG, he was informed that the EIG had lost all of his records in the attack on the Pentagon on September 11, 2001, and this was the last conversation he had with the EIG), 5011 (Walters) (stating that he had a conversation with Mr. Jones on August 6, 2004, which was when he was told that the records had been lost); PX 134 (reflecting that Mr. Jones conversed with Mr. Walters on August 6, 2004).

   Mr. Jones from the EIG's office returned Mr. Walters's telephone call on August 6, 2004.  PX 134.  Mr. Jones's notes reflect that the EIG had closed its initial inquiry in December 2000, and that the Little Rock District was supposed to have found money to construct the road to the Cove Creek Park marina site.[115]  Id.  Mr. Jones told Mr. Walters that he would investigate why the road had not been built.  Tr. 5040 (Walters).

---

[115]  The source of Mr. Jones's information is unclear, since he apparently advised Mr. Walters that the EIG's records regarding the inquiry were lost in the attack on the Pentagon on September 11, 2001.  See Tr. 4983 (Walters).

Mr. Jones called Lee Bass at the Little Rock District.  PX 134.  Mr. Bass, who was then the chief of the district's Operations Division, Tr. 2072 (Park), 3300 (Murdock-McDaniel), advised Mr. Jones that there was no money available for the $2.4 million project, and that he would research the status of the "1000 feet shoreline swap."  PX 134.  Mr. Jones called Mr. Bass again on August 30, 2004.  Id.  Mr. Bass reported that that the district had agreed to construct the road when funds became available, that the district had placed the road in its FY 2005 budget request as part of a larger Cove Creek Park package, and that the road, which accounted for $700,000 of the $2 million package, would not be funded.  Id.  Mr. Bass also informed Mr. Jones that the 1,000 feet of shoreline at Eden Isle Marina given up by plaintiff was now residential, id., even though the land fronting the shoreline was owned by the government and the owners of adjacent residential property had not changed since 1999, Tr. 5041 (Walters).

Mr. Jones continued his investigation during the month of September 2004, having conversations with a number of individuals at Corps headquarters.  PX 134.  Then, on October 7, 2004, Mr. Jones had a conversation with the Little Rock District's deputy district engineer and learned that constructing the road to the Cove Creek Park marina site would cost $850,000, and not $700,000.  Id.  Mr. Jones next exchanged telephone calls with Paris Embree, who was a program manager at the Southwestern Division, PX 132-A, and served as a liaison between the division and district offices, Tr. 3410 (Murdock-McDaniel).  PX 134.  During an October 20, 2004 telephone call, Ms. Embree indicated that she would investigate further and report back to Mr. Jones.  Id.

That same day, Ms. Embree sent an electronic-mail message to Carlos Aguilar, who worked at the Southwestern Division's Operations Division.  PX 132-A.  She explained that Mr. Jones had called to inquire about funding for the road to the Cove Creek Park marina site, and that according to Mr. Jones, there was an agreement with a lessee that in exchange for losing 1,000 feet of shoreline at one location, the lessee received another marina location, with the expectation that the Corps would build a road to the new location when funds were available.  Id.  Ms. Embree asked Mr. Aguilar to "investigate and if appropriate the district can make a funding request or reprogramming request with justification for this road."  Id.

It appears that Mr. Aguilar almost immediately sent an electronic-mail message to a number of individuals at the Southwestern Division and Little Rock District.[116]  PX 132.  The two Southwestern Division recipients, Larry Bogue and Elisa Pellicciotto, id., were, respectively, an employee and the chief of the division's Operations Division, PX 170-A; Tr. 3410 (Murdock-McDaniel).  Also among the recipients was Chuck Stein at the Little Rock District, who advised Mr. Aguilar that Corps headquarters had contacted the district about the issue.  PX 132.  Mr.

---

[116]  The only evidence of this message is a partial electronic-mail message header indicating the sender and recipients of the message.  PX 132.  Although the partial header lacks a date, an individual responded to the message on October 20, 2004, at 10:03 a.m.  Id.  Given that Ms. Embree's message was sent at 9:29 a.m., PX 132-A, it is logical that Mr. Aguilar sent his message shortly thereafter.

Stein asked Brinda Jackson, a project manager in the district's Operations Division, to provide Mr. Aguilar with more information.  Id.

Ms. Jackson provided the requested information in an October 21, 2004 electronic-mail message, which she sent to, among others, Mr. Stein, Mr. Aguilar, Mr. Leggett, Mr. Miller, and Mr. Park.  Id.  She explained the terms of the MOU and reported:

> Design was initiated in 1999 and is currently 'on the shelf' awaiting funds for construction.  [The Little Rock District] did not (and currently does not) have the funds for this project.  This project has been in [the Little Rock District's Operations] budget on an annual basis, but has been below the funded level.

Id.  Then, after erroneously noting that Mr. Walters had complained to the EIG "numerous" times over the prior five years,[117] she summarized what occurred as a result of Mr. Walters's 2000 complaint:

> In Dec[ember] 2000, [the Little Rock District/Southwestern Division were] directed by [Corps headquarters] to reprogram funds from available sources.  It was decided that sources were not available, so the reprogramming never happened.  When the reprogramming didn't take place, [Corps headquarters] was to provide additional funding, but this never materialized.

Id.  Ms. Jackson then explained that after Mr. Walters's most recent contact with the EIG, the district explained the lack of available funds and provided a current cost estimate for the road to the Cove Creek Park marina site to the EIG.  Id.  Finally, she reported that it was her understanding that Corps headquarters "was going to try and provide the funds" to the district.  Id.  Neither Ms. Jackson, nor any of the recipients of her message, provided the information contained her message to Mr. Walters.  Tr. 5044-45 (Walters).  Moreover, Mr. Walters did not see Ms. Jackson's message prior to 2006 or 2007.  Id. at 5043 (Walters).

Mr. Aguilar provided Mr. Jones with the information from Ms. Jackson on October 27, 2004.  PX 132-A at 1; PX 134.  In particular, he advised Mr. Jones that for the past several years, funding had not been sufficient to meet all of the Greers Ferry Lake Project Office's needs, and that although the road to the Cove Creek Park marina site had been included in all of the office's budget requests, "it [had not] ranked high enough to receive funding."  PX 132-A at 1.  Mr. Aguilar stated that he would contact Joseph Bittner, an appropriation manager at Corps headquarters, PX 133, to "determine possible courses of action."  PX 134.

---

[117]  As noted above, the trial record reflects that Mr. Walters filed one complaint with the EIG in the summer of 2000, PX 117, possibly called the EIG's office following a February 8, 2001 meeting with the Corps, DX 224, and did not call the EIG's office again until the summer of 2004, PX 134; Tr. 4983, 5011 (Walters).  The court would not characterize these two, or possibly three, contacts as "numerous."

After his conversation with Mr. Jones, Mr. Aguilar circulated to several Corps employees, including Mr. Miller, Ms. Jackson, Mr. Stein, Mr. Park, Ms. Pellicciotto, and Mr. Bogue, a draft message to Mr. Bittner.[118] DX 304.  Mr. Aguilar proposed posing the following inquiry to Mr. Bittner:

> Mr[.] Jones detailed his discussion with you some time ago where you told him you can make the $800k available to the District.  In view of this funding opportunity, is this now a matter for the District to request funds so that you can allocate to [the Little Rock District] to construct this road?  Will the $800k be taken against [Little Rock District]/Greers Ferry project funds or the overall [Little Rock District Operations] work allowance or are you willing to provide the $800k in addition to their FY 2005 [Operations] program?

PX 132-A at 2.  It appears that Mr. Aguilar did not immediately send this message to Mr. Bittner.  Rather, he sent a similar message to Mr. Bittner almost a month later, on November 22, 2004.[119]  Id. at 1.  In that message, he inquired:

> Mr[.] Jones mentioned his discussion with you some time ago where you told him you may be able to make the $840k available to the District.  In view of this funding opportunity, is this now a matter for the District to request funds so that you can allocate to [the Little Rock District] the $840k in addition to their FY 2005 [Operations] program?

Id.  Nobody from the Corps advised Mr. Walters that funding for the road might be provided by Corps headquarters.  Tr. 5047 (Walters).

Mr. Aguilar sent Mr. Bittner another electronic-mail message on December 13, 2004, requesting an update.[120]  PX 132-A at 1; PX 133.  Mr. Bitter responded the following day:

> When I discussed Greers Ferry Lake with the EIG, we had identified funds around the Corps that could be revoked and applied to the marina access road.  Subsequently, the unusually heavy impacts of the hurricane season, shoaling in the Lower Mississippi, and payment of self-financing contractors in [another

---

[118]  Although not designated as such, the undated electronic-mail message at PX 132-A at 2 is more likely than not the draft message circulated by Mr. Aguilar.

[119]  Mr. Aguilar might have finally been spurred to action by Mr. Jones's repeated voice-mail messages for him.  See PX 132 (reflecting that Mr. Jones left voice-mail messages for Mr. Aguilar on November 10, November 15, and November 22, 2004).

[120]  The beginning of this message appears at the bottom of PX 133 and the remaining text appears at the top of PX 132-A at 1.

district] drained off this source of available funds.  Hence we have no funds available from outside [the Southwestern Division].

> In the very near future I will be sending a comprehensive spreadsheet to all [major subordinate commands ("MSCs")] . . . .  A column will be provided for MSCs to indicate any project increases or decreases within our reprogramming authority.  You could add $840,000 for Greers Ferry Lake providing this is offset by commensurate decreases to projects in the Division.  . . .  You may need to make a good case to justify placing the money for constructing an access road as opposed to funding other high priority work in the Division or elsewhere in the Corps.  A synopsis of a legal opinion and/or EIG report would help in the review process.

PX 133.  Mr. Aguilar forwarded this message to various Corps employees, including Mr. Stein, Mr. Miller, and Mr. Park, and noted that he would call Mr. Jones and tell him that "the road work [would] continue to compete with other project maintenance requirements."  Id.  The information in Mr. Bittner's message was not provided to Mr. Walters.  Tr. 5048 (Walters).  Indeed, the trial record reflects that for the next six months, Mr. Walters heard nothing from the Corps about funding for the road to the Cove Creek Park marina site.  It was not until May 22, 2005, that Mr. Jones attempted to contact Mr. Walters; the only result from their conversation when they finally connected on June 1, 2005, was that Mr. Walters would send Mr. Jones a copy of the 1999 lease and a chronology of events.  PX 134.  There is no evidence in the trial record indicating whether Mr. Walters sent Mr. Jones the specified documents or whether Mr. Jones or the EIG took any further action on Mr. Walters's complaint.[121]

## VI.  June 2005 to the Present:  Plaintiff's Attempts to Recover the Lease Area It Relinquished Under the 1999 Lease

### A.  Determining the Requirements for Requesting a Lease Area Expansion

Sometime during the first half of 2005, Mr. Walters retained an attorney, Marian McMullan of The McMullan Law Firm, to assist plaintiff in submitting a request to the Corps for permission to expand Eden Isle Marina.  Tr. 5052, 5337 (Walters).  Mr. Walters waited until 2005 to pursue the reinstatement of the marina's former lease area because he had "made a commitment" that he would comply with his agreements with the Corps and try to develop the Cove Creek Park marina site.  Id. at 5055 (Walters); accord id. at 5320 (Walters) (indicating that he did not investigate the truthfulness of the Corps' representations or the Corps' actions prior to this time because he had no reason to do so and because he had relied on the Corps' representations).

---

[121]  Mr. Jones did field a telephone call from the office of Mr. Walters's attorney on June 20, 2005.  PX 134.  The purpose of that call, however, was merely to learn about the functions of the EIG.  Id.

Mr. Walters and Ms. McMullan met with Mark Moore, the chief of the Real Estate Division, on June 28, 2005, to discuss the process for pursuing a lease area expansion. PX 170-A; PX 178. Mr. Moore advised them to confer with the staff at the Greers Ferry Lake Project Office about the process. PX 170-A. He also indicated that the process might involve the preparation of an EA or, at a minimum, a public comment period.[122] PX 178; cf. Tr. 2118 (Park) (remarking that Save Greers Ferry Lake, Inc. watched everything that happened on the lake like a hawk).

Pursuant to Mr. Moore's advice, Mr. Walters and Ms. McMullan met with Mr. Park on July 27, 2005. Also present at the meeting were Ms. Pellicciotto,[123] Mr. Leggett, and Ms. Best. PX 170-A. According to a memorandum prepared by Mr. Park to memorialize the meeting, the first topic of discussion was the Cove Creek Park marina site. Id. Mr. Park stated that the only holdup to work at the site was funding, and noted that Mr. Walters had been told that the Corps did not envision funds becoming available unless Mr. Walters obtained a congressional add. Id. Mr. Walters confirmed this, id., but at trial he testified that even though he had contacted his congressional delegation, he had not known what a congressional add was, Tr. 5056 (Walters). Moreover, Mr. Walters had not been aware of the escalating costs associated with performing the work at Cove Creek Park. Id.

The discussion then turned to plaintiff's desire for the restoration of the lease area that was removed from Eden Isle Marina pursuant to the MOU and the 1999 lease. PX 170-A. In response to Ms. McMullan's inquiry regarding how to make such a request, Mr. Park explained that plaintiff could make a written request to the Greers Ferry Lake Project office or directly to the Real Estate Division at the Little Rock District Office. Id. Ms. McMullan was also advised that an environmental study might need to be performed at the marina.[124] Id.; see also PX 174 (noting Ms. McMullan's understanding from her two meetings with the Corps that plaintiff needed to submit an EA along with a written reinstatement request); PX 178 at 2 (containing Ms.

---

[122] The suggestion that an EA might not be necessary appears to be contrary to the Little Rock District's prior stated policy that a lessee must provide an EA when seeking to expand its lease area. See PX 366 (containing Mr. Park's statement, in an August 2, 2000 electronic-mail message, that it was Little Rock District policy to require "commercial marinas to perform an EA prior to Corps granting an expansion to lease area," with the cost to be borne by the marina operators). The policy likely resulted from the district becoming more educated about NEPA's requirements during the Save Greers Ferry Lake, Inc. litigation. See Tr. 2121 (Park). There is no evidence in the trial record indicating that NEPA's requirements or the district's policy changed after August 2000. However, Mr. Moore's hesitation to definitively state whether an EA would be required might stem from the fact that plaintiff's expansion request encompassed land and water area that had previously been part of the Eden Isle Marina leasehold.

[123] Mr. Park testified at trial that Ms. Pellicciotto was at the project office for an unrelated matter, and he asked her whether she wanted to attend the meeting. Tr. 2758 (Park).

[124] See supra note 122.

McMullan's assertion that Mr. Park stated that "an EA was required"). Ms. Best then stated that the decision to allow a lease area expansion would have to come from Corps headquarters due to Mr. Lancaster's involvement in prohibiting plaintiff from developing the marina in the portions of the lease area that were subsequently removed. PX 170-A. Factors affecting a lease area expansion–the political climate, the changing views of the property owners, NEPA compliance, and public review–were discussed. Id. At the close of his notes from the meeting, Mr. Park wrote: "It is obvious Mr. Walters wants to see some action, either in the restoration of his former lease area or in the development of the Cove Creek site. It is assumed Mr. Walters will be providing a request for the restoration of his former lease area." Id.

## B.  Plaintiff Retains a Consultant to Perform an Environmental Study at Eden Isle Marina

At some point after Mr. Walters and Ms. McMullan met with the Corps to discuss the expansion of Eden Isle Marina, plaintiff engaged ATOKA, Inc. ("ATOKA"), Dr. Overton's environmental and engineering consulting firm, to perform an environmental study at the marina and prepare an EA. Tr. 3709, 3714, 4195 (Overton), 5061 (Walters). See generally PX 171. In preparation for conducting the study, an ATOKA employee visited the Little Rock District Office and Greers Ferry Lake Project Office to review their files and copy those documents that might be of interest. Tr. 4179-80 (Overton).

On June 23, 2006, after ATOKA provided her with copies of the documents it obtained during the search of the Corps' files, Ms. McMullan submitted a FOIA request to the Corps. Id. at 5000, 5071-72 (Walters). Mr. Walters had authorized his attorney to "to proceed as quickly as possible to get all the data that we could in order to make an intelligent decision about whether I could and would try to sue the federal government . . . ." Id. at 5000 (Walters). Five days later, James Fisher, assistant district counsel and FOIA officer for the Little Rock District, responded to the request and provided an estimated cost for the production. Id. at 5073-74, 5076 (Walters). In the months that followed, Mr. Fisher forwarded responsive documents to an outside copy service, the copy service provided copies and invoices to Mr. Walters, and Mr. Walters paid the invoices.[125] Id. at 5077-86 (Walters). According to Mr. Walters, it was not until he obtained the documents from ATOKA and the FOIA request that he knew "what was going on behind the scenes at the Corps . . . ." Id. at 5372 (Walters); accord id. at 4673 (Walters) (noting that he had been operating under the belief that the Corps was acting in good faith, but that his opinion changed upon ATOKA's review of the Corps' files and the FOIA requests, which revealed "damning documents" indicating that the Corps "didn't have any legal right to do what [it] did").

ATOKA published the EA for Eden Isle Marina in August 2006. PX 171. The EA addressed four alternative actions:  (1) no action, (2) reinstatement of the lease area described in the 1995 lease, (3) reinstatement of the lease area described in the 1995 lease and other areas that used to be part of the lease, and (4) construction of dry dock storage on plaintiff's private

---

[125]  From July 31, 2006, through November 28, 2006, Mr. Walters paid $9,894.98 to obtain copies of documents from the Corps in conjunction with the FOIA request. Tr. 5077-86 (Walters).

property or on reinstated lease area.  Id.  The proposed action was the second alternative: reinstatement of the lease area described in the 1995 lease.  Id.; Tr. 3748, 3762 (Overton).  With respect to the proposed action, the EA included a FONSI.  PX 171.  Upon the EA's publication, Dr. Overton attempted to discuss the EA with the Corps, but the Corps did not return any of his telephone calls.  Tr. 3763 (Overton).

## C.  The Corps' Budget Requests for FY 2007 and FY 2008

At the same time that Mr. Walters was making his initial efforts to recover the lease area at Eden Isle Marina that plaintiff relinquished pursuant to the MOU and the 1999 lease, the Greers Ferry Lake Project Office continued to include the Cove Creek Park work in its annual budget requests.  In its FY 2007 budget request, dated March 6, 2005, the project office assigned the Cove Creek Park package to the third increment of work, as it had in the previous two budget requests, ranking it fourteenth out of the fourteen items within that increment.  PX 153.  The cost of the package increased from the $2,575,000 sought in the FY 2006 budget request, PX 152, to $3,000,000, PX 153.  Then, in its undated FY 2008 budget request,[126] the project office increased the priority of the Cove Creek Park package, assigning it to the second increment of work, and ranking it fourteenth out of the fifteen items within that increment.  PX 154.  The cost of the package increased inexplicably by $2,000,000 to $5,000,000.  Id.  Mr. Walters was never advised of the costs for the work proposed by the project office in these budget requests.  Tr. 5050-51 (Walters).

At this point, it is worth summarizing the Corps' estimates–spanning from February 1999 to March 2007–for building the infrastructure at Cove Creek Park provided for in the MOU and the 1999 lease.  The data in Table 1 below is derived from the Little Rock District's annual budget requests and five-year major items lists.

| Date | Description of Work | Total Amount Requested |
|---|---|---|
| 2/12/1999 | Construct road to Eden Isle Marina optional site–Cove Creek | $418,000 |
| 3/9/2000 | Construct road to marina optional site–Cove Creek Park | $430,000 |
| 3/13/2001 | Construct Road Area C, Cove Creek (UF/CA FY00) | $418,000 |
| 12/12/2002 | Construct Road Area C, Cove Creek (UF/CA FY00) | $418,000 |
| 11/26/2003 | Construct Road Area C, Cove Creek (UF/CA FY00) | $1,500,000 |
| 11/2004 | Construct Road Area C, Cove Creek (UF/CA FY00) | $1,500,000 |
| 11/29/2005 | Construct Road Area C, Cove Creek (UF/CA FY00) | $2,500,000 |
| 3/2007 | Construct Road Area C, Cove Creek (UF/CA FY00) | $2,500,000 |

Table 1

---

[126]  Based on the dates of the prior budget requests, it is probable that the Greers Ferry Project Office prepared its FY 2008 budget request in early 2006.

See PX 145; PX 147; PX 156; PX 159; PX 160; PX 161; PX 162; PX 163.  As demonstrated by the data, the Corps' estimated cost for the work described in the MOU and the 1999 lease increased from $418,000 in February 1999 to $2,500,000 in March 2007, a 498% increase over eight years.

It is also worth summarizing the Little Rock District's budget requests–spanning from February 1999 through early 2006–as they pertain to the work it wanted performed at Cove Creek Park.  The data in Table 2 below is derived from the Little Rock District's annual budget requests.

| Date | Funding Level | Project Rank | Description of Work | Total Amount Requested |
|---|---|---|---|---|
| 2/12/1999 | 2 | 7 out of 7 | Construct road to Eden Isle Marina optional site–Cove Creek | $418,000 |
| 3/9/2000 | 3 | 8 out of 8 | Construct road to marina optional site–Cove Creek Park | $430,000 |
| 2/23/2001 | 2 | 7 out of 12 | Construct road to marina, waterborne toilet, and twenty-five campsites–Cove Creek Park | $2,525,000 |
| 2/17/2003 | 3 | 10 out of 15 | Construct road to marina, waterborne toilet, and twenty-five campsites–Cove Creek Park | $2,575,000 |
| 5/24/2004 | 3 | 13 out of 13 | Construct road to marina, waterborne toilet, and twenty-five campsites–Cove Creek Park | $2,575,000 |
| 3/6/2005 | 3 | 14 out of 14 | Construct road to marina, waterborne toilet, and twenty-five campsites–Cove Creek Park | $3,000,000 |
| Unknown; likely early 2006 | 2 | 14 out of 15 | Construct road to marina, waterborne toilet, and twenty-five campsites–Cove Creek Park | $5,000,000 |

Table 2

See PX 145; PX 147; PX 149; PX 151; PX 152; PX 153; PX 154.  Notably, in its 2000, 2004, and 2005 budget requests for FY 2002, FY 2006, and FY 2007 respectively, the Little Rock District placed the road to the Cove Creek Park marina site, or the package containing the road, dead last on its list of funding priorities for the Greers Ferry Lake Project Office.  PX 147; PX 152; PX 153.

**D.  Plaintiff's Request for Reinstatement of Its Former Lease Area at Eden Isle Marina**

Plaintiff ultimately made its official request for the reinstatement of its former lease area at Eden Isle Marina on February 23, 2007.  PX 172.  On that date, Ms. McMullan forwarded three items to Mr. Moore, with a copy to Mr. Allen at the Little Rock District's Office of

Counsel:  (1) plaintiff's "Request for Reinstatement or Expansion of the Eden Isle Marina Leasehold," (2) the August 2006 EA prepared by ATOKA, and (3) an "unrelated" certified claim pursuant to the Contract Disputes Act of 1978 ("CDA").[127]  Id.  Plaintiff's thirty-page reinstatement request included a discussion of factors justifying the expansion and development of the marina, a development plan, and responses to possible objections to plaintiff's plan.  PX 173.  And, attached to the reinstatement request were twelve supporting exhibits, including letters of support from the Red River Boating Center, the Lindsey Resort, the Cleburne County Economic Development Commission, the Cleburne County Sheriff, Judge Dill, the Greers Ferry Yacht Club, and an employee of the Arkansas Department of Health and Human Services; a development plan; a letter from the United States Department of the Interior; a map of adjacent property owners; two traffic counts; and a Red Apple Inn advertisement.  Id.

### E.  Plaintiff Files a Lawsuit Against the Corps

On February 26, 2007, merely three days after plaintiff submitted its reinstatement request to the Corps, plaintiff filed suit against the Corps in this court.[128]  Compl.  Plaintiff alleged that the Corps hindered its development of Eden Isle Marina, misrepresented material facts, and failed to disclose vital information that affected its performance of the lease, causing it to suffer damages.  Tr. 5323-24 (Walters).  Specifically, plaintiff asserted three claims for relief: (1) rescission of the MOU and the 1999 lease and restitution; (2) breach of the 1995 lease, the MOU, and the 1999 lease; and (3) the taking of its property without just compensation in violation of the Fifth Amendment.  Compl.

### F.  Plaintiff's Pursuit of Its Reinstatement Request

At some point after submitting plaintiff's reinstatement request, Ms. McMullan contacted Mr. Moore for a status update.  PX 174.  Likely due to the existence of the lawsuit, Mr. Moore directed her to contact Jim Cullum, an attorney at the Little Rock District's Office of Counsel, for more information.  Id.  During a March 13, 2007 telephone conversation, Mr. Cullum agreed to investigate the Corps' process for considering plaintiff's request; Ms. McMullan memorialized that agreement in a letter she sent the following day.  Id.  In that same letter, she asserted that plaintiff's reinstatement request, which sought to accommodate current and future demand at Eden Isle Marina, was "mutually exclusive" from its lawsuit and certified claim under the CDA,

---

[127]  The certified claim was not made part of the trial record.

[128]  It is well settled that the United States is the only proper defendant in the United States Court of Federal Claims ("Court of Federal Claims").  See 28 U.S.C. § 1491(a)(1) (2006) (providing that the Court of Federal Claims has jurisdiction over claims against the United States); RCFC 10(a) (requiring that the United States be designated as the defendant in the Court of Federal Claims); Stephenson v. United States, 58 Fed. Cl. 186, 190 (2003) ("[T]he only proper defendant for any matter before this court is the United States, not its officers, nor any other individual.").  However, for simplicity, the court refers to the defendant in this case as the Corps rather than as the United States.

which sought relief for past damages.  Id.  At the close of her letter, Ms. McMullan demanded that the Corps respond to plaintiff's reinstatement request by March 30, 2007, which she considered an amount of time in line with the Corps' prior practices in relation to other marinas in the district.  Id.

Per his agreement with Ms. McMullan, Mr. Cullum obtained the information about the Corps' process for considering plaintiff's reinstatement request from the Real Estate Division; he forwarded the information to Ms. McMullan in a March 28, 2007 electronic-mail message:

> Application received by Project Office[,] who will then forward [it] to the District Office along with [its] comments and recommendation.  (If the recommendation is "Denial" then [Operations] personnel will write the denial letter and Real Estate never knows there was a request).

> If the recommendation from the Project Office is "approval", it is forwarded to the District with comments and/or conditions.  The request is then routed by [Operations] to Real Estate and Regulatory for action.  Both offices work[] on the request simultaneously.  (Regulatory's permit is then forwarded back to [Operations] who then furnishes it to Real Estate).  Real Estate coordinates the request with Planning (environmental) if required.  Planning may determine that an EA is required for the action.[129]  If required, once the EA is completed it is given to Planning for review and preparation of a FONSI.  Once the FONSI is signed, Real Estate then prepares the final outgrant documents and sends [them] to [the] applicant for signature.  Upon receipt of the signed instrument, it is executed on behalf of the United States and a copy is sent to the applicant along with any required Regulatory permit.

PX 175 (footnote added).  Mr. Cullum added that the EA submitted by plaintiff had been forwarded to the Regulatory Branch for review, after which Mr. Fisher at the Office of Counsel would review the EA and provide a recommendation to the Real Estate Division.  Id.  Mr. Cullum also advised Ms. McMullan that he could not provide an accurate timeline for the Corps' review of plaintiff's reinstatement request because review time could "vary significantly" based on a variety of factors.  Id.  Ms. McMullan responded to Mr. Cullum later that day indicating that plaintiff understood the difficulties encountered by the Corps in providing a precise timeline, but expected that the Corps would act in a reasonable time, explaining:

> It is our position that a reasonable time frame is short because we have exceeded what the "normal" procedure is in providing the necessary information as we understood that procedure from our previous meetings with the Corp[s].  . . .  I believe a reasonable time would be no more than two weeks from today in view of the fact that the Corp[s] has had this information since our hand delivery of the materials on February 23, 2007, more than one month ago.

---

[129]  See supra note 122.

Id.

Mr. Walters and Ms. McMullan met with Corps employees at the Greers Ferry Lake Project Office on April 26, 2007, to discuss plaintiff's reinstatement request.  PX 176 at 2-3.  During the meeting the Corps employees requested that plaintiff provide a better description of the proposed expanded lease area at Eden Isle Marina.  Id. at 2.  On June 6, 2007, plaintiff submitted to the Corps "Revision One" to its reinstatement request, which included a drawing of the lease area superimposed over an aerial photograph of the marina.  Id. at 1-10.  In this revision, plaintiff asserted that upon its purchase of the marina in 1995, the lease area was actually 108 acres, so as to encompass the existing docks and wave breaks, and not the fifty-one acres specified in the 1995 lease's description of the lease area.  Id. at 3-4.

Two months later, on August 7, 2007, Ms. McMullan sent an electronic-mail message to Mr. Cullum requesting an update on the Corps' consideration of plaintiff's reinstatement request; she noted that neither she nor plaintiff had heard anything from the Corps since plaintiff submitted its revision.  PX 177.  Mr. Cullum asked Mr. Allen for an update, id., but the trial record lacks any evidence that Mr. Allen responded.

Rather, on September 10, 2007, Mr. Moore sent a letter to either plaintiff or Ms. McMullan.  PX 178 at 1.  This letter is not in the trial record, but subsequent correspondence sheds light on its contents.  Responding to the letter on October 11, 2007, Ms. McMullan asserted that Mr. Moore's correspondence reflected the Corps' continued bad faith in its dealings with plaintiff.  Id.  She explained that plaintiff had fully complied with the Corps' requirements for requesting for a lease area expansion, including the preparation and submission of an EA and a more detailed description of the proposed expanded lease area, but that the Corps had rendered all of that work unnecessary by taking the position that there was room within the existing lease area for expansion, so long as plaintiff submitted plans demonstrating that there would be sufficient parking.  Id. at 2.  Ms. McMullan noted:

> The above chain of events is consistent with the Corp[s'] treatment of my client.  The Corp[s'] mode of operation is to respond to each request from my client by turning it around stating more information is needed.  The motive of delay is obvious.  . . .

> Additionally, you have on the one hand stated the request for expansion must be addressed through the NEPA process but on the other hand said there was room to add docks within the existing lease, to which NEPA is not applicable.  Your contention that the docks be moved is unacceptable due to safety hazards [and because it] is virtually impossible.

> The request was for a lease area expansion.  My client complied with its obligations under NEPA.  The Corp[s], according to your letter, is not going to take further steps to follow NEPA or otherwise consider the expansion request.  Therefore, you have denied this request.

. . . . The Corp[s] has arbitrarily and capriciously applied its rules and guidelines governing leasehold expansion requests by Eden Isle Marina starkly different than [it has to] any other marina on Greers Ferry Lake.

Id. at 2-3.  Ms. McMullan asserted that if the Corps did not take action on plaintiff's reinstatement request within ten days, legal action would result.  Id. at 3.

Mr. Moore responded to Ms. McMullan's letter on October 24, 2007.  PX 179.  He stated that his September 10, 2007 letter did not constitute a denial of plaintiff's reinstatement request.  Id.  Rather, he asserted, it was meant to convey that the existing lease area must be fully utilized before expansion of the lease area could be considered, and that there appeared to be room in the existing lease area for more docks.  Id.  Mr. Moore explained that the Corps was previously unable to determine whether additional docks could be placed within the lease area because plaintiff's initial reinstatement request lacked a precise depiction of the lease area on an aerial photograph of the marina.  Id.  Then, with respect to the EA that plaintiff submitted, Mr. Moore noted that it was deficient in at least three respects:  it did not adequately address the cumulative effects of expansion, including the possible need for dredging; there was not a thorough public review and comment period; and only a district engineer could issue a FONSI.  Id.  Mr. Moore also requested that plaintiff submit data to support its contention that a realignment of existing docks would present a safety issue, stating that if acceptable proof was provided, the Corps would continue its evaluation of plaintiff's reinstatement request.  Id.

Before turning to Ms. McMullan's response to Mr. Moore, the court notes the lack of justification for Mr. Moore's waiting until September 2007 to advise plaintiff that it could fit more docks within the existing lease area.  There was no reason why Mr. Moore could not have advised Ms. McMullan and Mr. Walters, during their June 28, 2005 meeting, that plaintiff should ensure that the existing lease area was fully utilized before submitting an expansion request.  Similarly, there was no reason why the Corps employees from the Greers Ferry Lake Project Office could not have advised Ms. McMullan and Mr. Walters, during their July 27, 2005 meeting, that plaintiff should ensure that the existing lease area was fully utilized before submitting an expansion request.  And, the Corps had a relatively clear idea of how much of the lease area might be available for development without the aerial photograph provided by plaintiff in June 2007.  This fact is obvious because the Corps possessed (1) the map attached to the MOU, see Figure 3, supra, that it created; (2) the map included in the Greers Ferry Lake master plan, see PX 11 at 3, that it created; (3) the map in Exhibit A of the 1999 lease, see PX 98 at 21, that it created; (4) access to aerial photographs of Greers Ferry Lake, see Tr. 184 (Ragar) (noting that he compared a map of the lease area to an aerial photograph of the marina to determine that there were docks outside of the lease area); see also PX 190 at 9-10 (indicating that Dr. Overton obtained historical aerial photographs from the Arkansas State Highway and Transportation Department and other sources); and (5) presumably, access to satellite images from Google Earth, which are freely available to the public, see Tr. 4595 (Overton).  In other words, the Corps had all of the tools at its disposal necessary to have a sufficient awareness of plaintiff's utilization of the existing lease area at the time plaintiff first expressed its intent to seek the reinstatement of its former lease area.

-124-

Ms. McMullan responded to Mr. Moore on November 20, 2007, indicating that plaintiff wished to address the issues he raised in his letter.  PX 180.  She therefore requested that the relevant, knowledgeable Corps employees meet with the manager of Eden Isle Marina and Dr. Overton to discuss:  (1) all issues related to the realignment of existing docks to accommodate additional docks; (2) the purported deficiencies in the EA; (3) who was responsible for holding a public review and comment period; and (4) parking and dredging issues.  Id.  Ms. McMullan emphasized that she would not attend the meeting.  Id.  She further noted:

> My clients want to be candid with you.  My clients believe that no matter what they ask for the Corps will attempt to frame its response as a "no decision".  My clients believe the Corps is purposefully creating issues to delay.  My clients have recognized the Corps['] pattern of conduct in dealing with their requests which is a reply by the Corps stating additional items are required thus posturing itself so that the Corps seemingly never makes a decision or, the Corps arbitrarily makes requirements not made to other marinas.  . . .  However, indecisiveness by a government agency cannot legally go on indefinitely and not be deemed a decision particularly where there is proof the Corps has not done so equally.  The purpose of being candid is to invite you at the meeting to meet these concerns in an informal session if you so desire.

Id.

Because Mr. Moore did not respond to the request for a meeting, Ms. McMullan elevated the request by writing to the district engineer, Colonel Donald Jackson, Jr.,[130] on December 3, 2007.  PX 181.  She attached to her letter all of the recent correspondence and again requested a meeting with the relevant Corps employees.  Id.  No meeting was ever scheduled.  Tr. 5133, 5136 (Walters).  In fact, the trial record lacks any evidence that Colonel Jackson responded to Ms. McMullan at all.

### G. The Corps Constructs the Road to the Cove Creek Park Marina Site

The Corps' failure to engage in discussions concerning plaintiff's request to expand its lease area at Eden Isle Marina might have been due to the fact that they had decided on another course of action:  make every possible attempt to obtain funding to get the infrastructure in place at the Cove Creek Park marina site.  The evidence in the trial record suggests that in light of the lawsuit and Ms. McMullan's correspondence, the Corps reached the conclusion that if it provided plaintiff the ability to develop a marina at Cove Creek Park, it could use that as a reason to defer action on plaintiff's reinstatement request.  The strongest evidence that the Corps

---

[130]  Colonel Holden left the Little Rock District in July 2001, Tr. 2305, 2907 (Holden), and was apparently replaced by Colonel Benjamin Butler, see, e.g., PX 128.  When Colonel Butler left the district, presumably in July 2004, he was replaced by Colonel Wally Walters, see, e.g., DX 287.  Colonel Jackson replaced Colonel Walters in July 2007.  PX 181.

took this position is in the timing of its renewed efforts to find the funds to build the road to the Cove Creek Park marina site, which began around the same time that Ms. McMullan sent her letter to Colonel Jackson.

The efforts to locate the funds to build the access road were headed by Ms. Murdock-McDaniel.  Ms. Murdock-McDaniel had joined the Little Rock District as the deputy chief of the Operations Division in November 2006.[131]  Id. at 3479 (Murdock-McDaniel).  In that role, she was responsible for the day-to-day operations of the Little Rock District's $6.8 billion in infrastructure.  Id. at 3537-38 (Murdock-McDaniel).  Upon her arrival at the district, she was briefed on the important, "high priority," issues, including the road to the Cove Creek Park marina site.  Id. at 3382-83, 3413 (Murdock-McDaniel).  However, there is no evidence in the trial record that she took any immediate action as a result of this briefing.

Rather, the evidence reflects that Ms. Murdock-McDaniel began to pay special attention to the access road in December 2007,[132] when she sought information regarding the cost of building the infrastructure needed to support a marina at Cove Creek Park and the Corps' prior attempts to obtain the necessary funding.  Id. at 3389 (Murdock-McDaniel); PX 201 (containing a response to Ms. Murdock-McDaniel's inquiry).  On December 13, 2007, Benny Rorie, a Corps employee at the Greers Ferry Lake Project Office,[133] Tr. 3386-87 (Murdock-McDaniel), provided Ms. Murdock-McDaniel with some of the information she requested.  PX 201 at 1.  With respect to the cost of the road, Mr. Rorie provided a rough estimate, noting that the road was surveyed "some time ago" and that only not-to-scale copies of the road survey existed.  Id.  He also indicated that he was working with the utility companies to obtain estimates and that the Corps could expect to recover a small amount of money for the trees that would need to be removed from the road's right of way.  Id.  Then, with respect to the Corps' attempts to obtain funding, Mr. Rorie reported that he pulled the project office's five-year major items lists and budget requests back to 2000 and discovered that the Cove Creek Park work had been in the budget requests since the February 1999 request for FY 2001.  Id.  He further remarked:  "We have been looking at our budget and it does NOT look good for any available $ to put towards this project."  Id.

---

[131]  Ms. Murdock-McDaniel was promoted to the position of chief of the Operations Division in December 2008.  Tr. 3299-300 (Murdock-McDaniel).

[132]  This date is derived from the fact that she received a response to her inquiry from one of her staff members on December 13, 2007, PX 201 at 1, and the assumption that her staff members would respond promptly to her inquiries.  See also id. at 2 (noting her staff member's desire to get the necessary information as soon as possible).

[133]  Sometime around December 2007, Mr. Rorie was promoted from lead ranger to the deputy operations project manager.  Tr. 3386-87 (Murdock-McDaniel).  Mr. Park retired from the Corps around the same time.  Id. at 1795 (Park).

Despite Mr. Rorie's pessimism regarding the availability of funds that could be reprogrammed for the work at Cove Creek Park, Ms. Murdock-McDaniel found a source of funding.  See Tr. 3415-16, 3434 (Murdock-McDaniel) (noting that the Corps was able to secure funding for the work at Cove Creek Park outside of the regular budget process).  Apparently, ten to twelve employees left the Greers Ferry Lake Project Office, either through retirement, promotion, or transfer, in 2007; these departures freed up funds–each employee represents an annual expense of $150,000–because it takes time to fill positions and at least one of the positions was filled by an individual who was being paid by another district.  Id. at 3656-58 (Murdock-McDaniel).  At trial, Ms. Murdock-McDaniel did not state precisely when she determined that employee departures would result in cost savings that could be reprogrammed for other uses, see id. at 3492 (Murdock-McDaniel) (stating only that she began seriously pursuing the Cove Creek Park work because funds had become available), and so it is possible that she made the determination prior to Colonel Jackson's receipt of Ms. McMullan's December 3, 2007 letter.  The timing of that determination, however, is irrelevant; what matters is when she decided how to use those cost savings.  While it is possible that Ms. Murdock-McDaniel decided to use the available funds for work at Cove Creek Park on her own initiative, independent of outside influence, that possibility is belied by the fact that it was not until December 2007 that she expressed interest in funding the work at Cove Creek Park.[134]  The possibility is further belied by the fact that the work at Cove Creek Park was nowhere near the top of the Greers Ferry Lake Project Office's five-year major items list.  See PX 163 (reflecting, on the FY 2007 five-year major items list from March 2007, that the three elements of the work that the office wanted to perform at Cove Creek Park–the new campsites, the road to the marina site, and the waterborne toilet–had priority rankings of seventeen, eighteen, and nineteen, respectively).  Thus, it seems more likely that Ms. Murdock-McDaniel's decision to use the available funds for work at Cove Creek Park was prompted by Ms. McMullan's effort to involve the district engineer in the review process for the reinstatement request.[135]

In any event, it was clear that time was of the essence in gathering the information necessary to determine how much money would be needed to perform the work at Cove Creek Park.  For example, Mr. Rorie, in seeking cost estimates from the utility companies, stressed that

---

[134]  If Ms. Murdock-McDaniel decided to use the available funds for the work at Cove Creek Park prior to December 2007, documentation of that decision is not contained in the trial record.

[135]  At trial, Ms. Murdock-McDaniel denied that her decision to use the newly available funds for the work at Cove Creek Park was related to this lawsuit.  Tr. 3662 (Murdock-McDaniel); accord id. at 3415-16 (Murdock-McDaniel) (denying that her information gathering was due to the lawsuit), 3493 (Murdock-McDaniel) (denying that her attempt to obtain funding for the work at Cove Creek Park was related to the lawsuit).  The court does not find this testimony to be credible.  Nevertheless, this testimony is irrelevant because regardless of whether her decision to use the funds for the Cove Creek Park work was related to this lawsuit, it is doubtful that Ms. Murdock-McDaniel's decision was not influenced by Ms. McMullan's letter to the district engineer.

he needed the information as soon as possible so that the Corps could begin to allocate funds for the work.  PX 201 at 2.  He was able to provide the utility estimates to Ms. Murdock-McDaniel on December 20, 2007.  Id. at 3.  In addition, Ms. Murdock-McDaniel began consulting with the Southwestern Division; she spoke with Mr. Bogue on January 7, 2008, leading him to inform others at the division the following day that the issue was heating up again, that the cost of the road to the Cove Creek Park marina site had increased to $1,000,000, and that he expected that the Little Rock District would be submitting a request for funding.  DX 304.

Ms. Murdock-McDaniel received an estimate of the cost for constructing the access road and parking lot for the Cove Creek Park marina site on January 17, 2008.  PX 202-A at 1.  The estimated cost, $99,434.19, covered labor and equipment, but not materials or supplies, which would be provided by the Greers Ferry Lake Project Office.  Id. at 1-2.  Ms. Murdock-McDaniel therefore asked Mr. Rorie, later that day, to provide an estimate for the cost of materials for a gravel road so that she could "make a plea" to the Southwestern Division and Corps headquarters "for the money needed to do the total project."  Id. at 5.  She also asked Mr. Rorie whether the money they had "scrapped [sic] together locally" would be sufficient to allow them to begin work.  Id.  Mr. Rorie responded the next day, indicating that he was working on an estimate and that the $248,000 available locally could allow them to begin work, but that the funds would be depleted quickly once they began to purchase materials.  Id.

Mr. Rorie's supervisor, the acting operations project manager at the Greers Ferry Lake Project Office, forwarded an estimated cost of materials to Ms. Murdock-McDaniel on February 5, 2008.  Id. at 11.  The project office estimated that materials would cost $180,000, which when added to the cost for labor and equipment, resulted in a total estimated cost of approximately $280,000.  Id.  The project office may have increased its total cost estimate after June 26, 2008, when Mr. Rorie suggested a $30,000 to $50,000 increase to better reflect fuel and supply costs.  Id. at 12.

At some point prior to September 2, 2008, Mr. Walters learned that the Corps had begun to build the road to the Cove Creek Park marina site.  Tr. 5228 (Walters).  However, he did not learn about the construction project from the Corps.  Id. at 5228, 5243-45 (Walters); see also id. at 3493, 3499, 3501-03 (Murdock-McDaniel) (stating that that she did not advise plaintiff about plans to construct the road or the road construction itself, she did not direct someone else to so advise plaintiff, and she lacked any evidence that plaintiff was so advised).  This failure to notify Mr. Walters or his counsel is surprising, given the importance the Corps placed on coordination and communications with lessees to "balance the public need with the resource," achieve a common goal, and foster the lessees' success.  Id. at 3494-96 (Murdock-McDaniel).  Indeed, Ms. Murdock McDaniel testified at trial that plaintiff should have been advised of the construction, id. at 3504 (Murdock-McDaniel), because the construction of the road directly affected plaintiff's economic interests and therefore information about the road's construction was vitally important to plaintiff, id. at 3496-99 (Murdock-McDaniel).

Rather, Mr. Walters learned about the construction of the road to the Cove Creek Park marina site when the electric company called him to ask where at the site he wanted electrical service.  Id. at 5228 (Walters).  He advised his attorney about the telephone call.  Id.  Ms.

-128-

McMullan, along with another attorney retained by plaintiff in 2005, Patrick James, id. at 5337 (Walters), visited the site to inspect the road construction operation.  PX 203.  In a September 2, 2008 letter to Joan Stentiford, the attorney representing the Corps before the Court of Federal Claims, and Mr. Cullum, Mr. James expressed his and Ms. McMullan's shock at what they discovered; they were amazed by (1) the number of trees that were being razed in light of the Corps' concern over the much smaller number of trees that would have needed to be removed to allow for plaintiff to develop Eden Isle Marina;[136] (2) the Corps' sudden ability to obtain funds for the road; and (3) the Corps' failure to advise them or plaintiff of its plans to build the road or of the commencement of construction.  Id.  Mr. James also advised Ms. Stentiford and Mr. Cullum of plaintiff's position that the Corps was knowingly building a road to a site that was not a feasible location for a marina, and that the Corps intentionally concealed the fact that the site was not a feasible location for a marina from plaintiff.  Id.  On April 16, 2009, plaintiff amended its complaint in this matter to add allegations related to the construction of the road to the marina site at Cove Creek Park.  Am. Compl.

The Corps completed construction of the road to the Cove Creek Park marina site in 2010.[137]  PX 209 at 6; Tr. 3698 (Murdock-McDaniel).  Figure 4, cropped from PX 198-A, depicts the Corps' November 1, 2000 design of the site, which, aside from the size and shape of the lease area, appears to represent the current layout of the road and parking lots.[138]  See, e.g., PX 190 at 77 (depicting the path of the road).

---

[136]  In a February 2001 memorandum, the Corps estimated that 7.5 acres of trees, equivalent to 106.4 tons of sawtimber and 118 tons of pulpwood, would need to be cleared to build the road to the Cove Creek Park marina site.  PX 200.  When witnesses were asked at trial whether cutting down that many trees on Corps property was of concern, all responded in the affirmative.  See Tr. 769-70 (Berry), 1295-96 (Morris), 2484-85 (Holden).

[137]  Prior to trial, defendant claimed that the Corps completed the road to the Cove Creek Park marina site in August 2008.  Am. Answer ¶ 103-S(b).  Based on an allegation in the amended complaint that was not admitted by defendant, it appears that the Corps completed a gravel road in 2008.  See Am. Compl. ¶ 103-S(c).  It further appears that subsequent to the parties filing their amended pleadings, the Corps completed the road by paving it.  See Tr. 5266 (Walters) (noting that it was "an excellent-looking road" that "looked like a state highway").

[138]  The court takes judicial notice of the current layout of the road and parking lots pursuant to FRE 201(b)(2); the road and parking lots are clearly evident in satellite images available online from Google Maps.  See Greers Ferry Lake, AR, Google Maps, http://goo.gl/maps/IEKll (last visited Aug. 26, 2013).



Figure 4

The costs the Corps incurred to build the road are summarized below in Table 3:

| Fiscal Year(s) | Activity | Expenditures |
|---|---|---|
| FY 1999 & FY 2000 | Plans and specifications | $77,755.39 |
| FY 2002 | EA | $28,345.67 |
| FY 2008 & FY 2009 | Construction | $414,240.95 |
| FY 2010 | Construction | $495,791.10 |

Table 3

PX 209 at 6. The total cost of the road was $1,016,133.11. Id. The costs incurred were more than double the Corps' original $418,000 estimate, see PX 145, but less than half of the Corps' $2,500,000 estimate that appeared in its March 2007 five-year major items list, see PX 163.

The evidence in the trial record does not clearly indicate from where additional funds–those beyond the $248,000 available locally–for the Cove Creek Park work were obtained. At least some funds were made available after Arkansas experienced massive flooding in 2008; the flooding resulted in a presidential declaration of emergency and emergency funding from Congress, which the Little Rock District used for flood damage reduction items that otherwise would have been funded through regular appropriations. Tr. 3658-61 (Murdock-McDaniel).

There is no evidence that additional funds were requested from, or provided by, the Southwestern Division or Corps headquarters.

As of the time of trial, no one from the Corps had spoken with Mr. Walters about the road it built to the Cove Creek Park marina site. Id. at 5230 (Walters); see also id. at 5266 (Walters) (noting that the road is blocked by a locked gate and even though he is the lessee, he does not have a key to the gate). Nor had the Corps rendered a decision on plaintiff's request for the reinstatement of its former lease area at Eden Isle Marina. Id. at 5113-14, 5134 (Walters).

Currently, plaintiff has approximately 850 boat slips at Eden Isle Marina. Jt. Stip. ¶ 39. However, plaintiff has not begun development of the Cove Creek Park marina site, id., because of the determination of its experts, whose opinions are summarized below, that the site is not a feasible location for a marina.

## SUMMARY OF EXPERT OPINIONS

Plaintiff presented the opinions of four experts at trial: Dr. Overton, Roger Ross, John Miller, and Mr. Walters.[139]

## I.  Dr. Jerry Overton

Dr. Overton is ATOKA's president and senior hydrogeologist/hydrologist. PX 190 at 6. Plaintiff initially retained ATOKA to perform the EA described above. Id.; Tr. 3709 (Overton). Plaintiff then requested that ATOKA review, summarize, and evaluate the documents obtained from the Corps during the preparation of the EA, PX 190 at 6-7, in an effort to discern the Corps' policies with respect to activities at Eden Isle Marina and other marinas on Greers Ferry Lake, id.; Tr. 3710-11 (Overton). ATOKA was also asked to examine the feasibility of the proposed marina site at Cove Creek Park for use as a marina. PX 190 at 6-7; Tr. 3711 (Overton).

## A.  Credentials

Dr. Overton holds a bachelor's degree in geography with an emphasis in physical geography; a master's degree in geography with specializations in physical geography, hydrology, remote sensing, and statistics; a master's degree in geology, with a specialization in hydrogeology; and a doctorate in geography, with specializations in hydrology, water resources development, and rural land use planning. PX 190-A. But see PX 190 at 6 (indicating that his concentrations for his first master's degree were hydrology and land use management). He is a registered or professional geologist in several states, including Arkansas, and holds a number of other certifications. PX 190-A. He has more than forty years of experience as an environmental scientist and hydrogeologist. Id. He has served as an expert witness in four other cases. PX 190

---

[139]  Defendant cross-examined all four witnesses. Because defendant moved for judgment on partial findings at the close of plaintiff's case-in-chief, it offered no expert testimony.

at 36.  The court qualified Dr. Overton as an expert in land-use management, hydrogeology, geology, and hydrology.  Tr. 3734 (statement of the court) (referring to the expertise described at Tr. 3712 (statement of plaintiff's counsel)).  The court also qualified Dr. Overton as an expert in the Corps' regulations as they pertain to Greers Ferry Lake and commercial marinas.  Id. at 4070-71 (statement of the court).

## B.  The Formulation of His Opinion

As noted above, during its preparation of an EA for Eden Isle Marina, one of ATOKA's employees visited the Little Rock District Office and the Greers Ferry Lake Project Office to review their files and copy those documents that might be of interest.  Id. at 4179-80 (Overton).  As also noted above, plaintiff obtained a large number of documents from the Corps via a FOIA request.  Id. at 5077-86 (Walters).  "These documents included commercial real estate lease contracts, maps, master plans and related documents for marina properties at Greers Ferry Lake, and historical aerial photos, environmental reports and other documents related to the [Corps'] lease development and management of marinas at Greers Ferry Lake."  PX 190 at 7.  Dr. Overton reviewed these documents to (1) identify the Corps' "lease management protocols" for Eden Isle Marina and other marinas on Greers Ferry Lake, (2) discern the development of the lease areas at the same marinas, and (3) analyze "the feasibility of developing a marina" at Cove Creek Park.  Id.; accord Tr. 3792, 3879-80, 4033 (Overton).

In addition to his document review, Dr. Overton visited the proposed marina site at Cove Creek Park on approximately six occasions.  Tr. 4379 (Overton).  One of his visits to the site was by boat in late spring 2008, when Greers Ferry Lake was at flood stage.  Id. at 4097 (Overton).  He floated up to where the upper parking lot would be located, but was unable to find the shoreline, which was further inland amidst the trees.  Id.  Dr. Overton returned to the proposed marina site on January 21, 2009.  Id. at 3057 (Ross); PX 190 at 24.  Accompanying him on this trip were, among others, Mr. Walters and Mr. Ross.[140]  Tr. 3057 (Ross).  The site inspection lasted approximately three hours, id. at 3099 (Ross); accord id. at 4377-78 (Overton), during which time the participants measured water depths and distances, id. at 4084-87, 4374-75, 4380 (Overton).  At the time of the site inspection, Greers Ferry Lake was near its normal elevation of 461 feet.  Id. at 4088, 4090 (Overton).  Using the data he obtained from the site visits, Dr. Overton created several maps showing where, and how far from the shore, one would encounter depths of twenty feet, as well as where a wave attenuator would need to be placed.  Id. at 4087-90 (Overton); PX 190 at 75-76, 80.  He also created drawings showing the possible placement of docks.  Tr. 4089-90 (Overton).

---

[140]  This was the first and only time that Dr. Overton met Mr. Walters prior to trial.  Tr. 4348-49 (Overton).

## C. His Opinions

### 1. Eden Isle Marina

In his report, Dr. Overton concluded that the Corps altered its management of the lease area at Eden Isle Marina in 1996:

> It is my opinion, based on the documents referenced in this report, that the [Corps'] management of the lease area at Eden Isle Marina prior to 1996 was based primarily on the fee taking line and the landside eastern boundary, which generally followed the 434 topographic contour.  It is further my opinion that this area was never intended as the area in which all development, including floating docks, etc., must be restricted.  Rather, the described boundaries define the area in which floating facilities may be attached, due to fluctuating water levels as low as an expected lake low level of 434 elevation . . . .

PX 190 at 17.  His testimony at trial was consistent.  See Tr. 3778-79, 3787, 4317 (Overton) (explaining that from the inception of the lake through 1995, when plaintiff purchased the marina, the eastern, water boundary of the lease was drawn so as to include the land onto which docks would be attached, and not the water area into which the docks would extend); accord id. at 4310-11, 4319 (Overton) (indicating that the Corps had historically intended to allow docks attached to land within the lease area extend beyond the lease area's boundary), 3789 (Overton) (contending that there was no need for the Corps to define a water boundary for the marina because there were no competing public recreation uses for the area adjacent to the marina, such as swimming areas or campgrounds).

### 2. Other Marinas on Greers Ferry Lake

Dr. Overton also discussed in his report the inconsistencies in the Corps' treatment of Eden Isle Marina as compared to its treatment of other marinas on Greers Ferry Lake.  He identified inconsistencies in the following areas: (1) the descriptions and maps of lease areas, (2) master plan map submissions, (3) parking requirements, (4) the location of wave breaks in relation to lease areas, (5) ensuring that docks remain within the lease areas at all times, (6) allowing the expansion of lease areas when docks are discovered to extend beyond the lease area boundary, and (7) the determination of adjacent property owner rights.  PX 190 at 20.  At trial, Dr. Overton expanded on some of these and other inconsistencies, as summarized in Table 4:

| Issue | Inconsistency |
| --- | --- |
| Speed of response to, and approval of, lease expansion requests | "The speediness with which the expansions were approved, or at least responded to, was in most cases relatively rapid.  I believe that the Corps did an excellent job in turning around most of the requests for expansions by the different marinas.  The Eden Isle Marina was a little bit different.  There was not a speedy resolution to the request for expansions, and it was not always clear where things were going for this marina." |

| | |
|---|---|
| Requests to add new docks | At other marinas, there was a lack of Corps opposition to requests to add new docks within existing lease areas and the Corps promptly approved such requests in one to two months; in contrast, plaintiff could not get its requests approved. |
| Lease area descriptions | For all marinas except for Eden Isle Marina and Narrows Marina, the lease area descriptions always included land and water area. |
| Parking | Expansions within or without lease areas was tied to the availability of parking, and so long as there was adequate parking, there was usually no problem with an expansion request. |
| Property owner complaints | "[T]he Corps policy was that the [adjacent] landowner had no rights as far as the Corps property, and that the Corps would allow the concessionaires to expand as the need dictated, and if that meant expanding in front of or between a property owner and the lake, then so be it.  And there is even one statement made that if the concessionaire needed more land, and it was available and it belonged to the Corps, then [it] would probably be allowed to expand on that property.  With the situation at the Eden Isle Marina, just the reverse occurred.  There were complaints by the adjacent landowners, and the land was removed from the lease, and [the marina] would not be allowed to expand into those properties." |
| Safety | Safety was always a main concern of the Corps and the Corps limited marina development where there was a lot of boat traffic, but despite there being no boat traffic issues at Eden Isle Marina, a landowner raised safety as concern with respect to developing the northern portion of the lease area. |
| Violations of rules, regulations, or lease terms | Violations were generally treated very leniently, but that was not the case at Eden Isle Marina.  Instead, when the Corps determined that plaintiff had docks that extended outside of its lease area, it removed shoreline from the lease area and added water area to accommodate the docks.  In similar situations at other marinas, the Corps merely extended the lease area administratively without removing other parts of the lease area. |
| Slip demand | The Corps, with some exceptions, attempted to satisfy the public demand for boat slips.  One exception was at Eden Isle Marina. |
| Cooperation with lessees | The Corps "worked with the lessees for the most part in trying to assist in developing their facilities so that they could maximize not only their profits, but maximize the recreation experience for the public." |

| Lease area expansion | "[W]ith respect to the other marinas, with the exception of the Narrows [Marina], who wanted to expand to the north of Highway 16 and . . . in front of the campground, virtually every other marina expansion was allowed, and encouraged as much as possible within the regulations that had to be followed by the Corps . . . , with the exception of the Eden Isle Marina, where [it] had an opportunity to allow that marina to expand, to develop, within its lease area, . . . and they did not elect to do that." |
|---|---|

Table 4

See Tr. 4034, 4036-40, 4042-45, 4072-74 (Overton).

### 3. The Cove Creek Park Marina Site

During his first visit to the Cove Creek Park marina site in the spring of 2008, Dr. Overton observed that had there been a marina at the site, the flooding "would have caused severe problems":  the flatness of the site allowed floodwater to spread well inland, id. at 4095 (Overton), greatly increasing the distance between the shoreline and "where the docks would have been anchored."  Id. at 4098 (Overton).  Combining his observations with the analysis provided by Mr. Ross, described below, Dr. Overton concluded in his report:

> Based on ATOKA's analysis of the documents discussed above, as well as numerous site visits to Greers Ferry Lake and in conferring with [Mr.] Ross, it is ATOKA's opinion that the site at Cove Creek is unsuitable for a marina.  It is further ATOKA's opinion that a floating wave break would provide little to no protection for marina facilities.  Without expensive dredging and placement of rocked wave attenuation structures, any attempt to construct docks in the Cove Creek area would result in an unstable marina environment with inevitable damage to facility assets and to the watercraft present.  The construction of marina docks in this area would also pose a safety risk to boaters attempting to use the facilities as well as those who might be in the area during high winds, without the costly protective structures.

PX 190 at 27; accord Tr. 4101, 4105-08 (Overton); see also Tr. 4085-86 (Overton) (noting that it would cost $5.9 million to construct a fixed wave attenuator to protect a marina at the Cove Creek Park site), 4106 (Overton) (remarking that it was unlikely that the Corps would approve dredging at the site).  Dr. Overton based his opinion regarding the feasibility of developing a marina at the Cove Creek Park site on (1) the depth of the water at normal pool, Tr. 4351-52, 4639 (Overton); (2) the opinion of John Miller, P.E. regarding wave problems at the site, id. at 4352 (Overton); (3) the effect that the shallow depth of the soils on top of the bedrock would have on dredging, id. at 4352 (Overton); (4) the potential of flooding problem due to the site's topography, id. at 4352, 4642 (Overton); (5) aesthetic problems, id. at 4352-53, 4643-44

-135-

(Overton); and (6) the need to improve access to the site from the state highway located two miles away, id. at 4353, 4644 (Overton).

The court finds Dr. Overton to be credible and accepts all of his testimony as true.

## II.  Roger Ross and John Miller, P.E.

Mr. Ross was retained to evaluate the proposed marina site at Cove Creek Park to determine whether it was a feasible location for a marina, and if so, to determine the optimal design for such a marina.  PX 195 at 20.  As part of his evaluation, Mr. Ross obtained an engineering evaluation from Mr. Miller.  Id. at 20-21.

### A.  Credentials

Mr. Ross holds a bachelor's degree in business administration and has, since 1972, conducted marina site evaluations and designed marinas for feasible marina sites.  PX 195 at 39.  Currently, Mr. Ross is a regional sales manager for Atlantic Meeco.  Id.  In that position, he is involved in everything connected to the marina sales process.  Tr. 3038 (Ross).  He designs the marina, submits his design to the engineering department to create a set of plans, procures a cost estimate, and brings the design and estimate back to the client.  Id. at 3042 (Ross).  He only knows of two other people in the country who have been siting and placing marinas as long as him.  Id. at 3141 (Ross).  The court recognized Mr. Ross as an expert in the evaluation of a site's physical feasibility for the establishment of a marina.  Tr. 3059 (statement of the court).

Mr. Miller holds a bachelor's degree in civil engineering and is a registered professional engineer.  PX 195 at 40.  Since 1973, he has performed marina engineering and design work for Atlantic-Meeco and its predecessor company.  Id.  The court qualified Mr. Miller as an expert in marina engineering and design, and in wave forecasting for inland marinas.  Tr. 2943 (statement of the court).

### B.  The Formulation of Their Opinions

Typically, when Mr. Ross visits a site, he forms a preliminary opinion about whether the site would be a good or bad location for a marina.  Id. at 3045, 3069 (Ross).  He is generally able to determine how good the site is so long as he knows the water depth.  Id. at 3045 (Ross).  But he cannot usually determine how bad a site is without additional analysis.  Id. at 3045, 3069 (Ross).  Thus, if he feels that the site is a borderline or bad location for a marina, he brings in Mr. Miller to perform an analysis.  Id.

The first thing Mr. Ross evaluates at a potential marina site is the fetch distance and direction.  Id. at 3046 (Ross).  The fetch is "the straight line distance over which wind could blow [across water] to affect the site," id. at 2942 (Miller), and the industry standard is that an acceptable fetch distance is three miles or less, id. at 3032-33 (Miller).  After determining the fetch distance and direction, Mr. Ross evaluates water depth, water fluctuation, site access, and the distance from the site to metropolitan areas and major highways.  Id. at 3046 (Ross).  He also

evaluates the availability of parking, site topography, and the potential effects of a 100-year flood.  Id. at 3065-66 (Ross); accord id. at 3096-97 (Ross) (asserting that to determine the feasibility of a marina site, he needs a map of the leased property and knowledge of the water depths, fetch distances, roads to the site, and the site's topography).

Wind and waves have direct effects on marinas.  Id. at 3047 (Ross).  Both add to a marina's maintenance requirements; at first a marina will be able to reduce the effects of wind and waves by adjusting winches and tightening bolts on the docks, but eventually the docks will begin to fall apart.  Id.  In addition, wind and waves will damage boats and cause fueling difficulties.  Id. at 3047-48 (Ross).  To reduce the effects of wind and waves at a marina, a wave attenuator can be built.  Id. at 2936 (Miller).  A floating wave attenuator is sufficient when the fetch distance is three miles or less, the wave height is three feet or less, and the wave period is three seconds or less.[141]  Id. at 3032-33 (Miller).  If these parameters are exceeded, then a fixed wave attenuator is more appropriate.  Id. at 2966 (Miller).  A fixed wave attenuator is a permanent structure such as an earth embankment, rock embankment, or coffered dam.  Id. at 2988 (Miller), 3075 (Ross).  Atlantic Meeco will not build attenuators for waves over four feet in height.  Id. at 3051 (Ross).

If Mr. Ross does not have a good initial impression of the site, i.e., the fetch distance exceeds one-and-one-half or two miles, he requests that Mr. Miller perform a wave climate study.  Id. at 3045, 3069 (Ross); accord id. at 2937, 2941-42 (Miller).  A wave climate study is:

> a study of the development, the wave growth, over a fetch for a certain period, the return periods of winds.  Usually, it's checked for weekly winds to see if the climate is nice in the basin.  It's checked for annual winds to be sure that there is no damage to the craft or the marina . . . .  And it is checked for a free wind, which is usually chosen as a fifty-year wind, which means that that's a wind that there is a two percent chance of having that occur every year.

Id. at 2951 (Miller).  Important factors for wave prediction include the fetch, wind speed and direction, water depth, and water-air stability, "which is the temperature of the air versus the temperature of the water at the time of the wind."  Id. at 2942 (Miller).  Once Mr. Miller obtains the necessary data for a proposed marina site, he inputs the data into a computer program containing equations from the Coastal Engineering Manual, "a manual that is prepared by the Corps . . . and . . . used by oceanographers to determine wave predictions [and] erosion on beaches."  Id. at 2938-39, 2943 (Miller).  The computer program is the Automated Coastal Engineering System ("ACES"), a module of the Coastal Engineering Design and Analysis System ("CEDAS"),[142] both of which were created by the Corps.  Id. at 2939 (Miller).  Mr.

---

[141]  The wave period is the amount of time the wave takes to go from crest to crest.  Tr. 2966 (Miller).

[142]  The court takes judicial notice of the full names of ACES and CEDAS and their relationship to each other pursuant to FRE 201(b)(2).  See CHL - CEDAS - Coastal Engineering Design and Analysis System, U.S. Army Corps of Engineers, http://chl.erdc.usace.army.mil/

Miller uses ACES/CEDAS to perform the calculations necessary for his analysis, but ultimately wave forecasting is an art.  Id. at 2939-40 (Miller).

As previously noted, Mr. Ross visited the proposed marina site at Cove Creek Park on January 21, 2009.  Id. at 3057 (Ross).  The purpose of his visit was to become acquainted with the site, check water depths, and shoot (i.e., measure) distances to the shore.  Id. at 3060 (Ross); accord id. at 3101 (Ross) (noting that he relied upon the site visit in forming his opinion).  He also gathered information about lake fluctuations and the lease area boundaries.  Id. at 3061-62 (Ross).  Based on his impressions of the site, Mr. Ross requested that Mr. Miller perform a wave climate study.  PX 195 at 27.  Presumably, Mr. Miller obtained some of the data he needed, such as the fetch distance and water depth, from Mr. Ross.[143]  He also obtained data about wind speed and direction from other sources, including the National Weather Service and the National Climatic Data Center.  Id. at 23.  He did not do a detailed wind survey, but the survey he performed was a common industry practice.  Tr. 2949, 3023-35 (Miller).

## C.  Their Opinions

Upon visiting the site, Mr. Ross did not care for it as a marina location.  Id. at 3098 (Ross).  The water depth was one issue.  The minimum water depth needed for a marina is ten feet.  Id. at 3062 (Ross).  Because it was possible for the level of Greers Ferry Lake to drop by fifteen feet, a marina on the lake would need to be situated in at least twenty-five feet of water.  Id.  At the Cove Creek Park marina site, you had to travel 300 feet from the shoreline to get in twenty-five feet of water.  Id.  In other words, you would need 300 feet of gangway to get from the shore to the marina.  Id. at 3063 (Ross).  Another issue was the fetch distance, which was 6.28 miles, more than twice what was acceptable.  Id. at 3033 (Miller).  Mr. Ross has never designed a marina with a 6.28 mile fetch distance.  Id. at 3072 (Ross).  He concluded that that the proposed marina site at Cove Creek Park was undesirable and not feasible for a marina.  Id. at 3080 (Ross).  Mr. Miller's analysis reinforced Mr. Ross's impression that the site was a poor location for a marina.  Id. at 2987-88, 3034 (Miller); PX 195 at 33 ("Data Analysis Summary"), 34 ("Opinions").

In his report, titled "Cove Creek Marina Siting Evaluation," Mr. Ross advanced five opinions regarding the feasibility of the Cove Creek Park marina site to serve as a location for a marina:

> Model results indicate that unacceptable wave action would occur if a marina were to be constructed at the proposed site.

---

cedas (last visited August 23, 2013).

[143]  There is no evidence in the trial record that Mr. Miller visited the site himself.

> If the marina were to be built at the location and floating attenuation were employed, damage to the marina structures and moored vessels would be highly likely.
>
> Experience indicates that a permanent wave attenuation structure would be cost prohibitive.
>
> The small bay in which the proposed marina would be based is too shallow to accommodate the annual fluctuations in the lake's water levels, typically rendering the dock space unusable during some portions of the year. Dredging would be required to deepen the area for the marina.
>
> It is the opinion of Atlantic Meeco that the proposed marina site at Cove Creek is both undesirable and unfeasible.

PX 195; accord Tr. 2987-88, 3021-22 (Miller), 3076, 3078-80 (Ross).  Mr. Ross based his opinion regarding the site's feasibility for hosting a marina on the lease area's wind-driven waves, topography, boundary, and water depth, as well as the out-of-pocket costs that plaintiff would incur.  Id. at 3099-3100, 3135-36 (Ross).

Both Mr. Miller and Mr. Ross opined that the feasibility of the Cove Creek Park site for use as a marina could have been determined in 1999, id. at 3034 (Miller), 3103 (Ross), but Mr. Ross indicated that a marina operator generally would not do the analysis itself,[144] id. at 3103 (Ross).

The court finds both Mr. Miller and Mr. Ross to be credible and accepts their testimony as true.

### III.  Ronnie Walters

Plaintiff offered Mr. Walters as an expert in operating a commercial marina on Greers Ferry Lake.  Id. at 5267, 5276, 5295 (statement of plaintiff's counsel).  Mr. Walters's background is discussed earlier in this opinion.  See supra Part Facts.I.C.2.  Based on this background, the court recognized Mr. Walters as an expert in operating a commercial marina. Tr. 5296-97 (statement of the court).

### A.  The Formulation of His Opinion

Mr. Walters offered opinions on two main topics:  the economic feasibility of developing a marina at the Cove Creek Park site and how plaintiff could have developed Eden Isle Marina

---

[144]  At trial, Mr. Ross testified to his belief that had the Corps believed the site at Cove Creek Park was a feasible location for a marina, it would have found an expert to provide such an opinion.  Tr. 3141 (Ross).  He further stated that the Corps did not retain such an expert.  Id.

had it been permitted to do so.  See generally PX 214 (containing Mr. Walters's expert report).
In formulating his opinion regarding the Cove Creek Park marina site, he relied on the opinions
of Dr. Overton and Mr. Ross, as well as on his own expertise.  Id. at 5.  In formulating his
opinion concerning the development of Eden Isle Marina, he relied on his own expertise, as well
as on market and economic data from a variety of sources, such as an Eden Isle property owner
directory, waiting lists for boat slips, tax assessor records, and a report on retail sales activity in
Heber Springs.  Id. at 15-26, 101-64.

## B.  His Opinion

In his expert report, Mr. Walters addressed the economics of developing Eden Isle
Marina and the proposed marina at Cove Creek Park.  With respect to the Cove Creek Park site,
Mr. Walters, concluded:

> A marina at Cove Creek cannot be feasibly constructed and operated due
> to the physical limitations expressed by ATOKA and Atlantic-Meeco.  Also,
> based upon my cost estimates, a marina, if constructed, would never be able to
> generate positive cash flow.  Not only would a commercial marina never be
> profitable, due to the unsafe conditions, it is reasonable to conclude that few
> people would ever rent a slip at this location.  Under normal conditions, it would
> take hundreds of slips to support the capital infusion required for the construction
> and operation of the marina.  The cost of dredging and the cost of building an
> earthen levy (or jetty) alone[] makes this an impossible business venture.

Id. at 10; accord Tr. 5301-05 (Walters).  And, with respect to development at Eden Isle Marina,
Mr. Walters concluded that had plaintiff been permitted to fully develop the marina, it would
have been able to build and rent eighty slips per year to meet market demand.  PX 214 at 11-12.
He further concluded that plaintiff had suffered a "significant economic loss" from the Corps'
failure to permit development, including lost revenue and profits.  Id. at 15-16; accord Tr. 5311-
14 (Walters).

The court finds Mr. Walters to be a credible witness.

## PROCEDURAL POSTURE

The court convened a trial in Little Rock on February 28, 2011.  On March 23, 2011, at
the close of plaintiff's case-in-chief, defendant orally moved for judgment on partial findings
under RCFC 52(c).  Because defendant's motion could be dispositive of the case, the court
suspended the trial and directed the parties to fully brief defendant's motion.  Briefing is
complete, and the parties have waived oral argument.

**DISCUSSION**

**I. RCFC 52(c) Motions**

Defendant seeks a judgment dismissing this case pursuant to RCFC 52(c).  That rule provides:

> If a party has been fully heard on an issue during trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

RCFC 52(c).  When confronted with such a motion, a judge in the Court of Federal Claims "should weigh the evidence, draw the proper inferences therefrom, and, if he finds the evidence insufficient to make out a case for the plaintiff, render a decision for the defendant on the merits."  Howard Indus., Inc. v. United States, 115 F. Supp. 481, 485 (Ct. Cl. 1953); accord Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc., 231 F.3d 1339, 1343 (Fed. Cir. 2000) (noting that in ruling on such a motion, the court must weigh the evidence and resolve issues of credibility).  Because judges on this court serve as the triers of fact and the triers of law, their inquiry is not limited to determining whether the plaintiff has established a prima facie case.  Howard Indus., Inc., 115 F. Supp. at 484-86 (citing United States v. U.S. Gypsum Co., 67 F. Supp. 397 (D.D.C. 1946), rev'd on other grounds, 333 U.S. 364 (1948)).  Rather, it is their duty "to weigh the evidence in the same manner as if both sides had introduced evidence and closed, and, after drawing the proper inferences therefrom, to render a decision on the merits for the defendant if it found the evidence insufficient to make out a case of the plaintiff."  Id. at 486.

**II. Plaintiff's Amended Complaint**

As previously noted, plaintiff filed an amended complaint in April 2009.  As it did in its original complaint, plaintiff advances three claims for relief:  (1) rescission of the MOU and the 1999 lease and restitution; (2) breach of the 1995 lease, the MOU, and the 1999 lease; and (3) the taking of its property without just compensation in violation of the Fifth Amendment.  Am. Compl. ¶¶ 117-212.  In its first claim for relief, plaintiff asserts four grounds for rescission, including fraud, misrepresentation, and concealment; a lack, failure, or inadequacy of consideration; duress; and mistake of fact.  Id. ¶¶ 117 to 150-S(c).  In its second claim for relief, plaintiff contends that not only did the Corps fail to perform its contractual obligations, but also that the Corps' actions amounted to an anticipatory breach, the violation of implied duties, and misrepresentation and negligence.  Id. ¶¶ 157 to 182-S(b).  And, in its third claim for relief, plaintiff contends that the Corps, through its regulatory actions, took plaintiff's property interests at Eden Isle Marina and Cove Creek Park without just compensation.  Id. ¶¶ 192-93, 197.

One aspect of the amended complaint requires the court's attention as a threshold issue.  With respect to its breach of contract claims, plaintiff treats the 1995 lease, the MOU, and the 1999 lease as one agreement.  See id. ¶ 88 (noting that the agreements "should be construed as one contract").  See generally id. ¶¶ 157 to 182-S(b).  However, as reflected by the evidence

adduced at trial, plaintiff's treatment of the three documents as one agreement is incorrect.  First, the Corps' typical practice for amending marina leases was to execute a supplemental agreement with the marina operator, but neither the MOU nor the 1999 lease was a supplemental agreement to the 1995 lease; thus, the 1995 lease was distinct from the MOU and the 1999 lease.  Second, rather than incorporating the terms of the MOU by reference in the 1999 lease, the Corps added language to the 1999 lease that mirrored language from the MOU; thus, the MOU was distinct from the 1999 lease.[145]  Third, on the same date that plaintiff and the Corps executed the 1999 lease, they executed a separate agreement cancelling the 1995 lease; thus, the 1999 lease was distinct from the 1995 lease.  Therefore, each of these three documents is a separate and distinct agreement.  Accordingly, the court will treat plaintiff's breach-of-contract claims as claims that the Corps separately breached the 1995 lease, the MOU, and the 1999 lease.

### III.  The Statute of Limitations

In its RCFC 52(c) motion, defendant contends that plaintiff has not met its burden of proving any of its contract or Fifth Amendment takings claims.  Defendant also argues that all of plaintiff's claims violate the statute of limitations.  Because defendant's statute of limitations argument implicates the court's jurisdiction, the court must address it first.

#### A.  Legal Standards

##### 1.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the existence of subject matter jurisdiction at any time.  Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."  Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded

---

[145]  Although some of the obligations assumed by the parties in the MOU were incorporated into the 1999 lease, the MOU was not extinguished by the 1999 lease.

upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2006). In addition, any claim against the United States filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." Id. § 2501; see also John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-35 (2008) (providing that the limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a claim).

## 2.  Claim Accrual

"A claim first accrues within the meaning of the statute of limitations when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (internal quotation marks omitted). However, a "claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1356 (Fed. Cir. 2006), aff'd, 552 U.S. at 130. Thus, the accrual date of a claim is suspended if the government "concealed its acts with the result that [the] plaintiff was unaware of their existence" or if the plaintiff's injury was "'inherently unknowable' at the accrual date." Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States, 373 F.2d 356, 359 (Ct. Cl. 1967). This accrual suspension rule is "strictly and narrowly applied[.]" Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985), quoted in Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc). Accordingly, "a plaintiff's ignorance of a claim that he should have been aware of is not enough to suspend the accrual of a claim." Ingrum v. United States, 560 F.3d 1311, 1314-15 (Fed. Cir. 2009).

Normally, in an action for breach of contract, a claim accrues when the breach occurs. Holmes v. United States, 657 F.3d 1303, 1317 (Fed. Cir. 2011). And, because "[a] claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation," a Fifth Amendment takings claim "accrues when that taking action occurs." Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) (citation omitted); accord Ingrum, 560 F.3d at 1314 ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs.").

## B.  Breach of the 1995 Lease

As noted above, plaintiff alleges in its amended complaint that the Corps breached the 1995 lease by failing to perform its contractual obligations, committing an anticipatory breach, violating its implied duties, and engaging in misrepresentation or negligent behavior. Posttrial, plaintiff argues that it has established that the Corps breached the express terms of the contract, violated its implied duties, and engaged in misrepresentation. In particular, it contends that it has proven that the Corps deviated from its past interpretations and application of the Eden Isle Marina lease, incorrectly ascribed to the general public the views of the Eden Isle property

owners,[146] improperly bowed to political influence, failed to disclose the true motive for reconfiguring the original lease area, misrepresented or failed to disclose the true nature of the water boundary of the lease area, failed to disclose its meetings with politicians and other nonparties to the lease, failed to disclose its communications with politicians, and failed to disclose its true motives for deviating from its normal policies and procedures.  However, as poorly as plaintiff was treated by the Corps under the 1995 lease, the court cannot reach the merits of plaintiff's breach-of-contract claims.  On April 22, 1999, plaintiff and the Corps executed an agreement cancelling the 1995 lease.  Thus, the last possible day that the 1995 lease could have been breached–and plaintiff's breach-of-contract claims could have accrued–was April 22, 1999.[147]  Plaintiff did not file this lawsuit until February 26, 2007, almost eight years after the 1995 lease's cancellation, and well beyond the applicable six-year limitations period.  Thus, all of plaintiff's claims for breach of the 1995 lease are barred by the statute of limitations.

The accrual suspension rule does not rescue plaintiff's claims.  To suspend the accrual date beyond April 22, 1999, plaintiff must establish either that the Corps concealed its actions or that its injury was inherently unknowable.  The evidence in the trial record indicates that plaintiff had first-hand knowledge of the provisions of the 1995 lease, that the Corps was attempting to accommodate the concerns of the Eden Isle property owners, that the Corps rejected its March 5, 1996 long-term development plan for Eden Isle Marina, that the Corps was resisting plaintiff's attempts to develop the marina, and that the Corps ordered plaintiff to cease and desist all development activity at the marina.  See Ingrum, 560 F.3d at 1315-16 (holding that "open and notorious activity" is "not inherently unknowable").  Plaintiff also discovered, no later than the end of 1999, through documents produced during its lawsuit against Mr. Upton, that Mr. Lancaster had visited Eden Isle, that Mr. Lancaster had advised Colonel Morris that he opposed the marina's development, that Colonel Holden met with Mr. Berry to ascertain his position on the marina's development, and that Mr. Berry had expressed his continued opposition.  "It is a plaintiff's knowledge of the facts of the claim that determines the accrual date."  Young v. United States, 529 F.3d 1380, 1385 (Fed. Cir. 2008).  Plaintiff had knowledge of facts that support its claim that the Corps breached the 1995 lease no later than 1999; it might not have been cognizant of the reasons for the Corps' actions, but it was certainly aware that the Corps was not permitting any development at the marina.  These facts were not concealed from plaintiff and were not inherently unknowable.  Thus, the accrual suspension rule cannot be applied to extend the accrual date of plaintiff's breach-of-contract claim into the six-year period leading up to plaintiff's complaint.[148]

_____

[146]  Nothing in this opinion should be construed as a criticism of a citizen exercising any freedoms–whether granted by the Constitution or created at the federal, state, or local level–including the rights to express views concerning land development or to engage in the political process.  The facts of this case, however, demonstrate that plaintiff's contractual rights were infringed by political influence.

[147]  The agreement retroactively cancelled the 1995 lease effective December 31, 1998, but the 1995 lease remained in effect until the cancellation agreement was executed.

[148]  Because the statute of limitations bars plaintiff's claims under the 1995 lease, the

### C.  Breach of the MOU and the 1999 Lease

Unlike with the 1995 lease, at the time plaintiff filed its complaint in this matter, plaintiff and the Corps continued to be bound by the MOU and the 1999 lease.  Plaintiff seeks both money damages for breach of the two agreements and the rescission of the two agreements. "Because rescission is essentially an equitable remedy" and "will not ordinarily be invoked where money damages–in this case damages for breach of contract–will adequately compensate a party to the contract," Dow Chem. Co. v. United States, 226 F.3d 1334, 1345 (Fed. Cir. 2000), the court first addresses plaintiff's breach-of-contract claims.

Plaintiff alleges in its amended complaint that the Corps breached the MOU and the 1999 lease by failing to perform its contractual obligations, committing an anticipatory breach, violating its implied duties, and engaging in misrepresentation or negligent behavior.  Posttrial, plaintiff contends that it has established that the Corps materially misrepresented that Cove Creek Park was an appropriate site for a marina, breached its duty to ensure that plaintiff understood the meaning of "as funds become available"; failed to disclose its escalating cost estimates for building the road to the Cove Creek Park marina site, the actions it was taking or not taking with respect to obtaining funding to build a road to the Cove Creek Park marina site, and the risk of environmental litigation associated with the development of Cove Creek Park; and breached the implied duty of good faith and fair dealing by failing to pursue its obligations under the two agreements and refusing plaintiff's request to use an existing road, along with a temporary road, to access the marina site at Cove Creek Park so that it could begin construction of the marina.  In sum, plaintiff asserts that it has proven, at a minimum, the Corps' failure to

---

court does not analyze the merits of plaintiff's contentions.  Had it reached the merits, however, the court likely would have concluded that plaintiff had established a prima facie case on one or more of its claims.  In particular, plaintiff's contention that the Corps breached the implied duty of good faith and fair dealing when it issued the cease-and-desist order is extremely compelling. "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner," and "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  The federal government may breach the implied duty through a bait-and-switch maneuver–by "enter[ing] into a contract that awards a significant benefit in exchange for consideration," and then "eliminat[ing] or rescind[ing] that contractual provision or benefit through a subsequent action directed at the existing contract. Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 829 (Fed. Cir. 2010).  Plaintiff had a contract with the Corps that provided a right to expand the facilities at Eden Isle Marina within the lease area upon the approval of the district engineer, and the Corps consistently interpreted the contract as prohibiting the arbitrary or unreasonable denial of an expansion request.  The Corps' blanket prohibition of all development at the marina, and the multiple-year duration of the prohibition, appears to have been "for the specific purpose of eliminating an express bargained-for benefit in the contract[] . . . ."  Id. at 829-30.

-145-

perform under the "as funds become available" clauses, breach by misrepresentation, breach by failing to provide vital information, and breach of implied duties.

Based on the precedent cited above, plaintiff's breach-of-contract claims accrued when plaintiff knew or should have known of the existence of the events constituting the breaches of contract.  See Holmes, 657 F.3d at 1317; John R. Sand & Gravel Co., 457 F.3d at 1356; Brown Park Estates-Fairfield Dev. Co., 127 F.3d at 1455.  The court will address the accrual date of each category of alleged breach in turn.

### 1.  Failure to Perform Express Duties

Plaintiff generally alleges that the Corps failed to perform under the "as funds become available" clauses of the MOU and the 1999 lease.  As described above, the MOU contained the following provision:  "The COE will construct an access road and parking for the marina at Cove Creek Park as funds become available."  And, the 1999 lease contained a substantially similar provision:  "The Corps will construct an access road, utilities and parking for the marina at [the] Cove Creek Park site as funds become available."

To determine when plaintiff's claim accrued, it is necessary to determine the meaning of "as funds become available," as used in the two agreements.  "Contract interpretation is a question of law . . . ."  Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).  In interpreting a contract, the court begins by examining its language.  TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions."  Id.  However, the contract contains an ambiguity when it "is susceptible to more than one reasonable interpretation," and those interpretations "fall within a 'zone of reasonableness.'"  Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999) (quoting WPC Enters., Inc. v. United States, 323 F.2d 874, 876 (Ct. Cl. 1963)).  If the contract contains an ambiguity, the court must determine whether that ambiguity is patent.  Id.  An ambiguity is patent if it is so "'obvious, gross, [or] glaring'" that it creates a duty to inquire.  NVT Techs., Inc., 370 F.3d at 1162 (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)).  Thus, if a party fails to inquire about the patently ambiguous provision, that party's "interpretation will fail."  Id.  If the ambiguity is not patent and a party shows that it relied upon the ambiguity, then the court applies the general rule that the ambiguity will be construed against the drafter of the contract.  Id.

The phrase "as funds become available," on its face, reflects the Corps' obligation to build the Cove Creek Park marina site access road and other related infrastructure when it had available funds for that purpose.  However, the phrase does not reflect a deadline for obtaining funding.  Nor does it reflect who was responsible for ensuring that funds became available.  With respect to the latter omission, personnel in the Little Rock District believed that the Corps' responsibility was limited to placing the work in its annual budget requests, and that plaintiff was responsible for securing funding through a congressional add–although at least one district employee, Mr. Miller, recognized that the phrase did not address what would happen if a congressional add was not forthcoming.  In contrast, personnel from Corps headquarters believed

that the Corps was entirely responsible for securing the funding, whether through the normal budget process or via reprogramming.  And, it was Mr. Walters's understanding that the Corps would build the access road when the funds became available and that a congressional add would just speed up the process.

Notwithstanding the differing interpretations, the language of the clauses is clear in one respect:  There is no requirement that plaintiff obtain a congressional add.  Because there were only three avenues by which funding could be made available–(1) plaintiff requesting a congressional add from a member of the Arkansas congressional delegation, (2) the Corps' annual budget requests, or (3) the reprogramming of funds within the Corps–and because funding had to come from somewhere, the logical conclusion is that in the absence of a contractual requirement for plaintiff to procure the funding, it was the Corps' responsibility to ensure the availability of funding.  This conclusion is consistent with the Little Rock District's understanding that it would place the work in its annual budget requests, and the interpretation of the "as funds become available" clauses by personnel from Corps headquarters that the Little Rock District was obligated to make funds available through its annual budget requests or reprogramming.

Thus, the only ambiguity affecting the accrual date of plaintiff's claim is whether, under the "as funds become available" clauses, the Corps was only required to place the request for funds in its annual budget requests or was also required to reprogram funds that had become available through slippages and savings from other work.[149]  If the former, then plaintiff's claim would have accrued on October 1, 2001, the first day that the Corps could have received funding for the work at Cove Creek Park through the normal budget process,[150] and the first date that plaintiff could have known that funds had not been made available through the normal budget process.

---

[149]  Based on the testimony of Ms. Murdock-McDaniel and Mr. Noggle regarding the reprogramming of funds, the court declines to read the phrase "as funds become available" as requiring the Corps to reprogram funds that were designated by the Corps for other work.  Of course, it recognizes that two principles of appropriations law might be relevant:  (1) "when there is a lump-sum appropriation without a statutory cap, an agency is free to reprogram funds from that appropriation from one activity to another," Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1085 (Fed. Cir. 2003), aff'd sub nom. Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631 (2005), and (2) "in the absence of a statutory cap or other explicit statutory restriction, an agency is required to reprogram if doing so is necessary to meet debts or obligations," id. at 1086.  See also Cherokee Nation of Okla. v. Leavitt, 543 U.S. at 642-44 (discussing the government's contention that it has the "legal right to disregard its contractual promises if, for example, it reasonably finds other, more important uses for an otherwise adequate lump-sum appropriation").  However, the trial record does not contain sufficient evidence to ascertain the applicability of these principles in this case.

[150]  The Corps placed the work in its budget request on February 12, 1999, ten days after the execution of the MOU.  That budget request was for FY 2001, which began on October 1, 2001.

However, if the Corps was required to reprogram funds that became available due to slippages or savings to satisfy its contractual obligations, plaintiff's claim would have accrued when plaintiff first knew or should have known that there were available funds that were not reprogrammed for use for the work at Cove Creek Park.  The evidence adduced at trial clearly indicates that the Corps concealed its internal budget process and procedures, including how it actually allocated and spent the funds appropriated by Congress, from plaintiff.[151]  Indeed, plaintiff had no knowledge of the Corps' budget process until 2006 at the earliest.  In 2006, ATOKA obtained copies of electronic-mail messages from September 2000 that addressed the Corps' obligation to fund the work at Cove Creek Park in the absence of a congressional add and contained the implication that Corps headquarters might direct the Little Rock District to build the road in the absence of funds budgeted for that purpose or a congressional add.

Accordingly, regardless of the what the Corps was obligated to do under the "as funds become available" clauses that appear in the MOU and the 1999 lease, plaintiff's claim that the Corps breached the clauses accrued within the applicable limitations period.  Plaintiff's claim accrued either on October 1, 2001, or in 2006, and plaintiff filed its complaint on February 26, 2007, less than six years later.  Thus, under either accrual date analysis, plaintiff's claim is not barred by the statute of limitations.

### 2. Misrepresentation

Plaintiff next alleges that the Corps misrepresented that the site it chose at Cove Creek Park was a feasible location for a marina.  The evidence in the trial record reflects that while Mr. Walters may have been the first person to mention Cove Creek Park as an alternative marina site, it was Corps personnel who promoted Cove Creek Park as an alternative marina site during internal Corps meetings and with plaintiff.  The evidence further reflects that during the time leading up to the execution of the MOU and the 1999 lease, Corps personnel believed that the Cove Creek Park marina site was a feasible location for a marina and made such a representation to plaintiff.  Thus, by offering the site to plaintiff as consideration for the MOU and the 1999 lease, the Corps was representing to plaintiff that it was a feasible site for a marina.  Based on these facts, to the extent that the Corps misrepresented the feasibility of the marina site at Cove Creek Park, the misrepresentation would have occurred no later than April 22, 1999, the date that plaintiff and the Corps executed the 1999 lease granting plaintiff a lease area at Cove Creek Park and providing that the Corps would build a road, utilities, and parking to serve a marina at that site.

---

[151]   As noted above, in <u>Japanese War Notes Claimants Ass'n of the Philippines, Inc.</u>, the United States Court of Claims ("Court of Claims") held that the accrual date of a claim is suspended if the defendant "concealed its acts" from the plaintiff.  373 F.2d at 359.  The Court of Claims did not indicate that the concealment must be intentional.  Nevertheless, as recognized in <u>Petro-Hunt, L.L.C. v. United States</u>, some courts have grafted an intent requirement onto the rule.  90 Fed. Cl. 51, 61 & n.7 (2009).  Absent any binding precedent requiring plaintiff to establish intentional concealment, the court here declines to follow those courts' example.

Plaintiff's misrepresentation claim, however, may not have accrued on April 22, 1999. Because a claim does not accrue unless plaintiff knew or should have known of the purported misrepresentation, the court must determine when the purported misrepresentation did or should have become apparent to plaintiff.

Defendant contends that plaintiff should be credited with knowledge of the purported misrepresentation effective April 22, 1999, because the 1999 lease contained a provision in which plaintiff acknowledged its inspection, knowledge, and acceptance of the condition of the leased premises, as well as its understanding that the premises were being leased without representations or warranties. In response, plaintiff argues that the condition-of-premises clause should be interpreted to apply only to the condition of any existing facilities and improvements on the leased premises, and not to the condition of the water portion of the lease area. Doing so, plaintiff states, would give effect to the intent of the parties and avoid a violation of public policy.

However, before the court can consider the extrinsic evidence of the parties' intentions upon which plaintiff relies, it must find the contract language to be ambiguous. This the court cannot do. See TEG-Paradigm Envtl., Inc., 465 F.3d at 1338. On the first page of the 1999 lease, "premises" is defined as the property identified in Exhibit A to the lease, and Exhibit A includes both a description and depiction of the lease area at Cove Creek Park. Thus, the condition-of-premises clause expressed plaintiff's acknowledgement that it inspected and accepted the conditions at the Cove Creek Park lease area.

That plaintiff did not actually inspect the lease area is irrelevant to the statute-of-limitations analysis; for the purposes of determining the accrual date of plaintiff's misrepresentation claim, all the court need do is determine when plaintiff should have known about the condition of the Cove Creek Park lease area. Plaintiff's written agreement that it had inspected and accepted the condition of the premises is sufficient evidence that plaintiff should have known the condition of the lease area. Accordingly, plaintiff's claim accrued no later than April 22, 1999–the date it executed the 1999 lease containing the condition-of-premises clause.[152]   The claim is therefore barred by the statute of limitations.

---

[152]   Moreover, even in the absence of the condition-of-premises clause, plaintiff's claim would still be barred by the statute of limitations. The evidence in the trial record reflects that Mr. Walters actually visited the Cove Creek Park marina site on three occasions:  in January 1999 with his attorneys and Mr. Park; between May 1999 and November 27, 2000, with Corps employees; and on February 8, 2001, also with Corps employees. At these site visits, Mr. Walters had the opportunity–whether or not he took it–to evaluate the site himself or have someone help him evaluate the site. Thus, plaintiff could have and should have known about the feasibility of the site as a location for a marina no later than Mr. Walters's final visit on February 8, 2001, which is more than six years before plaintiff filed its complaint in this lawsuit.

### 3.   Failure to Disclose Superior Knowledge

In addition to alleging breach of express contract terms and misrepresentation, plaintiff contends that the Corps breached the MOU and the 1999 lease by failing to supply information that was vital to its exercise of its rights and responsibilities under those agreements. Specifically, plaintiff alleges that the Corps failed to disclose its escalating cost estimates for building the road to the Cove Creek Park marina site, the actions it was taking or not taking with respect to obtaining funding to build a road to the Cove Creek Park marina site, and the risk of environmental litigation associated with the development of Cove Creek Park.

"The government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor." AT&T Commc'ns, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002).  Thus, plaintiff's superior knowledge claim accrued when it knew or should have known that the Corps withheld the purportedly vital information.

With respect to the allegations regarding the Corps' estimates for building the infrastructure at Cove Creek Park provided for in the MOU and the 1999 lease, i.e., a road, utilities, and parking, plaintiff could not have had any knowledge about the escalating cost estimates until the Corps actually escalated its cost estimates.  As reflected in Table 1, above, the Corps' estimate for the work remained steady at approximately $418,000 from February 1999 through December 2002.  But, in November 2003, the Corps increased its estimate for the work to $1,500,000.  Thus, plaintiff cannot be charged with knowledge of the Corps' alleged nondisclosure of escalating cost estimates until sometime between December 2002 and November 2003.  Moreover, as reflected in Table 2, above, the Little Rock District's budget requests for the work at Cove Creek Park that included the marina access road jumped from $430,000 in March 2000 to $2,525,000 on February 23, 2001, due to the district's decision to attach the construction of the road to other work at Cove Creek Park unrelated to the proposed marina.  The evidence in the trial record reflects that the Corps concealed from plaintiff the fact that the Little Rock District had consolidated its Cove Creek Park-related budget items into one package.  Indeed, the record lacks any evidence that plaintiff knew or should have known about the consolidation until at least 2006, when ATOKA obtained copies of the Corps' September 2000 electronic-mail messages discussing funding for the Cove Creek Park work.  Accordingly, plaintiff's superior knowledge claim related to the Corps' cost estimates could not have accrued before November 2003, well within the six-year statute of limitations.

Next, regarding the allegations concerning the Corps' efforts to obtain funding to build the road to the Cove Creek Park marina site, plaintiff specifically contends that the Corps failed to disclose that it had attached the road construction work to other work at Cove Creek Park (i.e., the campsites and waterborne toilet) in its budget requests, deflected funding opportunities from Corps headquarters, and manipulated the budget in response to the EIG inquiry.  As noted above, the evidence adduced at trial reflects that the Corps concealed its internal budgeting and funding activities from plaintiff until approximately 2006, when ATOKA obtained copies of the Corps' September 2000 electronic-mail messages.  Moreover, the court cannot say that plaintiff should have been aware of the possibility that the Corps was withholding relevant information about its

funding of the road to the Cove Creek Park marina site before October 1, 2001, the first day that the Corps could have received funding for the work at Cove Creek Park through the normal budget process, and the first date that plaintiff could have known that funds had not been made available through the normal budget process. An October 1, 2001 accrual date is within the six-year statute of limitations.

In contrast, plaintiff's remaining allegations–that the Corps possessed superior knowledge of the risk of environmental litigation associated with the development of Cove Creek Park–accrued beyond the applicable limitations period. As noted above, the Corps issued a new Shoreline Management Plan for Greers Ferry Lake in March 2000 after preparing an EA and a FONSI, and immediately began to issue permits for the construction of private docks on the lake. In a lawsuit filed the following month, Save Greers Ferry Lake, Inc. challenged the plan's validity. The district court concluded that the Corps should have prepared an EIS for the lake, leading the Corps to withdraw the Shoreline Management Plan in June 2000. The Corps issued a final EIS in April 2002 and another Shoreline Management Plan in July 2002. Save Greers Ferry Lake, Inc. almost immediately filed suit to challenge the July 2002 Shoreline Management Plan, alleging, in part, that the Corps did not adequately address the construction of a marina at Cove Creek Park. The Corps issued an EA for Cove Creek Park in November 2002, and the district court upheld the validity of the July 2002 Shoreline Management Plan in September 2004.

The Corps' actions under NEPA, the issuance of the Shoreline Management Plans for Greers Ferry Lake, and the litigation initiated by Save Greers Ferry Lake, Inc. were all public proceedings. Thus, plaintiff should have known, at the time the events occurred, that the Corps performed an EA of Greers Ferry Lake prior to March 2000, issued a Shoreline Management Plan in March 2000, was sued by Save Greers Ferry Lake, Inc. in April 2000 after issuing permits for private docks, and withdrew the Shoreline Management Plan in June 2000 as a result of the lawsuit. In other words, plaintiff should have been aware during the first half of 2000 that there was an organization willing to sue the Corps over the environmental impacts of the Corps' actions on Greers Ferry Lake. Thus, plaintiff's superior knowledge claim, as it pertains to the Corps' purported withholding of information pertaining to the risk of environmental litigation associated with the development of Cove Creek Park, accrued more than six years before it filed suit in this court.[153]

---

[153] Although the court need not reach the merits of this claim, it notes that the Corps' NEPA-related actions from 2000 through 2002, the issuance of the Shoreline Management Plans for Greers Ferry Lake in March 2000 and July 2002, and the litigation initiated by Save Greers Ferry Lake, Inc. in April 2000 and July 2002 are all public proceedings. Thus, it is unlikely that plaintiff would have been able to establish a prima facie case of breach of contract based on a claim that the Corps withheld superior knowledge with respect to the risk of environmental litigation.

### 4. Implied Duty of Good Faith and Fair Dealing

Plaintiff's final breach-of-contract claim related to the MOU and the 1999 lease is that the Corps breached the implied duty of good faith and fair dealing by failing to pursue its obligations under the two agreements to obtain funds for the work at Cove Creek Park and by refusing plaintiff's request to use an existing road, along with a temporary road, to access the marina site at Cove Creek Park so that it could begin construction of the marina.  As noted above, under the implied duty of good faith and fair dealing, the federal government is obligated "not to interfere with the other party's performance" and "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  Centex Corp., 395 F.3d at 1304.  Therefore, a breach of the implied duty occurs, and a claim for that breach accrues, when the government interferes with contract performance or takes the destructive action.

With respect to plaintiff's first contention, the court reiterates that under the "as funds become available" clauses in the MOU and the 1999 lease, the Corps was either required only to place the request for funds in its annual budget requests or was also required to reprogram funds that had become available through slippages and savings from other work.  The court also concluded that plaintiff's claim for the Corps' failure to obtain funding accrued no earlier than October 1, 2001, within the statute of limitations.  Plaintiff's claim for breach of the "as funds become available" clauses is substantively similar to its claim that the Corps breached the implied duty of good faith and fair dealing by failing to pursue funding in accordance with the clauses.  Thus, the two claims bear the same accrual date—no earlier than October 1, 2001, which is within the applicable six-year limitations period.

Plaintiff's second claim for breach of the implied duty of good faith and fair dealing, however, did not accrue within the applicable limitations period.  Plaintiff alleges that the Corps treated it in an arbitrary and capricious manner, and differently from other marina operators on Greers Ferry Lake, when it refused plaintiff's request to use an existing road, along with a temporary road, to access the marina site at Cove Creek Park to begin marina construction.  The evidence adduced at trial reflects that plaintiff knew as early as March 1999 (when Mr. Park responded in person to Mr. Walters's February 26, 1999 request for a temporary road), but no later than June 27, 2000 (when Mr. Walters was advised that the Greers Ferry Lake Project Office was opposed to a temporary road), that the Corps would not allow him to access the marina site to begin construction, using a temporary road or other means, until funding was available.  Indeed, plaintiff's efforts to begin any work at the Cove Creek Park marina site were rebuffed by Mr. Park in March 1999 and again on August 11, 1999.  Based on this evidence, the court concludes that plaintiff's claim for breach of the implied duty of good faith and fair dealing with respect to accessing the marina site at Cove Creek Park accrued no later than June 27, 2000, beyond the six-year limitations period applicable in this case.

### D. Rescission of the MOU and the 1999 Lease

In addition to its request for money damages as compensation for the Corps' purported breaches of the MOU and the 1999 lease, plaintiff seeks the rescission of those two agreements.

"Rescission has the effect of voiding a contract from its inception, i.e., as if it never existed.  It is an equitable doctrine which is grounded on mutual mistake, fraud, or illegality in the formation of a contract."  Dow Chem. Co., 226 F.3d at 1345 (citations omitted).  "Contract rescission is . . . available . . . only when one or more of these circumstances is present."  Id.

In its amended complaint, plaintiff alleges the following grounds for rescission:  fraud, misrepresentation, and concealment; a lack, failure, or inadequacy of consideration; duress; and mistake of fact.  Posttrial, plaintiff contends that it has established that the two agreements should be rescinded due to duress, failure of consideration, and mutual mistake of fact.  The court examines each of these three bases for plaintiff's rescission claim in turn.

### 1.  Duress

The first basis for plaintiff's rescission claim is duress.  Specifically, plaintiff contends that it was placed under duress when the Corps (1) threatened to force it to move all of the docks at Eden Isle Marina into the existing lease area if it did not execute the MOU and (2) presented it with a take-it-or-leave-it offer as the only option for lifting the cease-and-desist order.  Plaintiff's claim of duress accrued when Mr. Walters knew or should have known that he was executing the MOU on plaintiff's behalf under duress.  Mr. Walters's testimony at trial clearly reflects that he felt under duress at the time he executed the MOU.  Indeed, as implied by the allegations themselves, Mr. Walters was aware of the threat to move the existing docks at Eden Isle Marina and the take-it-or-leave-it nature of the Corps' offer prior to the execution of the MOU.  Accordingly, plaintiff's claim for rescission on the basis of duress accrued no later than February 2, 1999, well beyond the six-year limitations period.

### 2.  Failure of Consideration

The second basis of plaintiff's rescission claim is a failure of consideration in the MOU and the 1999 lease.  Consideration is the bargained-for exchange between the parties to an agreement and can consist of a promise or performance.  Restatement (Second) of Contracts § 71 & cmt. a (1981).  Pursuant to the terms of the MOU, plaintiff obtained (1) 1,000 feet of shoreline at Cove Creek Park, (2) approval to build 192 new boat slips at Eden Isle Marina, (3) an extension of the term of its lease, (4) a favorable rental rate, (5) the lifting of the cease-and-desist order, (6) the Corps' promise to construct a road and parking for the future marina at Cove Creek Park as funds became available, and (7) the opportunity to develop a marina at Cove Creek Park, while the Corps obtained (1) plaintiff's relinquishment of the northern and southern portions of the lease area at Eden Isle Marina, (2) an agreement that no additional parking would be built at Eden Isle Marina, and (3) a limitation of the number of trees to be removed at Eden Isle Marina.  And, pursuant to the provisions of the 1999 lease, plaintiff obtained, among other things, (1) a lease area at Cove Creek Park, (2) an extension of the term of its lease, (3) a favorable rental rate, and (4) the Corps' promise to construct a road and parking for the future marina at Cove Creek Park as funds became available, while the Corps obtained, among other things, (1) plaintiff's relinquishment of the northern and southern portions of the lease area at Eden Isle Marina, (2) an agreement that no additional parking would be built at Eden Isle Marina, and (3) a limitation of the number of trees to be removed at Eden Isle Marina.  Plaintiff alleges that the Corps' approval

of plaintiff's request to add 192 slips at Eden Isle Marina, lifting of the cease-and-desist order, extension of the lease term, and continued use of a favorable rental rate did not constitute valuable consideration because plaintiff would have received all of these benefits in the absence of the MOU.  Plaintiff further alleges that the grant of a marina site at Cove Creek Park was not valuable consideration because the Corps never intended to fund and build the infrastructure for the site described in the MOU and the 1999 lease, and because the marina site at Cove Creek Park is not a feasible location for a marina.

As an initial matter, the court notes that both the MOU and the 1999 lease are nondivisible agreements; in other words, all that plaintiff gained and lost in the MOU constituted consideration for all that the Corps gained and lost in the MOU, and all that plaintiff gained and lost in the 1999 lease constituted consideration for all that the Corps gained and lost in the 1999 lease.  See, e.g., United States v. Bethlehem Steel Corp., 315 U.S. 289, 298 (1942) ("Whether a number of promises constitute one contract or more than one is to be determined by inquiring whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out."  (internal quotation marks omitted)); Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated."); John Cibinic, Jr. et al., Formation of Government Contracts 270 (4th ed. 2011) ("Government contracts involve a number of obligations of or benefits to each party.  In general, such contracts are not divided into individual exchanges."); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.13 (3d ed. 2004) ("A contract is said to be divisible if the performances to be exchanged can be divided into corresponding pairs of part performances in such a way that a court will treat the parts of each pair as if the parties agreed that they were equivalents.").  Thus, in determining when plaintiff's failure of consideration claim accrued, the court must, for each agreement, ascertain when plaintiff knew or should have known that the total consideration flowing from the Corps to plaintiff purportedly lacked any value.

Based on plaintiff's allegations, it is apparent that at the time the MOU was executed, plaintiff should have been aware of the facts supporting its claim that there was a failure of the consideration flowing from the Corps.  Plaintiff possessed a copy of the 1995 lease, which set forth its rights and the Corps' obligations.  Thus, it should have known what it was already entitled to prior to executing the MOU.  In addition, at the time the 1999 lease was executed, plaintiff should have been aware of facts supporting its contention that the Cove Creek Park marina site did not constitute valuable consideration.  The 1999 lease contained a provision in which plaintiff acknowledged its inspection, knowledge, and acceptance of the condition of the Cove Creek Park lease area, as well as its understanding that the lease area was being leased without representations or warranties.  As the court concluded above, this condition-of-premises clause was sufficient evidence that plaintiff should have known the condition of the lease area at Cove Creek Park.  Thus, plaintiff should have known about the purported lack of value of the Cove Creek Park marina site when it executed the 1999 lease.

In sum, plaintiff knew or should have known, no later than April 22, 1999, the date the 1999 lease was executed, sufficient facts supporting its claim that there was a failure of

consideration with respect to the MOU and the 1999 lease.  Because plaintiff's claim of failure of consideration accrued more than six years before it filed its complaint, it is time-barred.

### 3.  Mutual Mistake of Fact

The third and final basis of plaintiff's rescission claim is mutual mistake of fact. Specifically, plaintiff asserts that it and the Corps had the same understanding (1) as to the correct lease area boundary at Eden Isle Marina prior to the events leading up to the execution of the MOU, and (2) as to the feasibility of placing a marina at Cove Creek Park prior to plaintiff's discovery that the Cove Creek Park marina site was not a suitable location for a marina.

Plaintiff's claims of mutual mistake of fact accrued when plaintiff discovered, or should have discovered, the mutual mistake.  The evidence in the trial record reflects that plaintiff first became aware that the Corps held a different position regarding the boundary of the Eden Isle Marina lease area during a July 1996 meeting attended by Mr. Walters and several Corps employees.  Corps employees reiterated the Corps' position to Mr. Walters during a November 10, 1999 meeting.  Thus, prior to the execution of the MOU, plaintiff knew that its conception of the marina's lease area was different from the Corps' conception of the lease area.  Plaintiff's claim of mutual mistake in this respect therefore accrued on the date that the MOU was executed:  February 2, 1999.

In addition, as set forth above, the evidence also reflects that plaintiff acknowledged in the 1999 lease that it had inspected and accepted the condition of the Cove Creek Park marina site, and therefore could have, and should have, discovered the feasibility of the site as a marina location at the time it executed the lease on April 22, 1999.  Accordingly, plaintiff's claims of mutual mistake of fact, both of which accrued in 1999, are barred by the statute of limitations.

### E.  Fifth Amendment Taking

Plaintiff's final claim is that the Corps took its property without just compensation in violation of the Fifth Amendment.  Posttrial, plaintiff alleges both a physical taking–that the Corps took its 1,000 feet of shoreline at Eden Isle Marina–and a regulatory taking–that the Corps improperly altered its policies with respect to the lease area boundaries at Eden Isle Marina, leading to the Corps' reduction of the size of the lease area.  Under both theories, the property purportedly taken by the Corps was part of plaintiff's leasehold at Eden Isle Marina.

As previously noted, a takings claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action," Brown Park Estates-Fairfield Dev. Co., 127 F.3d at 1455, i.e., when the "taking action occurs," Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1481.  In this case, the act constituting the taking is the removal of the 1,000 feet of shoreline at Eden Isle Marina in April 1999.  Plaintiff argues that the accrual date of its takings claims should be suspended via application of the stabilization and mitigation doctrines discussed in Mildenberger v. United States, 643 F.3d 938 (Fed. Cir. 2011). Specifically, it contends that under the stabilization doctrine, plaintiff did not have a claim until it could reasonably know that the compensation proffered by the government–namely, the Cove

Creek Park lease area–had no value.  It further argues that under the mitigation doctrine, its takings claims could not have accrued until the Corps disclosed (1) that funds to build the infrastructure for the marina at Cove Creek Park would never be available, (2) other vital information about the Cove Creek Park marina site, or (3) accurate information about the lease area at Eden Isle Marina.  However, neither doctrine applies in this case.  As the United States Court of Appeals for the Federal Circuit ("Federal Circuit") noted in Mildenberger, the doctrines apply only when "property is taken by a gradual physical process . . . ."  Id. at 945; accord Fallini v. United States, 56 F.3d 1378, 1381-82 (Fed. Cir. 1995) (noting that Court of Claims had adopted a narrow interpretation of the stabilization doctrine, limiting it to flooding cases).  No such gradual physical process occurred here.  Thus, plaintiff's takings claims accrued on the date that the 1999 lease was executed, April 22, 1999, more than six years before plaintiff filed its complaint.

Even if plaintiff's takings claims accrued within the applicable six-year limitations period, the court would only address them as a last resort.  Normally, a court will not reach a constitutional issue when a case can be resolved on nonconstitutional grounds.  Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1368 (Fed. Cir. 2009).  Indeed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract."  Sun Oil Co, 572 F.2d at 818.  Here, plaintiff agreed in the MOU and the 1999 lease to give up the portion of the Eden Isle Marina leasehold at issue.  Accordingly, had the takings claim been timely, the court would have deferred ruling on it until after disposing of plaintiff's breach-of-contract claims, and then only if it concluded that plaintiff could not recover on those claims.

### F.  Summary of Viable Claims

In summary, although many of plaintiff's claims accrued more than six years before it filed its complaint, plaintiff has established that four of its claims were timely filed:  (1) that the Corps breached its express duties under the MOU and the 1999 lease to perform the work at Cove Creek Park "as funds become available"; (2) that the Corps breached the MOU and the 1999 lease by withholding vital information regarding its cost estimates for the work at Cove Creek Park; (3) that the Corps breached the MOU and the 1999 lease by withholding vital information regarding its efforts to secure funding for the work at Cove Creek Park; and (4) that the Corps breached the implied duty of good faith and fair dealing by failing to pursue funding in accordance with the "as funds become available" clauses in the MOU and the 1999 lease.  The court's next task is to determine whether the evidence adduced at trial is sufficient to support plaintiff's claims.  The court addresses each claim in turn.

### IV.  Express Contract Terms

The first claim over which the court possesses jurisdiction is plaintiff's contention that the Corps breached the provision of the MOU and the 1999 lease requiring it to perform specified work at Cove Creek Park "as funds become available."  "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused

by the breach."  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); see also Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach.  . . .  [A] breach of contract is a failure to perform a contractual duty when it is due.").

## A.  Valid Contract

Plaintiff has established that the MOU and the 1999 lease were valid contracts between the parties.  "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically:  mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."  Trauma Serv. Grp., 104 F.3d at 1326.  There is no dispute that the 1999 lease meets all of the requirements of a contract with the government.  With respect to the MOU, defendant contends that it was merely "an administrative document" that memorialized the parties' proposal and intent.  The court disagrees.  Pursuant to the plain language of the document, the MOU "establish[ed]" the parties' agreed-to proposal and the Corps affirmatively agreed to incur certain obligations (e.g., "The [Corps] agrees to allow the lessee to construct the 3 1/2 docks (192 slips) requested"; "The cease and desist order previously issued to the lessee is hereby lifted.").  The MOU meets all of the requirements of a contract with the government.

## B.  Obligation or Duty Arising From the Contract

In addition to establishing that the MOU and the 1999 lease were valid contracts, plaintiff has demonstrated that the Corps had obligations arising under those agreements regarding the work at Cove Creek Park.  Indeed, the court has already concluded that, under the plain language of the agreements, the "as funds become available" clauses in the MOU and the 1999 lease obligated the Corps to do the designated work at Cove Creek Park when it had available funds for that purpose, and that the Corps was obligated to ensure that there were funds available for the work.

## C.  Breach of the Obligation or Duty

The question of whether the Corps breached its duties under the "as funds become available" clauses in the MOU and the 1999 lease is not as straightforward.  The evidence in the trial record reflects that the Little Rock District immediately placed the Cove Creek Park work in its annual budget requests, but did not receive funding through that process.  The evidence also reflects that the district did not reprogram funds for the work prior to plaintiff requesting the reinstatement of its relinquished lease area and filing this lawsuit, even though it was advised to do so by personnel from Corps headquarters and the EIG.  Instead, the district initiated efforts to reprogram funds in December 2007 (ten months after plaintiff filed suit), began work at Cove Creek Park during the summer of 2008, and completed the work in 2010.  Based on these facts, and the fact that the "as funds become available" clauses did not prescribe a time for performance, defendant contends that the Corps satisfied its obligation to construct a road, utilities, and parking for the Cove Creek Park marina site with available funds.

Whether the Corps timely satisfied the terms of the MOU and the 1999 lease is an important factor in determining whether the Corps breached the agreements.  As noted by the Federal Circuit, "a breach of contract is a failure to perform a contractual duty when it is due." Trauma Serv. Grp., 104 F.3d at 1325 (emphasis added).  Under general principles of government contract law, in the absence of a specified time period for performance, performance must be tendered within a reasonable time.  B-E-C-K Constructors v. United States, 571 F.2d 25, 31 (Ct. Cl. 1978) (per curiam); Societe Anonyme des Ateliers Brillie Freres v. United States, 160 Ct. Cl. 192, 201 (1963); Carroll v. United States, 68 Ct. Cl. 500, 506 (1929); R. Guastavino Co. v. United States, 50 Ct. Cl. 115, 119 (1915).  What is a reasonable time for performance depends on the circumstances of the case.  B-E-C-K Constructors, 571 F.2d at 31; Carroll, 68 Ct. Cl. at 506.

Plaintiff and the Corps executed the MOU in February 1999 and the 1999 lease in April 1999.  The Corps did not make funds available for the work at Cove Creek Park before December 2007, and did not complete the work at Cove Creek Park until 2010.  In other words, the Corps' performance under the "as funds become available" clauses began almost nine years after the two agreements were executed.  In the meantime, the Little Rock District was being advised in 2000 that it was responsible for providing funds for the work.  Specifically, personnel from Corps headquarters informed district personnel that the district was responsible for providing funding during a September 19, 2000 conference call; the chief of the Program Management Division at Corps headquarters instructed the district to reprogram funds in a December 6, 2000 memorandum; and the EIG informed the district that it was responsible for providing funds for the work.[154]  However, the district did not reprogram funds at that time. Indeed, the Corps did not reprogram funds after being prodded to do so by the EIG again in 2004.  It was not until after plaintiff requested an expansion of its lease area at Eden Isle Marina and then filed a lawsuit that the Corps took steps to perform its duties under the "as funds become available" clauses.

Moreover, Little Rock District personnel were instructed to advise Mr. Walters that the district would not receive funds for the work at Cove Creek Park through the normal budget process for three to five years, and actually advised Mr. Walters that the district would not be able to begin the work at Cove Creek Park for three years in the absence of a congressional add. Behind the scenes, of course, district personnel understood that the work would never be funded through the normal budget process, but the balance of the evidence adduced at trial reflects that this understanding was never effectively communicated to plaintiff.[155]

---

[154]  The evidence supporting the conclusion that the EIG advised the Little Rock District of its responsibility to provide funding includes Mr. Walters relaying to district personnel, during a February 8, 2001 meeting, his conversation with someone from the EIG's office that the work would be done in 2001; Mr. Park's suggestion in a March 29, 2001 electronic-mail message that the EIG had issued a report describing the Corps' responsibility to provide funding; and Mr. Jones's notes from August 2004 reflecting that the district was supposed to have found money to construct the road to the Cove Creek Park marina site.

[155]  There is no documentary evidence in the trial record from 1999–when the MOU and

In addition to knowing that it was committed to ensuring that funds were made available to perform the required work at Cove Creek Park and advising plaintiff that the work could begin within three to five years, the Little Rock District took certain actions that almost guaranteed that the work would not be funded through the normal budget process. Specifically, beginning with its February 2001 budget request, the district attached the work it was contractually committed to perform for plaintiff to other work it wanted done at Cove Creek Park, increasing the amount that Congress would need to appropriate before the work for plaintiff could be done. And, the Corps repeatedly prioritized the contractually mandated work at Cove Creek Park below other deferrable, nonroutine, noncritical, noncontractually mandated work in its budget requests.[156]

Based on these facts, the court concludes that the Corps did not perform its contractual obligations within a reasonable time. The Little Rock District knew no later than September 2000 that it was responsible for providing funds for the work, advised plaintiff that construction could begin within three to five years of the execution of the MOU and the 1999 lease, and took deliberate behind-the-scenes action that delayed, and practically eliminated, the possibility of obtaining funding through its normal budget process. The evidence adduced at trial reflects that a reasonable time of performance was five years from the date the 1999 lease was executed. But even if a little more time could be considered reasonable, plaintiff clearly should not have had to wait approximately eleven years–from February 1999 to 2010–for the Corps to fully perform its obligations related to Cove Creek Park under the MOU and the 1999 lease.

---

the 1999 lease were executed–reflecting that Corps employees advised plaintiff that that the work at Cove Creek Park would never be funded through the normal budget process and that a congressional add would be necessary. The earliest-dated documents in the trial record that mention a congressional add were two documents drafted by the Corps in August 2000 reflecting that Mr. Walters had told Little Rock District employees that he had received a commitment for a congressional add from Senator Hutchinson–something that Mr. Walters denies–and that district employees advised Mr. Walters that the district would place the work in its budget but absent a congressional add, construction could not begin for three years. It was not until the following month, September 2000, that Mr. Noggle claimed to possess a "1″ thick file of documents" reflecting that Mr. Walters had been informed that no road would be built in the absence of a congressional add. No such documents were produced at trial.

Further, although Mr. Park testified at trial that Little Rock District employees informed Mr. Walters that they did not anticipate receiving funds for the work at Cove Creek Park through the normal budget process, the evidence weighs more strongly in favor of a finding that district employees advised Mr. Walters that they would place the work in the district's budget requests, but that in the absence of a congressional add, it would take three to five years for the work to be funded. In other words, a congressional add would merely speed up the process.

[156] It appears that a contractual commitment to perform work is not a factor that the Corps can, or would, take under consideration when prioritizing that work in a budget request.

In sum, the Corps breached its duties under the "as funds become available" clauses in the MOU and the 1999 lease.

## D.  Damages

The final inquiry is whether plaintiff suffered damages as a result of the Corps' breach of its duties under the "as funds become available" clauses in the MOU and the 1999 lease.  As the Court of Claims noted in Commerce Int'l Co. v. United States, "no matter how unreasonable the Government's delay, there can be no recovery without proof that that delay caused material damage."  338 F.2d 81, 89 (Ct. Cl. 1964).  Defendant argues that plaintiff could not have suffered any damages from the breach of the "as funds become available" clauses because plaintiff is claiming that a commercially viable marina cannot be built at the Cove Creek Park marina site.  In other words, since plaintiff contends that it cannot build a marina at the site, defendant asserts that the Corps' delay in building the road, parking, and utilities for the site was of no financial consequence to plaintiff.  In response, plaintiff suggests that for all of its breach-of-contract claims, it is entitled to damages to place it in as good a position as it would have been had the Corps fully performed, and that its damages should be measured by its lost opportunity to develop the portion of the lease area it gave up at Eden Isle Marina as part of the MOU and the 1999 lease.  Plaintiff's attempt to tie the Corps' breach of its obligations related to the Cove Creek Park marina site with its inability to develop the relinquished lease area at Eden Isle Marina finds no support in the law.

"The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed."  San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), quoted in Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001).  Thus, the injured party "must show that but for the breach, the damages alleged would not have been suffered."  San Carlos Irrigation & Drainage Dist., 111 F.3d at 1563; accord Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970) (per curiam) ("Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach.").  In other words, the damages must have "directly and naturally resulted from the breach of the contract for which the suit is brought."  Needles ex rel. Needles v. United States, 101 Ct. Cl. 535, 618 (1944); see also N. Helex Co. v. United States, 524 F.2d 707, 720 (Ct. Cl. 1975) ("[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages . . . ."); Locke v. United States, 283 F.2d 521, 526 (Ct. Cl. 1960) (noting that for an injury to be foreseeable, it "must be the natural and proximate result of the breach" and "capable of being traced to the breach with reasonable certainty").

The Corps' breach of its duties under the "as funds become available" clauses in the MOU and the 1999 lease prevented plaintiff from developing a marina at Cove Creek Park between 1999 and 2010.  The Corps' breach did not prevent plaintiff from developing the relinquished portion of the lease area at Eden Isle Marina.  Indeed, had the Corps not breached the "as funds become available" clauses by performing the required work at Cove Creek Park

within a reasonable time, plaintiff would still be prevented from developing the relinquished portion of the lease area at Eden Isle Marina.  In sum, plaintiff's alleged injury–its inability to develop the relinquished portion of the lease area at Eden Isle Marina–is not causally connected to the Corps' breach of the "as funds become available" clauses.  Accordingly, plaintiff's damages for the Corps' breach cannot be measured by any lost opportunity to develop at Eden Isle Marina.  Rather, the best measure of damages would be plaintiff's lost opportunity to develop a marina at Cove Creek Park.  However, as noted by defendant, plaintiff assigns no value to this lost opportunity because it contends that no economically viable marina can exist at the Cove Creek Park site.  Therefore, plaintiff cannot recover damages on its express breach-of-contract claim.

## V.  Superior Knowledge

Plaintiff's inability to establish damages is also fatal to its two superior knowledge claims over which the court possesses jurisdiction.  To reiterate, plaintiff contends that the Corps breached the MOU and the 1999 lease by failing to supply information that was vital to its exercise of its rights and responsibilities under those agreements, specifically alleging that the Corps failed to disclose (1) its escalating cost estimates for building the road to the Cove Creek Park marina site and (2) the actions it was taking or not taking with respect to obtaining funding to build a road to the Cove Creek Park marina site.

As noted above, "[t]he government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor." AT&T Commc'ns, Inc., 296 F.3d at 1312.  The superior knowledge doctrine applies in situations where:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

The Am. Ship Bldg. Co. v. United States, 654 F.2d 75, 79 (Ct. Cl. 1981).  And, as with any breach-of-contract allegation, the contractor may only recover for the government's withholding of vital information if it establishes that the government's breach caused it damages.

Both of plaintiff's superior knowledge claims pertain to information withheld by the Corps regarding funding of the work for the Cove Creek Park marina site.  Assuming that plaintiff can establish that the Corps breached the MOU and the 1999 lease by failing to disclose this information, it cannot establish damages.  As noted above, plaintiff suggests that its damages for all of its breach-of-contract claims should be measured by its lost opportunity to develop the portion of the lease area it gave up at Eden Isle Marina as part of the MOU and the 1999 lease.  To the extent that the Corps failed to disclose vital information to plaintiff regarding funding for the work at the Cove Creek Park marina site, the failure to disclose only affected plaintiff's

ability to develop a marina at Cove Creek Park.  It did not affect plaintiff's ability to develop the relinquished portion of the lease area at Eden Isle Marina.  In other words, plaintiff's alleged injury–its inability to develop the relinquished portion of the lease area at Eden Isle Marina–is not directly or proximately connected to the Corps' purported failure to disclose vital information regarding funding for the Cove Creek Park marina site.  Accordingly, plaintiff's damages for the Corps' breach cannot be measured by any lost opportunity to develop at Eden Isle Marina.  The best measure of damages is instead plaintiff's lost opportunity to develop a marina at Cove Creek Park, but since this lost opportunity has no value to plaintiff, plaintiff cannot recover damages on its superior knowledge claim.

## VI.  Implied Duty of Good Faith and Fair Dealing

Similarly, plaintiff cannot recover damages under its claim for breach of the implied duty of good faith and fair dealing over which the court possesses jurisdiction.  Plaintiff alleges that the Corps breached the implied duty of good faith and fair dealing by failing to pursue funding for the work at Cove Creek Park in accordance with the "as funds become available" clauses in the MOU and the 1999 lease.  The implied duty of good faith and fair dealing encompasses both the implied duty not to hinder and the implied duty to cooperate, Precision Pine & Timber, Inc., 596 F.3d at 820 n.1, and is breached when a contracting party "interfere[s] with the other party's performance" or "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  Centex Corp., 395 F.3d at 1304.  Again, as with any breach-of-contract allegation, the contractor may only recover for the breach of the implied duty of good faith and fair dealing if it establishes that the government's breach caused it damages.

Plaintiff's claim that the Corps breached the implied duty of good faith and fair dealing pertains to the Corps' pursuit of funding for the work at Cove Creek Park.  Assuming that plaintiff can establish that the Corps breached the implied duty inherent in the MOU and the 1999 lease, it cannot establish damages.  As noted above, plaintiff suggests that its damages for all of its breach-of-contract claims should be measured by its lost opportunity to develop the portion of the lease area it gave up at Eden Isle Marina as part of the MOU and the 1999 lease.  To the extent that the Corps did not adequately pursue funding for the work at Cove Creek Park, its failure affected plaintiff's ability to develop a marina at Cove Creek Park, not its ability to develop the relinquished portion of the lease area at Eden Isle Marina.  In other words, plaintiff's alleged injury–its inability to develop the relinquished portion of the lease area at Eden Isle Marina–is not causally connected to the Corps' purportedly inadequate pursuit of funding for the work at Cove Creek Park.  Accordingly, plaintiff's damages for the Corps' breach cannot be measured by any lost opportunity to develop at Eden Isle Marina.  The best measure of damages is, rather, plaintiff's lost opportunity to develop a marina at Cove Creek Park, but since this lost opportunity has no value to plaintiff, plaintiff cannot recover damages on its claim for breach of the implied duty of good faith and fair dealing.

## CONCLUSION

Plaintiff has presented extensive, compelling evidence of mistreatment by the Corps, which bowed to political influence in complete disregard of its contractual relationship with

plaintiff.  Corps employees lied to Mr. Walters about its contractual obligations and pressured plaintiff to accept a deal that removed valuable property from the lease area at Eden Isle Marina in exchange for, among other things, a lease area at Cove Creek Park that was neither a physically or economically viable marina location.  Then, having accomplished its bait-and-switch scheme, the Corps did not construct the infrastructure (road, parking, and utilities) it promised for Cove Creek Park to enable plaintiff to develop a marina at that site.  It was not until after plaintiff sought the restoration of its relinquished lease area at Eden Isle Marina and filed this lawsuit–a delay of almost nine years–that the Corps found the money required to build the infrastructure at Cove Creek Park.

Nevertheless, as reflected above, because of Mr. Walters's misplaced trust in Corps employees, plaintiff waited too long to assert most of its claims against the Corps, and was unable to establish an entitlement to recovery on the remainder of its claims.  Thus, the court must **GRANT** defendant's RCFC 52(c) motion and **DISMISS** plaintiff's suit.  No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-163-